# EXHIBIT "A"

# DEPOSITION OF JIMMY WILLIAMSON

## January 26, 2007

## Pages 1 through 346

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net



Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3               NORTHERN DIVISION
 4
 5   PIONEER SERVICES, INC.,
 6        Plaintiff,
 7   Vs                CIVIL ACTION NO
                       2:06CV377-WKW
 8   AUTO-OWNERS INSURANCE COMPANY,
     INC., et al.,
 9
          Defendant
10
11
12        * * * * * * * * * * * * *
13
14      VIDEOTAPED DEPOSITION OF JIMMY WILLIAMSON,
15   taken pursuant to stipulation and agreement before
16   Lisa J. Nix, Registered Professional Reporter and
17   Commissioner for the State of Alabama at Large, in
18   the Law Offices of Enzor & Enzor, 208 Dunson
19   Street, Andalusia, Alabama on Friday, January 26,
20   2007, commencing at approximately 10:10 p.m.
21
22        * * * * * * * * * * * * *
23
```

Page 2

```
 1                 APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   Mr. Harry P. Hall II
     FARMER, PRICE, HORNSBY & WEATHERFORD
 5   Attorneys at Law
     100 Adris Place
 6   Post Office Drawer 2228
     Dothan, AL  36302
 7
 8   FOR THE DEFENDANT:
 9   Mr. Joel H. Pearson
     MORROW, ROMINE & PEARSON, P.C.
10   Attorneys at Law
     122 South Hull Street
11   Montgomery, AL  36104
12
     ALSO PRESENT:  Vic Griswold, Videographer
13
14        * * * * * * * * * * * * *
15
                 EXAMINATION INDEX
16
17   JIMMY WILLIAMSON
          BY MR. PEARSON.......    5
18        EXHIBIT INDEX
19                 MAR
     DEFENDANT'S EXHIBIT
20    1   Secretary of State corporate detail page   17
21    2   Documents Bates stamped Pioneer 01 - 357   77
22    3   Documents Bates stamped A000001 - 000299  150
23
```

Page 3

```
 1                 STIPULATION
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of JIMMY WILLIAMSON is taken pursuant to
 5   the Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Lisa J. Nix,
 7   Registered Professional Reporter and Commissioner
 8   for the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same
23        It is further stipulated and agreed by and
```

Page 4

