# EXHIBIT "B"

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE FEDERAL COURT OF
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06CV 377-WKW

PIONEER SERVICES, INC,
    Plaintiff,
vs
AUTO OWNERS INSURANCE
COMPANY,
    Defendant.

VIDEOTAPE DEPOSITION TESTIMONY OF:
BILL REAVES

January 25, 2007
10 a.m.

COURT REPORTER:
APRIL R. BENDINGER, CSR

Page 2

1  STIPULATION
2  IT IS STIPULATED AND AGREED by and
3  between the parties through their respective
4  counsel that the deposition of BILL REAVES may
5  be taken before April R. Bendinger, Notary
6  Public, State at Large, at the Law Offices of
7  Morrow, Romine & Pearson, 122 South Hull Street,
8  Montgomery, Alabama 36103, on January 25, 2007,
9  commencing at approximately 10 a.m.
10  IT IS FURTHER STIPULATED AND AGREED
11  that the signature to and the reading of the
12  deposition by the witness is waived, the
13  deposition to have the same force and effect as
14  if full compliance had been had with all laws
15  and rules of Court relating to the taking of
16  depositions.
17  IT IS FURTHER STIPULATED AND AGREED
18  that it shall not be necessary for any
19  objections to be made by counsel to any
20  questions, except as to form or leading
21  questions and that counsel for the parties may
22  make objections and assign grounds at the time
23  of trial or at the time said depositions is

Page 3

1  offered in evidence, or prior thereto.
2  In accordance with Rule 5(d) of the
3  Alabama Rules of Civil Procedure, as amended,
4  effective May 15, 1988, I, April R. Bendinger,
5  am hereby delivering to MR. HARRY HALL the
6  original transcript of the oral testimony taken
7  January 25, 2007, along with exhibits.
8  Please be advised that this is the same
9  and not retained by the Court Reporter, nor
10  filed with the Court.

Page 4

INDEX

EXAMINATION BY:                PAGE
Mr Hall                         25
Certificate                    280

INDEX OF EXHIBITS

PX-10   (File)                  55

1 (Pages 1 to 4)

Page 21

1  nature of the objection under Rule 28(b), and I
2  note that your objection is being made on the
3  record before the commencement of the
4  deposition. And under Rule 30(c), I overrule
5  the objection at this time that you've already
6  noted on the record your objection to the
7  qualifications of the person doing the video
8  deposition, and the deposition will proceed as
9  Mr. Hall intends to pursue that this morning.
10  And, of course, Judge Watkins will rule on the
11  final admissibility or not of the videotape
12  should this matter get to trial.
13      MR. PEARSON: So as far as the
14  manner in which it's being videoed, just so it's
15  on the record, as far as objection to the
16  videoing of it, I've protected the record for
17  that and I don't need to make any ongoing
18  objection as to the videography of it?
19      THE COURT: That's correct.
20  That's why we ask that the court reporter take
21  these proceedings down was to make sure that
22  they were part of the record in this case. You
23  made your objection. I've overruled it on the

Page 22

1  basis of 30(c,) and we will proceed. But the
2  ultimate admissibility of it is another matter
3  that will be passed on to Judge Watkins should
4  this matter arise at the level that it goes to
5  trial.
6      MR. HALL: Judge, this is Harry
7  Hall. We have other depositions coming up. One
8  after this one this morning, and others in the
9  future. Do you have any instructions for us as
10  to future objections and how Mr. Pearson may
11  preserve his rights on each one of those? I am
12  certain he will be anxious to do that.
13      THE COURT: If there are other
14  objections along this same line, rather than
15  having to call me into the situation -- and I am
16  not scolding either of you. You're trying to
17  represent your parties as best you can. But in
18  the future if you have objections in this
19  particular case along the same lines, just go
20  ahead and note your objection before you begin
21  the deposition, have it recorded, and that will
22  just be the standing rule of this particular
23  case in regards to this same type of instance.

Page 23

1      MR. HALL: Thank you, Your honor.
2      THE COURT: You're welcome.
3      MR. PEARSON: Thank you, Judge.
4
5  (End of telephone conversation.)
6
7      VIDEOGRAPHER: This is the
8  beginning of disk one of the deposition of Bill
9  Reaves on January 25, 2007. I'd like everyone
10  here to identify themselves. My name is Harry
11  Hall, I represent the plaintiff.
12      MR. PEARSON: I'm Joel Pearson, I
13  represent the defendant, Auto Owners Insurance
14  Company. Just so the video shows some brief
15  record of -- there have been proceedings on the
16  stenographic record immediately preceeding the
17  turning on of this video that are part of the
18  deposition as well.
19      MR. HALL: That's true. We had
20  about a 20-minute session or less with Judge
21  Moorer that's not a part of the video record
22  because it has objections to the form of this
23  deposition going forward. So this record -- the

Page 24

1  video record is going to begin after the
2  stenographic record, but before any testimony
3  from the deponent has begun; is that a fair
4  statement?
5      MR. PEARSON: Yes. So what's on
6  the stenographic record is incorporated into the
7  deposition.
8      MR. HALL: And I'll stipulate the
9  stenographic record is the record of the
10  deposition. The video is in addition.
11  Mr. Reaves --
12      THE WITNESS: I'm Bill Reaves with
13  Auto Owners Insurance.
14      COURT REPORTER: April Bendinger,
15  court reporter with American Court Reporting.
16      MR. HALL: Usual stipulations?
17      MR. PEARSON: Yes.
18
19      BILL REAVES,
20  first being duly sworn, was examined and
21  testified as follows:
22
23  EXAMINATION BY MR. HALL:

6 (Pages 21 to 24)

American Court Reporting
toll-free (877) 320-1050

Page 157

1  A  Eight, maybe ten hours.
2  Q  Any damage to your house?
3  A  No
4  Q  Do you recall how many claims you
5  had come in as a result of Ivan?
6  A  No, I do not
7  Q  Was it more than 100?
8  A  There were thousands of claim that
9  came in
10  Q  For territory four?
11  A.  The claims aren't assigned to a
12  specific territory during a storm situation.
13  Q  I guess what I'm asking: Within
14  territory four, do you have an idea of how many
15  claims were made for damages from Ivan?
16  A  Hundreds.
17  Q  How do they get assigned out under
18  a situation where you've got that many claims
19  coming in? Is it any different than the normal
20  way they get assigned to you?
21  A  They're assigned to an independent
22  adjuster. A DO inspects the damages.
23  Q  How are those independent

Page 158

1  adjusters selected?
2  A  It's usually predetermined that a
3  certain adjuster -- adjusting firm will handle a
4  certain county or a certain territory
5  Q  They get contacted right after the
6  storm, I assume; is that right?
7  A  Yes.
8  Q  In our depositions we took earlier
9  this month, South Central Agency described a
10  packet of loss claim forms that are sent
11  prepared to them with all of their insureds'
12  names and information on them. Are you familiar
13  with that practice?
14  A  It's called a preprinted loss
15  notice
16  Q  And the preprinted loss notice --
17  are you involved in getting those to the agents
18  in your territory?
19  A  No, I'm not
20  Q  Does it happen automatically?
21  A  It's done at corporate
22  Q  Do you help process those in any
23  way?

