# EXHIBIT "D"

# American Court Reporting
## toll-free (877) 320-1050

Page 1

IN THE FEDERAL COURT OF
THE NORTHERN DISTRICT OF ALABAMA

CIVIL ACTION NUMBER
2:06CV 377-WKW

PIONEER SERVICES, INC.,
  Plaintiff,
vs
AUTO OWNERS INSURANCE
COMPANY,
  Defendant

VIDEOTAPE DEPOSITION TESTIMONY OF:
JOHN TOMBERLIN

January 5, 2006
10 a m

COURT REPORTER:
APRIL R. BENDINGER, CSR

Page 2

1  STIPULATION
2      IT IS STIPULATED AND AGREED by and
3  between the parties through their respective
4  counsel that the videotape deposition of JOHN
5  TOMBERLIN may be taken before April R
6  Bendinger, Notary Public, State at Large, at the
7  Offices of South Central Agency in Andalusia,
8  Alabama on January 5, 2006, commencing at
9  approximately 10 a m
10     IT IS FURTHER STIPULATED AND
11 AGREED that the signature to and the reading of
12 the deposition by the witness is waived, the
13 deposition to have the same force and effect as
14 if full compliance had been had with all laws
15 and rules of Court relating to the taking of
16 depositions
17     IT IS FURTHER STIPULATED AND
18 AGREED that it shall not be necessary for any
19 objections to be made by counsel to any
20 questions, except as to form or leading
21 questions and that counsel for the parties may
22 make objections and assign grounds at the time
23 of trial or at the time said depositions is

Page 3

1  offered in evidence, or prior thereto.
2      In accordance with Rule 5(d) of
3  the Alabama Rules of Civil Procedure, as
4  amended, effective May 15, 1988, I, April R
5  Bendinger, am hereby delivering to MR HARRY
6  HALL the original transcript of the oral
7  testimony taken January 5, 2006, along with
8  exhibits
9      Please be advised that this is the
10 same and not retained by the Court Reporter, nor
11 filed with the Court

Page 4

               INDEX
EXAMINATION BY:              PAGE NO
Mr Hall                      6,131
Mr Pearson                   118
Certificate                  133

           INDEX OF EXHIBITS

PX-1  (Subpoena)                23
PX-2  (SC Agency Documents)     23
PX-3  (Auto Owner Documents)    85
PX-4  (List of equipment)       87
PX-5  (Affidavit)               117
PX-6  (Tel-Com estimate)        97
PX-7  (Tel-Com estimate)        118

1 (Pages 1 to 4)

## www.AmericanCourtReporting.com
## January 5, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

APPEARANCES

FOR THE PLAINTIFF:
Mr. Harry Hall
FARMER, PRICE, HORNSBY & WEATHERFORD
100 Adris Place
Dothan, Alabama 36303


FOR THE DEFENDANT, AUTO OWNERS:

Mr. Joel Pearson

MORROW, ROMINE & PEARSON

122 South Hull Street

Montgomery, Alabama 36103


OF COUNSEL FOR JOHN TOMBERLIN:
Mr. James Robertson
SCOTT, SULLIVAN, STREETMAN & FOX
301 St Louis Street
Mobile, Alabama 36602

Page 6

I, April R Bendinger, a Court Reporter of Dothan, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the Offices of Auto Owners in Andalusia, Alabama commencing at approximately 10 a.m on January 5, 2006, JOHN TOMBERLIN in the above cause, for oral examination, whereupon the following proceedings were had:

JOHN TOMBERLIN,
being first duly sworn, was examined and testified as follows:

EXAMINATION BY MR HALL:
Q   We're here, Mr Tomberlin, for your deposition today  I want to ask you: Have you ever given a deposition before?
A   I can't remember doing one
Q   Where a court reporter sits down

