# EXHIBIT "B"

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE FEDERAL COURT OF THE
MIDDLE DISTRICT OF ALABAMA

CIVIL ACTION NUMBER
2:06CV-377-WKW

PIONEER SERVICES, INC,
  Plaintiff,
vs.
AUTO-OWNERS INSURANCE COMPANY,
  Defendant

THE VIDEOTAPED
DEPOSITION TESTIMONY OF:
WILLIAM BARRETT

February 2, 2007
9:55 a m

COURT REPORTER:
Gwendolyn P. Timbie, CSR

Page 2

1   STIPULATIONS
2       IT IS STIPULATED AND AGREED by and
3   between the parties through their
4   respective counsel that the deposition of
5   WILLIAM BARRETT, may be taken before
6   Gwendolyn P. Timbie, Certified Shorthand
7   Reporter and Notary Public, State at
8   Large, at the law offices of Morrow,
9   Romine & Pearson, Montgomery, Alabama, on
10  February 2, 2007, commencing at
11  approximately 9:55 a m
12      IT IS FURTHER STIPULATED AND
13  AGREED that the signature to and the
14  reading of the deposition by the witness
15  is waived, the deposition to have the same
16  force and effect as if full compliance had
17  been had with all laws and rules of Court
18  relating to the taking of depositions
19      IT IS FURTHER STIPULATED AND
20  AGREED that it shall not be necessary for
21  any objections to be made by counsel to
22  any questions, except as to form or
23  leading questions, and that counsel for

Page 3

1   the parties may make objections and assign
2   grounds at the time of trial or at the
3   time said deposition is offered in
4   evidence, or prior thereto
5       Please be advised that this is the
6   same and not retained by the Court
7   Reporter, nor filed with the Court

Page 4

1           INDEX
2   EXAMINATION BY:           PAGE NO:
3   Mr. Hall                  9
4   Certificate               175
5
6       LIST OF EXHIBITS
7   EXHIBITS:                 PAGE NO:
8   Plaintiff's 11            98
9   Plaintiff's 12            166

1 (Pages 1 to 4)

**www.AmericanCourtReporting.com**
**February 2, 2007**

Page 65

1 thing he would do is check coverage, make
2 sure that there's a policy in force
3 covering the -- that date of loss and
4 what's being reported. And then the next
5 thing would be contact --
6    Q   The customer?
7    A   Yes.
8    Q   All right.
9    A   From there, you would
10 determine what the needs of the claim were
11 from that -- hopefully from that initial
12 contact and then proceed. Make -- make
13 appointments. Do whatever is necessary on
14 that particular claim.
15   Q   All right. When a claim comes
16 from an insured or a customer up to
17 Auto-Owners, is it reported directly to
18 the Montgomery branch office, or does it
19 go somewhere else and then come back down
20 to Montgomery?
21   A   Usually they report to their
22 local agent, who reports directly to the
23 branch office.

Page 66

1    Q   Montgomery, the branch office
2 in Montgomery for Auto-Owners, would
3 receive claims notifications from the
4 agents within Montgomery's territory?
5    A   Yes.
6    Q   All right. How would you get
7 those? By fax or by e-mail or how?
8    A   Either by fax or by mail.
9    Q   We've had some testimony about
10 preprinted claim forms, when a substantial
11 storm would move through an area and
12 Auto-Owners would send out these forms.
13 Where were those generated?
14   A   Lancing.
15   Q   All right. That came from the
16 home office, and they went to each agent's
17 office?
18   A   Yes.
19   Q   And would -- if those were
20 filled out by the agent on behalf of a
21 customer that had a claim, they were faxed
22 to the Montgomery branch office?
23   A   Yes.

