# EXHIBIT "B"

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF ALABAMA
 2                      NORTHERN DIVISION

 3          CIVIL ACTION NO.:  2:06-cv-377-WKW

 4   PIONEER SERVICES, INC.,

 5         Plaintiff,

 6   vs.

 7   AUTO-OWNERS INSURANCE
     COMPANY, INC., et al.,
 8
           Defendants.
 9
     ------------------------------------------------------
10

11

12

13                   D E P O S I T I O N

14                          OF

15                 DONALD L. DINSMORE
              taken on behalf of the Defendant
16         pursuant to a Notice of Taking Deposition

17

18    DATE:          Wednesday, April 11, 2007

19    TIME:          9:35 a.m.

20    PLACE:         Scribe Associates, Inc.
                     201 Southeast 2nd Avenue, Suite 207
21                   Gainesville, Florida

22    REPORTER:      Ingrid T. Cox, RPR
                     Notary Public, State of
23                   Florida at Large

24

25
```

Certified Copy

——————— SCRIBE ASSOCIATES, INC. ———————

GAINESVILLE    OCALA    LAKE CITY    STARKE

1  Q. You've already discussed with Mr. Pearson at
2  length the different terms of the commercial policy of
3  insurance contract?
4  A. Yes, sir.
5  Q. And I would surmise from the lengthy discussions
6  we've had today, are you familiar with the terms of that
7  contract as it pertained to Pioneer Telephone Services,
8  Inc. in 2004?
9  A. Yes. Based -- I would say that I'm familiar with
10 the terms of the contract having reviewed this contract
11 since about 1991 and other contracts of similar since
12 the early '70s and mid '70s. The specific terms that
13 were at issue here are very standardized, very common.
14 Q. And based on the information that you have found
15 in the claims file that was produced on this contents
16 claim, do you have an opinion as to whether the Pioneer
17 Telephone Services, Inc. was entitled to be paid for
18 either portion of the contents claim?
19 A. Based on my review of the claim file, it's -- I
20 think I reported and testified that I believe they were
21 entitled to payment on both portions.
22 Q. And the two portions are the water damage and the
23 electrical damage?
24 A. Well, I call them both all risk areas.
25 Q. Very good.

1    A.  But I do mean, yeah, both those areas.

2    Q.  Okay.  And I think you hit on this a little bit
3 when Mr. Pearson was asking you about, I think it's
4 paragraph 12 of your report.  But based on your review
5 of the claims file and the documents listed in
6 Defendant's Exhibit 2 to your deposition, do you have an
7 opinion as to whether Auto-Owners acted in good faith in
8 its handling of Pioneer Telephone Services, Inc.'s
9 contents claim?

10       MR. PEARSON:  Object to form.

11       THE WITNESS:  From the perspective of an
12    insurance professional -- I mean, as a claims manager
13    you do review good faith claim handling and
14    controversial claims.  As a claims manager I would
15    say no, they did not act in good faith.

16 BY MR. PEARSON:

17   Q.  Can you tell or do you have an opinion as to
18 whether Auto-Owners had a legitimate basis to deny any
19 portion of the contents claim that we've covered today?

20       MR. PEARSON:  Object to form.

21       THE WITNESS:  It's my opinion they did not have a
22    legitimate basis to deny it because of the coverage,
23    the lack of investigation and the coverage question
24    handling.

25

```
 1  BY MR. HALL:
 2     Q.  Do you have an opinion as to whether Auto-Owners
 3  subjected this claim to a cognitive review once it had
 4  the documents we've talked about today?
 5         MR. PEARSON:  Object to form.
 6         THE WITNESS:  As claim manager I would think that
 7     -- by cognitive review I would think that you meant
 8     knowing, rational review, and that's what I was
 9     talking about with the home office response and so
10     forth.  And, no, I don't think they did have a
11     cognitive or a rational or knowing review considering
12     all the facts of the coverage question and the policy
13     and the claim.
14  BY MR. HALL:
15     Q.  Were there issues or facts that were ignored by
16  Auto-Owners, in your opinion?
17         MR. PEARSON:  Object to form.
18         THE WITNESS:  Yes, there were, specifically the
19     lightning affidavit, the -- to a degree the loss
20     report itself, the inventory.
21         There's one part that I need to clarify.  I know
22     that the inventories were given to the insurance
23     agents.  I know that Mr. Reeves picked them up from
24     the insurance agent on a -- like a weekly trip by the
25     insurance agent's office.  I don't know when they
```

