# EXHIBIT

# "C"

Page 1

IN THE FEDERAL COURT OF

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CIVIL ACTION NUMBER

2:06CV 377-WKW

PIONEER SERVICES, INC.,

     Plaintiff,

vs.

AUTO OWNERS INSURANCE

COMPANY,

     Defendant.

VIDEOTAPE DEPOSITION TESTIMONY OF:

BILL REAVES

January 25, 2007

10 a.m.

COURT REPORTER:

APRIL R. BENDINGER, CSR

ORIGINAL

**American Court Reporting**
**toll-free (877) 320-1050**

Page 104

1          Q.     Property damage claim.

2          A.     What kind of property damage?

3          Q.     Give me an example, and I'll pick

4    one.  I don't know what your classifications

5    are.

6          A.     Fire.

7          Q.     Well, we've talked about

8    electrical and lightning.  What about a

9    lightning damage claim?  What correspondence

10   would be sent from Auto Owners to the insured,

11   or from you to the insured on a claim like that?

12         A.     May send out a proof of loss,

13   personal property inventory forms, a letter may

14   go out requesting estimates for the damage.

15         Q.     Is that a form letter?

16         A.     Yes, it is.

17         Q.     Is that the request for the

18   inventory or a request for the estimates?  What

19   did you say it is?

20         A.     Both.

21         Q.     Both.  Other than the proof of

22   loss and the inventory forms and the request for

23   inventory and the request for estimates, which

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1      A.      That's correct.

2      Q.      And that helps you decide if it

3  was a covered loss?

4      A.      Mainly, he just determines if it's

5  an arson claim, if it's a set fire.

6      Q.      Okay.  Like you were talking about

7  earlier, those longer arson investigations?

8      A.      Right.

9      Q.      He helps you with those?

10      A.      If it's a set fire or if it's

11  accidental in nature.

12      Q.      What kind of claims does he help

13  you with besides lightning damage claims and

14  arson or fire claims?

15      A.      That's the only ones that I've

16  used him for.

17      Q.      Of the three to four per year, how

18  many of those are lightning claims?

19      A.      I don't think I've ever used him

20  but maybe once or twice for lightning.

21      Q.      Do you know if Pioneer Services

22  has ever submitted a lightning affidavit for any

23  of your insureds that you were handling claims

**American Court Reporting**
**toll-free (877) 320-1050**

Page 138

1   over?

2         A.      They have.

3         Q.      They have?  Do you know who they

4   were, the insureds?

5         A.      I don't recall.

6         Q.      How many times has Pioneer

7   Services submitted lightning affidavits?

8         A.      I don't know the exact number.

9         Q.      More than ten?

10        A.      I would say less than ten times.

11        Q.      More than five?

12        A.      Probably somewhere between four

13   and eight.

14        Q.      Okay.  Do you recall the time that

15   you used them for that -- or that they submitted

16   those affidavits?  Was it before or after the

17   claim that we're here about today?

18        A.      I don't recall any before.

19        Q.      You don't recall any before?

20        A.      No.

21        Q.      So the four to eight would have

22   been after?

23        A.      I think so.

Page 139

1          Q.      All right.  Do you know how

2     Pioneer Services got involved in those claims?

3     Did you call them or did the insureds call

4     them?  How did that happen?

5          A.      I think the insureds called them.

6          Q.      Did you have any problems with the

7     affidavits they submitted?

8          A.      No, I didn't.

9          Q.      Did you pay those claims?

10              MR. PEARSON:  Object to the form.

11          A.      I don't recall whether they were

12     paid or not.

13          Q.      Were they lightning damage claims?

14          A.      That's what they were turned in

15     as.

16          Q.      Do you recall ever questioning any

17     of the Pioneer Services' lightning affidavits as

18     being too vague?

19          A.      I don't think they were

20     questioned.

21          Q.      When you say weren't questioned,

22     under any of the three criteria that we

23     discussed earlier -- being too vague, not

**American Court Reporting**
**toll-free (877) 320-1050**

Page 140

1    detailed enough on the damage or doesn't list

2    the reasons they think the lightning damage was

3    the cause -- they were never questioned as to

4    any of those three potential deficiencies?

