# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| PIONEER SERVICES, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.: 2:06-cv-377-WKW** |
| v. | ) | |
| | ) | |
| AUTO-OWNERS INSURANCE | ) | |
| COMPANY, INC., et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT AUTO-OWNERS INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

ROGER S. MORROW (MOR032)
JOEL H. PEARSON(PEA019)
**Attorneys for Defendant Auto- Owners**
**Insurance Company**
MORROW, ROMINE & PEARSON, P. C.
122 South Hull Street
P. O. Box 4804
Montgomery, Alabama 36103-4804
Telephone: (334) 262-7707
Facsimile:  (334) 262-7742

## TABLE OF CONTENTS

Table of Contents ........................................................................................ i

Defendant's Reply to Plaintiff's Response to
Defendant Auto-owners Insurance Company's
Motion for Summary Judgment ....................................................................1

   I.   Introduction ..........................................................................................1

        Gunnin v. State Farm Fire & Cas. Co.,
           2007 WL 1100517 *5 fn 7 ..............................................................2

        Kervin v. Southern Garaunty Ins. Co.,
           667 So. 2d 704, 706 (Ala. 1995) ..................................................4

        National Savings Life Insurance Company v. Dutton,
           419 So. 2d 1357, 1362 (Ala. 1982) ..............................................2

        State Farm Fire & Cas. Co. v. Slade,
           747 So. 2d 293, 317 (Ala. 1995) ..................................................4

        West Beach Development Co., LLC v. Royal Indemnity Co.,
           2000 WL 1367994 *7 at fn 11 (S.D. Ala. Sept. 19, 2000) .......2, 4

   II.  Defendant's Response to Plaintiff's
       Purported Statement of Facts ..............................................................4

        Kanellis v. Pacific Indemnity Co.,
           917 So. 2d 149, 154 (Ala. in App. 2005) ....................................30

   III.  Standard of Review ............................................................................31

        Anderson v. Liberty Lobby, Inc.,
           477 U.S. 242, 255, 106 S. Ct. 2505 (1986) ..............................32

        Carter v. Miami,
           870 F. 2d 578, 585 (11th Cir. 1989) ..........................................32

        Celotex Corp. v. Catrett,
           477 U.S. 317, 106 S. Ct. 2548 (1986) ......................................32

        Ramsey v. Laeth,
           706 F. 2d 1166, 1170 (11th Cir. 1983) ......................................32

i

IV. Auto-owners Is Entitled to Entry of Summary
Judgment in Auto-owners' Favor as to Plaintiff's
Claim Alleging Breach of Contract . . . . . . . . . . . . . . . . . . . . . . . . . 32

State Farm & Cas. Co. v. Shady Grove Baptist Church,
838 So. 2d 1039 (Ala. 2002) . . . . . . . . . . . . . . . . . . . . . . . 33, 35

Village Market, Inc. v. State Farm Gen. Ins. Co.,
970 S.W. 2d 243 (Ark. 1998) . . . . . . . . . . . . . . . . . . . . . . . 34, 35

V. Auto-owners Is Entitled to Entry of Summary
Judgment in Auto-owners' Favor as to Plaintiff's
Claim Alleging "Abnormal" Bad Faith . . . . . . . . . . . . . . . . . . . . . . 35

Kervin v. Southern Garaunty Ins. Co.,
667 So. 2d 704, 706 (Ala. 1995) . . . . . . . . . . . . . . . . . . . . . . . 37

Kern v. Standard Fire Ins. Co.,
2006 WL 1982115 (M.D. Ala. 2006) . . . . . . . . . . . . . . . . . . . . 36

Morton v. Allstate Ins. Co.,
486 So. 2d 1263 (Ala. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 37

Mutual Service Cas. v. Henderson,
368 F. 3d 1309 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 36

National Savings Life Ins. Co. v. Dutton,
419 So. 2d 1357, 1362 (Ala. 1982) . . . . . . . . . . . . . . . . . . . . . 35

State Farm Fire & Cas. Co. v. Slade,
747 So. 2d 293, 317 (Ala. 1999) . . . . . . . . . . . . . . . . . . . . . . . 36

Turner v. State Farm Fire & Cas. Co.,
614 So. 2d 1029 (Ala. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 36

USAA v. Hobbs,
858 So. 2d 966 (Ala. Civ. App. 2003) . . . . . . . . . . . . . . . . . . . . 36

West Beach Development Co., LLC v. Royal Indemnity Co.,
2000 WL 1367994 (S.D. Ala. Sept. 19, 2000) . . . . . . . . . . . . 36, 37

IV. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ii

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **PIONEER SERVICES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.: 2:06-cv-377-WKW** |
| **v.** | ) | |
| | ) | |
| **AUTO-OWNERS INSURANCE** | ) | |
| **COMPANY, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT AUTO-OWNERS INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Defendant, Auto-Owners Insurance Company (Auto-Owners), and pursuant to this Honorable Court's order April 30, 2007order (Doc. 30), and files Auto-Owners' reply to Plaintiff's response (Doc. 27) to Defendant Auto-Owners' motion for summary judgment (Doc. 12) heretofore filed in this cause as follows, to wit:

I

### INTRODUCTION

At the outset it is significant for this Honorable Court to note that Plaintiff, Pioneer Services does not dispute Defendant Auto-Owners' Narrative Statement of Undisputed Facts. See, Doc. 27 at p. 1 L14-15. Instead, Plaintiff simply supplied the Court additional purported undisputed facts Plaintiff claimed were developed during discovery "[i]n addition to the facts claimed as 'undisputed' by the Defendant …." See, Doc. 27 at p. 1 L14-15 (emphasis supplied). Thus, Plaintiff has not disputed the facts set forth in Defendant Auto-Owners' brief which are fully dispositive of Auto-Owners' motion and establish as a matter of law that Defendant Auto-Owners is entitled to summary judgment in Auto-Owners' favor.

In addition, and as discussed in further detail below, Pioneer abandons any claim of alleged "normal" bad faith and addresses only its alleged claim for "abnormal" bad faith. See, Doc. 27 at p. 14 L 14-L 23. Plaintiff, therefore, has conceded that it cannot make out a *prima facia* case of "normal" bad faith refusal to pay an insurance claim and that Plaintiff is not entitled to recover on the contract claim as a matter of law. See, National Savings Life Insurance Company v. Dutton, 419 So. 2d 1357, 1362 (Ala. 1982) (in the "normal case, in order for a Plaintiff to make that a *prima facie* case of bad faith refusal to pay an insurance claim, the proof offered must show that the Plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law."); see also, West Beach Development Co., LLC v. Royal Indemnity Co., 2000 WL 1367994 *7 at fn 11 (S.D Ala. Sept. 19, 2000); Gunnin v. State Farm Fire & Cas. Co., 2007 WL 1100517 *5 fn 7 (on a "normal" bad faith claim "the insured must show that he is entitled to a directed verdict on the breach of contract claim"). Thus, the claims addressed in this brief pertain only to Plaintiff's claims alleging 1) breach of the insurance contract, and 2) "abnormal bad faith.[1] In responding to Plaintiff's argument, this brief also addresses the incomplete and distorted additional undisputed facts set forth by Plaintiff in its response.

Foremost among the evidence Plaintiff has not disputed and which its arguments do not address is the undisputed fact Plaintiff failed to comply with conditions of the policy in disposing of the property which precludes Plaintiff's recovery, as a matter of law, under its contract claim. This undisputed fact also demonstrates, as a matter of law, that Plaintiff

---

[1]Plaintiff's fraud claims were previously dismissed by the Circuit Court of Covington County, Alabama (Doc 1-2 at p. 162).

has not met its burden of proving that Pioneer suffered a "direct physical loss of or damage
to covered property". <u>See</u>, Doc 13 p. 3 L8; G-AO00027 L11.[2]  Thus, Auto-Owners is
entitled to summary judgment as to Plaintiff's breach of contract claim.

