# EXHIBIT "M"

---

**Page 1**

IN THE FEDERAL COURT OF
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06CV 377-WKW

PIONEER SERVICES INC ,
    Plaintiff,
vs
AUTO OWNERS INSURANCE
COMPANY
    Defendant

---

VIDEOTAPE DEPOSITION OF TODD WORLEY
Date: March 14, 2007
Time: 10:20 a m

COURT REPORTER:
APRIL R BENDINGER  CSR

---

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr  Harry Hall
    FARMER  PRICE  HORNSBY & WEATHERFORD
    100 Adris Place
    Dothan  Alabama 36303

FOR THE DEFENDANT:
    Mr  Joel Pearson
    MORROW  ROMINE & PEARSON
    122 South Hull Street
    Montgomery  Alabama 36103

---

**Page 3**

EXAMINATION INDEX

TODD WORLEY
    BY MR  HALL                          11

EXHIBIT INDEX
                                          MAR
Plaintiff's
    13   Notice                            15
    14   AO Document                       17
    15   AO Document                       17
    16   Homeowner's File                  30

---

**Page 4**

TODD WORLEY

INSTRUCTIONS TO THE WITNESS

Please read your deposition over carefully before you sign it   You should make all your changes on the attached errata sheet
    After making any changes which you have noted on the attached errata sheet, sign your name on the Deponent's Certificate and date it  You are signing it subject to the changes you have made on the errata sheet  which will be attached to the deposition
    Return the attached errata sheet and Deponent's Certificate to Bendinger & Associates, 513 Drake Drive, Dothan  Alabama 36305
    According to the Rules of Civil Procedure, you will have thirty (30) days from the date you receive this deposition in which to read it, sign it, and return the errata sheet and Deponent's Certificate to the above office  If you fail to do so, you automatically waive your right to make any corrections to your deposition

---

45

1   A   AO177
2   Q   What's the date of that e-mail?
3   A   December 21, 2004
4   Q   Is that e-mail from Cindy Jones,
5  who is now Gilner?
6   A   Yes, Cindy Jones
7   Q   Io Bill Reaves?
8   A   Correct, yes
9   Q   Is that responding to the caption
10  report you just talked about?
11  A   It is
12  Q   Is the e-mail from Cindy Jones the
13  sort of e-mail that you just described, proceed
14  in agreement with Bill Reaves' plan?
15  A   Yes
16  Q   What does she say?
17  A   Thanks for the file   It looks
18  like you are headed in the right direction  The
19  claimant must prove his claim, or it won't be
20  paid. Thanks, Cindy
21  Q   Is there any indication that this
22  file went to anyone other than Cindy Jones, now
23  Cindy Gilner, at Auto Owners?

46

1   A   No, there's not
2   Q   Did it go to get a coverage
3   opinion from anybody?
4   A   I don't believe so, no
5   Q   Io the legal department?
6   A   No
7   Q   And you have reviewed this file,
8   and I know you don't know where every single
9   page is, but have you also reviewed the claim
10  and the way the claim was handled?
11  A   Yes
12  Q   So you know the chronology
13  generally?
14  A   I generally know the chronology,
15  yes
16  Q   And how it was handled and what
17  was done?
18  A   Yes
19  Q   Was this claim handled correctly
20  by Auto Owners?
21  A   It would appear to be
22  Q   All right  Was this claim handled
23  in accordance with the claims handling guide

47

1  that's been introduced as Exhibit 15?
2   A   Each, you know, the claims
3   handling guide gives general guidelines and give
4   what would happen in a perfect world.  I don't
5   know each specific individual line item has been
6   done as prescribed by that, but, again, it's a
7   guideline  And in a catastrophe situation,
8   things happen
9   Q   All right  Can I take that to
10  mean that that guideline may not have been
11  complied with in this claim?
12       MR. PEARSON:  Object to the form
13  A   There is a possibility certain
14  items in there were not done, maybe as
15  recommended by the claims handling guide
16  Q   What kind of items?
17  A   I wanted to look at the
18  timeliness, it says we have to notify the
19  insured -- keep them up-to-date every 45 days
20  In this case, I would have to look and see, I
21  believe it is in line with that, but I haven't
22  got a calendar out and counted  It's my
23  understanding the insured was in contact with