```
 1   between the parties hereto and the witness that the
 2   signature of the witness to this deposition is
 3   hereby waived
 4
 5        * * * * * * * * * * * * *
 6
 7        VIDEOGRAPHER:  This is the
 8             deposition of Jimmy Williamson
 9             taken in the matter of Pioneer
10             Services, Incorporated,
11             plaintiff, versus Auto-Owners
12             Insurance Company,
13             Incorporated, et al.,
14             defendants, Case Number
15             2:06CV377-WKW held in the
16             United States District Court
17             for the Middle District of
18             Alabama, Northern Division
19             Today is January 26,
20             2007  We're at the offices of
21             Enzor and Enzor in Andalusia,
22             Alabama  The local time is
23             10:12 a.m.  If counsel would
```

Page 5

1    introduc e themselves, we can
2    ha ve the oath, please
3    MR. PEARSON: Joe l Pearson for
4        De fendant Auto-Owners
5        Insura nce Company.
6    MR. HALL: Ha rry Hall for the
7        pla intiff.
8    MR. WILLIAMSON: Jimmy Willia mson,
9        Pione er Telephone Services.
10   JIMMY WILLIAMSON
11   The witness, after having first been duly
12   sworn to speak the truth, the whole truth and
13   nothing but the truth testified as follows:
14           EXAMINATION
15   BY MR. PEARSON:
16   Q.  Good morning, Mr. Willia mson.
17   A.  Good morning.
18   Q.  We've introduced ourselves before. I'm
19       Joel Pearson. As you know, I re present
20       Auto-Owne rs Insurance Company in this
21       case.
22           You unde rstand we're going to take your
23       de position today?

Page 6

1    A.  Yes, sir.
2    Q.  You've attended some of the previous
3        depositions in this case, correct?
4    A.  One, yes, sir.
5    Q.  Well, actually, you attended two of them,
6        Mr --
7    A.  Oh, two, yes, sir, in one day, yeah.
8    Q.  So you know -- you know basically what I'm
9        going to -- how it's going to work today,
10       right?
11   A.  Yes, sir, somewhat.
12   Q.  I'm going to ask you questions, and I want
13       you to give me the answers to those
14       questions.
15           If I ask a question and you don't
16       understand it, just let me know that you
17       don't understand it; otherwise, I'm going
18       to assume that your answer to my question
19       is -- that you understood my question and
20       that your answer is to that question.
21       Okay?
22   A.  Yes, sir. Yes, sir.
23   Q.  If you would, tell us your full name for

Page 7

1    the record, please, sir.
2    A.  James Howard Williamson.
3    Q.  And what is your address?
4    A.  Home or business?
5    Q.  Both.
6    A.  The business is P.O. Box 1606. It's
7        Pioneer -- It's AlaWeb Pioneer Services
8        now. It was Pioneer Telephone Services.
9        The address is 1833-A East Three Notch
10       Street.
11   Q.  And that's in Andalusia, Alabama?
12   A.  Yes, sir, Andalusia, 36421.
13       And my residence is 261 74 Reddberry
14       Road.
15   Q.  Also in Andalusia?
16   A.  Yes, sir.
17   Q.  Okay.
18   A.  And that's where we live now. Previously,
19       it was on Sutton Road.
20   Q.  Okay. And what was that address --
21       previous address on Sutton Road?
22   A.  25083 Sutton Road, Andalusia, Alabama.
23   Q.  Okay. What's your date of birth?

Page 8

1    A.  4-30-62.
2    Q.  So you're 44 years old?
3    A.  Yes, sir.
4    Q.  And if you would, what's your social
5        security number?
6    A.  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.
7    Q.  Are you married?
8    A.  Yes, sir.
9    Q.  What is your wife's name?
10   A.  Kellie Williamson.
11   Q.  And what was her maiden name?
12   A.  McClain.
13   Q.  How do you spell Kellie?
14   A.  K-E-L-L-I-E.
15   Q.  And McClain, M-C --
16   A.  M-C, then capital C-L -A-I-N.
17   Q.  Are you from Covington County?
18   A.  Yes, sir, all my life.
19   Q.  Is your wife also from Covington County?
20   A.  Yes, sir.
21   Q.  I assume that both of you have relatives in
22       Covington County named either Williamson or
23       McClain?

Page 13

1    Q.  I'm sorry. What was the first name?
2    A.  Greg.
3    Q.  Greg. And where do they live?
4    A.  Andalusia
5    Q.  Any other Adkinsons?
6    A.  No, sir, I don't think so
7    Q.  And the Smiths
8    A.  Bobby.
9    Q.  That's a male?
10   A.  Yes, sir
11   Q.  And he resides where?
12   A.  Sanford It's in Covington County
13   Q.  Any others?
14   A.  (Shakes head from side to side.)
15   Q.  No?
16   A.  No, sir No, sir
17   Q.  Just to keep it easy for the record, you
18       know, we -- I think you understand that
19       verbal answers, either yes or no, because
20       it's tough for the court reporter to take
21       down uh-huh and huh-uh --
22   A.  Yes, sir
23   Q.  -- huh-uh and head nods, so.

Page 14

1        All right
2    A.  I'm sorry
3        MR. HALL:  Joel, can we talk about
4        that stipulation about the
5        corporate status of Jimmy's
6        testimony?
7        MR. PEARSON:  Yeah. We'll do --
8        Let me just finish the answers
9        and then we'll do that. We'll
10       finish that -- We'll do that
11       in just a second
12   Q.  All right Have we covered everybody --
13       Did I ask you about the Tatums?
14   A.  I don't know their names I really don't.
15       That's on my grandmother's side
16   Q.  Okay. Where do they live?
17   A.  That was the -- Crenshaw County, I think,
18       Luverne.
19   Q.  Okay.
20   A.  Luverne, Brantley area, up that way
21   Q.  Okay And the Sanfords, Bobby Sanford,
22       that's the only Sanford --
23   A.  Bobby Smith

Page 15

1    Q.  Bobby Smith I mean Excuse me Bobby
2        Smith was the only --
3    A.  Lives in Sanford.
4    Q.  Lives in Sanford All right And that's
5        the only Smith?
6    A.  Yes, sir, that I can think of right now
7    Q.  Okay. Now, let's go to what your attorney
8        was asking about You understand I'm going
9        to be asking you questions today about a
10       lawsuit that Pioneer Telephone Services has
11       filed, correct?
12   A.  Yes, sir
13   Q.  We've noticed your deposition
14       individually It's my understanding that
15       you can speak on behalf of Pioneer
16       Telephone Services with regard to this
17       claim; is that correct?
18   A.  Yes, sir
19   Q.  Okay And are you the appropriate person
20       to speak on behalf of Pioneer Telephone
21       Services in this case?
22   A.  Yes, sir
23   Q.  What is your office with Pioneer Telephone

Page 16

1        Services?
2    A.  Excuse me?
3    Q.  What --
4    A.  Oh, the office?
5    Q.  Yeah
6    A.  I'm president -- or at the time, before it
7        was -- before we merged, I was president
8    Q.  Okay And I'm going to ask you about that
9        a little bit, too
10   A.  Okay
11   Q.  We'll get into more on that, but
12       MR. PEARSON:  Is there anything
13       else you think we need to
14       cover on it?
15       MR. HALL:  Just that this will
16       serve as the 30(b)(6)
17       deposition for Pioneer
18       Services, Inc
19       MR. PEARSON:  Okay
20   Q.  Well, and I'm agreeable to that unless for
21       some reason you indicate to me that
22       somebody else is the appropriate person to
23       speak on a particular subject Okay?

Page 17

1    A.   (Witness nods head up and down.)
2    Q.   And so -- And the reason I say that is
3         because you've mentioned AlaWeb in that
4         question, and I'm going to ask you a little
5         bit about that.
6              What is the legal name of Pioneer
7         Telephone Services -- in September 2004,
8         what was it?
9    A    Pioneer Telephone Services, Incorporated
10   Q.   Has it ever been known as Pioneer Services,
11        Incorporated?
12   A.   No, sir. It was something that people, you
13        know, called it or -- we were trying to
14        diversify
15   Q.   Okay
16   A    To take -- Just by word of mouth, that
17        comes out of
18   Q.   Okay. But the legal name of the company
19        was Pioneer Telephone Services, correct?
20   A    Yes, sir.
21             (Defendant's Exhibit 1 was marked
22             for identification.)
23   Q.   I'm going to show you what I've marked as

Page 18

1         Defendant's Exhibit 1  It's just a
2         Secretary of State corporate detail page,
3         and I just want to make sure I've got the
4         right company. You mentioned your wife,
5         Kellie. Is her full name Jacqueline K.
6         Williamson?
7    A    Yes, sir
8    Q.   Okay. All right. So does that detail
9         sheet there appear to be a corporate detail
10        sheet for your -- for Pioneer Telephone
11        Services, Incorporated?
12             MR. HALL: Object to the form.
13   A    Okay. I don't understand, I mean, why
14        Walter Bracewell's name would be on it,
15        which the address is wrong
16             I mean, Walter Bracewell was the
17        founder, if that's why it's there, of the
18        corporation, and then he sold it. But when
19        he did the corporation, it was not at
20        1833-C if that makes any difference. In
21        fact, this is -- the address is where we
22        were before we moved up to the front of
23        the

Page 19

1    Q.   Okay. Okay. Well, what -- I guess what
2         I'm asking you, though, is this appears to
3         be Pioneer Telephone Services, Inc. is an
4         Alabama corporation that was formed in
5         Covington County?
6    A    Yes, sir. Yes, sir.
7    Q.   And it was incorporated on or about October
8         23, 1984?
9    A    Yes, sir, I think so
10   Q.   And Jacqueline K. Williamson is your wife?
11   A    Yes, sir
12   Q.   If you would, tell me your educational
13        background
14   A    I went to school at Straughn School,
15        elementary and high school. I received my
16        associate of arts degree at LBW and went on
17        to pursue my education at Troy State-Dothan
18        and received a bachelor of science degree
19        in social sciences and education
20   Q.   What was your associate's degree from -- at
21        Lurleen B Wallace?
22   A    Arts, I believe
23   Q    And that's what you referred to as LBW,

Page 20

1         correct?
2    A    Yes, sir. Lurleen B. Wallace, yes, sir, in
3         Andalusia
4    Q.   And that was a two-year program you
5         attended there?
6    A    Yes, sir, there it was
7    Q.   And then did some of those credits and
8         those hours apply toward your degree at --
9    A    Yes, sir
10   Q.   -- Troy State-Dothan?
11   A    Yes, sir
12             MR. HALL: Wait for him to finish
13             asking before you answer.
14             THE WITNESS: Okay
15   Q.   And then you completed your degree -- a
16        bachelor of arts degree, I believe you
17        said, at Troy State-Dothan, or a
18        bachelor of science?
19   A    Bachelor of science
20   Q.   Bachelor of science
21             And that was in education and what?
22   A    Education. It was social science -- It was
23        a bachelor of science degree in social

**Page 25**

1    A   Yes, sir  Yes, sir
2    Q   And then the warehouse job and the shipping
3        clerk job were tied together in the
4        warehouse?
5    A   Yes, sir  Yes, sir
6    Q   Okay  And I just want to make sure I
7        understand that both the warehouse and the
8        shipping clerk job involved taking in
9        products and then moving out products to
10       servicemen or workmen or whoever to go do
11       actual repairs?
12   A   Yes, sir  Yes, sir
13   Q   You weren't doing any actual repairs?
14   A   No, sir  No, sir, not at that -- not at
15       the -- at that level
16   Q   Then after 1984, you left Alabama Electric
17       Cooperative, correct?
18   A   (Witness nods head up and down )
19   Q   And went to where?
20   A   To -- I believe to Pioneer  It was an
21       opening for, like I said, communication
22   Q   Okay  When did you complete your program
23       at LBW?

**Page 26**

1    A   Just around   I went back to school  I
2        had been in business with Pioneer for
3        approximately five years, I believe, six
4        years, somewhere in there, and went back to
5        school in the fall of '90, and two, two and
6        a half years from there is when I completed
7        that --
8    Q   Okay
9    A   -- while I worked at Pioneer  I didn't own
10       the business at that time is what I'm
11       saying
12   Q   And when did you begin your program at Troy
13       State-Dothan?
14   A   Immediately following that
15   Q   Sometime in 1993 or 1994?
16   A   Yes, sir
17   Q   And when did you complete your program at
18       Troy State-Dothan?
19   A   I believe I graduated in June of '97  I
20       went at night
21   Q   Now, you stated that you started with
22       Pioneer -- you were hired by Pioneer in
23       1984; is that correct?

**Page 27**

1    A   Yes, sir, I believe so, around about there
2    Q   Who hired you and for what job?
3    A   Walter Bracewell hired me  He was the
4        owner at that time
5    Q   Is Mr Bracewell from Covington County?
6    A   Yes, sir  Covington County
7    Q   And what was Mr -- I'm sorry  You may
8        have already said  What was
9        Mr Bracewell's position with Pioneer at
10       that time when he hired you?
11   A   He was the owner
12   Q   Do you know if there were any other owners
13       of Pioneer Telephone Services at that time?
14   A   No, sir, not that I know of
15   Q   Are you -- Were you related to
16       Mr Bracewell in any manner?
17   A   No, sir
18   Q   Does Mr Bracewell have other family
19       located in Covington County, Alabama?
20   A   Yes, sir
21   Q   If you would, please tell me other
22       relatives of Mr Bracewell that you know of
23       that reside in Covington County, Alabama

**Page 28**

1    A   I don't know their -- I know he's got a
2        brother, Joe Bracewell  That's all I ..
3    Q   Is he married?
4    A   I'm not sure
5    Q   I mean, Mr Bracewell, Walter Bracewell
6    A   Oh, yes, sir, he's married
7    Q   Do you know his wife's name?
8    A   Cindy  Now, they're not in Covington
9        County anymore
10   Q   When did they move from Covington County?
11       When I say they, Walter and Cindy
12       Bracewell
13   A   '91, '92, somewhere in there
14   Q   Do you know if Joe Bracewell is still in
15       Covington County?
16   A   Yes, sir
17   Q   Do you know what Joe Bracewell does?
18   A   He works at Alabama Electric Cooperative
19       I mean, I guess he still does
20   Q   Do you know what -- Before Walter Bracewell
21       left in 1991, do you know what he did, what
22       his business was in Covington County?
23   A   He has the -- it's called Pioneer Telephone

Page 61

1  Q   And that was a separate business that you
2      had no ownership in?
3  A   No ownership or -- or any -- I've never
4      worked in it  I've always been with
5      Pioneer
6  Q   Okay  Did you have any other businesses
7      that you had an interest in -- that you had
8      an ownership interest in other than Pioneer
9      Telephone Services, Inc ?
10 A   No, sir.
11 Q   Pioneer Telephone Services, Inc  is the
12     only business ownership interest you have
13     had in any other business up through, say,
14     2004?
15 A   Yes, sir.
16 Q   Do you know of any other businesses that
17     Mac Bracewell or Greg Bryant had any
18     ownership interest in other than Pioneer
19     Telephone Services and Tel-Com Services
20     through 2004?
21 A   No, sir
22 Q   When Mr. Mac Bracewell and Mr  Greg Bryant
23     left Pioneer Telephone Services in 1995,

Page 62

1      what -- who were the employees of Pioneer
2      at that time?
3  A   Myself, Sheila, Jeff  I believe Bernie was
4      there
5  Q   And what was Bernie's -- This is Bernie
6      Bracewell?
7  A   Yes, sir
8  Q   And what was his relationship?  He was --
9      What relationship was he to Mac Bracewell?
10 A   Little brother
11 Q   Is Bernie Bracewell still with Pioneer
12     Telephone Services?
13 A   No, sir
14 Q   Was he with Pioneer Telephone Services in
15     2004?
16 A   No, sir.
17 Q   Now, from 1995 until 2005, did anyone else
18     have an ownership interest in Pioneer
19     Telephone Services other than you and your
20     wife?
21 A   No, sir
22 Q   Okay
23 A   Bernie -- I'm not -- I'm not really sure

Page 63

1      when Bernie -- Bernie might have left right
2      before I bought -- or right -- it might