Page 159

1  A  The loss notices?
2  Q  Yes, sir
3  A  Yes
4  Q  How? What do you do?
5  A  When they're returned to us and a
6  claim is being made, we review the claim,
7  determine which adjuster -- adjusting firm it's
8  assigned to, and put a reserve and open the
9  coverages
10  Q  Okay. Are the claims somehow
11  tracked by your territory? Is there a way to
12  see how many came out of a county or a territory
13  or a given area?
14  A  I don't know if there is or not
15  I don't know.
16  Q  Are the claim numbers that are
17  assigned -- is there a formula for how that
18  claim number is assigned? Does one part of it
19  mean territory four, one part means what year it
20  came in or something like that?
21  A  The last digits on the claim
22  number indicate the year that the claim was
23  reported

Page 160

1  Q  Turn over to the front of Exhibit
2  10 for me. And that would be that dash 04;
3  right?
4  A  That's correct
5  Q  Okay. The rest of the numbers, do
6  they mean anything to you?
7  A  37 is the branch number, which is
8  the Montgomery branch
9  Q  What about the 4873?
10  A  That's the claim -- the internal
11  guts of the claim number
12  Q  Is that sequential? Do those go
13  in order?
14  A  They're in order
15  Q  So that's the 4,873rd claim for
16  areas 37 in the year 2004?
17  A  That's correct
18  Q  Okay. Thank you.
19  MR. PEARSON: Let me put something
20  on the record. I think that actual page is Bate
21  stamped AO 72. Just for the record, it's not an
22  Auto Owners page, but a page run by my
23  secretary.

40 (Pages 157 to 160)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1   Q   Okay. How did you find out about
2   Pioneer's claim?
3   A   I was in the agent's office and
4   was given a stack of paperwork that they advised
5   that Mr. Williamson had dropped off.
6   Q   When you say Mr. Williamson,
7   you're talking about Jimmy Williamson?
8   A   That's correct.
9   Q   He's the owner of Pioneer
10  Services; correct?
11  A   That's my understanding.
12  Q   And you dealt with him personally,
13  didn't you?
14  A   I did.
15  Q   So if we say Mr. Williamson, we're
16  talking about Jimmy Williamson; right?
17  A   That's correct.
18  Q   Do you recall what day you were in
19  the South Central Agency and you got these
20  papers?
21  A   November 8, 2004.
22  Q   Okay. Do you recall when the --
23  let me see that stack.

Page 166

1         MR. PEARSON:  If you're at a
2   breaking point while you're shifting gears, I
3   need to make another call here in a few minutes.
4         MR. HALL:  We've got about 20
5   minutes left on this.  You want to take a break
6   right now and let me find mine because we're
7   about to do some details on this.  We'll stop
8   now.  We're going off the record.
9
10            2:15 p.m.
11           (Off the record)
12            2:19 p.m.
13
14         MR. HALL:  We're back onto disk 3
15  of Bill Reaves' deposition of January 25, 2007.
16  Q   (BY MR. HALL) Mr. Reaves, let me
17  get you to look at two pages out of Plaintiff's
18  Exhibit 10 that are AO 113 and AO 114.  What are
19  those documents, please?
20  A   It's a loss notice.
21  Q   Is that the preprinted loss notice
22  you were telling me about before?
23  A   That's correct.

Page 167

1   Q   What claim is that for?
2   A   It's for Pioneer Telephone
3   Services.
4   Q   Who filled that out?
5   A   Which part?
6   Q   Well, tell me how it got filled
7   out.  That's what I'm asking you.
8   A   The typed print on the page is
9   preprinted in -- at our home office.
10  Q   That's a part of what's sent out
11  to the agents?
12  A   That's correct.
13  Q   And the rest of it?
14  A   The rest of it appears to be
15  filled out by Ashley Sasser.
16  Q   Do you know who Ashley Sasser is?
17  A   Yes.
18  Q   Who is Ashley Sasser?
19  A   She was a lady that worked at
20  South Central Agency.
21  Q   So a representative of the agent
22  filled this out for Pioneer?
23  A   That's correct.

Page 168

1   Q   Where did she send it?
2   A   It would have been sent to Auto
3   Owners in Montgomery.
4   Q   There is -- across the top of it,
5   it looks like what I call a fax track.  It says
6   September 17, 2004, 10:20 a.m., HP Laser Jet
7   3200, Page 3.  Do you see that?
8   A   That's what it says.
9   Q   Look on the second page of the
10  document.  That says Page Four.  Do those seem
11  to have gone on September 7, 2004?
12  A   I don't know if they did or not.
13  Q   Well, have you ever seen fax track
14  like that set across there?
15  A   Yes, I have.
16  Q   Is that common for Auto Owners fax
17  machine to tab that on incoming documents?
18  A   I have seen faxes come in with
19  that.
20  Q   Well, would you -- does Ashley
21  have a date that she signed it?
22  A   September 17, 2004.
23  Q   Is that the same as that date

42 (Pages 165 to 168)

Page 173

1  fairly shortly to GAB Robbins, what happened
2  next?
3      A     We'd have to look at their report
4  to see what happened after they received the
5  claim
6      Q     Do you know Phillip Gauthier?
7      A     No, I don't know him
8      Q     Have you ever met him?
9      A     Never met him
10     Q     Are you aware of him submitting a
11 report or an estimate for damage in this case?
12     A     Yes, I am
13     Q     Did you see that before it was
14 paid in this case?
15     A     Yes, I did
16     Q     I have opened Exhibit 10 to AO 149
17 through AO -- be sure I got the last page right,
18 I want to say 176. Will you look at 149 through
19 176 and see if that's everything that GAB
20 Robbins would have sent up? And I say sent up,
21 would have done on this -- generated on this
22 file
23     A     That wasn't sent up here with it

Page 174

1      Q     That's 166; is that correct?
2      A     That's correct  Everything but
3  that one document appears to be what was sent to
4  us
5      Q     Does this come to you or to
6  someone else? When GAB submits their report and
7  estimate, does that go to you or to someone
8  else?
9      A     I think at the point it was sent
10 in, it was sent to me
11     Q     Did you send it to somebody else?
12     A     Send what? The --
13     Q     Let me ask it a different way
14 GAB did an investigation; is that correct?
15     A     That's correct
16     Q     And prepared the documents from
17 Page AO 149 through 176 with the exception of
18 166, which is a letter that they did not write,
19 that I think you wrote  GAB prepared these
20 documents; right?
21     A     That's correct
22     Q     Do you know when these
23 documents -- or what -- do you want to explain

Page 175

1  to me maybe what these consist of so we can
2  refer to them in your terms?
3      A     It is a copy of their estimate for
4  damages to the property at Pioneer Telephone
5      Q     And what's the date of that
6  estimate?
7      A     The date it was written?
8      Q     Yes, sir  Look at the bottom --
9      A     December 5, 2004
10     Q     Okay  Is that the only date for
11 any of the estimates that were prepared by GAB
12 Robbins?
13     A     Is that the only -- clarify that
14     Q     I'm trying to understand the order
15 or sequence that GAB Robbins handled this
16 claim  I know that we've got a report on
17 December 5, 2004 with estimates and what they
18 said was owed or what the value of the claim
19 was; is that fair?
20     A     That's correct
21     Q     Other than that, what other things
22 did they do on which dates? For instance,
23 there's a September 25th date under a lot of the