Page 7

near you and takes down everything you say?
A   No, sir, I can't remember one
Q   Can you give me your full name and Social Security Number?
A   John Tomberlin, John Spencer Tomberlin. Social Security Number?
Q   Yes
A   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
Q   And do you have -- well, actually, let me back up and cover this first  You have counsel here today  You are not a party to the lawsuit we're here about  Do you understand that?
A   Yes, sir
   MR HALL: And I would assume, Jim, that since he is not a party, you are not of record anymore because y'all are out  And I would assume that the only objections made in this deposition will be from Joel  That's my understanding of how this should proceed  Do you agree with that?
   MR ROBERTSON: Well, unless you can -- I can't imagine --

Page 8

   MR HALL: Something privileged?
   MR ROBERTSON: Yeah, privileged communications, or if there's something else that comes up that I wouldn't imagine  He's responding to the subpoena for the deposition
   MR HALL: Okay  Good
Q   Mr Tomberlin, we will select a jury out of southeastern counties of Alabama for this trial  I need to know: Do you have any relatives over the age of 19 who live in southeast Alabama, up to and including Montgomery?
A   Yes, sir, quite a few
Q   Can you give me the --
A   Last names?
Q   -- last names?
   MR ROBERTSON: You need to let him ask the question before you answer
Q   Since you haven't done a deposition before, let me give you some other guidelines  I will ask you a lot of questions today. We need to know what you know in order to help us develop this case. When I ask a

2 (Pages 5 to 8)

**www.AmericanCourtReporting.com**
**January 5, 2007**

Page 121

1　　Q　So Auto Owners would just be one
2　of a number of particular insurance companies
3　that y'all sold insurance for?
4　　A　Yes, sir
5　　Q　Now, when -- after your company
6　has sold insurance to someone, and a particular
7　insurance carrier -- which I understand from you
8　may be one of a number of carriers; right?
9　　A　Yes, sir
10　　Q　When that carrier has issued a
11　policy to those people, and if they subsequently
12　have a claim, what is it that South Central
13　Agency routinely does with respect to the claim?
14　　A　We just report it to the company
15　　Q　Does South Central Agency adjust
16　claims?
17　　A　No, sir
18　　Q　Does South Central Agency or you
19　investigate claims?
20　　A　No, sir
21　　Q　Do you or South Central Agency or
22　anyone else employed by South Central Agency
23　make decisions regarding claims?

Page 122

1　　A　No, sir
2　　Q　And in this case, you didn't -- in
3　this particular instance, with regard to the
4　claim by Mr Williamson and Pioneer Services,
5　you didn't do anything other than report the
6　claim; is that correct?
7　　A　Well, I didn't report it  Cindy
8　reported it  South Central Agency reported it
9　　Q　Now, you talked to him on several
10　occasions about it; correct?
11　　A　Checked on the status of the
12　claim, yes, sir
13　　Q　But with regard to any claim by
14　Pioneer Services, South Central Agency didn't
15　adjust that claim or make any decision regarding
16　that claim, did it?
17　　A　No, sir
18　　Q　Have you told us about all
19　conversations you had with Mr Williamson
20　regarding Pioneer Services' claim, to your
21　knowledge --
22　　A　Yes, sir --
23　　Q　-- today?

Page 123

1　　A　-- to my knowledge
2　　Q　Did you ever tell Mr Williamson
3　that it would be acceptable for him or Pioneer
4　Services to dispose of any damaged equipment at
5　Pioneer Services?
6　　A　No, sir
7　　Q　Similar question: Did you ever
8　instruct Mr Williamson to dispose of
9　property --
10　　A　No, sir
11　　Q　-- of Pioneer Services?
12　　A　No, sir
13　　Q　Did you ever have any discussions
14　with Mr Williamson about the disposal of the
15　property?
16　　A　Yes, sir
17　　Q　When were those discussions?
18　　A　I can't remember the date -- the
19　actual date, but he called me in the morning
20　I'm assuming it was probably 9 -- between 9 and
21　11 o'clock in the morning. And he called me in
22　a panic saying that he had been requested to
23　show the inventory, the equipment that was