Page 67

1    Q   All right. So when that came
2 in, Montgomery -- or the office here in
3 Montgomery would be the initial
4 investigating part of Auto-Owners?
5       MR. PEARSON: Object to form.
6    A   If there has been an occasion
7 to have preprinted loss notices, you don't
8 operate in a manner that you would when
9 those things are not required.
10   Q   Okay.
11   A   That means that you've had a
12 catastrophe.
13   Q   Yes, sir.
14   A   Everybody in the world has a
15 claim.
16   Q   Yeah.
17   A   There is not sufficient time
18 to go step by step by step.
19   Q   Okay.
20   A   So they're going out in bulk,
21 and you're making bulk assignments to
22 independent adjusters. And you're
23 juggling at that point.

Page 68

1    Q   All right. Well, then let's
2 talk about the -- that process during a
3 catastrophe scenario, where a hurricane,
4 for instance, comes through and you have
5 mass claims.
6       How did the Montgomery branch office
7 handle assignment of the excess work or
8 the extra work to third-party adjusters?
9    A   They would be -- the third
10 party as you call them, the independent
11 claims firms, would have been pre-noticed
12 that they're going to be receiving work
13 from us. They would -- in some cases,
14 they would set up temporary locations to
15 receive work from us.
16   Q   Where would they set those up?
17   A   Well, some did; some didn't.
18 Mobile -- for instance, GAB. We talked
19 about them. They set up a storm office in
20 Mobile and began receiving from us there.
21 United Storm Adjusters received in their
22 office in Tampa and then electronically
23 disbursed to their adjusters. The other

17 (Pages 65 to 68)

Page 69

1 group, who I can't think of their name
2 right now, set up an office in Mobile as a
3 temporary office and set up faxes and
4 whatnot to receive from us, and then they
5 disbursed electronically
6     But in the hurricane setting, they
7 would come -- we were receiving claims
8 hundreds at a time  So we were
9 determining where they should go, whether
10 they should go to United Storm Adjusters
11 or GAB or Cat Crew or Catastrophe
12 Specialists or whomever, and we would send
13 them a hundred at a time.
14    Q   How would you decide which
15 claims to send to third-party adjusters
16 rather than keep them in-house?
17    A   Most everything that was on a
18 preprinted loss notice would go out  That
19 would be a -- that would be a hurricane
20 claim  And most all the hurricane claims
21 went out.
22    Q   To third-party adjusters?
23    A   Yes.

Page 70

1    Q   Can you think of a reason why
2 a hurricane claim would be kept with an
3 in-house -- an Auto-Owners field claims
4 representative?
5    A   It could be -- I don't know of
6 one specifically, but it could be that
7 there was a coverage issue or an issue
8 that the independent didn't need to handle
9 it  It needed to be handled by staff
10    Q   Are there any criteria that
11 you're aware of that Auto-Owners would
12 have used to decide why a specific claim
13 might stay with an Auto-Owners claim rep
14 rather than going to a third-party
15 adjuster?
16    A   Not really.  Generally, if
17 they were on -- if they were preprinted
18 loss notices, they were -- they were
19 Hurricane Ivan or whatever the catastrophe
20 would be, they were -- then they would be
21 assigned down
22    Q   Is there a -- any
23 differentiation within Auto-Owners on

Page 71

1 these preprinted claims forms for property
2 damage versus contents damage, where you
3 might keep some in-house and send others
4 to third-party adjusters?
5    A   No
6    Q   Would it be unusual for an
7 insured customer to have part of their
8 claim handled by GAB Robins and part of it
9 handled by an Auto-Owners field claim --
10 claims representative?
11    A   Not necessarily  It's
12 situational, so I wouldn't see that as
13 really unusual
14    Q   All right  What kind of
15 documents does Auto-Owners send to its
16 insureds during the administration of a
17 claim?
18    A   They may receive a blank proof
19 of loss in order to fulfill the policy
20 requirements of filing  They may receive
21 personal property inventories to assist
22 them in preparing an inventory of loss.  I
23 don't really know of another document that