```
 1    actually got to the insurance agent's office.  See,
 2    that would trigger -- that day would actually trigger
 3    the 90 days or the 30 days.  So I don't think I've --
 4    because I haven't reviewed Mr. Williamson's
 5    deposition completely.
 6  BY MR. HALL:
 7    Q.  Are there any other items that were ignored by
 8    Auto-Owners, in your opinion, besides the inventories
 9    and the proof of loss and the lightning affidavit?
10    A.  Well, the insuring agreement, those parts of the
11    policy that I said were mistakenly handled.  That's all
12    I can think of.
13    Q.  What about Mr. Williamson's position that he was
14    told by the agents that he could throw away the damaged
15    equipment?
16    A.  Well, see, Mr. Reeves looked to me like he first
17    learned of that when Mr. Duberry reported.  See, it's my
18    understanding that Mr. Duberry is an engineer.  I don't
19    know if he's an insurance adjuster.  What you're talking
20    about is investigation of, part of investigation of an
21    insurance claim and interpretation matter.  So that's
22    why I didn't think that Auto-Owners and Reeves could
23    rely on what Duberry said because that's -- he's not an
24    adjuster.  He doesn't know or -- I don't think he's an
25    adjuster.  And I generally don't rely on nonadjusters
```

1  for policy and coverage information. That's why you're
2  compelled to go get it directly from the source.
3      In this case Reeves said he was going to get
4  information directly from Williamson, and that was
5  correct. He didn't do it. He said he was going to do
6  it, but he didn't do it. But that's why if there was a
7  -- and he did testify that he talked to the insurance
8  agents. And if there's a conflict there, then that's
9  why you need to preserve that evidence.
10  Q.  In his December 20th letter to Pioneer Telephone
11  Services Mr. Reeves indicated it was a conflict of
12  interest to write your own lightning affidavit and
13  request a third party verification of the damages. Do
14  you recall that letter?
15  A.  Yes.
16  Q.  Did Mr. -- did Pioneer Telephone submit other
17  documentation following that letter?
18  A.  Well, I was a little confused by that because the
19  lightning affidavit wasn't submitted -- what I call the
20  lightning affidavit wasn't submitted by Pioneer. It was
21  submitted by --
22  Q.  Telcom Services?
23  A.  Yes, Telcom. And I knew that there was some
24  relationship. I don't think it was -- I've ever saw it
25  completely developed. And so on the face of it -- on

1  the face of it there was a lightning affidavit submitted
2  by Williamson, but there was also this other one, this
3  Telcom one.  And on the face of it it didn't appear to
4  be a nonparty.  So I think I've already testified that I
5  don't think you needed a lightning affidavit on an all
6  risk policy.
7      Q.  Okay.  And are you aware of anything that Mr.
8  Reeves did with the Telcom Services estimates and the
9  lightning affidavit?
10     A.  Well, in his deposition he said he just put it in
11  the file.  He disregard it.
12         MR. PEARSON:  Object to form.
13         THE WITNESS:  Well, he said -- I'm sorry.  He
14     said he saw it.  I don't know that he disregarded it.
15     He just said he put it in the file.
16         MR. HALL:  Okay.  Thank you.
17                    REDIRECT EXAMINATION
18 BY MR. PEARSON:
19     Q.  Even in your own report, which has been marked as
20 Defendant's Exhibit 1, Mr. Dinsmore, you've stated that
21 you understand there are factual disputes existing in
22 this case, haven't you?
23     A.  Yes.
24         MR. PEARSON:  Okay.  I don't have anything else.
25     Thank you.

SCRIBE ASSOCIATES, INC.
GAINESVILLE    OCALA    LAKE CITY    STARKE

EXHIBIT "A"

## Professional Resume

DONALD L. DINSMORE, JD, AIC, P&CCLA
9200 NW 39 Avenue
Suite 130-311
Gainesville Florida 32606
Office: Toll-free (888) 551-8822
Fax (877) 848-0903
Cell (919) 593-1134
Dinsmore1@aol.com

### Career

2001 current: **Donald L. Dinsmore, JD, AIC, P&CCLA** also d/b/a Dinsmore Consulting

1998 - 2000   **Dinsmore Consulting Inc**, Casselberry FL. and Decatur, GA: Positions: President – Consultant.

1997 - 1998: **Cardinal Insurance Services, Inc.**, Casselberry, FL. Positions: Vice President & Senior Consultant.

1996 - 1997: **Douglas L. Grose, P.A.**, Tampa, FL. Positions: Law Clerk and Attorney At Law.

1994 – 1996: **Stetson University College of Law**, St. Petersburg, FL. Position: Law Student

1984 - 1994: **United Services Automobile Association (USAA)**, Tampa, FL. Positions: Casualty Claims Examiner, Large Loss Unit Manager, Hurricane Hugo Manager, Fraud and Arson Coordinator, Marine Claims Examiner.

1984: **The Lumbermens Mutual Insurance Co.**, Orlando, FL. Position: Regional Property Claims Supervisor.

1983: **Preferred Risk Mutual Insurance Co.**, Altamonte Springs, FL. Position: General Adjuster.

1982 - 1983: **Eddy Adjustment Co.**, Miami, FL. Position: Independent Adjuster.

1978 - 1982: **Prudential of America Group**, Miami, FL. Position: District Agent.

1969 - 1978: **State Farm Group**, Alexandria, VA, Greensboro, NC, and Miami, FL. Positions: Field Claims Representative, Claims Specialist, and Special Disaster Supervisor.

### Education

1965 - 1966: **Marquette University**, Milwaukee, WI.

1966 - 1969: **University of Florida**, Gainesville, FL.  Degree: B.S.

1994 - 1996: **Stetson University College of Law**, St. Petersburg, FL.  Degree: J.D.