5             MR. PEARSON:  Object to the form.

6        A.    No.

7        Q.    So would it be fair to say that

8    between four to eight times after Hurricane

9    Ivan, Auto Owners accepted lightning affidavits

10   from Pioneer Services for its insureds?

11       A.    That's correct.

12            MR. PEARSON:  Object to the form.

13       Q.    And paid claims based on those

14   lightning affidavits?

15            MR. PEARSON:  Object to the form.

16       A.    I don't know if the claims were

17   paid or not.

18       Q.    Do you recall denying any of those

19   claims?

20       A.    I don't recall paying or denying

21   any of them.

22       Q.    Do you have a list of approved

23   individuals or companies who can give lightning

Page 190

1      Q.    All right.  At the end of it, what

2  does it say?

3      A.    Do you want me to read the last

4  page?

5      Q.    Please.

6      A.    It says:  Belonging to Pioneer

7  Telephone Services, Incorporated.  I further

8  certify that to the best of my knowledge the

9  above described property was damaged by water

10  because of damage done to the printed circuit

11  boards in the above equipment.  And it's signed

12  Jimmy Williamson, James H. Williamson.

13      Q.    So regardless of what the title of

14  the first page was, the certification at the

15  end -- does that make that an affidavit of water

16  damage?

17      A.    That's what he's claiming.

18      Q.    That's what he's trying to do,

19  isn't he?

20      A.    Well, he starts out by saying it's

21  a lightning affidavit, and he ends up saying

22  it's a water -- I guess a water affidavit.

23      Q.    Is this the first time you noticed

Page 191

1    that it had both names on it?

2         A.    Today?

3         Q.    Yes, sir.

4         A.    No, it's not.

5         Q.    When did you first notice that?

6         A.    I don't recall the date.

7         Q.    Did you notice it on the 8th when

8    you first got it?

9         A.    I don't think I noticed it on the

10   8th.

11        Q.    Did you notice it on the 15th when

12   you talked to Jimmy Williamson about the claim?

13        A.    I don't think I had noticed that

14   at that time.

15        Q.    Have you ever looked at that

16   document closely to see if the numbers add up,

17   or have you ever scrutinized it in any way?

18        A.    Which numbers are you referring

19   to?

20        Q.    Any numbers on it.

21        MR. PEARSON:  Object to the form.

22        Q.    Anything that you would do to try

23   to figure out if that document made sense or was

Page 192

1  complete in any way?

2           MR. PEARSON:  Object to the form.

3       A.    I don't know if these -- I've

4  never added the quantity up, if that's what

5  you're asking.

6           MR. HALL:  That's what I'm asking.

7       Q.    Have you ever done anything with

8  that document other than receive it on the 8th?

9       A.    Not this particular document.

10      Q.    Okay.  And the affidavit that

11 you're holding and this invoice that starts Page

12 181 and 183, do they cover the same -- sorry,

13 184, do they cover the same items?  Have you

14 ever compared the two to see?

15      A.    I've spot checked to see if some

16 of the items matched up.

17      Q.    You've spot checked to see if some

18 did?

19      A.    That's correct.

20      Q.    When did you do that?

21      A.    I don't remember the date.

22      Q.    Was it in preparation for this

23 deposition?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 202

1          A.      The sixth picture is a picture of

2     one of these boards that he claimed was damaged.

3          Q.      Now, is that at a different

4     location?

5          A.      Yes, it is.

6          Q.      Where was that taken?

7          A.      That was taken at his residence.

8          Q.      How far was his residence from his

9     office?

10          A.      A mile, mile and a half.

11          Q.      All right.  Why did you go to his

12     residence?

13          A.      That's where the contents he

14     claimed were damaged were located.

15          Q.      All right.  Did you then go with

16     him to his residence to look at those?

17          A.      Yes, I did.

18          Q.      And were they stored in a

19     building?