In failing to dispute the facts set forth in Defendant's brief, Plaintiff has also
acknowledged the investigation undertaken by Defendant with regard to Plaintiff's claims.
Plaintiff's response also fails to present any evidence that Defendant intentionally or
recklessly failed to investigate Plaintiff's insurance claim, or a failure to properly subject
Plaintiff's insurance claim to a cognitive evaluation.[3]  Plaintiff's response sets forth no
evidence to demonstrate that a genuine dispute exists as to either 1) Plaintiff's failure to
prove a direct physical loss of or damage to covered property under the insurance policy,
or 2) Plaintiff's violation of the conditions regarding the retention and inspection of property
contained in the policy. See, G-AO00027 L11; <u>see also</u>, G-A00032-33 at ¶3a (4), (5), (6).

Plaintiff's response merely sets forth distorted facts to support Pioneer's criticism
of the investigation undertaken by Auto-Owners regarding one aspect (i e., the contents)
of the Pioneer claim.  This is not evidence Defendant intentionally or recklessly failed to
investigate Plaintiff's insurance claim or failed subject the claim to a cognitive evaluation.

---

[2]References to Exhibits A-J are references to Defendant's prior evidentiary submission and
Exhibits "K"-"R" refer to the supplemental submission attached here.

[3]The Court should note the context in which Plaintiff's claims are made.  Plaintiff's president
submitted homeowners structure and contents claims which were paid and upon which he asserts
no claim. <u>See</u>, F. 113 and 114; <u>see also</u>, A-Depo. of Williamson at p. 233 L22-p 234 L9, p 240
L12-15 p. 245 I4 - p. 246 L16. Plaintiff also submitted a claim for damage to the structure of the
Plaintiff upon which Plaintiff makes no claim. <u>See</u>, F-117; <u>see also</u>, A-Depo. of Williamson at p
248 L110-L14, p 326 L7-L18. Plaintiff's claim herein are limited to the contents of Pioneer Services
which were thrown away by its president within less than sixty days following Plaintiff's first
submission of any documentation regarding the contents loss to Auto-Owners. <u>See</u>, A-Depo. of
Williamson at p. 233 L22-p 234-L2

3

Instead, this is an attempt by Plaintiff to have this court create a cause of action for alleged

negligent or wanton handling of a claim which Alabama state and federal courts have

"consistently refused to recognize." See, Kervin v. Southern Garaunty Ins. Co., 667 So.

2d 704, 706 (Ala. 1995); see also, West Beach Development Co., LLC v. Royal Indemnity

Co., 2000 WL1367944 *6-*8 (S.D. Ala. Sept. 19, 2000). Furthermore, recovery under

an "abnormal" bad-faith failure to investigate an insurance claim theory is limited to those

instances in which the insured's losses were covered under the policy. See, State Farm

Fire & Cas. Co. v. Slade, 747 So. 2d 293, 317 (Ala. 1995); see also, West Beach

Development Co., supra at *5.

II

## DEFENDANT'S RESPONSE TO PLAINTIFF'S PURPORTED STATEMENT OF FACTS

1.    In paragraph 1 of its facts Plaintiff states that Pioneer submitted a

catastrophe loss notice which notified Auto-Owners of damage to Pioneer's building and

the contents thereof. See, Doc. 27 at p. 1 L 16-19. In fact, the preprinted portion of the

subject catastrophe (CAT) loss notice was a preprinted notice prepared by Auto-Owners'

home office in advance of a catastrophe and in anticipation of a large number of claims.

See, G-AO113; see also, Depo. of Barrett at p. 66 L9-p.67 L23; Depo. of Reaves at p. 158

L8-p.158 L21. The local independent agent, Harold Young, testified in his deposition:

> Q    Have you ever assisted a customer by forwarding
> documents to support their claim on to one of your
> insurance companies that you write policies for?
>
> A    Yes, sir
>
> Q    What do you do there?

4

A.    After the property loss notice is filed, people come in with estimates. Auto Owners does an exceptional job of producing an advanced preprinted claims notice - -

[Page 71 L 23 to Page 72 L 9] of Harold Young's Deposition (excerpt attached as Ex. "K").

\*      \*      \*

Q.    (By Mr. Hall) Mr. Young, I interrupted you, and I apologize for that

A.    No problem.

Q.    You were, I think discussing what you would do with information on claims that people brought to you after the fact?

A.    Yes, sir. After the property loss notice is sent in, people get estimates and bring those estimates by, and we usually fax those estimates in or get them to the adjuster that came by during that particular time.

Q.    And after faxing those in, would you have conversations or someone from South Central have a conversation with, say Auto Owners, about confirmation, you got it, is it okay, or enough?

A.    We usually follow up on those claims that we send in. Auto Owners is a little different than most companies. They had a preprinted claims form of every customer that we had. And we didn't have to go in and do the property loss notice on our computer, it was already done. So we would attach the estimate to that notice and mail it or fax it or give it to whatever adjuster was here at the time to provide quicker and more efficient service.

Q.    Would you hand-fill out the forms?

A.    No, sir, they were already preprinted, and we would just attach the estimates to them and give them to the adjuster or mail them in

5

Q.    Would you look through the Exhibit 2, and see if you find one for Pioneer for the hurricane. Exhibit 2 is the entire stack.

A.    Okay. Right there.

MR. ROBERTSON: Could we go off the record.

MR. HALL: Back on the record after taking a short break. This is disk 2 of Harold Young's deposition

Q.    (BY MR. HALL) Mr. Young, you have pulled out of Plaintiff's Exhibit 2 a document that, I believe, is a catastrophe loss notice prepared by Auto Owners for Hurricane Ivan?

A.    Yes, sir

Q.    Is that an example of the preprinted forms that were sent prior to the hurricane to cover every one of your insured that had insurance through Auto Owners?

A.    Yes.

Q.    Is this the one that was prepared by your staff concerning the Pioneer Telephone Services claim?

A.    Yes

[Page 72 L 20 to Page 75 L9] of Harold Young's Deposition (Ex "K" hereto).

\*        \*        \*

Thus, the preprinted portion of the notice was prepared by Auto-Owners' home office and the remainder of the notice was prepared by the independent agent's staff. The foregoing also reflects that insureds brought estimates of damage by which the independent agent assisted with by faxing them to the adjuster handling the claims. Plaintiff has already acknowledged that it was not until October 29, 2004 when he "started" looking at the contents claims of Pioneer. See, K-Depo. of Williamson at p. 254 L1-19; 259

L 7- L22. Thus, it is undisputed by Plaintiff that Plaintiff did not submit any documentation regarding a contents claim for Pioneer until after October 29, 2004, and it is further undisputed that Auto-Owners' representative did not receive the documents until November 8, 2004. See, B-Depo. of Reaves at p. 165 L18 -L20, p 182-L15-p.183-L17. As set forth in paragraph 4 below the initial documents submitted by Plaintiff consisted only of a list prepared by Plaintiff himself of items and a lump sum amount for the items. See, brief of Defendant (Doc. 13) at p. 8 ¶ 11. Auto-Owners' representative contacted and met with Mr. Williamson within a week of receiving the documents. See, B-Depo. of Reaves at p. 185 L6-186 L6.