48

1   the agent and with our engineers and knew what
2   was going on
3   Q   Is that based on reviewing the
4   file or talking to Bill Reaves?
5   A   Reviewing the file
6   Q   Have you spoken to Bill Reaves
7   about this file?
8   A   No  I mean, I mentioned I was
9   being deposed on it, and he mentioned to me he
10  was being deposed  but we didn't discuss it   I
11  wasn't there at the time the file was being
12  handled
13  Q   Flip over to page in Exhibit 15
14  page 953
15  A   Okay
16  Q   Is this the -- does this contain
17  some of those timelines you were just talking
18  about?
19  A   It does
20  Q   The first one says, on first party
21  losses -- is this a first party loss?
22  A   It is first party loss
23  Q   On first party losses, within 30

Page 49

```
 1  days the insured must be advised in writing or
 2  by dated notation in file what is needed to
 3  present their claim, and what constitutes a
 4  satisfactory proof of loss.  Was that done?
 5      A.  I don't know if we sent, you know
 6  we have a blank proof of loss form that we send
 7  out, and I'm not sure if that was done in this
 8  claim or not.
 9      Q.  Are you familiar with the
10  catastrophic claims protocol where if a
11  hurricane or big storm coming, every insured for
12  a given agency has a preprinted claims form sent
13  out?
14      A.  Yes.  That gets sent to the
15  agent.  And if the insured has a loss, the
16  insured marks the appropriate box on the form
17  and then sends that to us in lieu of sending us
18  an accord loss notice.
19      Q.  Is that the document that's
20  discussed right there on what I just read?
21      A.  No.
22      Q.  What document is it that would be
23  referred in the paragraph I just read from?
```

Page 50

```
 1      A.  It may not even be a document, it
 2  may just be the claim rep or whoever spoke with
 3  the insured and told them this is what they
 4  needed.  Plus, in the policy itself, it tells
 5  what we are going to need for proof of loss.
 6      Q.  Well, let me ask you:  It says
 7  within 30 days the insured must be advised in
 8  writing or by dated notation in the file, what
 9  is needed to present their claim and what
10  constitutes a satisfactory proof of loss.  Is
11  the proof of loss the document that was sent to
12  the agency or the claims notice?
13      A.  No.
14      Q.  That is the notice there is going
15  to be a claim, right?
16      A.  Yeah, those are printed and sent
17  for every insured that agency has.
18      Q.  That is to speed up getting the
19  claims process started, right?
20      A.  Yes.
21      Q.  This is something else?
22      A.  Yes.
23      Q.  This is -- there should be in
```

Page 51

```
 1  writing, notice to the insured of what they need
 2  to do to present their claim properly?
 3      A.  Right.  Or by, again, dated
 4  notation in the file.
 5      Q.  Can you check to tell me if there
 6  is any such notation in the file that this ever
 7  happened?
 8      A.  Yeah.  It looks like we contacted
 9  the insured on November 16th.
10      Q.  What page are you reading from?
11      A.  This is 112.  The insured was
12  going to furnish a breakdown of components.
13      Q.  Tell me which one you read from
14  again?
15      A.  Page 112, November 16, 2004.
16      Q.  Where it says "met with insured"?
17      A.  Right.
18      Q.  It says, "Part of roof blown up"?
19      A.  Uh-huh, (affirmative).
20      Q.  Read the rest?
21      A.  It says:  Telephone system
22  components in back storage room got wet.  Also
23  claimed the phone system and building was struck
```

Page 52

```
 1  by lightning.  He will furnish breakdown of
 2  components including invoice prices.  I think
 3  that's what that says.
 4      Q.  Is there anything in writing to
 5  the insured that will comply with the paragraph
 6  I was reading from, from A0953?
 7      A.  I cannot find anything, no.
 8      Q.  Is this notation on 11/16/04, that
 9  you just read, the closest thing to complying
10  with that paragraph you just read on page A0953
11  that you can find in the file?
12      A.  In writing, that is probably the
13  closest thing we have.  You know, we met with
14  the insured.  Bill spent -- I don't know how
15  much time Bill spent with him, so there is a lot
16  that was discussed that didn't get written down.
17      Q.  Doesn't the guide in your claims
18  handling guide on your response to notice of
19  claim require that you inform the insured of
20  exactly what is needed, and what constitutes a
21  satisfactory proof of loss, and that has to be
22  either in writing or by dated notation in the
23  file?
```