3      have been right -- I can't remember
4      Bernie went back to work at -- for Alabama
5      Electric at McWilliams.
6  Q   Okay  So Bernie Bracewell left Pioneer
7      either shortly before you bought it or
8      shortly after you bought it?
9  A   Yes, sir  It wasn't anything except he had
10     been able to get his other job back  He
11     had worked for Tel-Com and wanted to stay
12     home, and he started doing that  But
13     anyway, he got his -- his old job back up
14     at McWilliams
15 Q   And where is that?
16 A   It's -- it's down -- well, north of -- it's
17     on the river down here where the dam is.
18     It's owned by Alabama Electric Cooperative
19 Q   And what service do they provide?
20 A   Electricity  I mean, I guess just
21     furnishing -- or generating electricity
22 Q   Okay  Now, have you held any other jobs of
23     any type between 1995 and 2005 other than

Page 64

1      your job with Pioneer Telephone Services,
2      Inc ?
3  A   Yes, sir.
4  Q   Okay  If you would, tell me about those
5  A   I got talked into teaching some after I got
6      my degree
7  Q   Okay  And where was that?
8  A   At Straughn
9  Q   Can you spell that for me?
10 A   S-T-R-A-U-G-H-N High School
11 Q   And is that here in Covington County?
12 A   Yes, sir
13 Q   And what did you teach there?
14 A   History
15 Q   So that was a full-time teaching position?
16 A   It turned into it  It was supposed to have
17     been part-time
18 Q   In what year did you start that position?
19 A   '97
20 Q   So that was after you completed your degree
21     at Troy State-Dothan in June of '97, I
22     believe you said?
23 A   Yes, sir

Page 97

1    your position that those would be the sole
2    property of Pioneer Telephone Services,
3    Incorporated which consists solely of Jimmy
4    Williamson and Kellie Williamson, correct?
5  A  Yes, sir
6           MR. PEARSON: All right  We'll
7       take a break there
8       VIDEOGRAPHER: We're going off the
9       record  This is the end of
10      tape two
11      (Brief recess was taken )
12      VIDEOGRAPHER: We're back on the
13      record  This is the beginning
14      of tape three
15  Q  Mr. Williamson, I wanted to ask you a
16    little bit about some other documents your
17    attorney has produced to us and then some
18    documents that we were also provided by the
19    South Central Agency
20       One of the documents that your attorney
21    has produced is numbered Pioneer 342, and
22    it appears to be -- well, just look at that
23    document and tell me if you can tell me

Page 98

1    what that is  This is page Pioneer 342 of
2    Defendant's Exhibit 2
3  A  Yes, sir, it looks like a policy that
4    Pioneer had
5  Q  Okay  And when you say that Pioneer had,
6    this appears to be an insurance policy that
7    Pioneer Telephone Services, Inc  had with
8    Southern Guaranty Insurance Company
9  A  Was it Southern Guaranty? Oh, yes, sir,
10    with South Central Agency  It was one of
11    their carriers, yes, sir
12  Q  Right  And it says on here that this
13    would be for the policy period June 16,
14    2002 to June 16, 2003; is that correct?
15  A  Yes, sir
16  Q  Is it your recollection that Pioneer
17    Telephone Services, Inc  had insurance with
18    Southern Guaranty Insurance Company for a
19    number of years?
20  A  Yes, sir  We -- I had insurance with South
21    Central Agency  They did the carrier
22    thing
23  Q  Okay  Well, when you say that, you're

Page 99

1    saying that you would buy insurance through
2    the South Central Agency, and then you
3    would receive -- Pioneer Telephone
4    Services, Inc  would receive insurance
5    policies from the company that you had the
6    insurance with?
7  A  Yes, sir, most of the time  Sometimes it
8    took a while to get policies, but .
9       My secretary and all handled more of
10    that  I mean, I was just instructed by
11    Harold Young and John Tomberlin that we had
12    insurance
13  Q  Okay  Do you recall getting insurance
14    policies from Southern Guaranty Insurance
15    Company and Auto-Owners Insurance Company?
16  A  I remember Southern Guaranty and I remember
17    Mr  Harold Young telling us that he would
18    probably want to change it, and that was
19    how Auto-Owners came about
20  Q  Well, you're not disputing in this lawsuit
21    that you received your insurance policies
22    from either Southern Guaranty Insurance
23    Company or Auto-Owners Insurance Company,

Page 100

1    are you?
2  A  No, sir  We did  We did get them  We had
3    insurance with them
4  Q  And when you say you got them, your company
5    received those insurance policies, Pioneer
6    Telephone Services, Inc , and Pioneer
7    Telephone Services, Inc  and you as the
8    president of it would have had the
9    opportunity to review those policies when
10    you received them, wouldn't you?
11  A  I know that we got them  We paid for them
12  Q  And as the owner of that business and the
13    person that ran that business, you could
14    have access to them to read them anytime
15    you wanted to, couldn't you?
16  A  Yes, sir, if we had them
17  Q  Let me show you some of the documents --
18       Well, before I go to that, again, just
19    to clarify  You're not taking the position
20    in this lawsuit that you didn't receive
21    insurance policies from Southern Guaranty
22    or Auto-Owners, are you?
23  A  No, sir  No, sir

Deposition of Jimmy Williamson

January 26, 2007

Page 117

1  of that merger, did you convey it to
2  Pioneer Telephone Services, Inc.?
3  A  Yes, sir, I brought it into the
4  corporation.
5  Q  And so then when the merger took place,
6  Pioneer Telephone Services, Inc. could
7  convey that to AlaWeb as part of the
8  merger?
9  A  As stock, yes, sir.
10  Q  Okay. So, then, I'm understanding your
11  testimony is that Pioneer Telephone
12  Services, Inc. did not own Pioneer Plaza
13  structure at the time of Hurricane Ivan; is
14  that correct?
15  A  No, sir.
16  Q  I am correct, though?
17  A  Oh, yes, sir. Yeah.
18  Q  Pioneer did not?
19  A  No, sir.
20  Q  We've talked about the Christmas Eve 2002
21  claim you had. We've talked about, also --
22  briefly about a December 19th, 2002 claim
23  that you had. And then this last one that

Page 118

1  I was asking you about, I'm not sure what
2  that -- what that relates to. Do you know
3  what that --
4  A  I believe it was the same -- the same
5  storm, because it was -- it was rough.
6  And, again, we had a lot of -- lot of
7  customers that --
8     And that might have been some of the
9  reason it took a while to get it, because
10  we was taking care of our customers.
11  Q  All right. So you think that that March
12  payment and invoice that we just talked
13  about related either to the December 24,
14  2002 or the December 19th, 2002 claims,
15  correct?
16  A  Yeah, the -- I believe the building was the
17  24th claim because it -- that was -- I
18  think that was the bad storm.
19  Q  Okay.
20  A  One of them. It was either the 19th or the
21  20th -- one of them was the bad one.
22  Q  Okay.
23  A  The wind -- The one that had the wind in

Page 119

1  it.
2  Q  All right. Other than those two claims
3  which I may ask you more about here in a
4  moment and the Hurricane Ivan claim which I
5  understand was September 16, 2004, have you
6  submitted any other insurance claims on
7  either your personal or Pioneer Telephone
8  Services' insurance?
9  A  I don't remember if I have. I think I
10  might have had -- The only other thing I
11  can think of is I had a vehicle -- I mean,
12  one of my trucks that lost control and
13  damaged some rims on it -- I mean, warped
14  them, hit a curb. That's the only thing I
15  can think of right now.
16  Q  Okay. Any other storm-related claims other
17  than those three that I've mentioned?
18  A  I don't believe so, I don't think.
19     MR. PEARSON: I want to take a few
20       minutes. I would like to just
21       pause the camera to see if, in
22       fact, there are any other
23       claims that you -- looking

Page 120

1     through these documents, I
2     think I can help you.
3     VIDEOGRAPHER: Going off the
4       record.
5     (Off-the-record discussion.)
6     VIDEOGRAPHER: Back on the record.
7  Q  Okay. We took a moment to look through
8  some documents because I was asking you
9  about other claims that you or -- other
10  insurance claims you or your business have
11  made.
12     It's my understanding that you don't --
13  you don't recall any other claims that
14  you've made for property damage other than
15  the claim that relates to the matters which
16  are the subject of this lawsuit and the
17  December 19, 2002 incident and the December
18  24, 2002 incident; is that correct,
19  Mr. Williamson?
20  A  Yes, sir, to the best of my knowledge.
21  Q  All right. Now, with regard to the
22  December 19th, 2002 event, do you -- if you
23  would, just tell us what you recall about

Page 157

1    right?
2    A   Yes, sir.
3    Q   Okay. And the last time you were at your
4        office, am I understanding you to say, was
5        about 7:30 that night?
6    A   7:30, 8:30, somewhere in there.
7    Q   Okay. And what was the last time you were
8        at your home on that day?
9    A   Right before then.
10   Q   Okay. And at that time, had either your
11       home or your office sustained any damage
12       that -- or any -- or any property or
13       equipment or any item inside either
14       sustained any damage at that time?
15   A   No, sir.
16   Q   Okay. Then you went to the community
17       center sometime around 7:30 is what I
18       understood you to say.
19   A   I went and then came back and then went
20       back.
21   Q   And then -- You went to the office after
22       7:30, and then went back to the center at
23       8:30?

Page 158

1    A   The office and the house.
2    Q   And you had left -- Had you left your wife
3        and two children at the community center
4        while you did that during that period of
5        time, between 7:30 and 8:30?
6    A   Yes, sir.
7    Q   Okay. And as of that time, 8:30, had
8        either your home or your business sustained
9        any damage to the -- either the property or
10       contents of either?
11   A   No, sir. No, sir.
12   Q   Then you went back to the community center
13       at 8:30 p.m. is what I'm understanding you
14       to say.
15   A   Some -- Yes, sir, somewhere around there.
16       It might have even been a little bit
17       later. The storm had not gotten here yet.
18   Q   Okay. And then when you returned to the
19       community center around 8:30 p.m. the night
20       before the storm hit, did you leave the
21       community center again?
22   A   No, sir.
23   Q   And then you stayed at the community center

Page 159

1    during the storm?
2    A   Yes, sir.
3    Q   And then what time did you leave the
4        community center the next day after the
5        storm?
6    A   It was around mid morning probably, eight
7        o'clock, 7:30, eight o'clock, around --
8    Q   In the morning?
9    A   Yes, sir, that next morning.
10   Q   And you hadn't left anytime between 8:30
11       the night before and 7:30 or eight o'clock
12       the next morning is what you're telling me?
13   A   No, sir. The best I remember it, when we
14       got there -- I just remember you couldn't
15       hardly get anybody to do anything. We set
16       up lights, and we did -- the elderly, we
17       were toting oxygen tanks.
18   Q   Okay.
19   A   Then after that, it got dark and -- and the
20       emergency generators, and then those went
21       off and it was -- lightning was popping all
22       around and the wind -- it was pretty rough.
23   Q   Okay. And then the next -- Well, let me

Page 160

1    ask you about that. When you -- in this
2    gap -- Before I go to the next morning,
3    from 8:30 when you went to the community
4    center, describe for me what happened in
5    hourly kind of intervals or time periods,
6    you know, what progressed from there until
7    you left the next morning.
8        In other words, you were there at
9    8:30. You were helping with these things.
10   The weather became increasingly worse, I'm
11   taking it from you?
12   A   Yes, sir.
13   Q   And --
14   A   On over around mid -- mid morning -- when I
15       say -- about 2:00 or three o'clock,
16       somewhere around there, four o'clock is
17       when I guess you'd say the eye of the
18       storm, whatever, when it -- all of it came
19       over, about, the worst of it. It was --
20   Q   Was about 2:30 or 3:00 in the morning?
21   A   The best I remember. I'm not sure. I
22       mean, I just remember the rough part of it
23       being over in the morning because everybody

Page 161

1    was tired and it stunk  It was --
2  Q  So sometime between midnight -- Sometime
3     after midnight and 4:00 in the morning is
4     when you noticed this what you've described
5     as high winds and rain and lightning?  Is
6     that what you're telling me?
7  A  Yes, sir
8  Q  Anything else besides those three things
9     that you've -- I think you've stated and
10    what I've just stated?  Between midnight
11    and 4:00 a m , does that accurately
12    describe what you're saying occurred during
13    that period of time:  High winds,
14    lightning, and rain?
15  A  Yes, sir  It was just -- it was awful  I
16    mean, I hadn't -- since Opal, I don't think
17    I had ever -- which I had never been at a
18    place like that either  And I've got a lot
19    of respect for the folks that do stuff like
20    that
21       But it was -- Like I said, it just
22    progressively got worse  It got -- When
23    the power and everything got -- it got to

Page 162

1     stinking, and the storm was -- they
2     actually were worried about the building it
3     got that rough.
4  Q  Okay  And then sometime later in the
5     morning -- when I say late, I mean, really,
6     very early in the morning, like after
7     4:00 a m , the storm began to pass?
8  A  I'm not sure exactly when it was  It
9     was -- to me, it almost -- I think, the
10    best I remember -- because it was dark in
11    there  I mean, you know, everybody had
12    gotten to the -- to the back
13       But the best I remember from going
14    outside -- I mean, I would go out and check
15    and look along with some other folks, some
16    other men, and it was limbs  I mean, it
17    was close -- I mean, it was getting on
18    closer to daylight when everything started
19    calming down, but
20  Q  Okay.
21  A  It was bad enough that you couldn't -- it
22    was not safe to even go outside a door or
23    anything because you would have got hit by

Page 163

1     something, or either struck
2  Q  Okay  And then what time did you come out
3     of the building?
4  A  Well, different times I stepped out during
5     the night, but -- after everything was
6     over, is that what you mean?
7  Q  Well, hold on  Hold on  Well, you've just
8     described for me that at some point in
9     time, it had become too dangerous to even
10    step outside
11  A  Yes
12  Q  And so --
13  A  The front I'm talking about, out in the
14    open
15  Q  Okay  What I want to know is, what time it
16    was when you left the premises of the
17    senior citizens community center
18  A  About mid morning probably.
19  Q  And did you describe that as 7:30 or
20    8:00 a m  to me?
21  A  Yes, sir, somewhere in there, the best I
22    remember
23  Q  Okay  And where did you go at that time?

Page 164

1  A  The first place I went -- Well, I stopped
2     at the office for a minute, just looking at
3     everything, and I went to the house  And
4     then I came back to the office
5  Q  Okay  And that's sometime shortly after --
6     shortly -- around or shortly after eight
7     o'clock then?
8  A  Somewhere in there  It was in the
9     morningtime
10  Q  Had anyone been left at either your house
11    or your office during the storm or anytime
12    after you left there to go to the community
13    center?
14  A  No, sir.
15  Q  When you left to go to the community
16    center, did you lock both your home and the
17    Pioneer Telephone office?
18  A  Yes, sir
19  Q  And so nobody had been in either of those
20    buildings, meaning your house or Pioneer
21    Telephone Services, until you went back
22    around 8:00 a m  the next morning after the
23    storm?

Deposition of Jimmy Williamson                                           January 26, 2007

Page 201