Page 176

1  photographs  Do you know if that's the date
2  that the adjuster for GAB was out taking
3  pictures, or was there another report dated
4  September 25?
5      A     I don't know if that may be the
6  day that the pictures were printed
7      Q     I need to ask GAB what that date
8  was?
9      A     Yeah  I can't say exactly what
10 that date is
11     Q     Do you know what else on these
12 documents would tell you about what activity
13 took place based on GAB Robbins activity  And
14 that was a horrible question  Strike that
15 Do the documents in front of you show you
16 any other activity on GAB Robbins part?
17     A     Yes
18     Q     What other activity?
19     A     The dates on here that -- they say
20 they were given the assignment on September 20,
21 2004  They contacted the insured on September
22 21, 2004, and they indicate they inspected the
23 loss on September 23, 2004.

44 (Pages 173 to 176)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 181

1  Q. They went -- the only thing
2  reflected in these documents you're looking at
3  now is GAB Robbins adjusting the building
4  damage; is that true?
5  A. That's correct.
6  Q. All right. What you're telling me
7  is you don't know whether Pioneer Services ever
8  told GAB Robbins about the contents claim?
9  A. I don't know.
10 Q. Who would know? Mr. Gauthier?
11 A. Mr. Gauthier or Mr. Williamson
12 would probably know the answer to that.
13 Q. So what happened as a result of
14 the report provided on December 5, 2004 by GAB
15 Robbins concerning the building claim?
16 A. We sent a letter to Mr. Williamson
17 advising him that we had received the estimate
18 and would look to discuss the claim with him.
19 Q. Is that letter included in Exhibit
20 10?
21 A. Should be.
22 Q. Let's find that real quick.
23 A. Right here.

Page 182

1  Q. Let's put GAB Robbins back
2  together, and put it over here. You're
3  discussing, I believe, two pages of a letter
4  that are numbers 178 and 179; is that true?
5  A. That's correct.
6  Q. All right. That's a letter from
7  you; is that correct?
8  A. Yes, it is.
9  Q. And it's addressing the property
10 damage claim?
11 A. Yes, it is.
12 Q. Does it also address the contents
13 claim?
14 A. Yes, it does.
15 Q. Let's back up a little bit. Can
16 you tell me what involvement you had in Pioneer
17 Services' claim prior to the letter that's dated
18 December 20, 2004?
19 A. I received notice of a contents
20 claim on November 8, 2004.
21 Q. All right. How do you recall
22 November 8th? Is there something that happened
23 on that day specifically that you remember?

Page 183

1  A. I was in Andalusia that day.
2  Q. All right. How did you receive
3  notice of this claim?
4  A. I was in the agent's office.
5  Q. And?
6  A. They handed me a stack of papers
7  that Jimmy Williamson had presented to them.
8  Q. What were those papers?
9  A. It was a lightning affidavit and
10 some invoices and a water affidavit.
11 Q. Who made out those affidavits? Do
12 you recall?
13 A. Jimmy Williamson signed them. I
14 don't know who prepared them.
15 Q. So on November 8th, you -- let me
16 see this back. Let me show you some documents
17 out of Exhibit 10. They are AO 181 through
18 194. Take a look at that those for me.
19 A. Okay.
20 Q. All right. Are those the
21 documents that you were handed on November 8,
22 2004?
23 A. I believe they were.

Page 184

1  Q. All right. And let me be sure I
2  understand the nature of these. The first
3  document is a four-page document that says,
4  invoice, and it's dated October 29, 2004. It
5  has a list of equipment and it starts off with,
6  equipment in warehouse water damaged by Ivan
7  storm. Does that seem like it's one document?
8  A. It appears to be.
9  Q. All right. What do you consider
10 that document to be?
11 A. It appears to be an invoice where
12 Pioneer Telephone Services sold themselves some
13 equipment.
14 Q. Is it an estimate for damaged
15 equipment?
16 A. It says it's an invoice.
17 Q. Okay. Well, is that as far as you
18 looked is that top line on the left-hand side --
19 or right-hand side?
20 A. No.
21 Q. What did you do with that
22 document? What did you take it to be when you
23 got it?

46 (Pages 181 to 184)

Page 185

1    A    I thought he was probably taking
2    this invoice and wanting to make it an estimate
3    Q    Did you talk to anybody about
4    that?
5    A    I did
6    Q    Who did you talk to about that?
7    A    Jimmy Williamson.
8    Q    What did you tell Jimmy Williamson
9    and when?
10   A    I believe the date was November
11   15th
12   Q    Okay  About a weak later?
13   A    That's correct  I advised him
14   that the claim or the invoice was a lumped-sum
15   invoice and that we couldn't accept a lump item
16   like that  We needed invoice prices and line-
17   by-line prices of what these items costs
18   Q    You told Jimmy Williamson that on
19   the 15th?
20   A    That's correct
21   Q    Who else was present for that
22   conversation?
23   A    Just Jimmy Williamson

Page 186

1    Q    Where did it take place?
2    A    I don't remember if it took place
3    at his business at Pioneer Telephone Services or
4    if it took place at his residence in his shed
5    Q    One or the other?
6    A    One or the other
7    Q    And during the week that you had
8    this estimate or this invoice which is 181
9    through 184, did you do anything with it?
10   A    No, I didn't
11   Q    Did you see that language I was
12   talking about where it said "equipment in
13   warehouse water damaged by Ivan storm" on it?
14   A    Yes, I did
15   Q    Did you ever think this was an
16   invoice?
17   A    I wasn't quite sure what it was
18   I know what it said
19   Q    You're talking about the label up
20   here "invoice"?
21   A    That's right
22   Q    Well, was it obvious to you that
23   this was an estimate that was done on an invoice

Page 187

1    letterhead?
2    A    No
3    Q    So you were confused by this
4    document?
5    A    I did not know at the time what
6    that represented
7    Q    At the time it was handed to you?
8    A    That's correct
9    Q    What inquiry, if any, did you make
10   into the nature of this document?
11        MR. PEARSON: Object to the form
12   He's already testified to that
13   A    That's when I talked with Jimmy
14   Williamson about it to find out exactly what
15   that was
16   Q    What did he say?
17   A    He said that's the amount he was
18   claiming was water damaged
19   Q    Your testimony is that you told
20   him at that time you needed more details?
21   A    Needed a breakdown on it line by
22   line for the amount each item cost, and we
23   needed his invoices for price verification on

Page 188

1    it
2    Q    Wait a minute  You also asked him
3    for an invoice, a copy where he purchased it?
4    A    That's correct
5    Q    Okay  You didn't say that
6    before  Is there anything else that you asked
7    him for on the 15th of November besides a
8    breakdown item by item, and now you're saying a
9    copy of the invoice where he purchased each of
10   these items?
11   A    That's correct
12   Q    Anything else besides those two
13   things?
14   A    That I asked him to send to me?
15   Q    Yes
16   A    Not at that time
17   Q    Okay  Let me show you Pages 185
18   through 190  Have you seen that document
19   before?
20   A    Yes, I have
21   Q    When did you see that document?
22   A    The first time I saw it was
23   November 8.