Page 124

1　damaged to Auto Owners, either to the claims
2　adjuster or to someone else independently  He
3　told me he had thrown everything away, what
4　should he do
5　　Q　Was that the first conversation
6　you had with Mr Williamson or anyone with
7　Pioneer Services about disposal of any contents
8　of their property that we're talking about here
9　today?
10　　A　That's the only discussion we had
11　as far as disposal of equipment, but we had a
12　few conversations before that trying to get the
13　claim paid
14　　Q　I understand that, but I'm talking
15　about with regard to disposition or disposal of
16　equipment of Pioneer Services --
17　　A　That's the only conversation
18　　Q　What I'm understanding from you,
19　from what you testified to a moment ago, is that
20　you never had any discussion with Mr Williamson
21　or anyone with Pioneer Services, about disposal
22　of equipment until after -- when Mr Williamson
23　called you and told you he had already disposed

31 (Pages 121 to 124)

Page 125

1  of that equipment; is that correct?
2     A   That's correct
3     Q   Now, you mentioned going over to
4  Pioneer Services -- I believe, you said the day
5  after the storm; is that correct? You went --
6  physically went to the office next door of
7  Pioneer Services the day after the storm?
8     A   I did  To check on my client,
9  yes
10    Q   And that was the day after the
11 storm?
12    A   It was either the day after or
13 within a couple of days, I would think
14    Q   I believe you testified in
15 response to some questions by Mr Hall that you
16 saw some boxes with water on them  Is that what
17 you said?
18    A   Looked like --
19    Q   Don't let me characterize it
20 wrong  What I'm asking you -- I'm just asking
21 you am I correct  If I'm not, I want you to
22 tell me correctly what you --
23    A   I didn't see actual water, you

Page 126

1  know, like standing water, but I saw where water
2  appeared to be on the boxes  So the boxes had
3  incurred some type of water on them or some
4  liquid -- how about that? And I would assume
5  water
6     Q   And were these closed boxes?
7     A   The majority of them were
8     Q   Did you physically inspect the
9  boxes to see what was in or not in any of the
10 boxes?
11    A   No, sir
12    Q   Did you observe to see if the
13 boxes had cords coming out of them, or were any
14 of them connected to electrical service?
15    A   I didn't notice anything
16    Q   Okay  But there was a number of
17 boxes that were closed boxes; is that what
18 you're testifying to?
19    A   Yes
20    Q   Do you have --
21    A   In a storage room
22    Q   So all of these boxes that you saw
23 were in a storage room?

Page 127

1     A   Right  Most of them, I don't
2  remember being open
3     Q   It appeared that these boxes and
4  the items -- whatever items were in these boxes,
5  were in a storage room and not in use?
6     A   Yes, sir
7     Q   That's correct?
8     A   Yes, sir, that's correct
9     Q   With regard to the water that you
10 saw on the boxes, do you have an idea as to what
11 percentage of the boxes you saw any water damage
12 or water marks or stains on?
13    A   What percentage of the boxes that
14 I saw?
15    Q   Yeah
16    A   Just -- I can't remember  It
17 wasn't -- I didn't notice 15 boxes of water
18 damage  Probably four or five  I didn't really
19 pay that close attention
20    Q   Do you have an estimate of the
21 number of boxes you saw in the storage room?
22    A   There were quite a few  I can't
23 remember -- you know, 40 or 50  Maybe not that

Page 128

1  much  30  Counting the small boxes,
2  everything, I'd guess that
3     Q   Did you observe any damage to the
4  structure in that area of the building?
5     A   No, sir
6     Q   Did you have any discussion with
7  Mr Williamson at that time regarding those
8  boxes or the items in those boxes?
9     A   Probably said, I'm sorry to see
10 all damage  I'll try to get it taken care of as
11 quick as I can
12    Q   Did the offices of Pioneer appear
13 to you to be in the condition -- their poststorm
14 condition, or did it appear that people were
15 already over there working and cleaning up or
16 doing anything?
17    A   When I was over there, I didn't
18 notice anybody working indoors  There might
19 have been someone that worked on the outside
20 Might have had some leak in there  I can't
21 recall
22    Q   Now, you were asked a number of
23 times about conversations between you and Bill