Page 72

1 they would receive
2    Q   Okay  Let me stop for just a
3 moment and change out the disk
4       MR. HALL:  This is the end of
5 disk one of William Barrett's deposition
6       11:03 a.m.
7    (Recess taken to change out supplies )
8       11:04 a.m
9       MR. HALL:  All right  We're
10 back on the record with disk two of
11 William Barrett's deposition on February
12 2, 2007
13    Q   (BY MR. HALL) Mr. Barrett, we
14 were discussing documents generated by
15 Auto-Owners that would have been sent to
16 the insureds in the normal process of a
17 claim  And you've told me about a proof
18 of loss -- a preprinted proof of loss,
19 perhaps  Are there other kinds of proof
20 of losses forms?
21    A   No.
22    Q   Is there a form that's kept in
23 the agent's office for losses that don't

18 (Pages 69 to 72)

American Court Reporting
toll-free (877) 320-1050

Page 85

1  the building that allows water to cause
2  damage, but it's a wind claim?
3      A   Yes.
4      Q   All right. And so the home
5  office could run for you, as a manager, a
6  report based on date of loss and cause of
7  loss, and they can get that back to you.
8  How long would it take them to get a
9  report like that to you?
10     A   A couple of days.
11     Q   And they would fax that to you
12 or e-mail it?
13     A   Generally -- generally, that
14 was mailed because it was voluminous.
15     Q   Would they -- all right. You
16 say "voluminous." It doesn't come back
17 with a number? It comes back with a list
18 of the claims?
19     A   Yes.
20     Q   What information about each
21 claim would be on that list?
22     A   It would probably be name,
23 claim number, date of loss

Page 86

1      Q   Cause of loss?
2      A   It would possibly have a cause
3  code on it.
4      Q   What are "cause codes"?
5      A   Numeric codes for different
6  causes of loss.
7      Q   And do you recall, just from
8  memory, what those codes are for wind
9  damage?
10     A   Wind was twenty-three.
11     Q   What about lightning?
12     A   Thirteen.
13     Q   Is rain a cause code?
14     A   No.
15     Q   All right. What would be
16 water damage? Would that fall under the
17 wind because it opened the roof?
18     A   It would be -- it would be
19 wind.
20     Q   All right. Can you give me an
21 example of some other cause codes that you
22 remember?
23     A   Hail is fifty-three, extended

Page 87

1  coverage is twenty-two, fire is ten,
2  incendiary fire is twelve.
3      Q   "Incendiary" meaning set by
4  someone?
5      A   Yes.
6      Q   All right. What about
7  electrical damage that's not lightning?
8  Is there a cause code other than the
9  lightning?
10     A   I don't think so. I think
11 that would fall into the "all other,"
12 which would be a ninety. I think
13 that's....
14     Q   Can you restrict that loss run
15 to the Montgomery claims office?
16     A   Yes
17     Q   And can you restrict it to a
18 territory within the claims office?
19     A   You could -- I don't know.
20 No. I don't think you could do that. You
21 could -- you can narrow it down to a
22 ZIP code, probably.
23     Q   Oh, all right. Can you do it

Page 88

1  by adjuster, assign the file?
2      A   Yes.
3      Q   And can they go back and get
4  this information for not just what's
5  pending now, but for a prior date and
6  time?
7      A   I think so.
8      Q   What is needed to properly
9  adjust a claim for damage to a building?
10     Before, you talked about a proof of
11 loss and an inventory of personal
12 property. This may be the same thing, and
13 tell me if it is. But what -- what does
14 an adjuster or a field claim rep need to
15 adjust a property -- I mean, a building
16 damage claim?
17     A   To adjust a claim?
18     Q   Yes, sir. And then tell me if
19 that's not the right term.
20     A   Yeah.
21     Q   To adjust the claim meaning --
22     A   Right.
23     Q   -- determine what should, if

22 (Pages 85 to 88)

www.AmericanCourtReporting.com
February 2, 2007