20          A.      Yes, they were.

21          Q.      Protected from the elements?

22          A.      Yes, they were.

23          Q.      And did he make them available for

Page 203

1    you to look at?

2         A.      Yes, he did.

3         Q.      Did he place any restrictions on

4    your looking at them?

5         A.      No, he didn't.

6         Q.      Did he give you as much time as

7    you wanted?

8         A.      Yes, he did.

9         Q.      Did he allow you to take pictures?

10        A.      Yes.

11        Q.      Did he allow you to take samples

12    if you wanted them?

13             MR. PEARSON:  Object to the form.

14        A.      We didn't request to take any

15    samples.

16        Q.      Did he ever tell you you weren't

17    allowed to take samples?

18        A.      No, he didn't.

19        Q.      Did he ever indicate that it would

20    not be okay for you to take some of those?

21        A.      No, he didn't.

22        Q.      That picture on the top, what

23    number is that that shows the circuit boards?

Page 205

1      A.      Because they were inside a box

2   wrapped in plastic.

3      Q.      Did you look at any of the boards

4   to see if they had water stains on them?

5      A.      Yes, I did.

6      Q.      You took them out of the wrapping?

7      A.      I took a couple of them out.

8      Q.      What did you find?

9      A.      I didn't see any damage.

10      Q.      Did you take those with you?

11      A.      No, I didn't.

12      Q.      Was there any water stains on the

13   outside of the boxes?

14      A.      Some of the boxes did have slight

15   water stains on them.

16      Q.      They had water stains, though?

17      A.      On some of the boxes.

18      Q.      What about the next picture,

19   number -- I think that's eight?

20      A.      Uh-huh, (affirmative).

21      Q.      What does eight show?

22      A.      That's just a pile of stuff.

23      Q.      Was that all a part of this gear

Page 206

1    and equipment that he was showing you?

2          A.     That's what he was claiming.

3          Q.     Were you allowed access to that?

4          A.     Yes, I was.

5          Q.     Did you move any of those pieces

6    of equipment?

7          A.     No, I didn't.

8          Q.     Did you -- are there computers

9    there?

10         A.     Yes, there are.

11         Q.     With CPU -- the box that does all

12   the work on the computer, are they there too?

13         A.     Yes, they are.

14         Q.     Did you plug any of those in?

15         A.     No, I didn't.

16         Q.     Did you ask to take any of those

17   with you?

18         A.     No, I didn't.

19         Q.     What's on the next page?  What's

20   number nine?  That's a picture of a CPU, or a

21   computer.

22         Q.     All right.  I've heard it said

23   both ways.  CPU, I think, stands for central

Page 207

1    processing unit, which is the box that does all

2    the work on a computer, in my mind.  Is that

3    what that picture number nine is?

4         A.    That's correct.

5         Q.    Is number ten a picture of the

6    same unit or a different one?

7         A.    I believe it's a different one.

8         Q.    All right.  And did you plug those

9    in to see if they would operate?

10        A.    No, I didn't.

11        Q.    What's number 11?

12        A.    That's a photograph of something

13   he was claiming was damaged.

14        Q.    All right.  Is it a piece of

15   machinery, an electrical -- some kind of machine

16   that requires electricity to operate?

17        A.    It appears that it's some device

18   that would require some sort of electricity to

19   run it.

20        Q.    Did you ask him to explain what

21   that was?

22        A.    No, I didn't.

23        Q.    Did you ask him to correlate any

American Court Reporting
toll-free (877) 320-1050

Page 208

1    of the pieces of equipment depicted in the

2    photographs you've just been through with any of

3    the equipment that was outlined in the estimates

4    you received on November 8th?

5          A.    No, I didn't.

6          Q.    All right.  What's number 11?  I'm

7    sorry.  Is that 12?

8          A.    12.  It's just another photograph

9    of the same stuff that was taken in photograph

10   eight.