2.       In its statement of facts Pioneer misstates that Auto-Owners did not comply with requirements of its Claims Handling Guide. See, Doc. 27 at p. 1 ¶2. Paragraph 2 of Pioneer's facts also cites the deposition of Todd Worley for the assertion that Auto-Owners did not comply with the Claims Handling Guide. The Auto-Owners Claims Handling Guide actually states:

> ### Response to a Notice of a Claim
>
> On first party losses (policy benefits sought by an insured) within thirty days the insured must be advised in writing, or by dated notation in the file, what is needed to present their claim and what constitutes a satisfactory proof of loss. If the claim is resolved within thirty days the file should be self-explanatory.

AO-00953 L21 - L24; see also, Ex. "L" hereto.

Contrary to the assertion of Plaintiff, Mr. Worley's actual testimony at his deposition was as follows:

> Q.      The first one says, on first party losses - - is this a first party loss?

7

A.    It is first party loss.

Q.    On first party losses, within 30 days the insured must be advised in writing or by dated notation in file what is needed to present their claim, and what constitutes a satisfactory proof of loss. Was that done?

[Depo. of Worley at p. 48 L20 through p. 49 L4]

*    *    *

Q.    This is - - there should be in writing, notice to the insured of what they need to do to present their claim properly?

A.    Right. Or by, again, dated notation in the file.

Q.    Can you check to tell . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . .14
me if there is any such notation in the file that this ever happened?

A.    Yeah. It looks like we contacted the insured on November 16th.

Q.    What page are you reading from?

A.    This is 112. The insured was going to furnish a breakdown of components.

Q.    Tell me which one you read from again?

A.    Page 112, November 16, 2004.

Q.    Where it says "met with insured"?

A.    Right.

Q.    It says, "Part of roof blown up"?

A.    Uh-huh, (affirmative)

Q.    Read the rest?

A.    It says: Telephone system components in back storage

8

room got wet. Also claimed the phone system and
building was struck by lightning. He will furnish
breakdown of components including invoice prices. I
think that's what that says

Q.     Is there anything in writing to the insured that will
comply with the paragraph I was reading from, from
AO953?

A.     I cannot find anything, no.

Q.     Is this notation on 11/16/04, that you just read, the
closet thing to complying with that paragraph you just
read on page AO953 that you can find in the file?

A.     In writing, that is probably the closet thing we have.
You know, we met with the insured. Bill spent - - I don't
know how much time Bill spent with him, so there is a
lot that was discussed that didn't get written down.

[Depo. of Worley at p. 50 L23 through p. 52 L13]

Thus, there was a dated notation in the file dated November 16, 2004 noting

discussion between Auto-Owners representative Mr. Reaves and Mr. Williams pertaining

to additional breakdowns of components including invoice prices. This clearly satisfies the

guideline

3.     In paragraph 3 of its "facts" Plaintiff's counsel states Mr. Reaves "did not

review the figures presented in the affidavit supplied by Pioneer nor did he review it closely

enough to notice any discrepancies or errors" See, Doc. 27 at p. 2 L 3-L 6. This

statement is a misstatement of Mr. Reaves' testimony. Mr. Reaves actual testimony was:

Q     All right. Are those the documents that you were
handed on November 8, 2004?

A.     I believe they were.

Q.     All right. And let me be sure I understand the nature of
these. The first document is a four-page document that

9

says, invoice, and it's dated October 29, 2004. It has a list of equipment and it starts off with equipment in warehouse water damaged by Ivan storm. Does that seem like it's one document?

A.    It appears to be.

Q.    All right. What do you consider that document to be?

A.    It appears to be an invoice where Pioneer Telephone Services sold themselves some equipment.

Q.    Is it an estimate for damaged equipment?

A.    It says it's an invoice.

Q.    Okay. Well, is that as far as you looked is the top line on the left-hand side - - or right-hand side?

A    No.

Q.    What did yo do with that document? What did you take it to be when you got it?

A.    I thought he was probably taking this invoice and wanting to make it as estimate.

Q.    Did you talk to anybody about that?
A.    I did.

Q    Who did you talk to about that?

A.    Jimmy Williamson.

Q    What did you tell Jimmy Williamson and when?

A.    I believe the date was November 15th.

Q.    Okay. About a weak [sic] later?

A.    That's correct. I advised him that the claim or the invoice was a lumped-sum invoice and that we couldn't accept a lump item like that. We needed invoice prices and line-by-line prices of what these items costs.

10

Q.    You told Jimmy Williamson that on the 15th?

A.    That's correct.

(emphasis supplied)

[Page 183 L20 to 185 L 20] of Bill Reaves Deposition (excerpts attached hereto as Ex. "N").

\*        \*        \*

Q.    So you were confused by this document?

A.    I did not know at the time what that represented

Q.    At the time it was handed to you?

A.    That's correct.

Q.    <u>What inquiry, if any, did you make into the nature of this document</u>?

MR. PEARSON:    Object to the form. He's already testified to that.

A.    <u>That's when I talked with Jimmy Williamson about it to find out exactly what that was</u>.

Q.    What did he say?

A.    He said that's the amount he was claiming was water damaged.

Q.    <u>Your testimony is that you told him at that time you needed more details</u>?

A.    <u>Needed a breakdown on it line by line for the amount each item cost, and we needed his invoices for price verification on it</u>.

Q.    Wait a minute. You also asked him for an invoice, a copy of where he purchased it?

A.    That's correct.

11

(emphasis supplied)

[Page 187 L 3 to 188 L4] of Bill Reaves Deposition] (Ex. "N").

                          *        *        *

Q.     Okay. And the affidavit that you're holding and this
       invoice that starts Page 181 and 183, do they cover the
       same - - sorry, 184, do they cover the same   items?
       Have you ever compared the two to see?

A.     I've spot checked to see if some of the items matched
       up.

Q.     You've spot checked to see if some did?

A.     That's correct.

Q.     When did you do that?

A.     I don't remember the date.

Q.     Was it in preparation for this?

A.      No, it was not.

Q.     Was it before this lawsuit was filed?

A.     Yes, it was

Q.     Why did you spot check it?

A.     Just ran through it to verify -- let me take that back. I'm
       not sure if it was this particular document that I spot
       checked it versus the other ones that –

Q.     From Telecom?

A.     No. The other one that he sent in with the price list on
       it. I believe it was the price list, the breakdown of this
       that I spot checked.

Q.     Okay.

(emphasis supplied)

                              12

[Page 192 L 10 to 193 L 15] of Bill Reaves Deposition (Ex. "N").

*        *        *

Q        Did you do anything with those documents when you
         met with Jimmy Williamson?

A.       Yes.

Q        What did you do with those documents?

A.       I asked Mr. Williamson was this the amount he was
         claiming

Q.       And did he say yes?

A.       Yes, he did.

Q.       What else did you ask him or tell him about those
         documents.

A.       That's all I remember.

(emphasis supplied)

[Page 194 L 17 to 195 L 5] of Bill Reaves Deposition. (Ex. "N").

*        *        *

Q.       That is page AO 192.  You received the documents
         we've just talked about on November 8th at South
         Central Agency; is that right?

A        That's correct.

Q.       And then you came back a week later and met with
         Jimmy Williamson and brought those documents with
         you; is that right

A.       That's correct.

Q        At that meeting with Jimmy Williamson, tell me how that
         meeting went.  What happened in that meeting?

A.       I met with him at his business.

13

(emphasis supplied)

[Page 195 L 11 to 195 L 23] of Bill Reaves Deposition.  (Ex.  "N")

*        *        *

Q.    <u>After you met with Mr.  Williamson or while you met with
      him, did you take photographs</u>?

A.    <u>I did.</u>

Q.    There are two sets of photographs in Exhibit 10.  One
      set is color and the other is not.  Help me identify what
      photographs that you took when you met with Mr.
      Williamson.