77

1  A   I believe that's right, yes.
2  Q   The December 20th letter, which is
3 pages AO178 and 179, it sets out, in the second
4 paragraph, a request?
5  A   I have two copies of that in there
6 too, that's why I was confused.
7  Q   Are you satisfied with the page
8 numbers I gave you?
9  A   Yeah.
10 Q   The last sentence of the second
11 paragraph says: We are hereby requesting you
12 provide us with outside documentation and
13 evidence of the damages along with the salvage
14 value. Have I read that properly?
15 A   Correct.
16 Q   Is there another set of
17 correspondence from the insured -- and I think
18 they start on page 123 -- that are estimates
19 from Telcom Services and a lightning affidavit
20 from Telcom Services. I think they are AO123
21 through AO141.
22 A   Flipping through this file I have
23 got it out of order.

78

1  Q   Thank goodness for the numbers.
2  A   What number are they again?
3  Q   Let me show you Exhibits 3, 4, 5,
4 6 and 7 previously introduced in another
5 deposition. They used the same Bates numbers.
6 That's the first page there.
7  A   Okay.
8  Q   You can take my stickers off if
9 you want to. They will tell you each one, they
10 begin each document.
11 A   I think -- seems like this page
12 had something else on it, a cover page of some
13 sort. Maybe this was it, it was flipped around,
14 could have been.
15 Q   Do you see these documents I just
16 referenced?
17 A   I do.
18 Q   Are they lightning affidavits and
19 water damage affidavits along with estimates or
20 quotations for lightning and water damage costs
21 and repairs?
22    MR. PEARSON: Object to the form.
23 A   Let's see, these are estimates.

79

1  Q   The ones that say, Quotation?
2  A   Yes. The ones that say quoted to,
3 yeah quotation at the top.
4  Q   Okay.
5  A   Here is one that appears to be
6 some sort of lightning statement made by K. Mac
7 Bracewell. He didn't sign it. It was signed
8 for him by someone else. This is the same.
9 There is one that says water and one that says
10 lightning in here. I'm not sure if they are for
11 the same equipment.
12 Q   If you look at the totals, some of
13 the equipment is different, and you see a new
14 set of totals. But take your time.
15 A   Yeah.
16 Q   And I represent to you that Bill
17 Reaves testified when he received those
18 documents you're looking at, he spot checked
19 them to see if they matched up, they seemed to,
20 he saw nothing to indicate there was something
21 different in those list.
22 A   Okay.
23 Q   But here's my question to you:

80

1 The documents that you just looked at, the
2 Telcom documents, those were sent by the insured
3 to Bill Reaves, correct?
4  A   Yes, or delivered to the agent.
5 I'm not sure which the case is, I don't think
6 it's clear from the file.
7  Q   They were delivered to Auto Owners
8 somehow?
9  A   Yes.
10 Q   Bill Reaves testified he got those
11 after his letter of December 20th.
12 A   Okay.
13 Q   Will you show me where Mr. Reaves
14 responded to that correspondence from the
15 insured?
16 A   There is a denial letter dated
17 February 3, 2005, in the file. It appears that
18 is the response. I didn't see any other
19 correspondence in here regarding that.
20 Q   Any notations in the file about a
21 verbal response?
22 A   Let's see. He spoke with the
23 insured on January 31st, asking approximately

Page 81

```
 1  when he thought the lightning strike was.
 2      Q    Is that based on the notation in
 3  the file?
 4      A.   Right  The contact here  He just
 5  indicated it was sometime after he left on
 6  September 15th  At that point, we ordered the
 7  lightning strike report
 8      Q    Is there any documentation in the
 9  file to indicate that Mr Reaves ever wrote to
10  the insured or called the insured about any
11  deficiency or problems with the Ielcom Services
12  documentation?
13      A    I don't see anything in the file
14      Q    If there was a deficiency with the
15  Ielcom Services estimates where Mr Reaves had
16  questions about the sufficiency of that set of
17  documents to support the claim, is that
18  something he should have communicated to the
19  insured?
20          MR. PEARSON:  Object to the form
21      A    Well, the insured was told not to
22  dispose of the property
23      Q    No, no  I am talking about the
```