```
 1      again, I don't -- all I know is that they
 2      were not working, because some of them I
 3      could smell. Some of them -- some of them
 4      could have been water damage -- I mean, I'm
 5      not -- I just know they were dead because
 6      of the lightning hit on the system.
 7   Q  Well, you just mentioned water damage, too.
 8   A  Yeah, I mean, they were sitting on desks
 9   Q  And when you say lightning damage, do you
10      also mean -- are you also including the
11      surge caused by lightning --
12   A  Yes, sir
13   Q  -- as well?
14   A  Yes, sir
15   Q  Okay. And that surge could be either on
16      the premises or off the premises of
17      Pioneer?
18   A  Yes, sir. Usually it's somewhere close
19      when it's this bad
20   Q  Okay You've mentioned that you've seen it
21      as far as a mile away.
22   A  Yes, sir.
23   Q  Okay All right And then go through and
```

Page 202

```
 1      tell me what testing youdid to any of
 2      those items
 3   A  Opening up and looking at them  But, I
 4      mean, when you smell it -- most of the time
 5      when you smell it -- I mean, I've been
 6      doing this long enough there's no -- it's
 7      been burned
 8         But, again, if y'all don't mind me
 9      going back  When I was checking this stuff
10      where -- and some of the computers, water
11      may have shorted them, but what we had was
12      shorts  I mean, when something is
13      short-circuited and burned up, whether it
14      was --
15         You know, I know lightning came in
16      through the phone system, the voice mail
17      system  The camera system, it came in from
18      the outside  I know that happened.  That's
19      the Digital Sprite system, the power pack
20      The cameras were damaged and the camera
21      mounts were damaged also outside by the
22      limbs and trees  Television antenna was
23      damaged by something that hit it and
```

Page 203

```
 1      blew -- I think it was the metal that hit
 2      it, knocked it over into the power --
 3   Q  Which is that? Are you listing --
 4   A  The television antenna
 5   Q  Okay.
 6   A  There's a picture of it where it was
 7      knocked over  The antenna pole was what --
 8      was actually -- the antenna is on it.  The
 9      antenna amplifier was broken.
10         The four-head VCR when -- of course,
11      lightning came in through on it from the
12      antenna.  The receiver, it was a surge, the
13      stereo receiver, what plays the radio
14      system throughout the building
15         The computers, they were smoked
16      because -- and, I mean, like I said,
17      it's -- they had dial tones hooked to them
18      for Internet, but it could also have been
19      the water because water was on the desk,
20      too.
21         Subwoofer, all this was hooked in --
22      into this system.  The television -- I
23      don't see the television on here.  I mean,
```

Page 204