47 (Pages 185 to 188)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 201

1  Q   What does number three say under
2  it in handwriting?
3  A   Area insured claims inventory got
4  wet
5  Q   When did you write that?
6  A   After I printed these out.
7  Q   When did you print these out?
8  A   I don't recall the date
9  Q   Was it more than a week after you
10 inspected that building?
11 A   It was probably less than a week
12 Q   All right  Let's go to the next
13 page  What do you see on the next page?
14 A   That's -- picture five appears to
15 be some carpet.
16 Q   Why did you take that picture?
17 A   Mr Williamson had advised that
18 the carpet had been damaged
19 Q   Were you taking a picture of the
20 damage to the carpet?
21 A   I believe so
22 Q   All right  What about the next
23 picture?

Page 202

1  A   The sixth picture is a picture of
2  one of these boards that he claimed was damaged
3  Q   Now, is that at a different
4  location?
5  A   Yes, it is
6  Q   Where was that taken?
7  A   That was taken at his residence
8  Q   How far was his residence from his
9  office?
10 A   A mile, mile and a half
11 Q   All right  Why did you go to his
12 residence?
13 A   That's where the contents he
14 claimed were damaged were located.
15 Q   All right  Did you then go with
16 him to his residence to look at those?
17 A   Yes, I did
18 Q   And were they stored in a
19 building?
20 A   Yes, they were
21 Q   Protected from the elements?
22 A   Yes, they were
23 Q   And did he make them available for

Page 203

1  you to look at?
2  A   Yes, he did.
3  Q   Did he place any restrictions on
4  your looking at them?
5  A   No, he didn't
6  Q   Did he give you as much time as
7  you wanted?
8  A   Yes, he did
9  Q   Did he allow you to take pictures?
10 A   Yes
11 Q   Did he allow you to take samples
12 if you wanted them?
13     MR PEARSON:  Object to the form
14 A   We didn't request to take any
15 samples
16 Q   Did he ever tell you you weren't
17 allowed to take samples?
18 A   No, he didn't
19 Q   Did he ever indicate that it would
20 not be okay for you to take some of those?
21 A   No, he didn't
22 Q   That picture on the top, what
23 number is that that shows the circuit boards?

Page 204

1  A   Picture six
2  Q   Picture six  Tell me why you took
3  that picture
4  A   To show how these boards were
5  packaged.
6  Q   How were they packaged?
7  A   Inside a cardboard box with
8  protective foam and wrapped -- or inside a
9  plastic bag
10 Q   What about the next picture?
11 A   Seven?
12 Q   Yes
13 A   That's pictures of more of these
14 boards that were stacked in there
15 Q   What is written underneath number
16 seven?
17 A   It says, inventory insured claims
18 got wet.
19 Q   All right  Did you not believe
20 him at that time?
21 A   I had my suspicions whether the
22 actual board had gotten wet.
23 Q   Why was that?

51 (Pages 201 to 204)

Page 209

1  Q  Okay So there's different stacks
2  of boxes that got wet?
3  A  Yes
4  Q  Okay All right Let me see
5  Other that the 14 photographs we've just
6  reviewed, did you take any other photographs
7  concerning this claim?
8  A  No, I didn't
9  Q  After you photographed those
10 documents, what did you do?
11 A  I advised Mr Williamson to hang
12 onto all those items he was claiming was
13 damaged
14 Q  Why is that?
15 A  Because I had realized at that
16 point I could not verify or deny that the actual
17 items were damaged by lightning or water, and I
18 knew we needed an expert to come in on a claim
19 like this
20 Q  You knew on November 15 or 16th,
21 depending on which day it was -- whichever day
22 you were there?
23 A  Right

Page 210

1  Q  You knew that you needed an expert
2  to look at this?
3  A  That's correct
4  Q  Did you tell Mr Williamson that
5  you were going to get an expert to look at it?
6  A  I told him that day that we were
7  going to most likely send somebody out to look
8  at it
9  Q  Did you follow that up with a
10 letter?
11 A  No, I didn't
12 Q  Well, if it wasn't damaged by
13 water -- if this equipment was not damaged by
14 water, the claim would be denied, wouldn't it?
15 A  If they were not damaged, then
16 we'd have no reason to pay the claim
17 Q  If you've got a potential denial
18 of the claim, isn't that something you should
19 put in writing to your insured?
20 A  I wasn't going to notify him of a
21 denial claim Like I said, I had no basis to
22 confirm or deny what he was claiming
23 Q  So what you needed was a third

Page 211

1  party with experience in the field of looking at
2  electronics to see if they were damaged; is that
3  right?
4  A  That's correct
5  Q  Did you write Mr Williamson about
6  anything after the meeting on November 15th or
7  16th?
8  A  Yes, I did
9  Q  Good When did you write him
10 next?
11 A  I'd have to look at the claim to
12 see the exact date
13 Q  Did you call him before you wrote
14 him that next time?
15 A  No, I didn't
16 Q  Did you have any conversations
17 with him before you wrote him the next time?
18 A  No, I didn't
19 Q  Did you call South Central Agency
20 and tell them to tell him anything for you?
21 A  No, I didn't
22 Q  So when was the next time you had
23 any communication with Mr Williamson?

Page 212

1  A  Anytime that he and I conversed
2  Q  Next time y'all talked after the
3  meeting where you took those photographs we just
4  looked at?
5  A  I don't recall talking to
6  Mr Williamson after that day
7  Q  Then it would the next time you
8  wrote him a letter, I'd suspect?
9  A  That would be the next
10 communication between the two of us
11 Q  That's what I'm looking for Do
12 you know if it's your December 20th letter?
13 A  Yes Do you know what page that's
14 on?
15 Q  Not right off, but we can find it
16 I bet Joel does That's page what?
17 A  AO 205 and AO 206
18 Q  All right So you meet with him
19 and look at the equipment on November 15th or
20 16th The pictures say 16th, you recall 15th,
21 but it was one or the other?
22 A  That's correct
23 Q  And after that, you had no

53 (Pages 209 to 212)

Page 213

1  communication with him until you wrote this
2  letter on December 20, 2004; is that right?
3      A    That's correct
4      Q    What did that letter say?
5      A    It says, Dear Sir or Madam, we
6  received the estimate from an independent
7  adjuster for your building damages. I've
8  enclosed a copy for you to review. Once you've
9  had a chance to review, please give me a call so
10 that we may settle that portion of the claim.
11 As to the damages that you're claiming to your
12 phone system due to lightning and the water
13 damage to inventory, Auto Owners appreciates
14 your professional opinion as to the damages
15 claimed; however, it is a conflict of interest
16 to write your own lighting affidavit. We also
17 understand that you have disposed of the damaged
18 equipment without us being able to have a third
19 party verify the damages. We are hereby
20 requesting you provide us with outside
21 documentation and evidence for the damage, along
22 with the salvage value. Under your policy, the
23 following is contained: Used in the event of