32 (Pages 125 to 128)

Page 129

1  Reaves or -- is Bill Reaves the only person with
2  Auto Owners that you ever spoke to regarding
3  this claim, or were there other people with Auto
4  Owners that you spoke to?
5      A    I might have spoke with Billy
6  Barrett, the claims manager. You know, when
7  everything got over Bill's head, I went to bat
8  for Jimmy to try to get the claim paid.
9      Q    Okay. Let me narrow the question,
10 then. Before the conversation where
11 Mr. Williamson called you about the disposal of
12 the equipment, had you spoken with anyone else
13 at Auto Owners other than Bill Reaves? And
14 maybe not even Bill Reaves, but other than Bill
15 Reaves?
16     A    Before I learned of the disposal
17 of the equipment?
18     Q    Yes.
19     A    I don't believe I spoke to anybody
20 at Auto Owners other than Bill Reaves.
21     Q    Okay. That's what I'm trying to
22 get at. I'm trying to get at your recollection.
23 If you spoke to Billy Barrett, it would have

Page 130

1  been after you had received the call from
2  Mr. Williamson about the disposal of the
3  equipment?
4      A    It would. And probably to turn it
5  down or decline of the claim. That's probably
6  when I would have called -- when I first learned
7  there were any problems, I probably would have
8  called Billy.
9      Q    Had you spoken with Bill Reaves
10 prior to the phone call you received from
11 Mr. Williamson where he advised you that he had
12 disposed of the equipment?
13     A    Yes.
14         MR. HALL: I'm under two minutes
15 here. Can I change the disk?
16         MR. PEARSON: That'll be fine. I
17 only have a couple more minutes.
18         MR. HALL: Keep going.
19     Q    At any time, did Mr. Reaves ever
20 advise you that he had given Mr. Williamson any
21 indication that it was okay to dispose of the
22 equipment?
23     A.   No.

Page 131

1      Q    In fact, I believe I understood
2  you earlier, you testified that your
3  conversation in that regard with Mr. Reaves is
4  that he had expressly told Mr. Williamson not to
5  dispose of the equipment?
6      A    That's correct.
7          MR. PEARSON: I don't have
8  anything else.
9          MR. HALL: Just a final follow up
10 here.
11
12 REEXAMINATION BY HALL:
13     Q    Did Mr. Reaves ever mention to you
14 that instruction that Mr. Pearson was asking
15 about, to maintain the equipment -- did he ever
16 mention that before he learned the equipment had
17 been thrown away?
18     A    He never mentioned to me before,
19 but I was out of the claim loop. He might have
20 mentioned it to Cindy. I don't remember.
21     Q    But in all your phone calls, he
22 had never mentioned any instruction about how
23 long or if Jimmy Williamson should hold on to

Page 132

1  the equipment?
2      A    He didn't mention it then.
3          MR. HALL: Going off the record on
4  disk two of John Tomberlin's deposition.
5
6          ENDED AT 12:23 p.m.
7
8          FURTHER DEPONENT SAITH NOT.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1  CERTIFICATE
2
3  STATE OF ALABAMA )
4  MONTGOMERY COUNTY)
5
6        I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype, and the questions and answers thereto
9  were transcribed by means of computer-aided
10 transcription, and that the foregoing represents
11 a true and correct transcript of the deposition
12 give by said witness upon said hearing.
13       I further certify that I am
14 neither of counsel nor of kin to the parties to
15 the action, nor am I in any way interested in
16 the result of said cause.
17
18
    _____
19  APRIL BENDINGER, CSR
    CERTIFICATE NUMBER CSR-384
20
21
    My Commission Expires
22  June 8, 2008
23

34 (Page 133)