11         Q.    It was a lot of stuff, wasn't it?

12         A.    It was a lot of stuff.

13         Q.    What -- do we have another page?

14   What's on that page?

15         A.    It's photographs of some more of

16   the boxes that he claims got wet.

17         Q.    All right.  And you didn't believe

18   him, did you?

19         A.    No, I believe the boxes got wet.

20         Q.    All right.  Okay.  And both of

21   those last two pictures, number 13 and 14, are

22   they the same kind of boxes, similar?

23         A.    They're not the same boxes.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 211

1    party with experience in the field of looking at

2    electronics to see if they were damaged; is that

3    right?

4            A.      That's correct.

5            Q.      Did you write Mr. Williamson about

6    anything after the meeting on November 15th or

7    16th?

8            A.      Yes, I did.

9            Q.      Good.  When did you write him

10   next?

11           A.      I'd have to look at the claim to

12   see the exact date.

13           Q.      Did you call him before you wrote

14   him that next time?

15           A.      No, I didn't.

16           Q.      Did you have any conversations

17   with him before you wrote him the next time?

18           A.      No, I didn't.

19           Q.      Did you call South Central Agency

20   and tell them to tell him anything for you?

21           A.      No, I didn't.

22           Q.      So when was the next time you had

23   any communication with Mr. Williamson?

American Court Reporting
toll-free (877) 320-1050

Page 212

1          A.      Anytime that he and I conversed.

2          Q.      Next time y'all talked after the

3     meeting where you took those photographs we just

4     looked at?

5          A.      I don't recall talking to

6     Mr. Williamson after that day.

7          Q.      Then it would the next time you

8     wrote him a letter, I'd suspect?

9          A.      That would be the next

10    communication between the two of us.

11         Q.      That's what I'm looking for.  Do

12    you know if it's your December 20th letter?

13         A.      Yes.  Do you know what page that's

14    on?

15         Q.      Not right off, but we can find it.

16    I bet Joel does.  That's page what?

17         A.      AO 205 and AO 206.

18         Q.      All right.  So you meet with him

19    and look at the equipment on November 15th or

20    16th.  The pictures say 16th, you recall 15th,

21    but it was one or the other?

22         A.      That's correct.

23         Q.      And after that, you had no

Page 213

1    communication with him until you wrote this

2    letter on December 20, 2004; is that right?

3            A.      That's correct.

4            Q.      What did that letter say?

5            A.      It says, Dear Sir or Madam, we

6    received the estimate from an independent

7    adjuster for your building damages.  I've

8    enclosed a copy for you to review.  Once you've

9    had a chance to review, please give me a call so

10   that we may settle that portion of the claim.

11   As to the damages that you're claiming to your

12   phone system due to lightning and the water

13   damage to inventory, Auto Owners appreciates

14   your professional opinion as to the damages

15   claimed; however, it is a conflict of interest

16   to write your own lighting affidavit.  We also

17   understand that you have disposed of the damaged

18   equipment without us being able to have a third

19   party verify the damages.  We are hereby

20   requesting you provide us with outside

21   documentation and evidence for the damage, along

22   with the salvage value.  Under your policy, the

23   following is contained:  Used in the event of

Page 220

1    15th or 16th, you believe that you wanted to

2    have someone test the equipment?

3         A.    I was quite certain that we were

4    going to have to send somebody out to inspect

5    it.

6         Q.    But you never wrote him to tell

7    him that?

8         A.    I told him that while we were in

9    his shed?

10        Q.    But you didn't put that in

11   writing, did you?

12        A.    No, I didn't.

13        Q.    When you wrote this letter on

14   December 20th, you said, we also understand that

15   you have disposed of the damaged equipment

16   without us being able to have a third party

17   verify the damages.  We are hereby requesting

18   you provide us with outside documentation and

19   evidence of the damages, along with the salvage

20   value.  Did Mr. Williamson ever do that?

21        A.    He did send us some other

22   information.

23        Q.    What did you do with that

**American Court Reporting**
**toll-free (877) 320-1050**

Page 221

1    information?