A.    Those are the ones

(emphasis supplied)

[Page 197 L7 to 197 L 15] of Bill Reaves Deposition.  (Ex.  "N").

*        *        *

Q.    <u>You took pictures of the outside and inside of Pioneer
      Services building; is that true</u>?

A.    <u>Yes.</u>

Q.    You took pictures of the outside and the inside?

A.    Yes.

Q.    You took pictures of the areas where the stock and
      inventory were stored when they were damaged; is that
      true?

MR.  PEARSON:    Object to the form.

A.    That's correct

Q.    You took a picture of - - well, why don't you tell me what
      the picutres are.  Go through each one.  They've got a
      different number on each one, don't they?

14

A.    They do.

Q.    Why don't you tell em the number, and then tell me what it is.

A.    All right. The picture - - the first picture - -you want the MVC 001?

Q.    Just do the number after 00 because I think they all have MVC 00.

A.    They do. The first picture is a picture of the insured's building.

Q.    What's the second picture?

A.    Second picture is the area in the warehouse or storeroom where a leak occurred. The picture is showing where the insured had this contents that he claimed got wet, where they were stored. The fourth picture is what he claimed was his new phone system.

Q.    Does it have a note under that one?

A.    It does.

Q.    What does it say?

A.    New phone system in building.

Q.    Who wrote that?

A.    I did.

Q.    Is there a note on the other one? What number is that?

A.    Number three.

Q.    What does number three say under it in handwriting?

A.    Area insured claims inventory got wet.

Q.    When did you write that?

A.    After I printed these out.

15

Q.    When did you print these out?

A.    I don't recall the date.

Q    Was it more than a weak after you inspected that building?

A.    It was probably less than a week.

Q.    All right. Let's go to the next page. What do you see on the next page?

A.    That's - - picture five appears to be some carpet.

Q.    Why did you take that picture?

A.    Mr. Williamson had advised that the carpet had been damaged.

Q.    Were you taking a picture of the damage to the carpet?

A.    I believe so

Q.    All right. What about the next picture?

A.    The sixth picture is a picture of one of these boards that he claimed was damaged.

Q.    Now, is that at a different location?

A    Yes, it is

Q.    Where was that taken?

A.    That was taken at his residence.

Q    How far was his residence from his office?

A.    A mile, mile and a half.

Q.    All right. Why did you go to his residence?

A.    That's where the contents he claimed were damaged were located.

16

Q.    All right. Did you then go with him to his residence to look at hose?

A.    Yes, I did.

Q.    And were they stored in a building?

A.    Yes, they were.

Q.    Protected from the elements?

A.    Yes, they were.

(emphasis supplied)

[Page 199 L 5 to 202 L 22] of Bill Reaves Deposition. (Ex. "N")

\*        \*        \*

Q.    All right. How did you find out or come to know that the equipment had been disposed of?

A.    I received a call from Larry Dewberry.

Q.    <u>And let's back up a notch. When did you contact Mr. Dewberry to get him involved</u>?

A.    <u>I believe it was on December 9th</u>

Q.    What did you ask him to do?

A.    I'd have to pull the letter out to see.

Q.    Did you call him?

A.    No.

Q.    <u>The letter is the communication to Mr. Dewberry</u>?

A.    <u>That's correct</u>.

Q.    Had you - -

A.    Let me take that back. <u>I may have called him to let him know I was going to be sending him something</u>.

17

(emphasis supplied)

[Page 216 L 3 to 216 L 23] of Bill Reaves Deposition. (Ex. "N").

*     *     *

Q.   What activity took place on the claim from November 16th to December 20th other that the letter to Mr. Dewberry?

A.   That's all - - I take back. I believe that <u>Jimmy Williamson had, in the meantime, faxed me a breakdown of those invoices - - on those invoices and listed the prices on them</u>.

Q.   The details you were talking about earlier?

A.   That's correct. I believe those came in --

Q.   That would - -

A.   - - in that time period.

Q.   <u>That would have been what you were spot checking</u> - -

A.   <u>That's correct</u>.

Q.   - - <u>to see if it added up right</u>?

A.   <u>That's correct</u>

Q.   Did anything in your spot checking lead you to believe that the numbers did match up?

A.   No.

(emphasis supplied)

[Page 218 L 17 to 219 L 16] of Bill Reaves Deposition  (Ex. "N").

The suggestion by Plaintiff that the documents were not properly reviewed or considered in preposterous. The foregoing demonstrates that Mr. Reaves reviewed the

18

documents, the documents were discussed with Mr. Williamson, Mr. Williamson was advised further breakdown was needed, the items listed were "spot checked" against a subsequent list provided, that upon receipt of the documents Mr. Reaves contacted Mr Williamson and set up a meeting within a week, that Mr. Reaves brought the documents to the meeting with Mr. Williamson whereupon photographs were taken and items inspected. Mr. Reaves also located and contacted an engineer, telefaxed him, wrote a letter to the engineer requesting an inspection and forwarded documents to the engineer retained by Auto-Owners. See, Depo. of Dewberry (Ex. "O" hereto) at p. 11 L 13- p. 12 L7; p. 14 L3 - L21. These facts, alone, demonstrate the complete absence of any basis for Plaintiff's assertion of a claim for "abnormal" bad faith failure to investigate.

4.      In paragraph 4 of its facts Plaintiff states that lightning and water damage affidavits were provided to Auto-Owners and acknowledges that an inspection of the contents was undertaken by Bill Reaves within a week of receipt of the documents. See, Doc. 27 at ¶ 4. The documents submitted were basically a list of items dated October 29, 2004 and entitled "invoice" by Pioneer. See, G-AO00181-AO00184 and G-AO00191-AO00192; see also, Depo. of Barrett (Ex. "P" hereto) at p. 119 L 1 through 120 L15; 139 L13 of p. 139 L 20. Mr. Reaves testified that it appeared to be an invoice that Mr. Williamson wanted to make an estimate. See, Depo. of Reaves (Ex. "N" hereto) at p. 185 L 1 - p. 185 L23. Paragraph 4 of Pioneer's facts also acknowledges that Mr. Reaves undertook an inspection of the subject Pioneer contents within a week of his and Auto-Owners' receipt of the documents. See, Doc. 27 at ¶ 4. It is undisputed that Mr. Reaves advised Mr. Williamson at the time of his meeting with Mr. Williamson on November 15, 2004 that the claim or the invoice was lumped-sum and could not be accepted and Auto-

19

Owners needed invoice prices and line by line prices of cost and copies of any invoices where the items were purchased. See, Depo. of Reaves (Ex. "N" hereto) at p. 185 L1 -188 L15. See also, Ex. G-AO00112 at L8-L14. These facts again demonstrate the investigation conducted by Auto-Owners.

5.    In paragraph 5 of its facts Plaintiff acknowledges that Mr. Reaves undertook an investigation and inspection of the equipment, met with Mr. Williamson, and photographed equipment. Mr. Reaves took pictures of the outside of the building and the inside of the building. See, Depo. of Reaves (Ex. "N") at p. 199 L 5 to 199 L11 Mr. Reaves took a number of other pictures including items inside boxes wrapped in plastic. See, Depo. of Reaves (Ex. "N") at p. 204 L 1 to p. 205 L17. Mr. Reaves took some items out of the wrapping and did not observe any damage. See, Depo. of Reaves (Ex. "N") at p. 205 L 3 - 205 L9. Again, these facts demonstrate additional investigation by Auto-Owners.