Page 82

```
 1  sufficiency of the reports to support the proof
 2  of loss from Ielcom Services?
 3      A    I don't know if he did or not
 4      Q    If he felt that the Ielcom
 5  Services documentation was insufficient to
 6  support the proof of loss, doesn't the claims
 7  manual say he should communicate what
 8  constitutes a satisfactory proof of loss?
 9          MR  PEARSON:  Object to the form
10      A    I don't know that the insured had
11  returned a proof of loss at this point
12      Q    Does that not count as a proof of
13  loss --
14      A    No, I don't belive so
15      Q    -- the documents from Ielcom?
16      A.   No, that certainly does not
17  That's just part of it, that's the inventory
18      Q    Go ahead
19      A    That's the inventory  and I guess
20  they claim part of this as lightning and part of
21  this as water damage
22      Q    Well, can a proof of loss be on
23  more than one document?
```

Page 83

```
 1      A    It could be
 2      Q    It could be a compilation of
 3  documents that are delivered to Auto Owners,
 4  correct?
 5      A    That would be up to -- I think
 6  most state courts decide what constitutes a
 7  satisfactory proofs
 8      Q    So you would defer to the
 9  guidelines to the State of Alabama to answer
10  that question?
11          MR  PEARSON:  Object to the form
12      A    Yes  Generally in storm
13  situations, we're not as stringent upon the
14  insured maybe with the proof of loss if we have,
15  like you're saying, if we can compile enough, we
16  may be willing to accept just that
17      Q    Okay  If you have the notice of
18  claim, which is going to have the claim number,
19  the policy number and period, and the date of
20  loss, as well as the named insured, and then you
21  get these estimates from Ielcom Service that
22  sets out the amount of loss and cause of loss,
23  the only thing on there that's not covered is
```

Page 84

```
 1  the lienholder information  that is on your list
 2  of seven items required for a proof of loss --
 3      A    Is --
 4      Q    -- is that true?
 5      A    That is my list of seven items
 6  That is not necessarily the correct list  That
 7  is what we discussed earlier that I thought of
 8      Q.   Well, let me back up and say this
 9  I have noticed the deposition of the
10  representative of Auto Owners who can discuss
11  proper claims handling for this claim and claims
12  just like this claim  My question to you was:
13  What is required for a satisfactory proof of
14  loss?  And we went through it in some detail,
15  and I got these seven items --
16          MR  PEARSON:  Object to the form
17  Asked and answered  Mischaracterization of his
18  prior testimony
19          MR  HALL:  Anything else?  I mean,
20  I haven't asked a question, how could it be
21  asked and answered?
22          MR. PEARSON:  You asked him about
23  this at length earlier  Again, I'm not trying
```

189

    MR. HALL: Thank you.
 Q  I said in my question to you that Auto Owners determined in Pioneer's claim that at least two inspections would be reasonable under the policy. Is reasonable the right word?
    MR. PEARSON: Object to the form. He's already answered your question.
    MR. HALL: I'm trying to lay a predicate for a question, Joel.
    MR. PEARSON: He's already answered your question. He said what was reasonable was for their engineer to have an opportunity to inspect. He answered the question you asked.
 Q  All right. I'm going to ask it until I get an answer. So bear with me and Joel because we disagree about this. You said before that -- I think it's Paragraph Six that was in that letter of December 20 and February 3rd, said the policy requires that you make the damaged property available for, I think, a reasonable number of inspections. I'm paraphrasing. We can go back and pull the

190

actual lines but you know what I'm talking about.
 A  Yeah. You're combining four and six. That's okay. I understand what --
 Q  Let's just do six. I don't want to mischaracterize it. But it's the holding the property so that it's available for a reasonable amount of inspections. Is that --
 A  That combines four and six, yes. We want you to hold it for a reasonable amount. Again, what's reasonable varies. Varies on the claim.
 Q  In this case, Mr. Reaves looked at it on November 15th and took pictures and opened some boxes and looked at it. Are you familiar with that?
 A  Yes.
 Q  Is that an inspection of the property?
 A  I would say that is an inspection of the property, yes.
 Q  Okay. And Auto Owners has denied the claim because they weren't provided an