```
 1      the television was done, too, but it's not
 2      even on here.  I know it was at the house,
 3      but
 4   Q  Okay  Did you prepare -- The document
 5      that's marked Pioneer 0152, did you prepare
 6      that document?
 7   A  Between Sheila and Jeff and I, we did when
 8      we examined it
 9   Q  Okay  The document that's marked -- let me
10      show you what's marked Pioneer 0 --
11   A  0152 and 53?
12   Q  Yeah
13   A  Yes, sir
14   Q  You prepared that document?
15   A  Yes, sir, to the best of my knowledge
16   Q  Okay  And the document is --
17   A  Well, no, no, no, no  Here is why it's
18      different  This is Tel-Com  That's the
19      one that Mac and Sheila -- Sheila did for
20      Mac
21   Q  Sheila in your office did for --
22   A  She also works for Tel-Com Services.
23   Q  Okay  And Sheila also did it for Mac --
```

Page 221

1  A  Radio Shack

2  Q  Then on -- This is on the second page now,

3     AO192  That's where -- I mentioned the

4     antenna pole, and you said it came from

5     Radio Shack  The Sanyo four-head hi-fi

6     VCR?

7  A  May have come from Wal-Mart

8  Q  The THX select receiver?

9  A  That's our surround sound  At that time, I

10    think it came from Repstock, I believe

11  Q  Could you spell that for us?

12  A  R-E-P-S-T-O-C-K

13  Q  And where is Repstock located?

14  A  I think they're in Tennessee  They are

15    a -- or they were  They're not anymore

16    They were an Onkyo distributor, I believe

17  Q  Where is Martco?

18  A  I'm not sure

19  Q  And do you know where Hi-Line is?

20  A  I think they're in Texas

21  Q  Do you know the cities on any of these?

22  A  No, sir

23  Q  Then you have a Dell computer system with a

Page 222

1    flat panel, 17-inch, keyboard, printer,

2    laptop, flat panel display, port replicator

3    and printer  All of those items evidenced

4    lightning damage?

5  A  Between lightning and water, yes, sir

6  Q  Okay  Did you do any tests on any of those

7    to determine whether it was lightning or

8    water?

9  A  It was water in the keyboard  It just

10    wouldn't -- They said it was dead

11  Q  The Gateway computer system --

12  A  Same thing

13  Q  Water, and it was dead?

14  A  And -- Yeah  Now, the Gateway, I remember

15    the Gateway was the one, now, it did  It

16    stunk bad

17  Q  Okay  Did the Dell stink bad?

18  A  It smelled, but not like the Gateway

19  Q  Okay  Do you remember where you got -- The

20    Dell, I assume, came from Dell?

21  A  Yes, sir

22  Q  The Gateway, did it come from Gateway?

23  A  Yes, sir

Page 223

1  Q  Then you've got a Norstar cordless phone

2    That, you're maintaining, also showed signs

3    of lightning damage, the cordless phone?

4  A  Yes, sir

5  Q  And did that come from the same place as

6    the other Norstar equipment?

7  A  I believe it did

8  Q  And I've forgotten who you -- Is that

9    Hi-Line?

10  A  Yes, sir

11  Q  And then this last item on this -- on AO192

12    is a subwoofer

13  A  Subwoofer

14    (Brief interruption )

15  Q  The subwoofer came from who?

16  A  I think Repstock, I believe

17    (Brief interruption )

18  Q  All right  Now I want to go on to the

19    other one, which is AO181 through 184  Is

20    that the list of items you prepared that

21    you maintain were water damaged at the

22    premises of Pioneer Telephone?

23  A  Yes, sir  Yes, sir

Page 224

1  Q  All right  None of those items exhibited

2    signs of lightning damage to your

3    knowledge?

4  A  No, sir  These were -- all this right here

5    was on -- some of it was on that shelf

6    There was a picture of that shelf  A lot

7    of these was -- they were sitting on

8    that -- on the floor up under -- on the

9    bottom shelf

10  Q  Okay  And these items that -- These were

11    some of the items that I saw pictures of

12    that were in boxes and things?

13  A  That I took to the -- yes, sir, I took to

14    the -- to my shop at the house when John

15    and them said it was okay, John and Harold

16  Q  Okay  And I'm going to show you what are

17    marked as pages AO271, 272, and 273  I'll

18    also add 270 in there

19    Are those pictures of the items -- Are

20    those photographs of the items you've

21    described that are listed on AO181 through

22    184?

23  A  Yes, sir  These are -- this is where I

Page 225

1  took it -- The bottom ones is where I took
2  it and put them in the shop
3  Q   Okay   The bottom ones on what page are you
4  referring to?
5  A   The bottom ones on 271 and 272   Well,
6  that -- well, 273 is in the office -- in
7  the shop, I mean, too.
8  Q   Okay   And you don't -- I'm just asking
9  whether these are photographs of those
10  items   You don't know whether you took
11  these photographs or not?  You're not
12  saying you took these photographs?
13  A   No, sir   I don't -- I don't know.
14  Q   But what you're saying is the items that
15  I've asked you about on 181 through 180 --
16  A   Four
17  Q   -- four are the items pictured in -- on
18  pages 271 and 272 --
19  A   Well, no, all --
20  Q   And 273?
21  A   Yes, sir
22  Q   Are they shown on page AO270, also?
23  A   I don't think -- no, sir, I don't think

Page 226

1  all -- that's after -- some of that's after
2  the fact, after we -- I remember this one
3  here   This is some after we've cleaned up,
4  and that is what we had left on the ceiling
5  tiles here   That's the only one -- the
6  ones that wasn't that bad that we hadn't
7  replaced that I didn't have any left
8  Q   Okay   When you say this and that, the
9  first item -- well, the last thing you just
10  referred to was the items at the top
11  right-hand corner of AO270   Those are
12  items that aren't on the list or they are
13  on the list?
14  A   This is where -- I don't know for sure   I
15  don't think these are   This right here is
16  after we cleaned up, I believe
17  Q   The bottom left-hand picture of AO270 is
18  pictures of items after you had cleaned up?
19  A   (Witness nods head up and down )
20  Q   All right   But the pictures on 271 through
21  273 are pictures of items, some of which
22  were moved to your --- to your storage shed
23  at your home   Is that what you said?

Page 227

1  A   Yes, sir.
2  Q   Okay   And that would be the bottom
3  pictures in 271, 272, and perhaps 273?
4  A   Yes, sir
5  Q   The bottom pictures of 271, bottom pictures
6  of 272, and the pictures in 273 appear to
7  be items in your storage shed --
8  A   That I moved
9  Q   -- at your home that you moved?
10  A   Yes, sir, I moved from the office to the
11  shop
12  Q   All right   And did -- on those items,
13  those water-damaged items that are listed
14  on AO181 to 184, did you test or check
15  every one of those items to see if they
16  worked?
17  A   No, sir.
18  Q   Did you check any of the items listed on
19  page AO181 through 184 to see if they
20  worked?
21  A   No, sir   I checked and saw that there was
22  water in them, and that was, like I said,
23  why I called the insurance company

Page 228

1  Q   Okay   So what I'm understanding you to be
2  testifying to is that you visually observed
3  each of the items listed on AO181 through
4  184 and saw water on them and decided they
5  were not usable?
6  A   Yes, sir
7  Q   Okay   But you didn't actually do any test
8  or try to see if they actually worked?
9  A   No, sir
10  Q   All right   And describe the water damage
11  on these items that are listed on those
12  pages AO181 to 184   Were some -- Did some
13  have more severe water on them than others?
14  A   Oh, yes, sir.
15  Q   And was this water -- Were these items all
16  in boxes or were they not in boxes?
17  A   They were in boxes for the most -- boxes
18  that didn't tear up   But some of the boxes
19  were open -- I mean, you know, didn't have
20  the tops on them or wasn't sealed   Some of
21  them were closed up, but -- but they were
22  all opened for me to look at
23  Q   Do you know whether you provided any

Page 233

```
 1       say, of when you went over there?
 2   A   I'm not for sure  I'm just saying maybe
 3       within two weeks --
 4   Q   Okay
 5   A   -- three weeks  It might have been
 6       longer  I'm not sure  I know they were
 7       the first ones to come and help me
 8   Q   Okay  Tell me everything you discussed
 9       with either one of them that you recall
10   A   Mr. Cleveland came -- called me and came
11       He took care of the stuff at the house
12   Q   Okay  What did you and he discuss about
13       what he was going to do and what he was
14       going to look at?
15   A   He just looked at the damage  He asked me
16       what kind of damage I had and -- you know,
17       inside and out  He came and looked at
18       everything and was real thorough  Checked
19       everything, measured things, went up -- was
20       on the roof, in the house, all around the
21       house  Was very cordial, very nice
22   Q   Okay  And the claim -- The suit that we're
23       talking about here today deals with the
```

Page 234

```
 1       business, correct?
 2   A   Yes, sir
 3   Q   Okay  So I won't dwell on the home as
 4       long, but what I understand from you is you
 5       and he and -- everything was resolved with
 6       regard to the home to your satisfaction?
 7   A   Oh, yes, sir, more -- I mean, it was -- I
 8       was actually surprised, you know, at how
 9       quick he responded and it was done
10   Q   Well, you had submitted -- Does Pioneer 134
11       contain items you submitted regarding your
12       home, lightning damage at your home?
13   A   Yes, sir
14   Q   Okay  And then I'm looking at the items
15       here  Well, looking at the home, it looks
16       like it refers to a Norstar CICS at the
17       home
18   A   Right
19   Q   Okay  Is that what you're saying was at
20       the office?
21   A   I believe so
22   Q   And was -- was there a Norstar MICS or a
23       Norstar CICS at your house?
```

Page 235

```
 1   A   CIC -- Yes, sir  I know there was a CICS
 2       at the house  I have the same kind of
 3       equipment at the house that I have at the
 4       office
 5   Q   Okay  Now, you mentioned earlier today
 6       about a IV that wasn't shown on the office
 7       list, didn't you?
 8   A   Yes, sir  It was a 31-inch television
 9       The one I had at home was a 36
10   Q   And you had -- I'm looking on here at a
11       stereo receiver that you list at the office
12       being a TX-8511
13   A   Uh-huh  (Positive response)
14   Q   Did you have an identical stereo at your
15       house?
16   A   I think it's pretty much the same  I think
17       it was a little better -- I mean, a bigger
18       one, I mean  I believe  I'm not sure  It
19       was the same -- It was the same model
20       That's what we were trying to start to
21       sell
22   Q   Okay  Well, this one, looking at Pioneer
23       134, it also lists a TX-8511 stereo
```

Page 236