Page 214

1  loss or damage, you must see that the following
2  are done in the event of loss or damage to
3  covered property: Take all responsible steps to
4  protect the covered property; for further damage
5  by a covered cause loss; if feasible, set the
6  damaged property aside in the best possible
7  order for examination; also, keep a record of
8  your expenses for emergency and temporary
9  repairs for consideration of settlement of the
10 claim. This will not increase the limit of
11 insurance; and, at our request, give us complete
12 inventory of the damaged and undamaged property,
13 including quantities, cost, values and amount of
14 loss claimed; as often as may be reasonably
15 required, permit us to inspect the property
16 proving the loss or damage and examine your
17 books and records; also, permit us to take
18 samples of the damaged and undamaged property
19 for inspection, testing and analysis and permit
20 us to make copies from your books and records
21 Reservation: Please be advised that this letter
22 does not waive any rights or defenses which Auto
23 Owners Insurance Company may have regarding this

Page 215

1  matter under any policy of insurance issued by
2  Auto Owners Insurance, whether or not such
3  claims or defenses are set forth herein. Auto
4  Owners reserves the right to supplement this
5  letter upon receipt of further information which
6  may subsequently become available. Thank you
7  for your time and consideration in the matter
8  If you have any further -- if you need any
9  further assistance, please give me a call at
10 1-800-548-9881, Extension 204
11     Q    Is that a form letter?
12     A    No, it's not
13     Q    Is part of it a form letter?
14     A    No, it's not a form letter. The
15 duties in the event of a loss is part of the
16 policy language
17     Q    Okay. The reservation paragraph,
18 is that a form that you insert for this, or did
19 you dictate every word of that?
20     A    I don't think I dictated. I think
21 I typed this letter myself
22     Q    I'm sorry. So you typed this
23 letter, and you went and got all the policy

Page 216

1  language and put it in there yourself?
2      A    That's correct
3      Q    All right. How did you find
4  out or come to know that the equipment had been
5  disposed of?
6      A    I received a call from Larry
7  Dewberry.
8      Q    And let's back up a notch. When
9  did you contact Mr. Dewberry to get him
10 involved?
11     A    I believe it was on December 9th.
12     Q    What did you ask him to do?
13     A    I'd have to pull the letter out to
14 see
15     Q    Did you call him?
16     A    No
17     Q    The letter is the communication to
18 Mr. Dewberry?
19     A    That's correct.
20     Q    Had you --
21     A    Let me take that back. I may have
22 called him to let him know I was going to be
23 sending him something.

54 (Pages 213 to 216)

Page 217

1  Q.  All right. During this period of
2  time, November, December, January, did you make
3  your weekly stop in Andalusia to see South
4  Central Agency?
5  A.  Yes, I did.
6  Q.  Did you talk to either of the two
7  principals of that business every time you were
8  there?
9  A.  Not every time I was there.
10 Q.  Did you talk to one of them every
11 time, or did you try to talk to them? Tell me
12 about that.
13 A.  Sometimes they were there;
14 sometimes they were not there.
15 Q.  Do you know their names?
16 A.  John Tomberlin and Harold Young.
17 Q.  Okay. Did you talk to them about
18 this claim between November and December of '04?
19 A.  I don't recall talking to them
20 while in their office.
21 Q.  You don't recall talking to them
22 while you were at their office?
23 A.  No.

Page 218

1  Q.  Do you recall any other times you
2  talked to them? On the phone or any other way?
3  A.  I believe I got a phone call from
4  them asking what the status was on it.
5  Q.  And why were they calling about
6  that?
7  A.  I don't know that.
8  Q.  Why do agents usually call you
9  about status on a claim?
10 A.  Usually because the insured has
11 contacted them.
12 Q.  What did you tell them about the
13 status of the claim?
14 A.  I don't recall the exact words.
15 I'm sure I told them we were working on the
16 claim, and we're trying to resolve it.
17 Q.  What activity took place on the
18 claim from November 16th to December 20th other
19 that the letter to Mr. Dewberry?
20 A.  That's all -- I take back. I
21 believe that Jimmy Williamson had, in the
22 meantime, faxed me a breakdown of those
23 invoices -- on those invoices and listed the

Page 219

1  prices on them.
2  Q.  The details you were talking about
3  earlier?
4  A.  That's correct. I believe those
5  came in --
6  Q.  That would --
7  A.  -- in that time period.
8  Q.  That would have been what you were
9  spot checking --
10 A.  That's correct.
11 Q.  -- to see if it added up right?
12 A.  That's correct.
13 Q.  Did anything in your spot checking
14 lead you to believe that the numbers didn't
15 match up?
16 A.  No.
17 Q.  Did you communicate with Jimmy
18 Williamson in any way between the time you sent
19 the letter to Mr. Dewberry and the December 20th
20 letter?
21 A.  No, I didn't.
22 Q.  And it's your testimony that when
23 you left Jimmy Williamson's house on November

Page 220

1  15th or 16th, you believe that you wanted to
2  have someone test the equipment?
3  A.  I was quite certain that we were
4  going to have to send somebody out to inspect
5  it.
6  Q.  But you never wrote him to tell
7  him that?
8  A.  I told him that while we were in
9  his shed?
10 Q.  But you didn't put that in
11 writing, did you?
12 A.  No, I didn't.
13 Q.  When you wrote this letter on
14 December 20th, you said, we also understand that
15 you have disposed of the damaged equipment
16 without us being able to have a third party
17 verify the damages. We are hereby requesting
18 you provide us with outside documentation and
19 evidence of the damages, along with the salvage
20 value. Did Mr. Williamson ever do that?
21 A.  He did send us some other
22 information.
23 Q.  What did you do with that

Page 221

1 information?
2   A   Reviewed it.
3   Q   Can you find that for me in the
4 stack? Are those the estimates from Telcom?
5   A   That's correct.
6   Q   We've already marked those as a
7 separate exhibit. Just to keep us from taking
8 them out of the book, look at Page -- is 123
9 included in there?
10   A   1 what?
11   Q   123
12   A   No, it's not.
13   Q   How did we pull that off? All
14 right. Is there a gap --
15   A   There's a gap from 122 to 142
16   Q   Well, here, let me pass you over
17 something
18       MR. PEARSON: Again, Plaintiff's
19 Exhibit 10 is what Harry brought. He knows that
20 he had all those documents --
21       MR. HALL: That's right. We're
22 going to fill in the gaps.
23   Q   Let me show you what's been marked

Page 222

1 Plaintiff's Exhibit 3. Is that one of the
2 documents that Mr. Williamson sent you after the
3 meeting in November in his shed?
4   A   Yes, it is
5   Q   Is that signed by Mac Bracewell?
6   A   It appears to be signed by SWP
7   Q   On behalf of Mr. Bracewell?
8   A   It's signed K. Mac Bracewell by
9 SWP
10   Q   Do you take exception to that
11 signature line?
12   A   On an affidavit?
13   Q   Yes, sir
14   A   Yes
15   Q   What's wrong with that?
16   A   Never signed by -- or doesn't
17 appear to be signed by Mac Bracewell
18   Q   Did you ever call Mr. Bracewell to
19 find out if he authorized his signature on that
20 document?
21   A   No, I didn't
22   Q   Did you notice that it was by SWP
23 at the time you received it?