2          A.       Reviewed it.

3          Q.       Can you find that for me in the

4    stack?  Are those the estimates from Telcom?

5          A.       That's correct.

6          Q.       We've already marked those as a

7    separate exhibit.  Just to keep us from taking

8    them out of the book, look at Page -- is 123

9    included in there?

10         A.       1 what?

11         Q.       123.

12         A.       No, it's not.

13         Q.       How did we pull that off?  All

14   right.  Is there a gap --

15         A.       There's a gap from 122 to 142.

16         Q.       Well, here, let me pass you over

17   something.

18                  MR. PEARSON:  Again, Plaintiff's

19   Exhibit 10 is what Harry brought.  He knows that

20   he had all those documents --

21                  MR. HALL:  That's right.  We're

22   going to fill in the gaps.

23         Q.       Let me show you what's been marked

Page 233

1    A.    I don't believe I had received

2  Telcom's --

3    Q.    When you wrote this letter?

4    A.    -- when I wrote that letter.

5    Q.    So after the December 20th letter,

6  you got the Telcom Exhibits 3 through 7 we just

7  went through.  And at the time you wrote the

8  December 20 letter, had you received the

9  financial breakdowns, the cost breakdowns that

10  you talked about from Mr. Williamson?

11    A.    Yes, I had.

12    Q.    So you would agree that Telcom is

13  not Pioneer Services; right?

14    A.    I don't know if they are or not.

15    Q.    Did you do anything to find out if

16  they were?

17    A.    No, I didn't.

18    Q.    So you don't know who they are or

19  anything about them; right?

20    A.    Well, I told you what I had

21  learned about --

22    Q.    Mac Bracewell?

23    A.    -- Mac Bracewell.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 237

1   lightning damage to all that equipment?

2          A.      No.

3          Q.      Okay.  So instead of believing the

4   information that was submitted to you by two

5   different people, Mr. Williamson and then Telcom

6   Services, you chose to not believe that and go

7   get a lightning strike report?

8          MR. PEARSON:  Object to the form

9   and object to that characterization.

10         A.      After reviewing the lightning

11  affidavit/water affidavits, they appeared to be

12  so vague -- a claim of that magnitude, to put a

13  one-line sentence in there to describe damage to

14  numerous pages of items damaged, that it seemed

15  that the information was too vague to pay a

16  claim of this size based on that limited

17  information.

18         Q.      Did you ever tell that to Jimmy

19  Williamson or Mac Bracewell?

20         A.      No, I didn't.

21         Q.      Did you ever communicate that to

22  anybody?

23         A.      No, I didn't.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 238

1    Q.    All right.  Did you ever ask Mac

2    Bracewell to explain to you the basis for his

3    opinion that the different pieces of equipment

4    had been damaged?

5    A.    No.  Mr. Bracewell had -- or

6    somebody had put that on the affidavit as what

7    his opinion to the damages were.

8    Q.    You never asked him about that?

9    A.    I never asked him about that.

10   Q.    Did you ask him to explain with

11   more detail so it wasn't as vague?

12   A.    No, I didn't.

13   Q.    Why not?

14   A.    We wanted to inspect the items in

15   the beginning because this information that we

16   were given was too vague to substantiate a claim

17   of this size.

18   Q.    To this date, January 25, 2007,

19   have you or anybody from Auto Owners ever asked

20   Mr. Williamson or Mr. Bracewell to give you more

21   details about the damages to the specific pieces

22   of equipment?

23   A.    No.

Page 244

1          Q.      And you never told Mr. Bracewell

2   or Telcom Services or Jimmy Williamson or

3   Pioneer Services that, did you?

4          A.      No, I didn't.

5          Q.      You never conveyed to them that

6   after your request for more documentation from

7   an outside party and their supplying you with

8   documentation from an outside party -- which

9   they did; correct?

10         A.      They supplied the information from

11  Telcom.

12         Q.      Which is not Pioneer Services;

13  correct?

14         A.      I don't know if it's Pioneer.   I

15  can't answer if they're together or not.