In paragraph 5 the Plaintiff states that "[a]t no point did Mr. Reaves ask Pioneer's president to explain what any of the equipment was ... or to otherwise explain the affidavit supplied to support Pioneer's claim." See, Doc. 27 at ¶ 5. This again is a misstatement of the facts. Plaintiff has already admitted in his deposition testimony that Mr. Reaves took photographs of items (Depo. of Williamson (Ex. "Q" hereto) at p. 275 L 13 - 276 L 7). Mr. Williamson also acknowledged that Mr. Reaves looked in some of the boxes. See, Depo. of Williamson (Ex. "Q") at p. 280 L17 - L 22) Mr. Williamson also admitted Mr. Reaves inquired whether there were any salvageable parts. See, Depo. of Williamson (Ex. "Q") at p. 281 L4-L 9. Mr. Williamson also acknowledged that Mr. Reaves said he would be back in touch. See, Depo. of Williamson (Ex. "G") at p. 283 L8-L11.

6.     In paragraph 6 of Pioneer's facts, Pioneer states that Mr. Reaves did not decide to contact Franklin Engineering until three weeks after his inspection of the damaged equipment. See, Doc. 27 at L 1. This statement by Plaintiff again acknowledges Auto-Owners was continuing its investigation of Pioneer's contents claim. Mr. Reaves spoke with Larry Dewberry, an engineer, on December 9, 2004 requesting that he inspect the subject equipment. See, Depo. of Dewberry (Ex. "O") at p. 11 L17. Mr. Reaves also forwarded Mr. Dewberry a telefax. (Plaintiff's Exhibit "17" to Depo. of Larry Dewberry at p. 4.). Mr. Reaves also wrote a letter to Mr. Dewberry on December 9, 2004, requesting that he inspect to verify the damages and that Mr. Reaves gathered and included documentation provided by the Pioneer in his communication with the engineer retained by Auto-Owners. See, Plaintiff's Exhibit "17" to Depo. of Larry Dewberry (Ex. "O") at p. 5 - 20.

7.     In paragraph 7 of its facts Plaintiff references the December 20 letter to Pioneer requesting that Pioneer provide outside documentation and evidence of the damage along with salvage value. This letter reiterated the earlier verbal requests made by Mr. Reaves to Pioneer which were acknowledged by Mr. Williamson. See, Depo. of Williamson (Ex. "Q") p. 295 L 7 - p 296 L 2. See also, Depo. of Bill Reeves (Ex. "N") at p 185 L 8 - L 20; G-AO00112 at L8. Thus, it is undisputed that Auto-Owners was conducting an investigation and requesting additional information from the insured regarding the contents claimed damaged.

8.     In paragraph 8 of its facts Pioneer states that Pioneer submitted estimates and affidavits from Mac Bracewell of Telcom Services in response to a request in the December 20, 2004 letter of Bill Reaves to Pioneer Contrary to the blatant misstatement

21

of Plaintiff's counsel in paragraph 8 of Pioneer's facts that Mr. Reaves "did nothing with

them" (Doc. 27 at para. 8 ln. 9), Mr. Reaves testified that the additional documentation was

reviewed and considered before the claim was denied. <u>See</u>, Depo. of Reaves (Ex. "N")

at p. 268 L 14 - L 22; p. 245 L 9 - L 11. Also, Mr. Reaves observed that the documents

were not signed by Mr. Bracewell. <u>See</u>, Depo. of Reeves (Ex. "N") at p. 221 L 23 - p. 223

L 1. In his deposition Mr. Reaves testified regarding these documents as follows:

> Q.    Let me show you what's been marked Plaintiff's Exhibit
>        3   Is that one of the documents that Mr. Williamson
>        sent you after the meeting in November in his shed?
>
> A.    Yes, it is.
>
> Q.    Is that signed by Mac Bracewell?
>
> A.    It appears to be signed by SWP.
>
> Q.    On behalf of Mr. Bracewell?
>
> A.    It's signed K. Mac Bracewell by SWP.
>
> Q.    Do you take exception to that signature line?
>
> A.    On an affidavit?
>
> Q.    Yes, sir.
>
> A    Yes
>
> Q    What's wrong with that?
>
> A.    Never signed by – or doesn't appear to be signed by
>        Mac Bracewell.
>
> Q.    Did you ever call Mr. Bracewell to find out if he
>        authorized his signature on that document?
>
> A.    No, I didn't.
>
> Q.    Did you notice that it was by SWP at the time you

received it?

A.    Yes, I did.

Q.    What did you do with that information?

A     We didn't do with anything with it.

Q.    What did you do with this document that is AO 123 through 127?

A.    I did review the information contained in there.

Q.    Did you also receive Exhibit 4, which is AO 128 through 131?

A.    Yes, I did.

Q.    Is this a quotation from Telcom Services?

A.    That's what it says.

Q.    Did you review that document?

A.    Yes, I did.

Q.    What did you learn from that document when you looked at it?

A.    I saw that it was the exact same information that had been sent to me before except the names had been changed on it.

Q.    What did you do with it after you noticed that?

A.    That's all I did with it.

Q.    Did you put it in the file?

A.    It went in the file.

Q.    Did you compare it to any of the other invoices of quotations?

A.    I compared it with the previous invoices that had come

23

in.

[Page 221 L23 to 223 L1] of Bill Reaves Deposition. (Ex. "N").

Thus, Mr. Reaves reviewed the documents, and made observations regarding the

documents in the course of the investigation. Mr. Reaves also testified that he asked the

independent agents about Mac Bracewell and who Mac Bracewell was. See, Depo. of

Reaves (Ex. "N") at p. 225 L 2 - p. 227 L 17. Thus, Plaintiff's statement that Mr. Reaves

"did nothing with them" is absolutely untrue.

9. In paragraph 9 of its facts Pioneer references testimony by Mr. Reaves

regarding requests for additional details from Pioneer of Telcom regarding damage to the

equipment. Mr. Reaves' actual testimony was as follows:

> Q. All right. Did you ever ask Mac Bracewell to explain to you the basis for his opinion that the different pieces of equipment had been damaged?
>
> A. No. Mr. Bracewell had – or somebody had put that on the affidavit as what his opinion to the damages were.
>
> Q. You never asked him about that?
>
> A. I never asked him about that.
>
> Q. Did you ask him to explain with more detail so it wasn't as vague?
>
> A. No, I didn't.
>
> Q. Why not?
>
> A. We wanted to inspect the items in the beginning because this information that we were given was too vague to substantiate a claim of this size.

[Page 238 L1 to L17 Depo. of Bill Reaves (Ex. "N")]

This testimony by Mr. Reaves does not support a claim for breach of contract or

24

"abnormal" bad faith, but instead reflects Auto-Owners' right and desire to inspect the damaged equipment, Pioneer's failure to meet its burden of demonstrating loss or damage to covered property, and Pioneer's failure to comply with the conditions of the insurance policy requiring that Pioneer store the damaged equipment and make it available for inspection. See, G-A000027 and G-AO00032.

10.    In paragraph 10 of its facts, Pioneer refers to a report Mr. Reaves wrote to Auto-Owners home office regarding developments regarding Pioneer's contents claim and Pioneer's disposal of the equipment, and in particular a notation by Mr. Reaves about the possibility of a statement from Mr. Williamson. Mr. Reaves was, however, advised by Larry Dewberry, the engineer retained by Auto-Owners, that Mr. Williamson said the independent agent purportedly told Mr. Williamson that he could throw the damaged equipment away. This statement is set forth in the report to the home office. See, G-AO00110 at L13-L14. Mr. Reaves also did additional investigation, and his testimony in this regard was as follows:

> Q.    We're on the last line of the second paragraph of the second page: We have not yet verified that with the insured. And "that" being him being told by the agent he could dispose of the property. Do you follow me?
>
> A.    Okay. What is your question?
>
> Q.    <u>Did you do anything to verify that with the insured</u>?
>
> A.    <u>I verified that with the agent</u>.
>
> Q.    You never called the insured about that, did you?
>
> A.    No, I didn't.
>
> Q.    What did the agent say?