191

opportunity for a second inspection of the property by their expert.
    MR. PEARSON: Object to the form.
 Q  Is that true?
 A  It depends on -- we wanted -- the bottom line is we wanted our expert to inspect them. If -- the original adjuster, when he was out there, may have glanced at it -- I mean, is that an inspection? Not really. But the number is -- the number is really irrelevant. We wanted our expert to look at the damage in this claim.
 Q  Is there anything that Pioneer Services could have done since your expert couldn't look at it to get this claim paid?
 A  If they could have provided us enough documentation, then, yes, it's possible. However, they were not able to do so, plus the lightning strike on top of that --
 Q  Again, water and lightning. So the lightning strike would deal with the lightning damage, but the water damage -- you said they were not able to provide sufficient

192

documentation?
 A  Right, because we weren't able to inspect it.
 Q  I can't tell if you answered my question or not. I don't want to mischaracterize what you're saying. I want to understand what you're saying.
 A  Okay.
 Q  The claim was going to be denied because your engineer didn't get to inspect it; is that true?
 A  Yes.
 Q  And the only way that it could have been paid with the engineer not getting to inspect it would have been if Pioneer supplied what?
    MR. PEARSON: Object to the form.
 A  Again, if they had -- before they disposed of the property maybe they could have taken detailed photographs of it or somehow preserved the evidence through pictures for us to look at to see where the damage was. Again, we try and give the insured every benefit of the

193

1  doubt
2  Q   Did Auto Owners do everything
3  required of it under its contract with Pioneer
4  Telephone Services?
5      MR PEARSON: Object to the form
6  A   I believe so, by the policy
7  Q   Is this how Auto Owners would have
8  handled the claim again if it was ordered
9  tomorrow?
10     MR PEARSON: Object to the form
11 A   I think I already answered that
12 But like I said before we'd want better
13 communication  As far as contractually did we
14 do anything wrong, I don't believe so, but as
15 far as maybe keeping the insured a little bit
16 more informed
17 Q   Would you agree that Pioneer
18 timely reported its claim?
19 A   I believe so
20 Q   You would agree that Pioneer had a
21 contract for insurance with Auto Owners in
22 effect on -- in September of 2004?
23 A   Yes

194

1  Q   Would you agree that Pioneer
2  submitted the information required for a -- I
3  think it's called a satisfactory proof of claim
4  that's listed in the claims handling guide?
5      MR PEARSON: Object to the form
6  A   Again, it wasn't on one
7  comprehensive form, but it appears as though
8  they provided all the information that would
9  have been necessary to fill one of our forms out
10 or put it on one form  yes
11 Q   Would you agree Pioneer cooperated
12 in the investigation of the claim?
13     MR PEARSON: Object to the form
14 A   They cooperated on parts
15 Q   Up to the point where they threw
16 away the equipment?
17 A   Correct
18 Q   Before the equipment was thrown
19 away, did they cooperate with the investigation
20 of the claim?
21 A   I believe they did
22 Q   Can you find anything in the file
23 to indicate they did anything to hamper the

195

1  investigation?
2  A   I don't believe so prior to
3  throwing the contents away
4  Q   Would you agree Pioneer provided
5  written estimates for the cost of the items
6  claimed as damaged during hurricane Ivan?
7      MR PEARSON: Object to the form
8  A   Yes, they provided estimates
9  Q   Would you agree that Pioneer
10 provided access to the damaged items for an Auto
11 Owners adjuster in November following the
12 September hurricane?
13 A   Yes
14 Q   Do you have any reason to believe
15 that Pioneer interfered with Mr Reaves'
16 inspection and the photography of the damaged
17 goods?
18     MR PEARSON: Object to the form
19 A   They did not interfere with
20 Mr Reaves' inspection  It's just we weren't
21 allowed to have our expert inspect it at a later
22 date
23 Q   Would you agree that Auto Owners

196

1  has never directed Pioneer in writing to store,
2  hold or maintain the damaged contents past the
3  time that Mr Reaves looked at them and
4  photographed them?
5      MR PEARSON: Object to the form
6  A   We did not in writing request
7  that other than the fact that it is in the
8  policy, as we discussed before
9  Q   And you'd agree the policy says
10 it's to be maintained for a reasonable number of
11 inspections?
12     MR PEARSON: Object to the form
13 Policy speaks for itself
14 A   Yeah, allow reasonable number of
15 inspections
16 Q   You'd agree that Bill Reaves
17 requested in his December 20th letter that
18 Pioneer provide a third party estimate of
19 Pioneer's contents damage?
20 A   Yes he did request that
21 Q   And that even after this December
22 20th letter, Mr Reaves received from Pioneer a
23 set of lightning and water damage affidavits