```
 1   A   Uh-huh  (Positive response)
 2   Q   And is that what's listed at the office,
 3       also?
 4   A   Yes, sir  Now, the stuff at the office is
 5       cost, is what it cost us
 6   Q   Okay  And what -- are you saying --
 7   A   At the house is what -- is more than what
 8       it -- actual cost because, you know, when
 9       you buy something, it's more  Retail is
10       what I'm saying
11   Q   Well, did you buy this -- The items that
12       were at your house, did you buy them
13       through your business or did you buy them
14       on your own?
15   A   No, some of the stuff I bought through my
16       own -- through myself  My personal I'm
17       talking about
18   Q   Well, I'm looking -- This appears to be
19       more than one page to this document, but I
20       don't see that it's all here
21       In any event, I don't see the back
22       page  It appears that that page is
23       continued and there's more to that page
```

Page 237

1    than just Pioneer 134  135 is another
2    document, so I don't know where the rest of
3    that page is
4         Looking at it    That's okay,
5    Mr Williamson  Let me go on and ask you
6    about this
7    A   Okay
8    Q   Looking at it, can you tell me where the
9    items listed on page -- on Pioneer 134 came
10   from?  Just go down each item and tell us
11   as best you can where you believe they came
12   from
13   A   This -- I'm not sure where the telephone --
14   This was before we started dealing with
15   Hi-Line, I believe  Yeah, it was  Dell I
16   bought from Dell  I can't remember that --
17   the phone company that -- and I bought it
18   before -- before we started dealing with
19   the system -- I bought it down in Florida
20   I think I ampa I believe is the name -- I
21   mean, is where it's from  All the rest of
22   the stuff is like Circuit City or Wal-Mart
23   Q   Okay  Do you remember the totals you were

Page 238

1    paid for the resolution of your homeowners
2    claim?
3    A   No, sir
4    Q   Approximately, do you remember?
5    A   No, I really don't, because it wasn't
6    just -- I mean, I had the Pioneer -- the
7    roof and the hardwood floors, Sheetrock
8    damage, just
9    Q   Okay  I'm going to show you what is Bates
10   stamped page Pioneer 132  And does that
11   appear to be close to the amount you were
12   paid for the dwelling and for the structure
13   part of your loss at your house, being
14   approximately eighteen --
15   A   Eighteen, nineteen  It says it right here
16   Q   Okay  Read it for me
17   A   It says $19,050 32
18   Q   Okay  And then I'm going to show you
19   what's marked as Pioneer 133, and it
20   appears to state that it's for the
21   homeowner's personal property, and what's
22   the amount on that?
23   A   It says 18,694 48

Page 239

1    Q   So does a total of approximately $37,000
2    sound close to what you were paid for the
3    residential?  $37,700 sound --
4    A   I don't remember honestly
5    Q   Okay
6    A   I didn't think it was that much, but it may
7    be
8    Q   Okay
9    A   Is that not less the deductible or
10   something?
11   Q   I don't know  That's why I was asking you
12   A   Okay
13   Q   I'm hoping that you can remember some of
14   this, Mr Williamson, without me having to
15   search for every document
16        In any event, you were -- you and
17   Mr Cleveland are the ones -- the two that
18   dealt on the home?
19   A   Yes, sir
20   Q   Okay  And did Mr Gauthier also deal with
21   the home?
22   A   No, sir  He dealt with the building, the
23   office building

Page 240

1    Q   He dealt with the building of Pioneer
2    Telephone Services?
3    A   Yes, sir
4    Q   But you and Mr Cleveland dealt with the
5    home and -- on behalf of Auto-Owners, and
6    that claim was resolved to your
7    satisfaction and you don't make any claim
8    in this lawsuit regarding that, do you?
9    A   To Mr Gauthier?
10   Q   No
11   A   I'm sorry
12   Q   You're not making any claim in this lawsuit
13   with regard to any loss or damage at your
14   home, are you?
15   A   No, sir
16   Q   Okay
17   A   That was fine
18   Q   That was satisfied with -- You're satisfied
19   with Auto-Owners with respect to that
20   claim, correct?
21   A   Yes, sir
22   Q   All right  Now, then, how many times did
23   you meet with Mr Cleveland or

Page 241

1    Mr. Gauthier? Well, let's stick with
2    Mr. Cleveland first.
3        How many times did you meet with
4    Mr. Cleveland?
5  A  Twice, I believe.
6  Q  Okay. Were both of those at your home?
7  A  Yes, sir. He forgot to -- and I did, too.
8    We talked about it at first and out of
9    everything that was going on, he forgot to
10   look at the floor in the shop. That's what
11   he came back for. He actually called me.
12   I didn't even think about it. And he came
13   back and looked at that and.
14 Q  Okay. The shop being the shed that you
15   moved things to from Pioneer Telephone
16   Services?
17 A  Yes, sir. That -- now, that was -- At the
18   time that he came and looked at it, the
19   stuff wasn't there.
20 Q  Okay.
21 A  When he came back, it was there, and he
22   actually took some pictures of it himself.
23 Q  Okay. But none of the items -- When you

Page 242

1    moved it from the office to the shed, none
2    of those items were listed by
3    Mr. Cleveland, were they?
4  A  No, sir. That's when I stopped him.
5  Q  Okay. All right. Are those the only
6    discussions you had with Mr. Cleveland?
7  A  Yes, sir, to the best of my knowledge.
8  Q  Did you and Mr. Cleveland have any
9    discussions regarding retention or disposal
10   of any items of property of yours at your
11   house?
12 A  No, sir, not that I recall.
13 Q  Did you and -- Well, then, did you meet
14   with Mr. Cleveland or Mr. Gauthier first?
15 A  Cleveland.
16 Q  How about the next occasion?
17   That was -- Mr. Cleveland you thought
18   you met with sometime within a couple of
19   weeks of the storm?
20 A  Yes, sir, I believe so.
21 Q  And did you meet with Mr. Cleveland a
22   second time, or who was the next person you
23   met with after you met with Mr. Cleveland

Page 243

1    the first time?
2  A  I'm not sure. I mean, it would be -- the
3    next one I met with was Mr. Gauthier, but I
4    don't remember if it was before or after --
5  Q  The second meeting with Mr. Cleveland?
6  A  (Witness nods head up and down.)
7  Q  Okay. Well, then, tell me about your first
8    meeting with Mr. Cleveland.
9  A  I thought we did.
10 Q  I mean, excuse me, with Mr. Gauthier.
11 A  Oh, okay. He was very -- Well, he was
12   different. He wasn't as full of
13   personality as Mr. Cleveland was, but he
14   was -- this guy was from Louisiana he
15   said.
16     And he went through and looked and
17   measured and done all the structural stuff,
18   looked at all the stuff. And, actually, by
19   the time he'd gotten in there, we had
20   replaced some of the tiles and things
21   because it was so hot in there, insulation.
22 Q  Had you moved the equipment?
23 A  I think we had. I'm not sure. That was --

Page 244

1    I don't remember when it was that I went
2    and asked John about it because we had to
3    move stuff to clear out and do business.
4    That was -- That was when we moved it. I'm
5    not sure exactly when we did it.
6      It was between the time of -- the two
7    times I met with Kenny Cleveland, though,
8    is when we moved it because it wasn't there
9    the first time he was there.
10 Q  Okay.
11     MR. PEARSON: We'll take a break
12     here for a minute.
13     VIDEOGRAPHER: Going off the
14     record. This is the end of
15     tape five.
16     (Brief recess was taken.)
17     VIDEOGRAPHER: Back on the
18     record. This is the beginning
19     of tape six.
20 Q  During the break, Mr. Williamson, I found
21   the two checks that I was asking you about.
22 A  Okay.
23 Q  They were previously attached to the

Page 245

```
1    depositions by Pioneer, the depositions of
2    Mr. Tomberlin and Mr. Young.
3  A. Okay.
4  Q. It appears to me that you received a check
5    for the homeowners dwelling and other
6    structures from Auto-Owners in the amount
7    of $19,050.32.
8  A. Okay.
9  Q. Does that sound correct to you?
10 A. I guess. I think so.
11 Q. Don't guess. But, I mean --
12 A. Yes.
13 Q. -- looking at this document here, you don't
14   have any reason to dispute that?
15 A. No, sir. I mean, I agree. That's what I'm
16   saying. I don't remember the exact amount,
17   but I agree if that's what's on there.
18 Q. The second document I'm going to show you
19   is part of the same document. This is
20   claim payment 1-041216546, and it's in the
21   amount of $18,694.48 for dwelling,
22   homeowners personal property, correct?
23 A. Okay. Yes, sir.
```

Page 246

```
1  Q. And the other claim payment was the --
2  A. Is it the same number? Yeah. It's the
3    same.
4  Q. Well, the last number is different on them,
5    and the last number on the drafts are
6    different.
7  A. Okay.
8  Q. Do you see that?
9  A. Yes, sir.
10 Q. One is a draft that ends 45 for 19,050.32.
11   And the other one ends with 46, and the
12   amount of that one is $18,694.48, correct?
13 A. Yes, sir.
14 Q. Okay. So you were paid in excess of
15   $37,000 for your home claim, correct?
16 A. Yes, sir.
17 Q. All right. Now, going back to your next
18   meeting that you had after you submitted
19   the claim regarding your business, your
20   first meeting, the first meeting, as I
21   understand it, you took the claim
22   information over to South Central Agency.
23   You saw Mr. Tomberlin and Mr. Young and
```

Page 247

```
1    one of them said, you know, we've got lots
2    of claims, and you start taking care of
3    things to get back up and going, correct?
4  A. Yes, sir.
5  Q. All right. And then the next meeting you
6    had was someone from Auto-Owners regarding
7    Pioneer Telephone Services. Who was that
8    regarding Pioneer Telephone Services?
9  A. Oh, Pioneer? Well, Bill Reaves.
10 Q. Okay. And when was that that you spoke to
11   him?
12 A. This was after -- well after the
13   hurricane. It was after Kenny Cleveland
14   and Mr. Gauthier.
15 Q. Well, Mr. Gauthier, when we -- didn't you
16   tell me earlier that you saw Mr. Gauthier
17   regarding Pioneer Telephone Services?
18 A. Mr. Gauthier was the structural insurance.
19   That was regarding me, personally, because
20   I owned the buildings.
21     I owned the buildings personally. It's
22   James H. Williamson. Pioneer Telephone,
23   which I own Pioneer Telephone, which
```

Page 248