Page 223

1   A   Yes, I did.
2   Q   What did you do with that
3 information?
4   A   We didn't do with anything with
5 it
6   Q   What did you do with this document
7 that is AO 123 through 127?
8   A.   I did review the information
9 contained in there
10   Q   Did you also receive Exhibit 4,
11 which is AO 128 through 131?
12   A   Yes, I did
13   Q   Is this a quotation from Telcom
14 Services?
15   A   That's what it says
16   Q   Did you review that document?
17   A   Yes, I did
18   Q   What did you learn from that
19 document when you looked at it?
20   A   I saw that it was the exact same
21 information that had been sent to me before
22 except the names had been changed on it
23   Q   What did you do with it after you

Page 224

1 noticed that?
2   A   That's all I did with it.
3   Q   Did you put it in the file?
4   A   It went in the file
5   Q   Did you compare it to any of the
6 other invoices or quotations?
7   A   I compared it with the previous
8 invoices that had come in.
9   Q   Did you contact Telcom Services?
10   A   No, I didn't
11   Q   Did you contact Jimmy Williamson?
12   A   No, I didn't
13   Q   Did you contact anybody about this
14 when you received it?
15   A   No, I didn't.
16   Q   Did you do anything with the
17 information other than put it in the file?
18   A   I reviewed it and saw that it was
19 the exact same thing that we had prior to that
20   Q.   So you reviewed it and put it in
21 the file?
22   A   That's correct
23   Q.   What about Exhibit 5? What is

56 (Pages 221 to 224)

Page 225

1  Exhibit 5?
2  A   It's listed as a lightning
3  affidavit from Telcom Services.
4  Q   Did you receive that as well after
5  your November 16th meeting with Jimmy
6  Williamson?
7  A   I did receive it after that.
8  Q   What did you do with it?
9  A   I reviewed it
10 Q   What did you do with it after you
11 reviewed it?
12 A   I put it in the file
13 Q   Did you call Telcom Services about
14 this affidavit?
15 A   No, I didn't
16 Q   What about Plaintiff's Exhibit 6?
17 Did you review that?
18 A   Yes, I did.
19 Q   What is Plaintiff's Exhibit 6?
20 A   It's a quotation for damaged
21 items
22 Q   Okay  Who submitted this
23 quotation?

Page 226

1  A   Jimmy Williamson submitted it.
2  Q   Who quoted it?
3  A   It says Telcom
4  Q   Did you ever call Telcom Services
5  for any reason?
6  A   No, I didn't
7  Q   Did you find out who they were?
8  A   I found out who Mac Bracewell was.
9  Q   What did you do to find out who
10 Mac Bracewell was?
11 A   I asked the agent
12 Q   Which of the agents did you speak
13 to about that?
14 A   I can't remember if it was Harold
15 or John
16 Q   And when -- did you do that in
17 person or on the phone?
18 A   I think I did it on one of my
19 weekly visits down there
20 Q   So in person, you asked one of the
21 agents about Mac Bracewell?
22 A   I asked who Mac Bracewell was.
23 Q   What did they tell you?

Page 227

1  A   That he -- they weren't exactly
2  sure, but they said he either used to own
3  Pioneer Telephone or worked at Pioneer Telephone
4  or may be the one who sold Pioneer Telephone to
5  Jimmy Williamson
6  Q   Was that information relevant to
7  your investigation?
8  A   It was relevant for me to just
9  generally inquire on who Mac Bracewell was.
10 Q   Did you make any further inquiries
11 besides asking South Central Agency who he was?
12 A   No, I didn't
13 Q   Were you satisfied with the
14 information you received from them?
15 A   It gave me an idea of who Mac
16 Bracewell was
17 Q   Okay  Was that enough information
18 for you?
19     MR. PEARSON: Object to the form.
20 A   It was all the information that I
21 obtained from them
22 Q   Was it all the information you
23 needed about him?

Page 228

1      MR. PEARSON: Object to the form
2  A   It was all the information that I
3  was going to find out about Mac Bracewell
4  Q   All right  You said that's all
5  that you were going to find out about him  Why
6  is that all you that were going to find out
7  about him?
8  A   At this point, after reviewing
9  these lightning affidavit/water affidavits that
10 he sent in, they were nothing more than a
11 duplicate of what we had already received  And
12 then find out the fact that he had ties to Jimmy
13 Williamson in the past or had some sort of
14 dealings with him, then it made his lightning
15 affidavit and water affidavit seem less
16 credible
17 Q   Did you ever communicate that to
18 Jimmy Williamson?
19 A   No, I didn't
20 Q   Did you ever communicate that to
21 Mac Bracewell?
22 A   No, I didn't
23 Q.  Did you ever communicate that to

57 (Pages 225 to 228)

Page 229

1  anybody?
2  A   No, I didn't -- I take that back.
3  This may have been discussed with our home
4  office claims
5  Q   Who at the home office would you
6  have talked to about that?
7  A   Cindy Gilner, or Cindy Jones
8  Q   Any other documents you received
9  from Jimmy Williamson after your meeting at his
10 house on November 16th before you sent the
11 letter on December 20?
12 A   No
13 Q   Is there one more document behind
14 that one, maybe?
15 A   No.
16 Q   Okay  Now, in addition to the
17 documents that we've just reviewed, Jimmy
18 Williamson sent you other itemization with
19 dollar figures about the cost?
20 A   I believe he did
21 Q   Did you use that information to
22 spot check the earlier estimates he had prepared
23 for you?

Page 230

1  A   The earlier estimates that he sent
2  were -- didn't have figures on it
3  Q   What I'm asking, did you do
4  anything with that information when he sent it
5  to you?
6  A   Which information are you --
7  Q   The dollar figure
8  A   We've got so many that he sent in
9  that I'm having trouble keeping up with when and
10 where
11 Q   Fair question  The ones that I
12 haven't seen are the ones you're talking about,
13 which are the -- the information with the cost
14 of the specific equipment  You said he sent you
15 that  And I think you said you spot checked
16 some of it  I may be wrong about that
17 A   Right
18 Q   I think you said earlier that you
19 spot checked the cost of different equipment
20 with the earlier estimates that Williamson sent
21 up -- the first batch that you received back on
22 November 8th
23 A.  No, I didn't spot check the