16         Q.      Do you have any reason to believe

17  that they're the same entity?

18         A.      I don't think they are the same

19  entity.

20         Q.      All right.  My question to you is:

21  In your letter of December 20th, you said you

22  wanted documentation from an outside source.

23  Would you agree Exhibits 3 through 7 are

Page 245

1   documentation from an outside source concerning

2   this claim?

3       A.      They are documents from an outside

4   source.

5       Q.      So you received documents pursuant

6   to your request in your December 20th letter;

7   right?

8       A.      That's correct.

9       Q.      And you didn't do anything with

10  them, did you?

11      A.      Other than review them, no.

12      Q.      You never told anybody that they

13  were insufficient in some way, did you?

14      A.      No, I didn't?

15      Q.      You looked at them and put them in

16  the file; right?

17              MR. PEARSON:  Object to the form.

18      A.      They were reviewed and put in the

19  file.

20      Q.      All right.  Now, you listed a part

21  of the policy, Section Three, duties in the

22  event of loss, and then you put down four, five

23  and six as the subparts that you quoted.  Why

**American Court Reporting**
**toll-free (877) 320-1050**

Page 247

1              MR. HALL:  Well, object to the

2      form.

3              MR. PEARSON:  I am objecting to

4      the form.  You keep characterizing --

5              MR. HALL:  The Court says don't do

6      this.

7              MR. PEARSON:  I'm not doing

8      anything other than --

9              MR. HALL:  This is a speaking

10     objection suggesting an answer.

11             MR. PEARSON:  Harry, I've been

12     through -- we're about to reach a time limit on

13     this thing.

14             MR. HALL:  And I wish you would

15     stop taking the time limit.

16             MR. PEARSON:  No, I haven't taken

17     up any time all day to object to the questions

18     that you've asked repeatedly making a

19     mischaracterization of something.  But anyway,

20     you can go ahead and ask the question.  I've

21     objected to it, and he can answer.

22             MR. HALL:  Thank you.

23        Q.    Back to you, Mr. Reaves.  You have

American Court Reporting
toll-free (877) 320-1050

Page 248

1    three subparts that are listed here.  One says,

2    take reasonable steps to protect the covered

3    property.  And it goes on beyond that, but

4    that's the way it starts, number four.  Did he

5    do that?

6         A.    Yes, he did.

7         Q.    Okay.  By taking it out of his

8    office at Pioneer Services and storing it in the

9    shed where you took the pictures, he complied

10   with number four, didn't he?

11        MR. PEARSON:  Object to the form.

12        A.    He did take the property and

13   protect it for --

14        Q.    Did he do what's called for in

15   number four?

16        MR. PEARSON:  Object to the form.

17   He's still answering the question, and you cut

18   him off.

19        A.    Let me see number four.  Yes, he

20   did.

21        Q.    All right.  Let's skip on to

22   five.  At our request, give us complete

23   inventories of the damaged and undamaged

Page 249

1    property, including quantities, cost, values and

2    amount of loss claimed.  Did he do that?

3          A.    Let me see which ones he did.  He

4    gave us a complete inventory of the damaged --

5    of what he claimed was damaged.  Including the

6    quantities -- he included cost, but he did not

7    produce any invoices showing his cost.  And he

8    did provide the value that he claimed, which may

9    or may not be the actual amount of the claim.

10         Q.    All right.  So under five, he gave

11   you a complete inventory, gave you the

12   quantities, he gave you the cost, because he

13   sent up those dollar values that you told me

14   about that we talked about some; right?

15         A.    He gave cost.  Whether they are

16   his cost or just retail cost, I don't know.

17         Q.    He gave you cost?

18         A.    He gave me some cost.

19         Q.    Values, and the amount of the loss

20   claimed.  He did all those, didn't he?