25

> A.    The agent advised that Jimmy Williamson had called
>        them in a panic saying that somebody wanted to come
>        look at the equipment, and he'd already thrown it away.
>        And the agent said that he was telling them that they
>        had told him he could throw it away.
>
> Q.    And?
>
> A.    <u>The agents advised that they didn't tell him he could
>        throw it away.</u>

(emphasis supplied)

[Page 260 L17 to Page 261 L16 Depo. of Bill Reaves (Ex. "N")]

These undisputed facts demonstrate Mr. Reaves not only investigated the claim but also contacted Auto-Owners' home office regarding developments in the claim, and conducted additional investigation including inquiry of the independent agent. Paragraph 10 of Plaintiff's facts also states that Mr. Reaves never spoke to Mr. Williamson after November 15, 2004 inspection of the damaged equipment. It is, however, undisputed that there were numerous communications between Mr. Williamson and Auto-Owners including the request for and submission of the additional documents by Mr. Williamson. It is also undisputed that Mr. Reaves spoke with Mr. Williamson on January 31, 2005 regarding the specific time the lightning was purported to have occurred. <u>See</u>, Depo. of Worley at p. 80 L10 - p. 81 L17; <u>see also</u>, G-AO00111 at L9-L12. Mr. Williamson also acknowledged conversations with the local independent agent and being aware that there was a problem with the Telcom documentation. <u>See</u>, Depo. of Williamson (Ex."Q") at p. 288 L 21 - 23. As stated above, the foregoing establish additional investigation by Auto-Owners.

11.    In paragraph 11 of Plaintiff's facts, Pioneer distorts the testimony of Mr. Reaves stating that he agreed that Pioneer complied with conditions outlined in the policy

concerning protecting the property under paragraph 4 and 5 and referenced in Auto-Owners' December 20, 2004 letter. See, Doc. 27 at p. 4 ¶ 11. In making this statement, counsel for Pioneer blatantly disregards Mr. Reaves' testimony that Mr. Williamson only protected the property for a short period of time. Mr. Reaves' testimony was as follows:

> Q.    So you still had four and six. And we've already agreed that he complied with four as far as protection the property; right?
>
> *  *  *
>
> A.    He protected it for a short period of time.
>
> Q.    Okay. Well, six is really what you're focusing on here: As often as may be reasonably required, permit us to inspect. Did you believe he violated four or six?
>
> A.    Yes, I did.
>
> Q.    Both or one or the other?
>
> A.    Let me look at four. What was the question again?
>
> Q.    I believe my question was: Did you believe he had complied with Paragraph Four where he protect the equipment?
>
> *  *  *
>
> A.    He did for a short period of time
>
> Q.    You said before he had. Now you're going to put on there, for a short period of time?
>
> A.    Well, he did protect it for – I don't know when he moved it to the storage shed.
>
> > Q.    That right, you don't know.
>
> A.    I don't know that. But he protected it for less than a month.

27

Q.    <u>Six is what you're really concerned about.  That you</u>
      <u>weren't really about to see it again; right</u>?

                              *   *   *

A.    <u>Number six is where there was a problem with the</u>
      <u>claim</u>.

Q     <u>And six says, as often as may be reasonably expected;</u>
      <u>correct</u>?

A.    <u>Correct</u>.

Q.    <u>Any you believe that mans more than the inspection</u>
      <u>that took place on November 15th</u>?

A.    <u>Absolutely</u>.

Q.    But you never wrote him and told him you wanted
      another inspection, did you?

A.    <u>No.  I told you I told him while we were in the shed that</u>
      <u>we were going to send somebody to look at it.</u>

Q.    <u>And you waited how long before you sent somebody</u>?

A.    <u>It was less than a month</u>

(emphasis supplied)

[Page 276 L11 to Page 278 L13 Depo   of Bill Reaves (Ex.  "N")].

The testimony is clear that Pioneer received prompt communication from Auto-
Owners by letter dated December 20, 2004 of (G-AO 00205 L7-9; F -102) after learning
on December 16, 2004 of Pioneer's disposal of the equipment, and verification with the
agent that Mr.  Williamson was not told he could throw the equipment away  <u>See</u>, B-Depo.
of Reaves at p.  229, 257 L12, p.  260 L17 - p.  261 L16; D-Depo. of Tomberlin at p  123
L2 - L12: E-Depo of Young at p.  124 L7- p   125 L3.

12.    In paragraph 12 of its of facts Pioneer attempts to attach some significance

28

to the fact that Mr. Williamson's homeowner's claim was paid. Mr. Williamson has acknowledged that neither the structure or the contents the homeowner's claim are the subject of his action. See, A-Depo. of Williamson at p. 233 L22-p.234 L9. Mr. Williamson has also acknowledged that the structure claim regarding Pioneer Services is not the subject of this action. See, id. at p. 248 L10-L14; p. 320 L7-L18. The only claim which is the subject of this action is Pioneer's contents claim. See, id. at p. 233 L22-p. 234-L2.

The fact that Mr. Williamson's personal homeowner's claim was paid under another policy on another claim does not create coverage. Coverage cannot be created by estoppel. Furthermore, these facts demonstrate investigation by Auto-Owners and absolutely no basis for an "abnormal" bad faith failure to investigate the claim.

13.    In paragraph 13 Pioneer states that it "is qualified to issue lightning affidavits for telephone and computer equipment and Auto-Owners has accepted Pioneer affidavits on as many as eight other claims since Hurricane Ivan". In prior paragraphs of this reply, Auto-Owners has already set forth that the documents submitted by Pioneer were in the nature of lists. See, ¶ 4 above  Pioneer has not produced in this action any other lightning affidavits it has submitted  Regardless, Pioneer's submission of lists or affidavits on behalf of other claimants regarding other claims is completely irrelevant to Pioneer's own claim, particularly since it is undisputed Auto-Owners requested outside documentation See, G-AO00205 L14. More importantly, this has absolutely nothing to do with the investigation of Pioneer's contents claim or Pioneer's violation of the conditions of it policy.

14.    In paragraph 14 of its facts Pioneer states that Mr. Reaves never did anything to determine what, if any, relationship existed between Pioneer and Telcom Services that might have shown a conflict of interest between Telcom and Pioneer  Again, this is a

29

misstatement of the facts. Furthermore, whether Pioneer did or did not have a relationship with Telcom did not excuse Pioneer's violation of the conditions of the policy and does not satisfy Pioneer's burden of proving damage or loss of covered property. Paragraph 14 is, in fact, untrue in that it has already been demonstrated in paragraph 10 of this reply that Mr. Reaves made inquiry with the independent agent as to who Mac Bracewell was and the relationship between Pioneer and Telcom. It is also undisputed that Telcom's statement was not even signed by Mr. Bracewell of Telcom. See, B-Depo. of Reaves at p. 222 L8-L9.