```
1    Pioneer Telephone was the contents because
2    they're renting from me.
3  Q. Did you have separate insurance policies
4    for the --
5  A. Yes, sir.
6  Q. -- for the structure and the contents of
7    Pioneer Telephone Services?
8  A. Yes, sir. Each tenant is required to have
9    insurance for their contents.
10 Q. Mr. Williamson, do you recall whether you
11   were paid for damage to the structure --
12 A. Yes, sir.
13 Q. -- at Pioneer Telephone Services?
14 A. Yes, sir. I was paid -- I was paid for the
15   damage for the buildings -- all of the
16   buildings, not for -- and then, of course,
17   some of the inside stuff.
18 Q. Do you remember what that payment was for?
19 A. No, sir.
20 Q. Do you remember who that payment was made
21   to?
22 A. I think -- Well, the structural had to be
23   made to me.
```

Page 253

1    at the Pioneer documents we had.
2         181 through 184 is one of them. That's
3    one of the documents I want you to look
4    at. And the other is 274, 275, and the
5    sequential pages following that.
6    A    There's 274.
7    Q    Yeah, I'm looking for the rest of it.
8         In any event, the documents that are
9    marked -- the page beginning AO274 and the
10   page beginning AO181, those are documents
11   you took to -- well, that you prepared
12   regarding the damage to the property at
13   Pioneer Telephone Services, aren't they?
14   A    Yes, sir. This was the contents.
15   Q    Okay. What I want to ask you about is, on
16   those contents, is that the first documents
17   you gave to anyone from the agency or
18   anyone regarding Auto-Owners Insurance or
19   gave to somebody else regarding your
20   contents claims?
21   A    The one that -- if this -- if this is it, I
22   mean, I'm sure I gave it to South Central
23   Agency. I walked it over.

Page 254

1    Q    Okay. When you say it, you mean both the
2    document AO274 and the document that starts
3    AO181, correct?
4    A    I guess so. I'm not -- I'm not sure if
5    both of them went the same -- I think, if
6    I'm not badly mistaken, I knew the
7    lightning stuff. And I don't think I -- I
8    may not have gone through the water
9    damage -- all of the water damage stuff yet
10   because we were so busy with other
11   customers.
12        Because I had to go through all this
13   because the stuff was in boxes. I did not
14   know exactly what was in it. But I do know
15   the lightning stuff went -- I believe went
16   first.
17        It's like I said, it's all so crazy, we
18   were so busy trying to take care of
19   everybody else.
20   Q    Well, what I want to know is when you
21   presented those documents there, I want to
22   know first of all, are those -- to your
23   recollection, are those the first documents

Page 255

1    you presented to Auto-Owners or somebody
2    else to get to Auto-Owners regarding
3    contents claims.
4    A    It looks like them. I would say, yes,
5    sir. I mean, I'm just -- I believe it is.
6    Q    We've talked about earlier some lightning
7    affidavits you did, but did you submit
8    those before or after those invoices?
9    A    Those were done -- We always try to do them
10   the same time when we do it.
11   Q    The document marked invoice, AO181, and the
12   document marked quotation, AO274, do you
13   know if you did those before, after, or at
14   the same time as the documents -- the
15   lightning affidavits?
16   A    I'm not sure. Sheila did it. Usually
17   as -- when we know we have -- or there's
18   going to be a claim involved, the affidavit
19   is actually done -- the item numbers is
20   actually done off of the invoice when -- we
21   try to keep everything the same.
22   Q    And do you know the date that you took
23   those items or the date you first took any

Page 256

1    item to South Central Agency regarding
2    contents?
3    A    No, sir, I don't -- I don't remember when I
4    did that.
5    Q    Was it on -- Was it on September 17th?
6    A    Oh, Lord, no.
7    Q    Okay.
8    A    All they -- All that we knew was we just
9    had a bunch of messed up stuff.
10   Q    So it was sometime a good while after that?
11   A    Well, it wasn't a good while. I would say
12   a couple of weeks, maybe a week and a
13   half. Because we -- I mean, like I said,
14   we had -- we had other customers, and we
15   operated the first -- first three or four
16   days, we operated off regular telephones,
17   not even a business system.
18   Q    Had you done it by the time you met with
19   Mr. Gauthier?
20   A    Oh, yes, sir.
21   Q    You had taken the list to Harold -- to
22   South Central Agency prior to that?
23   A    I believe we had. And if not, it might

Page 257

1　　have been right after   I know that I had
2　　told them that I was working on it, trying
3　　to get it, and they understood   They said
4　　they knew how it was
5　Q　And your best recollection is that it
6　　was -- is when in relation to September
7　　16th, 2004?
8　A　I'm just not sure   I mean-- I mean, if I
9　　was going to guess, what I'd say, three
10　　weeks, somewhere in there to be fair
11　　　　　MR. HALL: Don't guess
12　　　　　THE WITNESS: Okay
13　A　Well, I'm just not sure then
14　Q　Well, the two documents are dated   What is
15　　the date on these two documents marked
16　　AO181 and AO274?
17　A　October 29th, 2004
18　Q　Let me -- I'm going to show you the
19　　lightning affidavit   You did one, and
20　　then-- let me show you what was -- I
21　　previously think we've been over it maybe
22　　AO185, does this regard lightning or water
23　　here, these items?

Page 258

1　A　Water
2　Q　Okay   And there, you've listed -- I want
3　　to ask you about that   It's got a date
4　　on -- that you did something on the 20th of
5　　September   You're not maintaining you
6　　presented that to anybody on the 20th of
7　　September, are you?
8　A　No, this is when I done a list   I hadn't
9　　checked anything   Why, I mean --
10　Q　Is that the date you started looking at
11　　stuff --
12　A　Yes, sir
13　Q　-- and compiling it?
14　A　(Nods head up and down )
15　Q　But it was sometime well after that that
16　　you submitted it?
17　A　Right
18　Q　Okay   And would the -- would the documents
19　　that are marked AO181 and AO274 have been
20　　presented prior to that -- I mean, yeah,
21　　prior to you submitting that?
22　A　What we do, and this is -- I'm doing it
23　　like we do everybody else's   We try to

Page 259

1　　keep this date -- because we have looked at
2　　it, but we haven't fully examined   It's as
3　　close as we can to the actual date of the
4　　problem
5　Q　That you started looking at it?
6　A　Yes, sir
7　Q　Okay   And I guess what I'm getting at and
8　　what I'm asking you is, it was much
9　　closer -- it was probably October 29th,
10　　2004 when you presented this material to
11　　South Central Agency?
12　A　Again, I don't know   I mean, we've done --
13　　had to do this again   Got Sheila to -- The
14　　date could be wrong   I'm trying to
15　　remember
16　Q　You're welcome to look through any of these
17　　documents if you think something will help
18　　give you a better -- a better idea on that
19　A　I'll be glad to   I just don't know if
20　　　　I'm going to say, I mean, it's close,
21　　because I know we were so busy with
22　　everything else
23　Q　And when you say it was close, it's close

Page 260

1　　to somewhere around October 29th, 2004 when
2　　you presented that to South Central Agency?
3　A　I believe -- what I'm saying is the -- You
4　　know, we reported the claim to them   But,
5　　now, you know -- I'm not making myself
6　　clear still
7　　　　We reported the claim, of course, that
8　　day that it happened   But this may be when
9　　we actually got the figures to them, not
10　　actually the equipment   But this -- she
11　　may have done -- run this that day, typed
12　　it out where I had it done
13　Q　Well, that's what I'm asking you about is
14　　the day that you first submitted anything
15　　to Auto-Owners or to South Central Agency
16　　or Mr Gauthier or Mr Cleveland or anyone
17　　else that was looking at the claims
18　　regarding damaged contents at Pioneer
19　　Telephone Services
20　A　This -- when we done -- where is the
21　　Tel-Com? Let's see   Let's see   I think
22　　that we did this -- we done another with
23　　Pioneer when they -- Bill neglected

Page 261

1    Tel-Com's or somebody, Mr. -- what's his
2    supervisor's name? Bill's supervisor
3    Barrett?
4    Q  Billy Barrett?
5    A  Billy Barrett. But I just -- I don't
6    remember it being that late, us getting
7    that to it -- I mean, that's not late,
8    but -- considering everything we had
9    going.
10        But the 29th is the one I want to think
11   is when we got the Tel-Com one to him, when
12   they decided they wanted -- that it needed
13   to be looked at by -- you know, have --
14   Bill told me to put -- let anybody else
15   that I knew seen it. And this is when we
16   still had it. And we done Tel-Com's. We
17   put -- Mac said, yes, I've seen it and --
18   like I said, because he was there at that
19   time. He asked us to change the name on
20   it, and we did.
21        So that may be why the 29th is on this
22   one, also. And it could be that's the
23   first time we -- I mean, that I was able to

Page 262

1    actually get everything to them. But this
2    is definitely not -- I mean, this is not
3    the first time that they looked at it. I
4    don't believe.
5    Q  Well --
6    A  Like I say, I'm just not sure.
7            MR. HALL: Let him ask the
8        question.
9            THE WITNESS: Okay.
10   Q  We left off with -- I believe you stated
11   that Mr. Gauthier and you discussed
12   something about that he was looking at the
13   building structure and you said that he
14   said somebody else would look at the
15   contents. Is that what you're saying?
16   A  Yeah, he said he didn't have anything on
17   the content. What -- The insurance that I
18   had, the policy that he was taking care of
19   took care of structural damage.
20   Q  Do you know -- All right. Have you told me
21   about every conversation you had with
22   Mr. Gauthier?
23   A  To the best of my knowledge.

Page 263

1    Q  Is that the only time you met with him?
2    A  I believe so.
3    Q  All right. Tell me your next contact with
4        anyone regarding the claim after that
5        meeting.
6    A  I talked to John and Harold again.
7    Q  Okay. And what did y'all -- you and John
8        and Harold discuss?
9    A  Well, the content situation. I said, you
10       know, what do we -- that's what
11       Mr. Gauthier had told me. And it was, of
12       course, yeah, that's right. We do have
13       insurance for that with Pioneer.
14   Q  And you don't remember when that
15       conversation was?
16   A  No, sir. It was just after talking with
17       Mr. Gauthier.
18   Q  And you don't remember when that was?
19   A  (Shakes head from side to side.)
20   Q  I mean, do you even know the month that
21       these conversations took place?
22   A  October I would say. September, October,
23       the first -- no, the last of September, the

Page 264

1    first of October probably.
2    Q  Okay. And do you know if in this
3        conversation you had with Harold and John
4        at the last of September or the first of
5        October --
6    A  We had several conversations.
7    Q  Well, okay. I want to cover -- I mean,
8        when I'm asking you about these
9        conversations, I want to go in a sequential
10       order --
11   A  Okay.
12   Q  -- of every conversation that you had with
13       any adjuster or anybody at your agency or
14       anybody with Auto-Owners, and that's what
15       I'm trying to do. I'm having trouble
16       getting dates on it and getting them in
17       sequential order because you're having
18       trouble telling me any dates.
19           But what I want to know is, I started
20       out -- you took the claim form over there
21       right after the hurricane on, like, the
22       17th, the afternoon of the 17th, September
23       17th, 2004. Then you received a call

Page 269

1      And then Mr. Gauthier, you were
2  indicating he called you sometime before he
3  walked over --
4  A  No, I'm not sure. I mean, I talked -- I
5     know I talked to him one time on the phone,
6     but that could have been afterward.
7  Q  Okay. All right. Sometime the last week
8     of September or the first week of October,
9     you remember talking to Mr. Gauthier and
10    meeting with him at your office?
11 A  Yes, sir.
12 Q  All right. And then you stated that you
13    discussed that he didn't have anything on
14    the contents, so he was looking at the
15    structure? Is that what --
16 A  He told me that's what he was doing, was
17    looking at the structure, or the wind
18    damage, the water damage. And when I
19    proceeded to show him some things and -- he
20    showed me that he was doing the -- my --
21    the personal -- being -- because I owned
22    the building personally, he was doing that
23    policy.

Page 270

1  Q  So Pioneer Telephone Services, Inc. doesn't
2     even own this building?
3  A  No, sir.
4  Q  All right. And then -- then what was the
5     next contact you had after that meeting
6     with Mr. Gauthier?
7  A  I went and talked -- after that -- after
8     Mr. Gauthier --
9         I don't remember the time. I mean, it
10    was right after he and I had talked --
11        -- to ask John about, you know -- you
12    know, who I needed -- who was going to come
13    by or what was going to happen with the --
14    because Mr. Gauthier was doing the
15    structural part, that side of the
16    insurance, the personal side. And that's
17    when they told me they'd get that taken
18    care of.
19 Q  Okay. And that -- that conversation with
20    John or Harold was when?
21 A  It was after Mr. Gauthier. Just wasn't
22    long after. A day or that afternoon or the
23    next day.

Page 271

1  Q  Okay. Sometime around the first week of
2     October?
3  A  I guess. Right after Mr. Gauthier.
4  Q  You said the last week of September or the
5     first week of October, you met with
6     Mr. Gauthier.
7  A  Okay.
8  Q  And so then it would be sometime around
9     that same --
10 A  Okay.
11 Q  -- period of time?
12 A  Well, yes, sir. I mean, you're giving me
13    the dates. I just know the order I talked
14    to the people. I don't remember the dates.
15 Q  Well, I'm not trying to put any dates in
16    your --
17 A  Oh, I know. I know.
18 Q  All right. Then you saw John and Harold,
19    and they discussed it with you. You said
20    you had a contents claim, and they said,
21    you know, we'll get that going for you?
22 A  (Witness nods head up and down.)
23 Q  Is that correct?

Page 272

1  A  Yes, sir, best of my knowledge. I mean,
2     they're the ones that sent Bill over there.
3  Q  Okay. How long was it after that
4     conversation with John and Harold that Bill
5     came over there?
6  A  I'm not sure. Bill called me.
7  Q  Okay. How long was it after you had that
8     conversation with John and Harold that Bill
9     called you?
10 A  I'm not sure.
11 Q  Well.
12 A  It wasn't -- let me -- I got a call from
13    Bill, the first call, a lot quicker than I
14    did the other ones. I mean, Bill, he would
15    go for a while without contacting me. And
16    that is when the meetings -- when I started
17    going to John and Harold, calling them and
18    talking to them about, hey, when are we
19    going to get this going.
20        MR. HALL: Let him ask a question.
21 Q  Okay. But the first call you got from Bill
22    Reaves was sometime after the first week of
23    October?

Page 273

1   A   Yes, sir, I believe so.
2   Q   Do you know if it was after the second --
3       second week of October?
4   A   No, sir
5   Q   Do you know whether -- whether your first
6       conversation with Mr. Reaves regarding
7       contents or anyone with Auto-Owners
8       regarding contents was in November?
9   A   It was before then.
10  Q   Do you know how long before then?
11  A   I mean, I believe -- I believe it was
12      around the first week in October, second
13      week in October, I believe.
14  Q   Okay Do you recall when -- And then what
15      was the next contact you had with anyone
16      from Auto-Owners?
17  A   After I talked with Bill on the phone?
18  Q   Yeah First of all, before you tell me
19      about the next conversation, tell me what
20      took place in that first conversation
21      between you and Bill Reaves.
22  A   Not a whole lot I mean, he just didn't
23      talk much. He didn't respond much You

Page 274

1       know, he -- I hear you've got a claim I
2       said, yes, sir When was a good time? I
3       said anytime And I believe it was on a
4       Tuesday that he came
5   Q   And you're talking about actually came to
6       meet with you?
7   A   Yes, sir I think it was the following
8       week after I talked to him
9   Q   Okay Your recollection is that you met
10      with him approximately one -- after your
11      first conversation with Mr Reaves, you met
12      with him approximately one week later?
13  A   Yeah, somewhere in there, a week, two -- I
14      mean, I think it was earlier than a week
15      I mean, it wasn't long after he called
16      because he was ready to -- I think
17      something -- he come -- he came over to the
18      office every so often or something
19  Q   And your recollection was that the call
20      that you got from Bill Reaves was not that
21      long after you went over and discussed the
22      contents claim with John and Harold for the
23      first time?

Page 275

1   A   The Pioneer contents claim?
2   Q   Yes, sir
3   A   Yes, sir
4   Q   And then you told me not much went on in
5       that first conversation, but y'all --
6       apparently, you set up a time to meet
7       approximately a week later?
8   A   Yes, sir, somewhere -- from what I
9       remember, he said I'm going to be there
10      this Tuesday I don't remember exactly
11      when the call was, but he was trying to
12      schedule when he was down that way
13  Q   Okay And did you, in fact, meet at the
14      time that he said he would be down there
15      next?
16  A   Yes, sir
17  Q   And did you meet at the premises of Pioneer
18      Telephone Services?
19  A   No, sir He came to the office, and then
20      we went out to the -- to my shop at the
21      house
22  Q   To see the items that you had moved to that
23      shop?

Page 276

1   A   Yes, sir And I had it all, you know, laid
2       out for him
3   Q   And do you recall whether he took
4       photographs out there at that time?
5   A   Yes, sir
6   Q   He did?
7   A   Yes, sir
8   Q   And tell me again looking at these photos
9       which ones are pictures of items in your
10      shop
11  A   Here
12  Q   Hold on for me just a minute
13  A   Oh, I'm sorry
14  Q   One is at the bottom of AO213
15  A   All of the pictures on 213 All of the
16      pictures on 273 All of the pictures on
17      272, and the picture -- oh, the two
18      pictures at the bottom of page 271 It's
19      actually two pictures
20  Q   All right And all of those pictures that
21      you've pointed out to me now appear to have
22      a date stamp on the bottom of them of
23      11-16-2004, don't they?

Page 281

1    I had in the shop -- I'm talking about
2    other -- my other items than the
3    equipment.
4         And in a moment, he asked me was there
5    any salvageable parts. And I thought it
6    was very strange the way things were
7    going. Very few words. And then when he
8    asked me about salvageable parts, I told
9    him no, sir.
10        Do you want me to go on?
11   Q  I want to know every -- every conversation
12      that you and he had.
13   A  Okay.
14   Q  As far as what you noticed or this and that
15      and the other -- what I'm specifically
16      asking you about is the conversations, what
17      you said to him and what he said to you
18      during your meeting.
19   A  Okay.
20   Q  That's all I want to hear from you.
21   A  Okay.
22   Q  If you want to expand on it and say other
23      stuff -- I'm trying to give you leeway to

Page 282

1    do it because I'm not trying to cut you
2    off.
3    A  Okay.
4    Q  But my specific question is what he said to
5       you and what you said to him during your
6       meeting.
7    A  Okay.
8    Q  And that's all I want to know.
9    A  Okay. We -- After I stood there and
10      watched, he asked me was there any
11      salvageable parts. I told him that there
12      was none, that -- that I would not use it
13      for my customers because it had been
14      soaking wet and that it was going to
15      corrode because it was printed circuit
16      boards.
17        And, he said, I couldn't use it
18      anywhere? I said, no, sir. I said, I
19      mean, I can't, I said, because I've worked
20      too hard to build my reputation and the
21      company's reputation and, I said, I can't
22      use it.
23        And I offered to load it up, help him

Page 283

1    take it and load it up, and he said, no --
2    Q  Your entire shed of -- your entire shed of
3       equipment?
4    A  Well, the corner here. It was just this
5       corner.
6         That I'd be glad to do what I needed
7       to, that I needed the space. And he said
8       that, no, he didn't need to take it. And I
9       don't really remember if he -- I think he
10      said he would be back in touch, something
11      to that effect, and I never heard from him
12      again. I to the best of my knowledge, it was
13      only through John Tomberlin and Harold
14      Young.
15   Q  Okay. Have you told me everything that
16      took place and was discussed between you
17      and Mr. Reaves in that -- in that
18      conversation that you had at your first
19      meeting?
20   A  Let me think. Let me make sure I didn't
21      miss anything.
22        Yes, sir, I believe so.
23   Q  Okay. Did you meet with Mr. Reaves after

Page 284

1    that day?
2    A  No, sir.
3    Q  Did you talk with him on the phone after
4       that day?
5    A  I believe I talked to -- it was either him
6       or somebody in his office.
7    Q  Okay.
8    A  No. I talked -- I called his office. John
9       had gave me the number, but I dealt mainly
10      through John and him. He relayed messages
11      to John.
12   Q  Okay. Before we get to that, I want to ask
13      you the next contact you had with anyone
14      regarding your contents claim for Pioneer
15      Telephone Services after that meeting with
16      Bill Reaves that we've just discussed.
17   A  I don't remember any.
18   Q  Well, I thought you just said --
19   A  I mean, other than -- not with Bill.
20   Q  No, I'm asking with anybody. Anybody
21      regarding your contents claim after that
22      meeting with Bill Reaves, who was the next
23      discussion with?

Deposition of Jimmy Williamson                                    January 26, 2007

Page 293

1    A    Yes, sir
2    Q    Okay  And down there -- And what does it
3         say in the bottom left-hand corner of that
4         draft?
5    A    In payment of building damage
6    Q    All right  And what is the date of that
7         draft, Mr Williamson?
8    A    January 18th, 2005