Page 231

1  prices  I didn't have any prices to go with
2  Q   What did you spot check?
3  A   I just spot checked -- he claimed
4  he had six item 105, and checked to see if he
5  had that same amount on the invoice.
6  Q   Okay  Did they match up?
7  A   They seemed to
8  Q   Did you find anything in the
9  documents that Jimmy Williamson sent you or that
10 Mac Bracewell sent you that seemed to indicate
11 they were not being truthful about the documents
12 they were listing as damaged?
13 A   Ask that again
14 Q   Did you see anything in the
15 documents that Jimmy Williamson sent you or that
16 Mac Bracewell sent you that indicated they were
17 being less than truthful about the documents
18 they were claiming had been damaged?
19 A   No, I did not
20 Q   Okay
21     MR HALL: Let's stop and change
22 tapes
23

Page 232

1       3:43 p m.
2  (Off the record discussion)
3       3:46 p m.
4
5     MR HALL: This is disk five of
6  the deposition of Bill Reaves on January 25,
7  2007
8  Q   (BY MR HALL) Mr Reaves, in your
9  -- by the time you sent the letter on December
10 20, 2004, you had received not only the initial
11 documentation that we reviewed that
12 Mr Williamson dropped off and you got on
13 November 8th, but also these subsequent
14 documents that we've been through which are
15 Exhibits 3 through 7; is that true?
16 A   Is that the ones from Telcom?
17 Q   Yeah, the ones we just went over
18 A   I don't believe I had received
19 Telcom --
20 Q   By the time you got this letter?
21 A   On that December 20th -- let me
22 see the December 20th letter
23 Q.  Absolutely.

58 (Pages 229 to 232)

Page 257

1  A   No, he didn't
2  Q   After your December 20th letter,
3  you received Exhibits 3 through 7, and you sent
4  a letter to Mr Dewberry and got a letter back
5  from Mr. Dewberry  What did you do next?
6  A   I believe I reported this to our
7  home office claims
8  Q   Let's look at that document  Is
9  this a fax you sent up to the home office?
10  A   Yes, it is.
11  Q   Is that a fax -- I think it's
12  maybe 109 -- tell me what that is, Pages 109 and
13  110 of Exhibit 10
14  A   It's an interoffice communication
15  that was done on December 21st to our corporate
16  claims office
17  Q   In that, did you outline to your
18  corporate claims office the information about
19  this claim?
20  A   Yes, I did
21  Q   Did you draft this before the 21st
22  of December?
23  A   I may have  It may have been

Page 258

1  drafted on the 20th and printed on the 21st.
2  Q   At the most, one day delay?
3  A   Right
4  Q   In this you said, as to the phone
5  system, I saw that the -- what the insured said
6  was phone system, but was unable to identify any
7  internal lightning damage  What did you do to
8  attempt to verify internal lightning damage?
9  A   I just looked at the phone system
10  Q   Didn't you tell me earlier that
11  you had no way of determining if there was
12  lightning damage?
13  A   I'm not an expert in determining
14  lightning damage
15  Q   Right  So you wouldn't be able to
16  just by looking at it, could you?
17  A   However, I didn't see any obvious
18  visible damage.
19  Q   Did you ask him to point out the
20  damage to you?
21  A   I don't recall asking him
22  Q   Did Mr. Dewberry tell you that
23  Jimmy Williamson was told by the agent that he

Page 259

1  could dispose of the property?
2  A   Larry Dewberry told me that.
3  Q   Have you ever talked to Jimmy
4  Williamson about that?
5  A   No, I haven't
6  Q   Did you ever call him to find out
7  if that was true?
8  A   No  I believe I mentioned that in
9  my December 20th letter
10  Q   How did you mention that in your
11  December 20th letter?
12  A   Okay.  I was mistaken  I did not
13  mention that in the December 20th letter
14  Q   All right  In this letter of
15  December 21st, it says --
16  A   No, no  Let me back up  It says,
17  we also understand that you have disposed of the
18  damaged equipment without us being able to have
19  a third party verify the damages
20  Q   But not about who told him he
21  could dispose of it?
22  A   No
23  Q   This letter of December 21st says,

Page 260

1  it was Mr Dewberry's understanding that the
2  insured's agent had advised him that he could
3  dispose of the property  We have not yet
4  verified that with the insured  Did you do
5  anything to find out -- to verify that with the
6  insured?
7  A   I didn't call him
8  Q   Did you do anything to verify
9  that?
10  A   I put it in the December 20th
11  letter
12  Q   No, you didn't  I'm asking if you
13  did anything to verify whether or not the agent
14  told Mr Williamson he could dispose of the
15  property?
16  A   I'm sorry  Ask me again
17  Q   We're on the last line of the
18  second paragraph of the second page:  We have
19  not yet verified that with the insured  And
20  "that" being him being told by the agent he
21  could dispose of the property  Do you follow
22  me?
23  A.   Okay.  What is your question?

65 (Pages 257 to 260)

Page 261

1    Q.  Did you do anything to verify that
2  with the insured?
3    A.  I verified that with the agent.
4    Q.  You never called the insured about
5  that, did you?
6    A.  No, I didn't.
7    Q.  What did the agent say?
8    A.  The agent advised that Jimmy
9  Williamson had called them in a panic saying
10 that somebody wanted to come look at the
11 equipment, and he'd already thrown it away. And
12 the agent said that he was telling them that
13 they had told him he could throw it away.
14    Q.  And?
15    A.  The agents advised that they
16 didn't tell him he could throw it away.
17    Q.  Did you ever ask Jimmy Williamson
18 whether the agents told him he could throw it
19 away?
20    A.  No, I didn't.
21    Q.  If the agents had told him to
22 throw it away, would that affect your decision
23 about this claim?

Page 262

1    A.  I would have to -- that decision
2  would have to be made from a branch manager or
3  somebody.
4    Q.  Well, if an agent told an insured
5  it was okay to throw something away, would you
6  agree that it would reasonable for the insured
7  to rely on that and throw it away?
8        MR. PEARSON:  Object to the form.
9    A.  I wouldn't think it would be
10 reasonable if they were told to keep the damaged
11 equipment, and they threw it away.
12   Q.  If they were told by their agent
13 after they had held it for almost a month that
14 it was okay to get rid of it, would there be any
15 reason for them to hold on to it?
16   A.  I don't know. I would think I
17 would want to check with whoever was handling
18 the claim.
19   Q.  Because you're an insurance man.
20 You know that, don't you?
21   A.  Yes.
22   Q.  Well --
23   A.  Especially after he had been told

Page 263

1  that somebody was coming to look at it.
2    Q.  That's what you've said. You said
3  that December 15th --
4    A.  That's correct.
5        MR. PEARSON:  Object to the form.
6  Object to the mischaracterization of the date.
7        MR. HALL:  All right. What'd I
8  say?
9        MR. PEARSON:  I believe -- April,
10 did he say December 15?
11       COURT REPORTER:  December 15.
12       MR. HALL:  November 15th. Thank
13 you, Joel.
14   Q.  We have not yet verified that with
15 the insured. You never tried to verify it with
16 the insured, did you?
17   A.  No.
18   Q.  I plan to get a statement from the
19 insured when he calls about the building damages
20 and what the agent told him. You did not do
21 that, did you?
22   A.  He never called.
23   Q.  He never called?