21         A.    Yes.

22         Q.    Number six, as often as may be

23   reasonably required, permit us to inspect the

Page 251

1      Q.     And Mr. Williamson never
2   restricted your access to that equipment on that
3   visit, did he?
4      A.     No.
5      Q.     Did he indicate to you you could
6   never come back and look at it again?
7      A.     No, he didn't.
8      Q.     Did you ever write him and tell
9   him that you wanted to come back and look at it
10  again?
11     A.     No, I didn't.  I told him while we
12  were there that we were going to send somebody
13  to look at it.
14     Q.     All right.  Well, he disagrees
15  with that, and we'll talk to him tomorrow about
16  that.  Other than your word that you told him on
17  November 16 that you wanted to come back and
18  look at it again or have someone come look at
19  it, is there any other evidence that supports
20  your position that you asked him to hold on to
21  the equipment?
22     A.     No.
23     Q.     How many inspections are required

Page 259

1    could dispose of the property?

2        A.    Larry Dewberry told me that.

3        Q.    Have you ever talked to Jimmy

4    Williamson about that?

5        A.    No, I haven't.

6        Q.    Did you ever call him to find out

7    if that was true?

8        A.    No.  I believe I mentioned that in

9    my December 20th letter.

10       Q.    How did you mention that in your

11   December 20th letter?

12       A.    Okay.  I was mistaken.  I did not

13   mention that in the December 20th letter.

14       Q.    All right.  In this letter of

15   December 21st, it says --

16       A.    No, no.  Let me back up.  It says,

17   we also understand that you have disposed of the

18   damaged equipment without us being able to have

19   a third party verify the damages.

20       Q.    But not about who told him he

21   could dispose of it?

22       A.    No.

23       Q.    This letter of December 21st says,

American Court Reporting
toll-free (877) 320-1050

Page 260

1    it was Mr. Dewberry's understanding that the

2    insured's agent had advised him that he could

3    dispose of the property.  We have not yet

4    verified that with the insured.  Did you do

5    anything to find out -- to verify that with the

6    insured?

7         A.    I didn't call him.

8         Q.    Did you do anything to verify

9    that?

10        A.    I put it in the December 20th

11   letter.

12        Q.    No, you didn't.  I'm asking if you

13   did anything to verify whether or not the agent

14   told Mr. Williamson he could dispose of the

15   property?

16        A.    I'm sorry.  Ask me again.

17        Q.    We're on the last line of the

18   second paragraph of the second page:  We have

19   not yet verified that with the insured.  And

20   "that" being him being told by the agent he

21   could dispose of the property.  Do you follow

22   me?

23        A.    Okay.  What is your question?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 261

1      Q.      Did you do anything to verify that

2   with the insured?

3      A.      I verified that with the agent.

4      Q.      You never called the insured about

5   that, did you?

6      A.      No, I didn't.

7      Q.      What did the agent say?

8      A.      The agent advised that Jimmy

9   Williamson had called them in a panic saying

10   that somebody wanted to come look at the

11   equipment, and he'd already thrown it away.  And

12   the agent said that he was telling them that

13   they had told him he could throw it away.

14      Q.      And?

15      A.      The agents advised that they

16   didn't tell him he could throw it away.

17      Q.      Did you ever ask Jimmy Williamson

18   whether the agents told him he could throw it

19   away?

20      A.      No, I didn't.

21      Q.      If the agents had told him to

22   throw it away, would that affect your decision

23   about this claim?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 268

1    20th letter from both Pioneer Services as well

2    as a third party, Telcom Services, didn't you?

3        A.      I did.

4        Q.      You chose to disregard both of

5    those and put them in the file after looking at

6    them; right?

7        A.      The one from Pioneer Services was

8    disregarded because it was a conflict of

9    interest to write your own lightning affidavit.

10       Q.      So when he supplied you with a

11   replacement from a third party, you disregarded

12   that one as well, didn't you?

13       A.      Not totally.

14       Q.      In what way did you not disregard

15   it?

16       A.      It was considered before it was

17   denied.

18       Q.      And then put in the file?

19       A.      I mean, it was in the file.

20       Q.      You looked at it and put it in the

21   file, you told me earlier?

22       A.      Right.

23       Q.      That's all you did with it; right?