15. In paragraph 15 of its facts, Pioneer states there is no evidence to support Mr. Reaves' testimony that he instructed Mr. Williamson to preserve the damaged equipment after Mr. Reaves inspected it on November 15, 2004. Obviously, the insured was already aware or made aware of the significance and need for storage of the equipment as evidenced by his storage of the equipment in a shed. See, Doc. 13 at ¶ 14. As a matter of law, the insured is deemed to be familiar with the terms of his policy including the requirements that he store the equipment and allow the inspection of the equipment. Kanellis v. Pacific Indemnity Co., 917 So. 2d 149, 154 (Ala. in App. 2005) (an insured is presumed to be familiar with policy provisions). Furthermore, Mr. Williamson has stated that he threw the equipment away based on statements of the independent agent who has been dismissed from this case. See, Doc. 1-2 at p. 162. Mr. Williamson also acknowledged Mr. Reaves advised him at their November 15, 2004 meeting that Mr. Reaves would be back in touch with Mr. Williamson. Depo. of Williamson at (Ex. Q.) at p. 283 L 11.

16. In paragraph 16 of its facts, Plaintiff states that the inspection conditions of

30

the Auto-Owners policy is a subjective part that varies from case to case. Each of the Auto-Owners representatives that were deposed in this action testified that the insured failed to store the equipment for inspection. Depo. of Reaves (Ex. "N") at p. 276 L17-278 L13; Depo. of Barrett (Ex. "P") at p. 164 at L3 to p. 165 L2; Depo of Worley (Ex. "M") p. 192 L10-L13, 194 L12-L18. It is undisputed that Plaintiff was not authorized by any Auto-Owners employee to dispose of the property, but alleges the independent agent, John Tomberlin, told him he could throw it away. See, Doc. 1-4 p. L16; see also, Depo. of Williamson (Ex. "Q") at p.301 L11-L21. It is also undisputed the Plaintiff cannot, as a matter of law, meet its burden of proving a physical loss or damage to covered property, and as a matter of law Pioneer failed to comply with the conditions of the Auto-Owners policy

## III.

## STANDARD OF REVIEW

Auto-Owners set forth in its previous brief in support of summary judgment the appropriate standard of review. See, Doc. 13 at p. 17 - 19. As stated earlier, Plaintiff has acknowledged in its brief that the facts set forth in Defendant Auto-Owners' brief are undisputed and merely set forth additional purported facts, many of the distortions of which were set forth in the preceding section of this brief  The material facts mandating summary judgment are, therefore, undisputed.

Auto-Owners adopts by reference its prior standard of review set forth in its prior brief. See, Doc. 13 at p. 17 - 19. Rule 56(c) mandates entry of summary judgment after adequate time for discovery and upon motion against a party failing to make a showing

specifically establishing the existence of an essential element of that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is not "significantly probative." Id. at 249. A fact is not material unless it is identified by the controlling substantive law as an essential element of the non-moving party's case. Id. at 248. Conclusory allegations based on mere subjective beliefs do not create a genuine issue of material fact. See, Carter v. Miami, 870 F. 2d 578, 585 (11th Cir. 1989); see also, Ramsey v. Laeth, 706 F. 2d 1166, 1170 (11th Cir. 1983).

IV.

### AUTO-OWNERS IS ENTITLED TO ENTRY OF SUMMARY JUDGMENT IN AUTO-OWNERS' FAVOR AS TO PLAINTIFF'S CLAIM ALLEGING BREACH OF CONTRACT

In the Breach of Contract section of its Response, Plaintiff cites one case setting forth the elements of a breach of contract claim. See, Doc. 27 at p. 8 - 11. Pioneer cites absolutely no legal authority for the proposition that summary judgment is inappropriate in this case. Instead, the Plaintiff makes conclusory statements suggesting Pioneer performed under the contract and that "there is also" no question that the breach of contract damages claimed in the matter are the $56,491.25 identified in Pioneer's affidavits." See, Doc. 27 at p. 8 L12 - 14

Auto-Owners set forth at length in its prior brief applicable law which requires that the insured or the party claiming coverage has the burden of submitting substantial evidence showing that the claimed loss or damage for which the insured is seeking coverage fits within the insuring language, the term of the policy and the definitions in the policy so that the loss falls within the coverage of the policy. See, Doc. 13 at p. 21 L1 citing State Farm & Cas. Co. v. Shady Grove Baptist Church, 838 So. 2d 1039 (Ala. 2002). In this case Pioneer has wholly failed to prove a loss or damage of property covered under the policy. It is undisputed that the President and owner of Pioneer threw away the items which are the subject of its claim in direct contravention of the terms and conditions of the insurance policy, and despite the fact that such items were critical evidence to its claims for coverage. See, G-AO00032-33 at ¶3.a.(4)(5) and (6). The insurance policy expressly required Pioneer "to take all reasonable steps to protect the covered property...[and] if feasible, set the damaged property aside." See, id. at ¶(4). The insurance policy also expressly required Pioneer, as "often as may be reasonably required, permit [Auto-Owners] to inspect the property...[and] to take samples of damaged and undamaged property for inspection, testing and analysis..." See, id. at ¶ 6.

Instead of citing any applicable authority for the proposition that Plaintiff is entitled to maintain its breach of contract claim under facts similar to this case, the Plaintiff relies on conclusory testimony of its purported expert. Defendant Auto-Owners has filed contemporaneously herewith a motion to strike the testimony of Plaintiff's expert. The grounds of that motion are adopted by reference herein. Regardless, it is undisputed that Plaintiff has presented no evidence that Pioneer suffered direct physical loss to covered property caused by or resulting from a covered loss. See, Shady Grove, supra. Plaintiff

33

has produced no admissible evidence that its property sustained direct physical loss by any risk has not been paid and Plaintiff has admitted to spoliation by disposing of all property that was purportedly damaged by lighting or water. Plaintiff has not contested Auto-Owners' evidence that lightning did not strike Plaintiff's property on the date of alleged loss. Plaintiff failed to produce any evidence of tests conducted on the allegedly damaged property.

Plaintiff also fails to cite any authority for the proposition that Plaintiff's destruction of the property did not violate the conditions of the policy and does not preclude Pioneer's recovery under the policy. In contrast, Auto-Owners cited in its brief the opinion of the Supreme Court of Arkansas in Village Market, Inc. v. State Farm Gen. Ins. Co., 970 S.W. 2d 243 (Ark. 1998) which directly addressed the issue of a party's right to recover under identical conditions of an insurance policy. In Village Market, the Supreme Court of Arkansas expressly held that "the trial court was correct in granting summary judgment to the [insurer] due to the [insured's] failure to retain the damaged property for inspection." Id. at 246 - 247, aff'd. in part and rev'd in part, 975 SW 2d 86 (Ark. 1998) (reversing only attorney fee award to insurer). On page 14 of its brief, Pioneer makes a conclusory assertion that because Auto-Owners had the opportunity to inspect the equipment on one occasion, if they wanted to inspect it again "they were obligated to inform Pioneer so that Pioneer would be on notice of their request." See, Doc. 27 at p. 14. Contrary to Plaintiff's unsupported assertion, the conditions of the policy expressly require that the insured "take all reasonable steps to protect the covered property from further damage", "set the damaged property aside and in the best possible order for examination" and "as often as made be reasonably required, permit [Auto-Owners] to inspect the property proving the

loss or damage and examine your books and records" and "also permit [Auto-Owners] to take samples of damaged and undamaged property for inspection, testing and analysis..." See, G-AO00032-33 at ¶ 3.a.(4),(5) and (6).

In this case, Pioneer threw the equipment away without authorization from Auto-Owners. Plaintiff has not and cannot, as a matter of law, meet its burden of proof of a direct loss of covered property and, as a matter of law, Pioneer failed to comply with provisions under the policy, failed to set aside the damaged property, and failed to make it available for Auto-Owners to inspect. State Farm v. Shady Grove, 838 So. 2d at p. 1046; see also, Village Market, 970 S.W 2d at p. 246-247.