9    Q    All right  Now, then, you -- we were
10        discussing, one, about the check was
11        being -- going to be -- or being processed
12        and then a conversation you had with John
13        where he said that Bill said there's a
14        problem and somebody else to look at it
15            And I believe you told me that the
16        conversation where Bill said there's a
17        problem, need somebody else to look at it
18        was before your conversation you said you
19        had with John about there being a check
20        processed
21    A    The only problem -- The problem I'm talking
22        about is the one where it had Pioneer -- to
23        Pioneer  He just said he wondered if there

Page 294

1         was anybody else I could put there  That
2         was the only problem that he saw  And when
3         I said that we had that, he said, okay, no
4         problem  He said, if you would, get that
5         done and get it sent
6    Q    Okay  And is that when you did the
7         lightning affidavits?
8    A    Well, the second one  We'd already done
9         the one for Pioneer
10   Q    The one for Pioneer -- Let me just get that
11        correct
12   A    Okay
13   Q    Is that the document that's marked AO185 to
14        190?
15   A    Yes, sir, I believe so
16   Q    And the second one is  The second one is
17        the one we discussed earlier today --
18   A    Here it is  Tel-Com
19   Q    That is pages AO132 and 133?
20   A    Yes, sir
21   Q    And that's what you submitted in response
22        to that conversation?
23   A    Yes, sir  He said all -- we just needed to

Page 295

1         change the name
2    Q    Well, who said that?
3    A    Bill  Bill told John, and John told me
4    Q    You didn't specifically have any
5         conversation with Bill about that?
6    A    No, sir
7    Q    You just heard there was a problem, that
8         Bill told John there was a problem and that
9         could somebody else look at it?
10   A    Uh-huh  (Positive response )
11   Q    Yes?
12   A    Yes, sir  Yes, sir  I'm sorry
13   Q    And so then what you submitted in response
14        to that was what's marked AO132 and 133,
15        which is this Tel-Com  States that it's a
16        lightning affidavit, and it's -- it's
17        signed K  Mac Bracewell, and you've already
18        testified earlier it was signed by Sheila
19   A    Yes, sir
20   Q    His name was signed by Sheila
21   A    Yes, sir
22   Q    All right  And Sheila being the woman that
23        worked for both you -- at that time worked

Page 296

1         for both you and for Tel-Com?
2    A    Yes, sir
3    Q    All right  Then what was the next
4         conversation you had after that?  And I
5         believe you -- because you got them out of
6         order, the next conversation was John and
7         you had a conversation that he said
8         something to the effect that he understood
9         a check was being processed
10   A    Uh-huh  (Positive response )  The first
11        one would be -- it was 21 -- I think it was
12        21,000 and something, something like that,
13        and that -- that everything was okay
14        Everything was being processed
15   Q    At that time, you hadn't received any check
16        from Auto-Owners, had you?
17   A    I'm not -- I may have got -- had one for
18        the home  I don't remember what the date
19        was on the house
20   Q    Well, what I'm talking about, at that time,
21        you hadn't received a check from
22        Auto-Owners for anything regarding Pioneer
23        Telephone Services' --

Page 301

1   A   Yes, sir, and none after that.
2   Q   Okay.
3   A   I mean, no -- no any other kind of
4       discussion.
5   Q   All right. At this time, did you still
6       have the equipment -- the contents
7       equipment in your shed at your house of
8       Pioneer Telephone Services?
9   A   I'm not sure.
10  Q   Did you --
11  A   I don't believe that I did because John had
12      told me -- because I was needing space for
13      Christmas, and John had told me that since
14      three adjusters had looked at it, taken
15      pictures of it, and none of them had told
16      them, had told me that I had to keep it,
17      that he didn't see a problem with throwing
18      it away because everybody else's claims had
19      been taken care of.
20  Q   And who told you this?
21  A   John Tomberlin.
22  Q   Okay. Well, I've asked you in detail every
23      conversation you had with them, and that's

Page 302

1       the first time I've heard anything about
2       that conversation, right?
3   A   I guess.
4   Q   Isn't that the first time in your
5       deposition I've heard anything about that
6       conversation?
7   A   I'm not sure.
8   Q   Okay. Well, in this list of conversations
9       you've told me, when did that conversation
10      take place?
11  A   I'm not sure. I'm not sure. It was before
12      Christmas. I do know. I do know. I do
13      remember.
14  Q   Okay. When was it?
15  A   It was when the check was being done. That
16      was -- it was right -- it was right during
17      then, because John said it had been cleared
18      or it was being processed, whatever you
19      call it.
20  Q   Okay. And is it your testimony here today
21      that -- Well, and tell me again what that
22      discussion was and who you had it with --
23  A   Which one?

Page 303

1   Q   The one about where you decided -- well,
2       when I asked you about the disposal of the
3       equipment and you told me about the
4       conversation you had --
5   A   With John?
6   Q   Yeah. Is that who it was with, with John?
7   A   Yes, sir.
8   Q   Okay.
9   A   Because I told him I needed the room. And
10      I asked what -- was Bill ever going to come
11      get it or what was they going to do with
12      it, did I need to throw it away, whatever.
13      And John, that's when he said that since
14      the adjusters had come, took pictures of
15      it, I had taken pictures of it and
16      everybody and -- and he said the check was
17      being done -- that's right. The best I
18      remember, that's when it was.
19  Q   And you were present at both John's and
20      Harold's deposition, weren't you?
21  A   Yes, sir.
22  Q   And you heard their testimony in those
23      depositions, didn't you?

Page 304

1   A   Yes, sir.
2   Q   And you understood that both of them
3       said -- it's my recollection is that one or
4       both of them said they didn't have any
5       conversation with you about the disposal of
6       the equipment until after you had already
7       disposed of it. Is that your basic
8       recollection?
9   A   I don't remember what they said, but I -- I
10      know Harold did a complete turnaround,
11      but.
12  Q   Well, is it your --
13  A   I remember John -- I mean, John telling
14      about the $21,000 check that was being
15      processed.
16  Q   And what I'm asking you is, did you discuss
17      the disposal of the equipment -- and when I
18      say equipment, the contents equipment of
19      Pioneer Telephone Services, did you discuss
20      disposing of that equipment prior to your
21      disposing of it?
22  A   Yes, sir.
23  Q   Okay. Tell me what that conversation was.

Page 305

1   A   That was it, the one with the check
2       being -- with John -- the check -- I mean,
3       what John was talking about was when I
4       called him when this Berry -- Dewberry or
5       whoever called me. I said, you know, I've
6       already thrown that stuff away. I mean,
7       what's he calling for?
8   Q   Okay. Is that when the conversation took
9       place that John and Harold told you that if
10      they've already looked at it, is that the
11      same --
12  A   No, sir.
13  Q   Was it after --
14  A   No, sir, that wasn't the same time. This
15      guy called, I believe, sometime in
16      December. I know when it was. It was
17      right -- it was the week before -- it was
18      the week before or during -- no, it was the
19      week -- the Wednesday or Thursday before
20      the kids were getting out for Christmas
21      holidays when this Dewberry guy called,
22      because I was at Andalusia High School
23      trying to get some security stuff taken

Page 306

1       care of before they left.
2   Q   Okay. Well, before we -- before we talk
3       about that conversation, I just want to
4       make sure we're staying in sequential order
5       as best -- as best we can.
6   A   Okay.
7   Q   You've gone back and told me that these
8       other conversations -- and you've made some
9       statements about those. I think the last
10      one we talked about, though, was you and --
11      you and John and Harold had a conversation
12      where Bill Reaves made some comment to them
13      to the effect that, excuse me, he had a
14      hard-on for you; is that correct?
15  A   No, no, no. They asked me -- John and
16      Harold asked me before the meeting even got
17      good and started why he had a hard-on for
18      me.
19  Q   If I indicated it differently, that is
20      my -- that's what I understood your
21      testimony to be.
22  A   Oh, okay.
23  Q   That they were asking you that --

Page 307

1   A   Yes, sir
2   Q   -- is that correct?
3   A   Yes, sir.
4   Q   Okay. Is that all that took place in that
5       conversation?
6   A   No, sir. That was when they proceeded to
7       tell me that Bill was trying to -- that
8       they didn't -- they did not understand what
9       Bill's problem was. But by the end of the
10      day, John had figured out that it was too
11      much money for him to handle, and he had
12      been sitting on it. It was more money than
13      he was authorized to fool with. And I told
14      him that's not -- you know, of course, that
15      wasn't my problem.
16  Q   And you don't know when that conversation
17      was?
18  A   No, sir.
19  Q   All right. All right. Then tell me what
20      the next conversation you had with anyone
21      was, anyone regarding the contents and
22      property of Pioneer Telephone Services.
23  A   I don't -- Other than that phone call, I

Page 308

1       don't remember anything other than getting
2       a letter after I had told John -- you know,
3       after when the Dewberry guy called me.
4   Q   Okay. So the next contact, then, that you
5       had after that conversation with John and
6       Harold, anyone regarding the contents or
7       equipment of Pioneer Telephone Services,
8       was a call you received from Larry
9       Dewberry?
10  A   Yes, sir, I believe so. I mean, I talked
11      to them I don't know how many times, but
12      in -- seeing each other out on the porch or
13      the deck, casual conversation, and, of
14      course, them not understanding why Bill was
15      having a problem with this, what the
16      problem -- the thing was and that he should
17      have never held on to it. If he didn't --
18      If he knew he didn't have the authority to
19      fool with it, he shouldn't have kept it.
20      He should have, you know, sent it on up.
21      And that's -- Then I get the letter later
22      on.
23  Q   Okay. Well, first, though, let me -- I

Page 309

1  want to ask you  The conversation with
2  Larry Dewberry took place prior to that,
3  did it not, or did it?  Do you know?
4  A  No, sir  I just know that it was the
5  week -- the Wednesday or Thursday of --
6  before the kids got out for Christmas
7  break
8  Q  That's when you spoke to Larry Dewberry?
9  A  If I'm not badly mistaken
10 Q  And tell me about -- Tell me what the
11 substance of that conversation was
12 A  He told me who he was and caught me
13 offguard  I didn't know anybody was going
14 to be calling  And said that he was
15 being -- was wanting -- had been assigned
16 or whatever to check it, to check out the
17 equipment  And that's when I told him, I
18 said, I've already been told I could
19 dispose of the equipment, that it was gone,
20 and that was it
21 Q  Okay  Did he say anything else to you?
22 A  No, sir  And then I -- not -- I mean,
23 nothing to any substance if he did  But he

Page 310

1  said, well, okay -- oh, no  He said, well,
2  okay  I guess if it's not there, I
3  can't -- and then --
4        MR. HALL:  Just answer his
5        question
6        THE WITNESS:  Okay
7  Q  Well, I think that is part of the
8  question  What I wanted to know was
9  everything that you said and he said in
10 your conversation with him
11 A  That was it  Yes, sir  I mean --
12 Q  Anything else?
13 A  No, sir  We hung up  Then I called John
14 Q  Okay  That's the next conversation you
15 had  But, again, you don't know the date
16 except that you believe this is sometime
17 about a week before Christmas holidays?
18 A  During the week, I think, yes, sir, I was
19 somewhere -- I just know I was at -- I was
20 at Andalusia High School  I just remember
21 that  I was out there looking at some
22 things outside and it was late  I mean,
23 when I say late, it was almost quitting

Page 311

1  time
2  Q  When you got the call from Dewberry or when
3  you called John --
4  A  At the same time, same thing  I turned
5  right around and called John and said,
6  what's going on?
7  Q  Okay  And you've told me everything about
8  the conversation with Mr Dewberry  So now
9  tell me everything about the conversation
10 with John that you had right after that
11 A  John was shocked  He said, do what?  And I
12 said, this is -- some Berry guy called me
13 And he proceeded to -- about this was
14 ridiculous, and it was the same kind of
15 conversations we'd had before  He couldn't
16 believe what was going on and they'd taken
17 care of everything else and that, you know,
18 this Bill must have called the guy or
19 something, trying to see what he could do
20        And that was basically it  And John
21 was supposed to check in on it, check in
22 and see
23 Q  Okay  Is that everything that transpired

Page 312

1  in that conversation?
2  A  Yes, sir, as far as I can remember
3  Q  And what's the next communication or
4  conversation you had with anyone regarding
5  the contents or claim of Pioneer Telephone
6  Services?
7  A  I don't remember if it was ever any
8  formal -- I mean, we just -- they -- John
9  contacted Bill, and that was when Bill told
10 him he was sending it up again  And he --
11 Of course, Bill threatened again  He
12 wanted -- He was trying to do everything I
13 [sic] could for me to drop it
14 Q  And this is a conversation you're having
15 with who?
16 A  John Tomberlin
17 Q  And John Tomberlin told you that?
18 A  Yes, sir
19 Q  That Bill said that?
20 A  Yes, sir
21 Q  Or that was John's interpretation of what
22 Bill said?
23 A  No  John told me that Bill told him

Page 317

1　　acknowledge you received that letter?
2　A　There's some of it I remember. I don't --
3　　See, I don't actually remember if I saw it
4　　or if I was -- they told me. I don't know
5　　if it actually came to them or to me is
6　　what I'm saying.
7　Q　Well, the letter is addressed to you, isn't
8　　it?
9　A　Right. Yes, sir. Uh-huh. (Positive
10　　response.)
11　Q　And I'm going to represent to you that your
12　　lawyer has produced this to me in this
13　　case. I'm not sure where he would say that
14　　he obtained it from.
15　A　Okay.
16　Q　He's produced it to me in this case.
17　A　Okay. The one that just sticks out in my
18　　mind is -- the one that I remember is the
19　　one where they were -- came up with the
20　　excuses about rejecting it.
21　Q　And I'm going to ask you about that.
22　A　Okay.
23　Q　I'm just trying to go in sequential order,

Page 318

1　　Mr. Williamson.
2　A　Okay.
3　Q　We're going to get to that.
4　A　Okay.
5　Q　And you believe this was prior to -- You
6　　told me about the conversation you had with
7　　John about where Bill asked if there was --
8　　there was -- that there was a problem and
9　　could somebody else look at it, and you
10　　believe that this letter was received by
11　　you sometime around that time?
12　A　Yes, sir, to the best of my knowledge.
13　　Can I read the first part?
14　　　　MR. HALL: Joel, how much more
15　　　have you got?
16　　　　MR. PEARSON: Off the record.
17　　　(Off-the-record discussion.)
18　　　　VIDEOGRAPHER: Back on the record.
19　Q　All right. Mr. Williamson, we were just
20　　talking about your communications with
21　　Auto-Owners and the sequence of them.
22　　Do you remember what the next
23　　communication you had with anyone regarding

Page 319

1　　your claim, Pioneer Telephone Services'
2　　claim for damage to its contents?
3　A　No, sir, just chitchat about me
4　　wondering -- me trying to get in touch
5　　with -- I mean, I was trying to contact
6　　Bill, and that's -- and I told John, I
7　　mean, in person -- you know, we'd see each
8　　other -- that he still hadn't called me
9　　back.
10　Q　Okay. And did I understand you to say that
11　　you don't think you discussed the claim
12　　with Bill Reaves after the date that you
13　　and he met in his shed?
14　A　No, sir, I don't believe so. I think all
15　　we did was, one of those conversations,
16　　Bill -- John called Bill on the phone while
17　　I was sitting there in their office and --
18　　and getting this information, that's --
19　Q　Well, that's a new -- that's a different
20　　conversation. I want to -- If you were
21　　there and you heard Bill Reaves say
22　　something --
23　A　No, sir, I didn't hear him. No. He was on

Page 320

1　　the phone. John had -- John went out and
2　　called him on the phone while I was there.
3　Q　Okay. In that conversation, what did you
4　　understand Bill Reaves to be saying?
5　A　That he had -- was sending it up because it
6　　was too much for him to handle.
7　Q　All right. And then is the next
8　　communication you had after that the --
9　　You did receive a check for the
10　　building structure of Pioneer, didn't you?
11　A　Yes, sir.
12　Q　Okay. And we've been over that earlier,
13　　correct?
14　A　Yes, sir.
15　Q　All right. And that check, then, that you
16　　received, there's a check that you received
17　　dated 1-18-2005 for $11,607.92, isn't it?
18　A　Yes, sir, building damage.
19　Q　Okay. All right. Is that the only check
20　　that you received from Auto-Owners
21　　regarding the building or contents --
22　A　Yes, sir.
23　Q　-- for Pioneer Telephone Services?

Page 333

1    you  Like in particular the phone system,
2    I believe you told me that was from Hi-Line
3    or --
4  A  Yes, sir
5  Q  Is that right?
6  A  Yes, sir, the stuff at the office  I mean,
7    a lot of the stuff at the house I, you
8    know, purchased on my own
9  Q  Are there any other major customers of
10    Pioneer Telephone Services that you haven't
11    told me about today, any big customers like
12    hospitals or schools or -- I don't remember
13    you mentioning hospitals, but I said
14    schools -- schools or --
15  A  We have a lot of doctors' offices and
16    lawyers' offices
17  Q  Do you do any bigger things like hospitals
18    or --
19  A  Well, we've done motels and things like
20    that  We've been asked, but, I mean, I --
21    I really don't want to get into those
22    things if I don't have -- I mean, not with
23    you  I mean, I'm talking about have to

Page 334

1    service those kind of things if we don't
2    have to
3  Q  But to your knowledge, y'all don't have
4    anything like that?
5  A  We have before, but we just try to stay
6    away from it if we can  And I'm sure when
7    we get through I'll remember one, but I
8    can't remember one right now
9  Q  Well, I guess I'd like to know what big
10    commercial accounts -- big commercial
11    accounts that you may have had before  I
12    mean, because what I'm taking it is,
13    this -- this equipment here, most of this
14    was inventory for large customers, wasn't
15    it? Is that what this is for?
16  A  No, sir, not necessarily  For small
17    customers, too.
18  Q  Okay  And so any of this equipment you
19    could use for small or large customers?
20  A  Yes, sir, for the most part  Now, like the
21    Mytel pictures y'all saw, that would be a
22    bigger customer, too  But the Northern
23    Tel-Com goes big, too  It will go on up

Page 335

1    there.
2       We always keep that -- Anything we
3    sell, we always keep a spare or more,
4    one -- at least one, if not more  It's
5    according to how many we have out in the
6    field so we can take care of people
7  Q  Do you keep records of what you sold to a
8    particular customer? I mean, does the
9    business --
10  A  Oh, yes, sir
11  Q  -- Pioneer Telephone Services keep --
12  A  Yes, sir
13  Q  So for any school or any customer, you
14    would know what you sold to them?
15  A  Yes, sir  Should
16  Q  Have you ever -- Have you ever been
17    arrested or convicted of a felony?
18  A  No, sir
19  Q  Have you ever been arrested for anything?
20  A  No, sir
21  Q  If I didn't get it clear -- How did you
22    dispose of the property that we're talking
23    about today?

Page 336

1  A  In hoboes
2  Q  Do you mean like a dumpster?
3  A  Yes, sir  I'm sorry
4       I mean, what we did, there was so much
5    of it that -- because we have two hoboes
6    We just put in what we could and --
7  Q  And we meaning you and your staff, would be
8    Sheila or Jeff?
9  A  Well, basically, me and Jeff did it, I
10    mean  I mean, and Jeff did for the most
11    part, he and -- oh, I can't -- it might
12    have been Ben  I can't remember  Because
13    when I was given the okay, that was what we
14    got -- went and got it on the trailer
15  Q  Now, I'm finishing up in just the last
16    minute or so
17       We talked a lot about your looking at
18    the equipment and stuff, but I want to know
19    what specific testing or anything you did
20    You mentioned voltmeters  Did you actually
21    attach voltmeters to any of this equipment?
22  A  Yes, sir
23  Q  What other -- What other testing did you do

Page 345

1      REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    MONTGOMERY COUNTY:
4        I, Lisa J Nix, Registered Professional
5    Reporter and Commissioner for the State of Alabama
6    at Large, do hereby certify that I reported the
7    deposition of:
8        JIMMY WILLIAMSON
9    who was first duly sworn by me to speak the truth,
10   the whole truth and nothing but the truth, in the
11   matter of:
12       PIONEER SERVICES, INC ,
13       Plaintiff,
14       Vs
15       AUTO-OWNERS INSURANCE COMPANY, INC ,
16       et al ,
17       Defendant
18       In The U S  District Court
19       For the Middle District of Alabama
20       Northern Division
21       Case Number 2:06CV377-WKW
22   on Friday, January 26, 2007
23       The foregoing 344 computer printed pages

Page 346

1    contain a true and correct transcript of the
2    examination of said witness by counsel for the
3    parties set out herein  The reading and signing of
4    same is hereby waived
5        I further certify that I am neither of kin
6    nor of counsel to the parties to said cause nor in
7    any manner interested in the results thereof
8        This 21st day of February 2007
9
10
11       _____
         Lisa J Nix, Registered
12       Professional Reporter and
         Commissioner for the State
13       of Alabama at Large
14
15
16
17
18
19
20
21
22
23