Page 264

1    A.  No.
2    Q.  Did you have his phone number?
3    A.  Yes, I did.
4    Q.  Did you call him?
5    A.  I sent him a letter requesting he
6  contact me.
7    Q.  What letter? The February 3rd
8  letter?
9    A.  I'd have to see that letter.
10   Q.  So you're saying that, I plan to
11 get a statement from the insured when he calls
12 about the building damages and what the agent
13 told him, you're saying you accomplished that by
14 writing a letter to Mr. Williamson?
15   A.  I'm sorry. Ask me again.
16   Q.  I plan to get a statement from the
17 insured when he calls about the building damages
18 and what the agent told him. You wrote that;
19 right?
20   A.  Let me back up. I'd have to see
21 the letter to --
22   Q.  Find the letter. It's a February
23 3rd letter. You can do it faster than I can.

66 (Pages 261 to 264)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 269

1    A    Right.
2    Q    Even in this December 21 fax to
3    the home office you said, I've requested he
4    provide us with outside documentation of the
5    damages to support his claim. That was
6    important, wasn't it?
7    A    Yes
8    Q    Outside documentation could have
9    been sufficient to just pay the claim, couldn't
10   it?
11       MR. PEARSON: Object to the form
12   A    I don't know that we would have
13   paid the entire claim base on just that
14   information
15   Q    If you had a Ph D in electrical
16   engineering like you referenced earlier come in
17   and say, every one of these pieces of equipment
18   were damaged by lightning and these were damaged
19   by water, just the way it was reported to you by
20   your insured, would you have paid the claim?
21   A    It'd depend on --
22       MR. PEARSON: Object to the form
23   A    It depends on what we'd received

Page 270

1    from him. If it was a well-documented lightning
2    affidavit with photographs and the description
3    on how each item was damaged and what led them
4    to believe that it was damaged, it certainly
5    would have been taken into consideration
6    Q    And you never interviewed either
7    of the individuals who provided the lightning
8    affidavits on this claim to see if they had that
9    information, did you?
10   A    No  I just reviewed the
11   information that was their affidavit
12   Q    And put it in the file?
13   A    That's correct
14   Q    On December 21st, 2004, did have
15   any claims besides Pioneer Telephone's still
16   pending from Hurricane Ivan?
17   A    No Hurricane Ivan claims that went
18   on for several months.
19   Q    Can you answer my question?
20   A    Did I personally have any?
21   Q    Did you have any claims pending
22   under your supervision as of December 21, 2004,
23   that were from Hurricane Ivan other than this

Page 271

1    one?
2    A    I'm sure I did
3    Q    How many?
4    A    I don't have a number
5    Q    How would you find out?
6    A    I don't think there is a way to
7    find out
8    Q    So I just have to take your word
9    on it?
10   A    These Hurricane Ivan claims were
11   not assigned to claim rep number four, which is
12   my claim rep. They were only given a claim rep
13   four if something out of the ordinary was going
14   on, and we changed it over from just a general
15   hurricane claim to make it a claim that had a
16   claim rep assigned to it
17   Q    Did you receive information that
18   Mr Williamson threw away the equipment?
19   A    I received information from Larry
20   Dewberry and from the agent
21   Q    About what?
22   A    That he had disposed of the
23   equipment

Page 272

1    Q    Do you have any reason to believe
2    that Jimmy Williamson did not throw all that
3    equipment into the dumpster?
4    A    I don't have any idea if he did or
5    did not
6    Q    Do you have any suspicions that he
7    did or didn't?
8    A    I don't have an opinion whether he
9    did or didn't
10   Q    One way or the other?
11   A    I don't know if he did or didn't
12   You'd have to ask him that
13   Q    If he says he threw it in the
14   dumpster, would you have any reason to disagree
15   with that?
16   A    If he told me he threw it away, I
17   would assume he threw it away
18   Q    You don't have any suspicion that
19   he sold it to somebody else or did something
20   else with it, do you?
21   A    I don't have any evidence to point
22   in that direction
23   Q    I asked you if you have any

68 (Pages 269 to 272)

**www.AmericanCourtReporting.com**
**January 25, 2007**

Page 277

1  question again?
2  Q  I believe my question was: Did
3  you believe he had complied with Paragraph Four
4  where he protected the equipment?
5  　　MR. PEARSON: Object to the form
6  and asked and answered.
7  A.  He did for a short period of time.
8  Q.  You said before he had. Now
9  you're going to put on there, for a short period
10  of time?
11  A.  Well, he did protect it for -- I
12  don't know when he moved it to the storage shed.
13  Q.  That's right, you don't know.
14  A.  I don't know that. But he
15  protected it for less than a month.
16  Q.  Six is what you're really
17  concerned about. That you weren't really able
18  to see it again; right?
19  　　MR. PEARSON: Object to the form.
20  A.  Number six is where there was a
21  problem with the claim.
22  Q.  And six says, as often as may be
23  reasonably expected; correct?

Page 278

1  A.  Correct.
2  Q.  And you believe that means more
3  than the inspection that took place on November
4  15th?
5  A.  Absolutely.
6  Q.  But you never wrote him and told
7  him you wanted another inspection, did you?
8  A.  No. I told you I told him while
9  we were in the shed that we were going to send
10  somebody to look at it.
11  Q.  And you waited how long before you
12  sent somebody?
13  A.  It was less than a month.
14  　　MR. PEARSON: Object to the form.
15  I'm telling you, Harry, this -- I've been very
16  generous on letting you cover the same ground
17  over and over. Now, get on with it. We've been
18  here -- the time limit is coming in ten
19  minutes. If this deposition isn't over in ten
20  minutes, we're going to call the judge again.
21  　　MR. HALL: Thank you.
22  　　MR. PEARSON: Because I believe
23  that we set a limit on it, but I'll check --

Page 279

1  we'll stop and check the report and see what the
2  time limit is on it. But I'm trying to be -- we
3  are going on six hours.
4  Q.  Have you had any other
5  conversations or exchange of information with
6  Pioneer Telephone Services other than the
7  February 3rd letter, December 20th letter and
8  the conversation on November 15th?
9  A.  I don't believe so.
10  Q.  All right. Did you ever tell
11  South Central Agency, either one of the
12  principals there, that if Jimmy Williamson
13  pursued this claim any further that you would
14  subrogate against his personal claim?
15  A.  No, I didn't.
16  　　MR. HALL: That's all I've got.
17  Thank you. We'd attach Exhibit 10, which I'll
18  put back together in the right order. Do you
19  have anything?
20  　　MR. PEARSON: No, I don't have
21  anything.
22  　　ENDED AT 5 p.m.
23  　　FURTHER DEPONENT SAITH NOT

Page 280

1  　　CERTIFICATE
2
3  STATE OF ALABAMA )
4  MONTGOMERY COUNTY)
5
6  　　I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype, and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the deposition
12  give by said witness upon said hearing.
13  　　I further certify that I am
14  neither of counsel nor of kin to the parties to
15  the action, nor am I in any way interested in
16  the result of said cause.
17
18
19  　　APRIL BENDINGER, CCR
　　　CERTIFICATE NUMBER CCR-384
20
21
　　My Commission Expires
22  June 8, 2008
23