**V.**

### AUTO-OWNERS IS ENTITLED TO ENTRY OF SUMMARY JUDGMENT IN AUTO-OWNERS' FAVOR AS TO PLAINTIFF'S CLAIM ALLEGING "ABNORMAL" BAD FAITH

As set forth earlier in this Brief, Plaintiff's response demonstrates that it has abandoned any claim for "normal" bad faith, obviously recognizing that it could not meet its burden of proof and show "that the Plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. See, National Savings Life Ins. Co. v. Dutton, 419 So. 2d 1357, 1362 (Ala. 1982). Instead, Plaintiff attempts to set forth a claim for "abnormal" bad faith asserting that Auto-Owners intentionally or recklessly failed to conduct an adequate investigation of the facts and submit those facts to a thorough review. See, Doc. 27 at p. 14 ln. 13

The facts set forth in Auto-Owners' previous brief which are undisputed by the Plaintiff and those facts set forth earlier in this brief demonstrate prompt investigation of

Pioneer's claim within one week after Hurricane Ivan and additional investigation undertaken by Auto-Owners with regard to Pioneer's contents claims within one week after Pioneer submitted documentation (i.e., a list of items of it contents claim). In fact, it is undisputed Mr. Reaves met with a Pioneer's president within one week of Pioneer's first submission of documentation of the contents allegedly damaged.

In its brief the primary authority Plaintiff cited this Court to was <u>Mutual Service Cas. v. Henderson</u>, 368 F. 3d 1309 (11th Cir. 2004) which is not even a property damage claim. Instead, the Plaintiff cites the Court to the <u>Henderson</u> case regarding the obligation of an insurer to defend its insured as to a liability claim. Plaintiff has not controverted any of the authorities cited by Auto-Owners in its prior brief. In particular, Plaintiff failed to distinguish <u>USAA v. Hobbs</u>, 858 So. 2d 966 (Ala. Civ. App. 2003) which was cited by Defendant for the proposition that an investigation less thorough than that conducted by Auto-Owners in this case did not, as a matter of law, establish a abnormal bad faith claim for failure to properly investigate. <u>See</u>, <u>id.</u> at p. 978; <u>see also</u>, <u>Kern v. Standard Fire Ins. Co.</u>, 2006 WL 1982115 (M.D. Ala. 2006); see also, <u>Turner v. State Farm Fire & Cas. Co.</u>, 614 So. 2d 1029 (Ala. 1993)(examination of property by insurer fulfilled insurer's duty and entitled insurer to summary judgment on insured's "abnormal" bad faith claim). <u>See also</u>, <u>West Beach Development Co., LLC v. Royal Indemnity Co.</u>, 2000 WL 1367994 at *5 (S.D. Ala. Sept. 19, 2000).

Furthermore, "when the Alabama Supreme Court recognized the tort of ["abnormal"] bad faith in this context, it intended to limit liability under that tort to those instances in which the insured's losses were covered under the policy." <u>State Farm Fire & Cas. Co. v. Slade</u>, 747 So. 2d 293, 317 (Ala. 1999). As set forth in the preceding section of this Brief,

36

Plaintiff is not entitled to coverage under the policy and therefore not entitled to recover on its claim for "abnormal" bad faith failure to investigate. Furthermore, the Alabama Supreme Court has held that even where an insured is entitled to coverage, uncertainty as to the amount of the insurer's liability establishes a debatable reason for denying at least that portion of the claim, and entitled the insurer to judgment as a matter of law as to a bad faith claim. See, Morton v. Allstate Ins. Co., 486 So. 2d 1263 (Ala. 1986).

At the conclusion of its brief Plaintiff again relies on conclusory legal conclusions of Plaintiff's purported expert which do not preclude summary judgment. Defendant has filed a motion to strike the testimony of Plaintiff's expert contemporaneously herewith and Defendant adopts the grounds thereof as if fully set forth herein. Defendant also has submitted herewith excerpts of the deposition of Ron Davenport, an Alabama lawyer, opining that Auto-Owners is not guilty of breach of contract or bad faith with regard to Plaintiff and the subject claim. See, "R" hereto.

The facts set forth in this brief and Auto-Owners' prior brief demonstrate the investigation undertaken by Auto-Owners including receipt and review of documents, inspection, retention of an engineer, communications with the insured and Auto-Owners home office, and receiving a weather lightning strike report demonstrating no lightning within five miles of Plaintiff's premises. There is absolutely no evidence Defendant intentionally or recklessly failed to investigate Plaintiff's insurance claim or to subject the claim to a cognitive evaluation. Instead Plaintiff seeks to have this court create a cause of action for alleged negligent or wanton handling of a claim which Alabama state and federal courts have "consistently refused to recognize." See, Kervin v. Southern Garaunty Ins. Co., 667 So. 2d 704, 706 (Ala. 1995); see also, West Beach Development Co., LLC

37

v. Royal Indemnity Co., 2000 WL1367944 *6-*8 (S.D. Ala. Sept. 19, 2000). Furthermore, recovery under a theory of an abnormal case of bad-faith failure to investigate an insurance claim is limited to those instances in which the insured's losses were covered under the policy. See, State Farm Fire & Cas. Co. v. Slade, 747 So. 2d 293, 317 (Ala. 1995); see also, West Beach Development Co., supra at *5.[4]

## VI

## CONCLUSION

For the reasons set forth in the foregoing brief and Auto-Owners' prior brief, summary judgment is due to be entered in favor of Defendant, Auto-Owners Insurance Company, and against Plaintiff, Pioneer Services, Inc., pursuant to rule 56 of the *Federal Rules of Civil Procedure.* In the event the Court determines that this action may not be disposed of in its entirety by entry of summary judgment in favor of Auto-Owners, Auto-Owners Insurance Company requests that this Court enter partial summary judgment in favor of Defendant, Auto-Owners Insurance Company, and against Plaintiff, Pioneer Services, Inc., as to those issues, claims, damages and/or actions upon which the Court determines summary judgment in favor of Auto-Owners Insurance Company is proper.

Dated this the 8th day of May, 2007.

---

[4]Auto-Owners set forth it its prior brief and in the preceding section the reasons Auto-Owners is entitled to summary judgment as to plaintiff's contract claim.

Respectfully submitted,

_____
ROGER S. MORROW (MOR032)

_____
JOEL H. PEARSON (PEA019)
**ATTORNEYS FOR DEFENDANT**
**AUTO-OWNERS INSURANCE COMPANY**

**OF COUNSEL:**

**MORROW, ROMINE & PEARSON, P.C.**
**P.O. Box 4804**
**Montgomery, AL 36103-4804**
**Telephone:  (334) 262-7707**
**Facsimile:   (334) 262-7742**
**Email:        rsmorrow@mrplaw.com**
                **jhpearson@mrplaw.com**

## CERTIFICATE OF SERVICE

I hereby certify that on _____May 8, 2007_____, I electronically filed the foregoing with the Court using the CM/ECF system, and I hereby certify that I am serving the foregoing document to the following:

Leland Enzor, Jr., Esq.                 Harry P. Hall, II, Esq.
Enzor & Enzor                           Farmer, Price, Hornsby & Weatherford, LLC
P.O. Box 339                            P.O. Drawer 2228
Andalusia, AL 36420                     Dothan, AL 36303

Respectfully submitted,

JOEL H. PEARSON (PEA019)
Attorney for Defendant
Auto-Owners Insurance Company
Morrow, Romine & Pearson, P.C.
P.O. Box 4804
Montgomery, Alabama 36103-4804
Telephone: (334) 262-7707
Fax: (334) 262-7742
E-mail: jhpearson@mrplaw.com

40