# EXHIBIT "N"

# American Court Reporting
## toll-free (877) 320-1050

Page 1

IN THE FEDERAL COURT OF
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:06CV 377-WKW

PIONEER SERVICES, INC.,
    Plaintiff,
vs
AUTO OWNERS INSURANCE
COMPANY,
    Defendant.

VIDEOTAPE DEPOSITION TESTIMONY OF:
BILL REAVES

January 25, 2007
10 a.m.

COURT REPORTER:
APRIL R. BENDINGER, CSR

Page 3

1 offered in evidence, or prior thereto
2     In accordance with Rule 5(d) of the
3 Alabama Rules of Civil Procedure, as amended,
4 effective May 15, 1988, I, April R. Bendinger,
5 am hereby delivering to MR. HARRY HALL the
6 original transcript of the oral testimony taken
7 January 25, 2007, along with exhibits.
8     Please be advised that this is the same
9 and not retained by the Court Reporter, nor
10 filed with the Court.

Page 2

1     S T I P U L A T I O N
2     IT IS STIPULATED AND AGREED by and
3 between the parties through their respective
4 counsel that the deposition of BILL REAVES may
5 be taken before April R. Bendinger, Notary
6 Public, State at Large, at the Law Offices of
7 Morrow, Romine & Pearson, 122 South Hull Street,
8 Montgomery, Alabama 36103, on January 25, 2007,
9 commencing at approximately 10 a.m.
10     IT IS FURTHER STIPULATED AND AGREED
11 that the signature to and the reading of the
12 deposition by the witness is waived, the
13 deposition to have the same force and effect as
14 if full compliance had been had with all laws
15 and rules of Court relating to the taking of
16 depositions.
17     IT IS FURTHER STIPULATED AND AGREED
18 that it shall not be necessary for any
19 objections to be made by counsel to any
20 questions, except as to form or leading
21 questions and that counsel for the parties may
22 make objections and assign grounds at the time
23 of trial or at the time said depositions is

Page 4

I N D E X

EXAMINATION BY:         PAGE
Mr. Hall         25
Certificate         280

INDEX OF EXHIBITS

PX-10   (File)         55

1 (Pages 1 to 4)

# American Court Reporting
## toll-free (877) 320-1050

Page 157

1   A.  Eight, maybe ten hours
2   Q  Any damage to your house?
3   A.  No
4   Q.  Do you recall how many claims you
5  had come in as a result of Ivan?
6   A.  No, I do not
7   Q.  Was it more than 100?
8   A.  There were thousands of claim that
9  came in
10   Q  For territory four?
11   A.  The claims aren't assigned to a
12  specific territory during a storm situation
13   Q  I guess what I'm asking: Within
14  territory four, do you have an idea of how many
15  claims were made for damages from Ivan?
16   A  Hundreds
17   Q  How do they get assigned out under
18  a situation where you've got that many claims
19  coming in? Is it any different than the normal
20  way they get assigned to you?
21   A.  They're assigned to an independent
22  adjuster  A DO inspects the damages.
23   Q  How are those independent

Page 158

1  adjusters selected?
2   A  It's usually predetermined that a
3  certain adjuster -- adjusting firm will handle a
4  certain county or a certain territory.
5   Q  They get contacted right after the
6  storm, I assume; is that right?
7   A  Yes
8   Q  In our depositions we took earlier
9  this month, South Central Agency described a
10  packet of loss claim forms that are sent
11  prepared to them with all of their insureds'
12  names and information on them  Are you familiar
13  with that practice?
14   A  It's called a preprinted loss
15  notice
16   Q  And the preprinted loss notice --
17  are you involved in getting those to the agents
18  in your territory?
19   A.  No, I'm not.
20   Q  Does it happen automatically?
21   A.  It's done at corporate
22   Q  Do you help process those in any
23  way?

Page 159

1   A  The loss notices?
2   Q.  Yes, sir
3   A  Yes.
4   Q  How? What do you do?
5   A.  When they're returned to us and a
6  claim is being made, we review the claim,
7  determine which adjuster -- adjusting firm it's
8  assigned to, and put a reserve and open the
9  coverages
10   Q  Okay  Are the claims somehow
11  tracked by your territory? Is there a way to
12  see how many came out of a county or a territory
13  or a given area?
14   A  I don't know if there is or not.
15  I don't know
16   Q  Are the claim numbers that are
17  assigned -- is there a formula for how that
18  claim number is assigned? Does one part of it
19  mean territory four, one part means what year it
20  came in or something like that?
21   A  The last digits on the claim
22  number indicate the year that the claim was
23  reported

Page 160

1   Q  Turn over to the front of Exhibit
2  10 for me  And that would be that dash 04;
3  right?
4   A.  That's correct
5   Q.  Okay  The rest of the numbers, do
6  they mean anything to you?
7   A  37 is the branch number, which is
8  the Montgomery branch
9   Q  What about the 4873?
10   A  That's the claim -- the internal
11  guts of the claim number
12   Q  Is that sequential? Do those go
13  in order?
14   A  They're in order
15   Q  So that's the 4,873rd claim for
16  areas 37 in the year 2004?
17   A  That's correct
18   Q  Okay  Thank you.
19      MR PEARSON: Let me put something
20  on the record  I think that actual page is Bate
21  stamped AO 72  Just for the record, it's not an
22  Auto Owners page, but a page run by my
23  secretary.

## www.AmericanCourtReporting.com
## January 25, 2007

# American Court Reporting
## toll-free (877) 320-1050

Page 181

```
1      Q      They went -- the only thing
2  reflected in these documents you're looking at
3  now is GAB Robbins adjusting the building
4  damage; is that true?
5      A      That's correct
6      Q      All right  What you're telling me
7  is you don't know whether Pioneer Services ever
8  told GAB Robbins about the contents claim?
9      A      I don't know
10     Q      Who would know? Mr Gauthier?
11     A      Mr Gauthier or Mr Williamson
12 would probably know the answer to that
13     Q      So what happened as a result of
14 the report provided on December 5, 2004 by GAB
15 Robbins concerning the building claim?
16     A      We sent a letter to Mr Williamson
17 advising him that we had received the estimate
18 and would look to discuss the claim with him
19     Q      Is that letter included in Exhibit
20 10?
21     A      Should be
22     Q      Let's find that real quick
23     A      Right here
```

Page 182

```
1      Q      Let's put GAB Robbins back
2  together, and put it over here  You're
3  discussing, I believe, two pages of a letter
4  that are numbers 178 and 179; is that true?
5      A      That's correct
6      Q      All right  That's a letter from
7  you; is that correct?
8      A      Yes, it is
9      Q      And it's addressing the property
10 damage claim?
11     A      Yes, it is
12     Q      Does it also address the contents
13 claim?
14     A      Yes, it does
15     Q      Let's back up a little bit  Can
16 you tell me what involvement you had in Pioneer
17 Services' claim prior to the letter that's dated
18 December 20, 2004?
19     A      I received notice of a contents
20 claim on November 8, 2004
21     Q      All right  How do you recall
22 November 8th? Is there something that happened
23 on that day specifically that you remember?
```

Page 183

```
1      A      I was in Andalusia that day
2      Q      All right  How did you receive
3  notice of this claim?
4      A      I was in the agent's office
5      Q      And?
6      A      They handed me a stack of papers
7  that Jimmy Williamson had presented to them
8      Q      What were those papers?
9      A      It was a lightning affidavit and
10 some invoices and a water affidavit
11     Q      Who made out those affidavits?  Do
12 you recall?
13     A      Jimmy Williamson signed them  I
14 don't know who prepared them
15     Q      So on November 8th, you -- let me
16 see this back  Let me show you some documents
17 out of Exhibit 10  They are AO 181 through
18 194  Take a look at that those for me
19     A      Okay
20     Q      All right  Are those the
21 documents that you were handed on November 8,
22 2004?
23     A      I believe they were
```

Page 184

```
1      Q      All right  And let me be sure I
2  understand the nature of these  The first
3  document is a four-page document that says,
4  invoice, and it's dated October 29, 2004  It
5  has a list of equipment and it starts off with,
6  equipment in warehouse water damaged by Ivan
7  storm  Does that seem like it's one document?
8      A      It appears to be
9      Q      All right  What do you consider
10 that document to be?
11     A      It appears to be an invoice where
12 Pioneer Telephone Services sold themselves some
13 equipment
14     Q      Is it an estimate for damaged
15 equipment?
16     A      It says it's an invoice
17     Q      Okay  Well, is that as far as you
18 looked is that top line on the left-hand side --
19 or right-hand side?
20     A      No
21     Q      What did you do with that
22 document?  What did you take it to be when you
23 got it?
```

46 (Pages 181 to 184)

## www.AmericanCourtReporting.com
## January 25, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 185

1   A    I thought he was probably taking
2  this invoice and wanting to make it an estimate
3   Q    Did you talk to anybody about
4  that?
5   A    I did
6   Q    Who did you talk to about that?
7   A    Jimmy Williamson.
8   Q    What did you tell Jimmy Williamson
9  and when?
10   A    I believe the date was November
11  15th.
12   Q    Okay. About a weak later?
13   A    That's correct. I advised him
14  that the claim or the invoice was a lumped-sum
15  invoice and that we couldn't accept a lump item
16  like that. We needed invoice prices and line-
17  by-line prices of what these items costs
18   Q    You told Jimmy Williamson that on
19  the 15th?
20   A    That's correct
21   Q    Who else was present for that
22  conversation?
23   A    Just Jimmy Williamson

Page 186

1   Q    Where did it take place?
2   A    I don't remember if it took place
3  at his business at Pioneer Telephone Services or
4  if it took place at his residence in his shed.
5   Q    One or the other?
6   A    One or the other
7   Q    And during the week that you had
8  this estimate or this invoice which is 181
9  through 184, did you do anything with it?
10   A    No, I didn't
11   Q    Did you see that language I was
12  talking about where it said "equipment in
13  warehouse water damaged by Ivan storm" on it?
14   A    Yes, I did.
15   Q    Did you ever think this was an
16  invoice?
17   A    I wasn't quite sure what it was.
18  I know what it said
19   Q    You're talking about the label up
20  here "invoice"?
21   A    That's right
22   Q    Well, was it obvious to you that
23  this was an estimate that was done on an invoice

Page 187

1  letterhead?
2   A    No
3   Q    So you were confused by this
4  document?
5   A    I did not know at the time what
6  that represented.
7   Q    At the time it was handed to you?
8   A    That's correct
9   Q    What inquiry, if any, did you make
10  into the nature of this document?
11       MR. PEARSON: Object to the form
12  He's already testified to that
13   A    That's when I talked with Jimmy
14  Williamson about it to find out exactly what
15  that was.
16   Q    What did he say?
17   A.    He said that's the amount he was
18  claiming was water damaged
19   Q    Your testimony is that you told
20  him at that time you needed more details?
21   A    Needed a breakdown on it line by
22  line for the amount each item cost, and we
23  needed his invoices for price verification on

Page 188

1  it
2   Q    Wait a minute. You also asked him
3  for an invoice, a copy where he purchased it?
4   A    That's correct
5   Q    Okay. You didn't say that
6  before. Is there anything else that you asked
7  him for on the 15th of November besides a
8  breakdown item by item, and now you're saying a
9  copy of the invoice where he purchased each of
10  these items?
11   A    That's correct
12   Q    Anything else besides those two
13  things?
14   A    That I asked him to send to me?
15   Q    Yes.
16   A.    Not at that time.
17   Q    Okay. Let me show you Pages 185
18  through 190. Have you seen that document
19  before?
20   A    Yes, I have
21   Q    When did you see that document?
22   A    The first time I saw it was
23  November 8.

47 (Pages 185 to 188)

# American Court Reporting
## toll-free (877) 320-1050

Page 189

1   Q    It was handed to you at the same
2  time as the other one we were just talking
3  about?  The invoice that was four pages long
4  concerning water damage?
5   A    That's correct
6   Q    Did you do anything -- what is
7  that document that you're holding, that four-
8  page document?
9   A    It's listed as a lightning
10 affidavit from Pioneer Telephone Services
11  Q.   All right  Does that itemize the
12 items discussed that were damaged down to part
13 number and other details?
14  A    It does contain the part number
15 and some other details?
16  Q    Does it have a dollar figure at
17 the end?
18  A    No, it does not
19  Q    But it gives you a list of items
20 that were damaged by lightning; is that right?
21  A    It gives me a list of items that
22 he claims were damaged by water, and that was
23 written on a lightning affidavit

Page 190

1   Q    All right  At the end of it, what
2  does it say?
3   A    Do you want me to read the last
4  page?
5   Q    Please
6   A.   It says:  Belonging to Pioneer
7  Telephone Services, Incorporated  I further
8  certify that to the best of my knowledge the
9  above described property was damaged by water
10 because of damage done to the printed circuit
11 boards in the above equipment  And it's signed
12 Jimmy Williamson, James H  Williamson
13  Q    So regardless of what the title of
14 the first page was, the certification at the
15 end -- does that make that an affidavit of water
16 damage?
17  A    That's what he's claiming
18  Q    That's what he's trying to do,
19 isn't he?
20  A    Well, he starts out by saying it's
21 a lightning affidavit, and he ends up saying
22 it's a water -- I guess a water affidavit
23  Q.   Is this the first time you noticed

Page 191

1  that it had both names on it?
2   A    Today?
3   Q    Yes, sir
4   A    No, it's not
5   Q    When did you first notice that?
6   A    I don't recall the date
7   Q    Did you notice it on the 8th when
8  you first got it?
9   A    I don't think I noticed it on the
10 8th
11  Q    Did you notice it on the 15th when
12 you talked to Jimmy Williamson about the claim?
13  A    I don't think I had noticed that
14 at that time
15  Q    Have you ever looked at that
16 document closely to see if the numbers add up,
17 or have you ever scrutinized it in any way?
18  A    Which numbers are you referring
19 to?
20  Q    Any numbers on it
21      MR PEARSON:  Object to the form
22  Q    Anything that you would do to try
23 to figure out if that document made sense or was

Page 192

1  complete in any way?
2      MR PEARSON:  Object to the form
3   A    I don't know if these -- I've
4  never added the quantity up, if that's what
5  you're asking
6      MR HALL:  That's what I'm asking
7   Q    Have you ever done anything with
8  that document other than receive it on the 8th?
9   A.   Not this particular document
10  Q.   Okay  And the affidavit that
11 you're holding and this invoice that starts Page
12 181 and 183, do they cover the same -- sorry,
13 184, do they cover the same items?  Have you
14 ever compared the two to see?
15  A    I've spot checked to see if some
16 of the items matched up
17  Q    You've spot checked to see if some
18 did?
19  A    That's correct
20  Q    When did you do that?
21  A    I don't remember the date
22  Q    Was it in preparation for this
23 deposition?

48  (Pages 189 to 192)

# American Court Reporting
## toll-free (877) 320-1050

Page 193

```
1     A.   No, it was not
2     Q.   Was it before this lawsuit was
3  filed?
4     A.   Yes, it was
5     Q.   Why did you spot check it?
6     A.   Just ran through it to verify
7  that -- let me take that back  I'm not sure if
8  it was this particular document that I spot
9  checked it versus the other one that --
10    Q.   From Telcom?
11    A.   No  The other one that he sent in
12 with the price list on it  I believe it was the
13 price list, the breakdown of this that I spot
14 checked
15    Q.   Okay
16    A.   And do you recall if you got any
17 other documents -- I think probably these are
18 the two other -- let's just do this:  Let me
19 show you two other documents that are AO 191 and
20 192, and then AO 193 and 194 that are two
21 documents concerning lightning damage  Have you
22 ever seen those before?
23    A.   Yes, I have
```

Page 194

```
1     Q.   Were those presented to you on
2  November 8th at South Central Agency?
3     A.   Yes, they were
4     Q.   Did you do anything with those
5  documents between November 8 and November 15th
6  when you met with Jimmy Williamson?
7     A.   No, I didn't
8     Q.   What did you do with them when you
9  met with Jimmy Williamson?
10       MR. PEARSON:  Object to the form
11 On the last question, I believe you stated the
12 dates incorrectly
13    Q.   Did you do anything with those
14 documents between the time you received them and
15 the time you met with Jimmy Williamson?
16    A.   No
17    Q.   Did you do anything with those
18 documents when you met with Jimmy Williamson?
19    A.   Yes
20    Q.   What did you do with those
21 documents?
22    A.   I asked Mr Williamson was this
23 the amount he was claiming.
```

Page 195

```
1     Q.   And did he say yes?
2     A.   Yes, he did
3     Q.   What else did you ask him or tell
4  him about those documents?
5     A.   That's all I remember
6     Q.   All right  Let me see those
7  back  This was a claim for $21,575 72 for
8  lightning damage to the contents of Pioneer
9  Telephone Services?
10    A.   That's correct
11    Q.   That is page AO 192  You received
12 the documents we've just talked about on
13 November 8th at South Central Agency; is that
14 right?
15    A.   That's correct
16    Q.   And then you came back a week
17 later and met with Jimmy Williamson and brought
18 those documents with you; is that right?
19    A.   That's correct
20    Q.   At that meeting with Jimmy
21 Williamson, tell me how that meeting went  What
22 happened in that meeting?
23    A.   I met with him at his business
```

Page 196

```
1     Q.   All right
2     A.   He walked me through the business,
3  showing me what all had been damaged  Most of
4  the -- everything he showed me was -- everything
5  he showed me was related to the building except
6  for these items that he claimed he had already
7  replaced that were damaged by water, such as the
8  phone system, some computers  I think he showed
9  me some stereo equipment or something that he
10 claimed had already been replaced
11    Q.   He showed you new equipment?
12    A.   He said it was new equipment
13    Q.   Did you have any reason to doubt
14 him?
15    A.   No, I didn't
16    Q.   Okay  You said "he said"  It
17 sounds like you suspect he's lying  I'm trying
18 to ask you:  Do you think he was lying about
19 that?
20    A.   I can't say he was lying  He just
21 told me it was new equipment  I can't verify
22 that it was or if it was six months old
23    Q.   Do you have any reason to believe
```

49 (Pages 193 to 196)

# American Court Reporting
## toll-free (877) 320-1050

Page 197

1  he was lying?
2    A    No, I don't
3    Q    Has anyone ever presented to you
4  with any reason to believe that he was lying
5  about that equipment?
6    A    No
7    Q    After you met with Mr. Williamson
8  or while you met with him, did you take
9  photographs?
10   A    I did
11   Q    There are two sets of photographs
12  in Exhibit 10. One set is color and the other
13  is not. Help me identify what photographs that
14  you took when you met with Mr. Williamson
15   A    Those are the ones
16   Q    I'm doing my best to get you to
17  them just to show you I've got them. I think
18  those are the photographs. See what you think
19   A    These are the ones
20   Q    Let's put these others back over
21  here
22   A    Can we go off the record for a
23  second?

Page 198

1
2            3:07 p.m.
3        (Off the record discussion)
4            3:10 p.m.
5
6        MR. HALL: We're back on the
7  record
8    Q    (BY MR. HALL) You have shown me
9  Pages 270 through 273. These are what appear to
10  be 14 photographs. Does that seem right?
11   A    That's right
12   Q    Okay. Under the photographs, is
13  there a caption under each one of them? A
14  computer-generated caption
15   A    Yes, there is
16   Q    Let me see that, please. Is the
17  caption MVC-001F JPG? I know what a JPG is
18  What is the MVC?
19   A    The file name for the picture
20   Q    All right. 2004/11/16, is that
21  the date that you took the picture?
22   A    I don't know if it was taken on
23  the 16th or the 15th.

Page 199

1    Q    Does this say 11/16 of 2004?
2    A    Yes, it does
3    Q    At 11:01:48?
4    A    Yes, it does
5    Q    You took pictures of the outside
6  and inside of Pioneer Services building; is that
7  true?
8    A    Yes
9    Q    You took pictures of the outside
10  and the inside?
11   A    Yes
12   Q    You took pictures of the areas
13  where the stock and inventory were stored when
14  they were damaged; is that true?
15       MR. PEARSON: Object to the form
16   A    That's correct
17   Q    You took a picture of -- well, why
18  don't you tell me what the pictures are. Go
19  through each one. They've got a different
20  number on each one, don't they?
21   A    They do
22   Q    Why don't you tell me the number,
23  and then tell me what it is

Page 200

1    A    All right. The picture -- the
2  first picture -- you want the MVC 001?
3    Q    Just do the number after 00
4  because I think they all have MVC 00
5    A    They do. The first picture is a
6  picture of the insured's building
7    Q    What's the second picture?
8    A    Second picture is the area in the
9  warehouse or storeroom where a leak occurred
10  The picture is showing where the insured had
11  this contents that he claimed got wet, where
12  they were stored. The fourth picture is what he
13  claimed was his new phone system
14   Q    Does it have a note under that
15  one?
16   A    It does.
17   Q    What does it say?
18   A    New phone system in building
19   Q    Who wrote that?
20   A    I did
21   Q    Is there a note on the other one?
22  What number is that?
23   A    Number three.

## www.AmericanCourtReporting.com
## January 25, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 201

```
 1    Q    What does number three say under
 2  it in handwriting?
 3    A    Area insured claims inventory got
 4  wet
 5    Q    When did you write that?
 6    A    After I printed these out
 7    Q    When did you print these out?
 8    A    I don't recall the date
 9    Q    Was it more than a weak after you
10  inspected that building?
11    A    It was probably less than a week
12    Q    All right  Let's go to the next
13  page  What do you see on the next page?
14    A    That's -- picture five appears to
15  be some carpet
16    Q    Why did you take that picture?
17    A    Mr  Williamson had advised that
18  the carpet had been damaged
19    Q    Were you taking a picture of the
20  damage to the carpet?
21    A    I believe so
22    Q    All right  What about the next
23  picture?
```

Page 202

```
 1    A    The sixth picture is a picture of
 2  one of these boards that he claimed was damaged
 3    Q    Now, is that at a different
 4  location?
 5    A    Yes, it is
 6    Q    Where was that taken?
 7    A    That was taken at his residence
 8    Q    How far was his residence from his
 9  office?
10    A    A mile, mile and a half
11    Q    All right  Why did you go to his
12  residence?
13    A    That's where the contents he
14  claimed were damaged were located
15    Q    All right  Did you then go with
16  him to his residence to look at those?
17    A    Yes, I did
18    Q    And were they stored in a
19  building?
20    A    Yes, they were
21    Q    Protected from the elements?
22    A    Yes, they were
23    Q    And did he make them available for
```

Page 203

```
 1  you to look at?
 2    A    Yes, he did
 3    Q    Did he place any restrictions on
 4  your looking at them?
 5    A    No, he didn't
 6    Q    Did he give you as much time as
 7  you wanted?
 8    A    Yes, he did
 9    Q    Did he allow you to take pictures?
10    A    Yes
11    Q    Did he allow you to take samples
12  if you wanted them?
13        MR  PEARSON:  Object to the form
14    A    We didn't request to take any
15  samples
16    Q    Did he ever tell you you weren't
17  allowed to take samples?
18    A    No, he didn't
19    Q    Did he ever indicate that it would
20  not be okay for you to take some of those?
21    A    No, he didn't
22    Q    That picture on the top, what
23  number is that that shows the circuit boards?
```

Page 204

```
 1    A    Picture six
 2    Q    Picture six  Tell me why you took
 3  that picture
 4    A    To show how these boards were
 5  packaged
 6    Q    How were they packaged?
 7    A    Inside a cardboard box with
 8  protective foam and wrapped -- or inside a
 9  plastic bag
10    Q    What about the next picture?
11    A    Seven?
12    Q    Yes
13    A    That's pictures of more of these
14  boards that were stacked in there
15    Q    What is written underneath number
16  seven?
17    A    It says, inventory insured claims
18  got wet
19    Q    All right  Did you not believe
20  him at that time?
21    A    I had my suspicions whether the
22  actual board had gotten wet
23    Q    Why was that?
```

**www.AmericanCourtReporting.com**
**January 25, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 205

1    A    Because they were inside a box
2  wrapped in plastic
3    Q    Did you look at any of the boards
4  to see if they had water stains on them?
5    A    Yes, I did
6    Q    You took them out of the wrapping?
7    A    I took a couple of them out
8    Q    What did you find?
9    A    I didn't see any damage
10   Q    Did you take those with you?
11   A    No, I didn't.
12   Q.   Was there any water stains on the
13 outside of the boxes?
14   A    Some of the boxes did have slight
15 water stains on them
16   Q    They had water stains, though?
17   A    On some of the boxes
18   Q    What about the next picture,
19 number -- I think that's eight?
20   A    Uh-huh, (affirmative)
21   Q    What does eight show?
22   A    That's just a pile of stuff
23   Q    Was that all a part of this gear

Page 206

1  and equipment that he was showing you?
2    A    That's what he was claiming
3    Q    Were you allowed access to that?
4    A    Yes, I was
5    Q    Did you move any of those pieces
6  of equipment?
7    A    No, I didn't
8    Q    Did you -- are there computers
9  there?
10   A    Yes, there are.
11   Q    With CPU -- the box that does all
12 the work on the computer, are they there too?
13   A    Yes, they are
14   Q    Did you plug any of those in?
15   A    No, I didn't
16   Q    Did you ask to take any of those
17 with you?
18   A    No, I didn't.
19   Q    What's on the next page?  What's
20 number nine?  That's a picture of a CPU, or a
21 computer
22   Q    All right  I've heard it said
23 both ways. CPU, I think, stands for central

Page 207

1  processing unit, which is the box that does all
2  the work on a computer, in my mind  Is that
3  what that picture number nine is?
4    A    That's correct
5    Q    Is number ten a picture of the
6  same unit or a different one?
7    A    I believe it's a different one
8    Q    All right  And did you plug those
9  in to see if they would operate?
10   A    No, I didn't
11   Q    What's number 11?
12   A    That's a photograph of something
13 he was claiming was damaged
14   Q    All right  Is it a piece of
15 machinery, an electrical -- some kind of machine
16 that requires electricity to operate?
17   A    It appears that it's some device
18 that would require some sort of electricity to
19 run it
20   Q    Did you ask him to explain what
21 that was?
22   A    No, I didn't
23   Q    Did you ask him to correlate any

Page 208

1  of the pieces of equipment depicted in the
2  photographs you've just been through with any of
3  the equipment that was outlined in the estimates
4  you received on November 8th?
5    A    No, I didn't
6    Q    All right  What's number 11?  I'm
7  sorry  Is that 12?
8    A    12  It's just another photograph
9  of the same stuff that was taken in photograph
10 eight
11   Q    It was a lot of stuff, wasn't it?
12   A    It was a lot of stuff
13   Q    What -- do we have another page?
14 What's on that page?
15   A    It's photographs of some more of
16 the boxes that he claims got wet
17   Q    All right  And you didn't believe
18 him, did you?
19   A    No, I believe the boxes got wet
20   Q.   All right  Okay  And both of
21 those last two pictures, number 13 and 14, are
22 they the same kind of boxes, similar?
23   A.   They're not the same boxes.

52 (Pages 205 to 208)

1  communication with him until you wrote this
2  letter on December 20, 2004; is that right?
3      A    That's correct
4      Q    What did that letter say?
5      A    It says, Dear Sir or Madam, we
6  received the estimate from an independent
7  adjuster for your building damages  I've
8  enclosed a copy for you to review  Once you've
9  had a chance to review, please give me a call so
10 that we may settle that portion of the claim
11 As to the damages that you're claiming to your
12 phone system due to lightning and the water
13 damage to inventory, Auto Owners appreciates
14 your professional opinion as to the damages
15 claimed; however, it is a conflict of interest
16 to write your own lighting affidavit  We also
17 understand that you have disposed of the damaged
18 equipment without us being able to have a third
19 party verify the damages  We are hereby
20 requesting you provide us with outside
21 documentation and evidence for the damage, along
22 with the salvage value  Under your policy, the
23 following is contained: Used in the event of

1  loss or damage, you must see that the following
2  are done in the event of loss or damage to
3  covered property: Take all responsible steps to
4  protect the covered property; for further damage
5  by a covered cause loss; if feasible, set the
6  damaged property aside in the best possible
7  order for examination; also, keep a record of
8  your expenses for emergency and temporary
9  repairs for consideration of settlement of the
10 claim  This will not increase the limit of
11 insurance; and, at our request, give us complete
12 inventory of the damaged and undamaged property,
13 including quantities, cost, values and amount of
14 loss claimed; as often as may be reasonably
15 required, permit us to inspect the property
16 proving the loss or damage and examine your
17 books and records; also, permit us to take
18 samples of the damaged and undamaged property
19 for inspection, testing and analysis and permit
20 us to make copies from your books and records
21 Reservation: Please be advised that this letter
22 does not waive any rights or defenses which Auto
23 Owners Insurance Company may have regarding this

1  matter under any policy of insurance issued by
2  Auto Owners Insurance, whether or not such
3  claims or defenses are set forth herein  Auto
4  Owners reserves the right to supplement this
5  letter upon receipt of further information which
6  may subsequently become available  Thank you
7  for your time and consideration in the matter
8  If you have any further -- if you need any
9  further assistance, please give me a call at
10 1-800-548-9881, Extension 204
11     Q    Is that a form letter?
12     A    No, it's not
13     Q    Is part of it a form letter?
14     A    No, it's not a form letter   The
15 duties in the event of a loss is part of the
16 policy language
17     Q    Okay  The reservation paragraph,
18 is that a form that you insert for this, or did
19 you dictate every word of that?
20     A    I don't think I dictated  I think
21 I typed this letter myself
22     Q    I'm sorry  So you typed this
23 letter, and you went and got all the policy

1  language and put it in there yourself?
2      A    That's correct
3      Q    All right  How did you find
4  out or come to know that the equipment had been
5  disposed of?
6      A    I received a call from Larry
7  Dewberry
8      Q    And let's back up a notch  When
9  did you contact Mr  Dewberry to get him
10 involved?
11     A    I believe it was on December 9th
12     Q    What did you ask him to do?
13     A    I'd have to pull the letter out to
14 see
15     Q    Did you call him?
16     A    No
17     Q    The letter is the communication to
18 Mr  Dewberry?
19     A    That's correct
20     Q    Had you --
21     A    Let me take that back  I may have
22 called him to let him know I was going to be
23 sending him something

# American Court Reporting
## toll-free (877) 320-1050

Page 217

```
1     Q   All right  During this period of
2  time, November, December, January, did you make
3  your weekly stop in Andalusia to see South
4  Central Agency?
5     A   Yes, I did
6     Q   Did you talk to either of the two
7  principals of that business every time you were
8  there?
9     A   Not every time I was there
10    Q   Did you talk to one of them every
11 time, or did you try to talk to them?  Tell me
12 about that
13    A   Sometimes they were there;
14 sometimes they were not there
15    Q   Do you know their names?
16    A   John Tomberlin and Harold Young
17    Q   Okay  Did you talk to them about
18 this claim between November and December of '04?
19    A   I don't recall talking to them
20 while in their office
21    Q   You don't recall talking to them
22 while you were at their office?
23    A   No
```

Page 218

```
1     Q   Do you recall any other times you
2  talked to them?  On the phone or any other way?
3     A   I believe I got a phone call from
4  them asking what the status was on it
5     Q   And why were they calling about
6  that?
7     A   I don't know that
8     Q   Why do agents usually call you
9  about status on a claim?
10    A   Usually because the insured has
11 contacted them
12    Q   What did you tell them about the
13 status of the claim?
14    A   I don't recall the exact words
15 I'm sure I told them we were working on the
16 claim, and we're trying to resolve it
17    Q   What activity took place on the
18 claim from November 16th to December 20th other
19 that the letter to Mr Dewberry?
20    A   That's all -- I take back  I
21 believe that Jimmy Williamson had, in the
22 meantime, faxed me a breakdown of those
23 invoices -- on those invoices and listed the
```

Page 219

```
1  prices on them
2     Q   The details you were talking about
3  earlier?
4     A   That's correct  I believe those
5  came in --
6     Q   That would --
7     A   -- in that time period
8     Q   That would have been what you were
9  spot checking --
10    A   That's correct
11    Q   -- to see if it added up right?
12    A   That's correct
13    Q   Did anything in your spot checking
14 lead you to believe that the numbers didn't
15 match up?
16    A   No
17    Q   Did you communicate with Jimmy
18 Williamson in any way between the time you sent
19 the letter to Mr Dewberry and the December 20th
20 letter?
21    A   No, I didn't
22    Q   And it's your testimony that when
23 you left Jimmy Williamson's house on November
```

Page 220

```
1  15th or 16th, you believe that you wanted to
2  have someone test the equipment?
3     A   I was quite certain that we were
4  going to have to send somebody out to inspect
5  it
6     Q   But you never wrote him to tell
7  him that?
8     A   I told him that while we were in
9  his shed?
10    Q   But you didn't put that in
11 writing, did you?
12    A   No, I didn't
13    Q   When you wrote this letter on
14 December 20th, you said, we also understand that
15 you have disposed of the damaged equipment
16 without us being able to have a third party
17 verify the damages  We are hereby requesting
18 you provide us with outside documentation and
19 evidence of the damages, along with the salvage
20 value  Did Mr Williamson ever do that?
21    A   He did send us some other
22 information
23    Q.  What did you do with that
```

55 (Pages 217 to 220)

# American Court Reporting
## toll-free (877) 320-1050

Page 221

```
1   information?
2      A    Reviewed it.
3      Q    Can you find that for me in the
4   stack? Are those the estimates from Telcom?
5      A    That's correct.
6      Q    We've already marked those as a
7   separate exhibit. Just to keep us from taking
8   them out of the book, look at Page -- is 123
9   included in there?
10     A    1 what?
11     Q    123.
12     A    No, it's not.
13     Q    How did we pull that off? All
14  right. Is there a gap --
15     A    There's a gap from 122 to 142.
16     Q    Well, here, let me pass you over
17  something.
18          MR. PEARSON: Again, Plaintiff's
19  Exhibit 10 is what Harry brought. He knows that
20  he had all those documents --
21          MR. HALL: That's right. We're
22  going to fill in the gaps.
23     Q    Let me show you what's been marked
```

Page 222

```
1   Plaintiff's Exhibit 3. Is that one of the
2   documents that Mr. Williamson sent you after the
3   meeting in November in his shed?
4      A    Yes, it is.
5      Q    Is that signed by Mac Bracewell?
6      A    It appears to be signed by SWP.
7      Q    On behalf of Mr. Bracewell?
8      A    It's signed K. Mac Bracewell by
9   SWP.
10     Q    Do you take exception to that
11  signature line?
12     A    On an affidavit?
13     Q    Yes, sir.
14     A    Yes.
15     Q.   What's wrong with that?
16     A    Never signed by -- or doesn't
17  appear to be signed by Mac Bracewell.
18     Q    Did you ever call Mr. Bracewell to
19  find out if he authorized his signature on that
20  document?
21     A    No, I didn't.
22     Q    Did you notice that it was by SWP
23  at the time you received it?
```

Page 223

```
1      A    Yes, I did.
2      Q    What did you do with that
3   information?
4      A    We didn't do with anything with
5   it.
6      Q    What did you do with this document
7   that is AO 123 through 127?
8      A.   I did review the information
9   contained in there.
10     Q    Did you also receive Exhibit 4,
11  which is AO 128 through 131?
12     A    Yes, I did.
13     Q    Is this a quotation from Telcom
14  Services?
15     A    That's what it says.
16     Q    Did you review that document?
17     A    Yes, I did.
18     Q    What did you learn from that
19  document when you looked at it?
20     A    I saw that it was the exact same
21  information that had been sent to me before
22  except the names had been changed on it.
23     Q    What did you do with it after you
```

Page 224

```
1   noticed that?
2      A    That's all I did with it.
3      Q    Did you put it in the file?
4      A    It went in the file.
5      Q    Did you compare it to any of the
6   other invoices or quotations?
7      A    I compared it with the previous
8   invoices that had come in.
9      Q    Did you contact Telcom Services?
10     A    No, I didn't.
11     Q    Did you contact Jimmy Williamson?
12     A    No, I didn't.
13     Q.   Did you contact anybody about this
14  when you received it?
15     A    No, I didn't.
16     Q    Did you do anything with the
17  information other than put it in the file?
18     A    I reviewed it and saw that it was
19  the exact same thing that we had prior to that.
20     Q    So you reviewed it and put it in
21  the file?
22     A    That's correct.
23     Q.   What about Exhibit 5? What is
```

56 (Pages 221 to 224)

## www.AmericanCourtReporting.com
## January 25, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 225

1 Exhibit 5?
2     A    It's listed as a lightning
3 affidavit from Telcom Services
4     Q    Did you receive that as well after
5 your November 16th meeting with Jimmy
6 Williamson?
7     A    I did receive it after that
8     Q    What did you do with it?
9     A    I reviewed it
10     Q    What did you do with it after you
11 reviewed it?
12     A    I put it in the file
13     Q    Did you call Telcom Services about
14 this affidavit?
15     A    No, I didn't
16     Q    What about Plaintiff's Exhibit 6?
17 Did you review that?
18     A    Yes, I did.
19     Q    What is Plaintiff's Exhibit 6?
20     A    It's a quotation for damaged
21 items
22     Q    Okay  Who submitted this
23 quotation?

Page 226

1     A    Jimmy Williamson submitted it
2     Q    Who quoted it?
3     A    It says Telcom
4     Q    Did you ever call Telcom Services
5 for any reason?
6     A    No, I didn't
7     Q    Did you find out who they were?
8     A    I found out who Mac Bracewell was
9     Q    What did you do to find out who
10 Mac Bracewell was?
11     A    I asked the agent
12     Q    Which of the agents did you speak
13 to about that?
14     A    I can't remember if it was Harold
15 or John
16     Q    And when -- did you do that in
17 person or on the phone?
18     A    I think I did it on one of my
19 weekly visits down there
20     Q    So in person, you asked one of the
21 agents about Mac Bracewell?
22     A    I asked who Mac Bracewell was
23     Q.    What did they tell you?

Page 227

1     A    That he -- they weren't exactly
2 sure, but they said he either used to own
3 Pioneer Telephone or worked at Pioneer Telephone
4 or may be the one who sold Pioneer Telephone to
5 Jimmy Williamson
6     Q    Was that information relevant to
7 your investigation?
8     A    It was relevant for me to just
9 generally inquire on who Mac Bracewell was.
10     Q    Did you make any further inquiries
11 besides asking South Central Agency who he was?
12     A    No, I didn't
13     Q    Were you satisfied with the
14 information you received from them?
15     A    It gave me an idea of who Mac
16 Bracewell was
17     Q    Okay  Was that enough information
18 for you?
19     MR PEARSON:  Object to the form
20     A    It was all the information that I
21 obtained from them
22     Q    Was it all the information you
23 needed about him?

Page 228

1     MR. PEARSON:  Object to the form
2     A    It was all the information that I
3 was going to find out about Mac Bracewell
4     Q    All right  You said that's all
5 that you were going to find out about him  Why
6 is that all you that were going to find out
7 about him?
8     A    At this point, after reviewing
9 these lightning affidavit/water affidavits that
10 he sent in, they were nothing more than a
11 duplicate of what we had already received  And
12 then find out the fact that he had ties to Jimmy
13 Williamson in the past or had some sort of
14 dealings with him, then it made his lightning
15 affidavit and water affidavit seem less
16 credible
17     Q    Did you ever communicate that to
18 Jimmy Williamson?
19     A    No, I didn't
20     Q    Did you ever communicate that to
21 Mac Bracewell?
22     A    No, I didn't
23     Q.    Did you ever communicate that to

**www.AmericanCourtReporting.com**
**January 25, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 237

1  lightning damage to all that equipment?
2      A.   No.
3      Q    Okay  So instead of believing the
4  information that was submitted to you by two
5  different people, Mr Williamson and then Telcom
6  Services, you chose to not believe that and go
7  get a lightning strike report?
8          MR. PEARSON: Object to the form
9  and object to that characterization
10     A    After reviewing the lightning
11  affidavit/water affidavits, they appeared to be
12  so vague -- a claim of that magnitude, to put a
13  one-line sentence in there to describe damage to
14  numerous pages of items damaged, that it seemed
15  that the information was too vague to pay a
16  claim of this size based on that limited
17  information
18     Q    Did you ever tell that to Jimmy
19  Williamson or Mac Bracewell?
20     A    No, I didn't
21     Q    Did you ever communicate that to
22  anybody?
23     A    No, I didn't.

Page 238

1      Q    All right  Did you ever ask Mac
2  Bracewell to explain to you the basis for his
3  opinion that the different pieces of equipment
4  had been damaged?
5      A    No  Mr Bracewell had -- or
6  somebody had put that on the affidavit as what
7  his opinion to the damages were
8      Q    You never asked him about that?
9      A    I never asked him about that
10     Q    Did you ask him to explain with
11  more detail so it wasn't as vague?
12     A    No, I didn't
13     Q    Why not?
14     A    We wanted to inspect the items in
15  the beginning because this information that we
16  were given was too vague to substantiate a claim
17  of this size
18     Q    To this date, January 25, 2007,
19  have you or anybody from Auto Owners ever asked
20  Mr Williamson or Mr Bracewell to give you more
21  details about the damages to the specific pieces
22  of equipment?
23     A.   No.

Page 239

1      Q    Do you know --
2      A    Well, let me rephrase that  I
3  have not  I cannot speak for everybody that
4  works for Auto Owners
5      Q    And you're not aware of anyone
6  doing it, are you?
7      A    No
8      Q    And is there any information that
9  they could have given you that would have made
10  it less vague, made the report less vague?
11     A    I don't know what they could have
12  given me  They could have given a better
13  description of the items  It seems not
14  realistic that every item in here damaged is due
15  to -- damaged because of damages done to the
16  printed circuit boards  That's an awful lot of
17  items to claim under --
18     Q    Are you familiar with printed
19  circuit boards?
20     A    I know what a printed circuit
21  board is
22     Q    Have you worked with them?
23     A    No, I never have

Page 240

1      Q    Have you ever put them into
2  equipment to service telephone systems?
3      A    I've never serviced telephone
4  systems
5      Q.   Would you agree Mac Bracewell is
6  familiar with that kind of equipment?
7          MR. PEARSON: Object to the form.
8      A    I don't know whether Mac Bracewell
9  is familiar with that or not.
10     Q    And you never tried to find out,
11  did you?
12     A    No, I didn't
13     Q    You did find out from South
14  Central Agency, though, that he had worked in
15  that business, didn't you?
16     A    That's what they told me
17     Q    And you had no reason to doubt
18  them, did you?
19     A    No, I didn't
20     Q    You also knew that Pioneer
21  Telephone Services worked in the telephone
22  installation business, didn't you?
23     A.   That's correct.

## www.AmericanCourtReporting.com
### January 25, 2007

# American Court Reporting
## toll-free (877) 320-1050

Page 245

1  documentation from an outside source concerning
2  this claim?
3      A    They are documents from an outside
4  source.
5      Q    So you received documents pursuant
6  to your request in your December 20th letter;
7  right?
8      A    That's correct.
9      Q    And you didn't do anything with
10 them, did you?
11     A    Other than review them, no.
12     Q    You never told anybody that they
13 were insufficient in some way, did you?
14     A    No, I didn't.
15     Q    You looked at them and put them in
16 the file; right?
17          MR. PEARSON: Object to the form.
18     A    They were reviewed and put in the
19 file.
20     Q    All right. Now, you listed a part
21 of the policy, Section Three, duties in the
22 event of loss, and then you put down four, five
23 and six as the subparts that you quoted. Why

Page 246

1  did you quote those in this letter?
2      A    That was letting the insured know
3  he had not followed procedures under the policy.
4      Q    Did you say that he had not
5  followed procedures under the policy?
6      A    No. That was -- the information
7  in that letter was notifying him of what his
8  duties are according to the policy.
9      Q    So you wanted him to follow those
10 duties from that point forward; right?
11          MR. PEARSON: Object to the form.
12     A    No. I was advising him of what
13 his obligations are under the policy.
14     Q    Which one of these did you want
15 him to do?
16          MR. PEARSON: Object to the form
17 and object to the characterization of which one
18 he wanted him to do. That it's suggesting that
19 it's asking him to do something.
20          MR. HALL: We've done good, Joel,
21 until now.
22          MR. PEARSON: No, I'm just saying
23 you keep nitpicking this stuff.

Page 247

1          MR. HALL: Well, object to the
2  form.
3          MR. PEARSON: I am objecting to
4  the form. You keep characterizing --
5          MR. HALL: The Court says don't do
6  this.
7          MR. PEARSON: I'm not doing
8  anything other than --
9          MR. HALL: This is a speaking
10 objection suggesting an answer.
11          MR. PEARSON: Harry, I've been
12 through -- we're about to reach a time limit on
13 this thing.
14          MR. HALL: And I wish you would
15 stop taking the time limit.
16          MR. PEARSON: No, I haven't taken
17 up any time all day to object to the questions
18 that you've asked repeatedly making a
19 mischaracterization of something. But anyway,
20 you can go ahead and ask the question. I've
21 objected to it, and he can answer.
22          MR. HALL: Thank you.
23     Q    Back to you, Mr. Reaves. You have

Page 248

1  three subparts that are listed here. One says,
2  take reasonable steps to protect the covered
3  property. And it goes on beyond that, but
4  that's the way it starts, number four. Did he
5  do that?
6      A    Yes, he did.
7      Q    Okay. By taking it out of his
8  office at Pioneer Services and storing it in the
9  shed where you took the pictures, he complied
10 with number four, didn't he?
11          MR. PEARSON: Object to the form.
12     A    He did take the property and
13 protect it for --
14     Q    Did he do what's called for in
15 number four?
16          MR. PEARSON: Object to the form.
17 He's still answering the question, and you cut
18 him off.
19     A    Let me see number four. Yes, he
20 did.
21     Q    All right. Let's skip on to
22 five. At our request, give us complete
23 inventories of the damaged and undamaged

62  (Pages 245 to 248)

# American Court Reporting
## toll-free (877) 320-1050

Page 257

1   A    No, he didn't
2   Q    After your December 20th letter,
3   you received Exhibits 3 through 7, and you sent
4   a letter to Mr. Dewberry and got a letter back
5   from Mr. Dewberry. What did you do next?
6   A    I believe I reported this to our
7   home office claims
8   Q    Let's look at that document. Is
9   this a fax you sent up to the home office?
10  A    Yes, it is.
11  Q    Is that a fax -- I think it's
12  maybe 109 -- tell me what that is, Pages 109 and
13  110 of Exhibit 10
14  A    It's an interoffice communication
15  that was done on December 21st to our corporate
16  claims office
17  Q    In that, did you outline to your
18  corporate claims office the information about
19  this claim?
20  A    Yes, I did
21  Q    Did you draft this before the 21st
22  of December?
23  A    I may have. It may have been

Page 258

1   drafted on the 20th and printed on the 21st
2   Q    At the most, one day delay?
3   A    Right.
4   Q    In this you said, as to the phone
5   system, I saw that the -- what the insured said
6   was phone system, but was unable to identify any
7   internal lightning damage. What did you do to
8   attempt to verify internal lightning damage?
9   A    I just looked at the phone system.
10  Q    Didn't you tell me earlier that
11  you had no way of determining if there was
12  lightning damage?
13  A    I'm not an expert in determining
14  lightning damage
15  Q    Right. So you wouldn't be able to
16  just by looking at it, could you?
17  A    However, I didn't see any obvious
18  visible damage.
19  Q    Did you ask him to point out the
20  damage to you?
21  A    I don't recall asking him
22  Q    Did Mr. Dewberry tell you that
23  Jimmy Williamson was told by the agent that he

Page 259

1   could dispose of the property?
2   A    Larry Dewberry told me that.
3   Q    Have you ever talked to Jimmy
4   Williamson about that?
5   A    No, I haven't
6   Q    Did you ever call him to find out
7   if that was true?
8   A    No. I believe I mentioned that in
9   my December 20th letter.
10  Q    How did you mention that in your
11  December 20th letter?
12  A    Okay. I was mistaken. I did not
13  mention that in the December 20th letter
14  Q    All right. In this letter of
15  December 21st, it says --
16  A    No, no. Let me back up. It says,
17  we also understand that you have disposed of the
18  damaged equipment without us being able to have
19  a third party verify the damages
20  Q    But not about who told him he
21  could dispose of it?
22  A    No
23  Q    This letter of December 21st says,

Page 260

1   it was Mr. Dewberry's understanding that the
2   insured's agent had advised him that he could
3   dispose of the property. We have not yet
4   verified that with the insured. Did you do
5   anything to find out -- to verify that with the
6   insured?
7   A    I didn't call him
8   Q    Did you do anything to verify
9   that?
10  A    I put it in the December 20th
11  letter.
12  Q    No, you didn't. I'm asking if you
13  did anything to verify whether or not the agent
14  told Mr. Williamson he could dispose of the
15  property?
16  A    I'm sorry. Ask me again.
17  Q    We're on the last line of the
18  second paragraph of the second page: We have
19  not yet verified that with the insured. And
20  "that" being him being told by the agent he
21  could dispose of the property. Do you follow
22  me?
23  A    Okay. What is your question?

65  (Pages 257 to 260)

# American Court Reporting
## toll-free (877) 320-1050

Page 261

1    Q.    Did you do anything to verify that
2    with the insured?
3    A    I verified that with the agent
4    Q    You never called the insured about
5    that, did you?
6    A    No, I didn't
7    Q    What did the agent say?
8    A    The agent advised that Jimmy
9    Williamson had called them in a panic saying
10   that somebody wanted to come look at the
11   equipment, and he'd already thrown it away  And
12   the agent said that he was telling them that
13   they had told him he could throw it away
14   Q    And?
15   A    The agents advised that they
16   didn't tell him he could throw it away
17   Q    Did you ever ask Jimmy Williamson
18   whether the agents told him he could throw it
19   away?
20   A    No, I didn't
21   Q    If the agents had told him to
22   throw it away, would that affect your decision
23   about this claim?

Page 262

1    A    I would have to -- that decision
2    would have to be made from a branch manager or
3    somebody
4    Q    Well, if an agent told an insured
5    it was okay to throw something away, would you
6    agree that it would reasonable for the insured
7    to rely on that and throw it away?
8         MR. PEARSON: Object to the form
9    A    I wouldn't think it would be
10   reasonable if they were told to keep the damaged
11   equipment, and they threw it away
12   Q    If they were told by their agent
13   after they had held it for almost a month that
14   it was okay to get rid of it, would there be any
15   reason for them to hold on to it?
16   A    I don't know  I would think I
17   would want to check with whoever was handling
18   the claim
19   Q    Because you're an insurance man
20   You know that, don't you?
21   A    Yes
22   Q    Well --
23   A    Especially after he had been told

Page 263

1    that somebody was coming to look at it
2    Q    That's what you've said  You said
3    that December 15th --
4    A    That's correct
5         MR. PEARSON: Object to the form
6    Object to the mischaracterization of the date
7         MR. HALL: All right  What'd I
8    say?
9         MR. PEARSON: I believe -- April,
10   did he say December 15?
11        COURT REPORTER: December 15
12        MR. HALL: November 15th  Thank
13   you, Joel
14   Q    We have not yet verified that with
15   the insured  You never tried to verify it with
16   the insured, did you?
17   A    No
18   Q    I plan to get a statement from the
19   insured when he calls about the building damages
20   and what the agent told him  You did not do
21   that, did you?
22   A    He never called
23   Q    He never called?

Page 264

1    A    No
2    Q    Did you have his phone number?
3    A    Yes, I did
4    Q    Did you call him?
5    A    I sent him a letter requesting he
6    contact me
7    Q    What letter?  The February 3rd
8    letter?
9    A    I'd have to see that letter
10   Q    So you're saying that, I plan to
11   get a statement from the insured when he calls
12   about the building damages and what the agent
13   told him, you're saying you accomplished that by
14   writing a letter to Mr Williamson?
15   A    I'm sorry  Ask me again
16   Q    I plan to get a statement from the
17   insured when he calls about the building damages
18   and what the agent told him  You wrote that;
19   right?
20   A    Let me back up  I'd have to see
21   the letter to --
22   Q    Find the letter  It's a February
23   3rd letter  You can do it faster than I can.

66  (Pages 261 to 264)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 265

```
 1        MR. PEARSON: 244
 2    A    Okay. Let me go back.
 3    Q    All right.
 4    A    I did not -- is there another
 5 letter before the February 3rd in here
 6 somewhere? I thought there was a letter that we
 7 had sent him sometime early January or late
 8 December to contact us concerning his claim.
 9 Okay. It was in the December 20th letter.
10    Q    What was in the December 20th
11 letter?
12        MR. PEARSON: I don't what the
13 question was now.
14        MR. HALL: I don't remember now
15 either.
16        MR. PEARSON: You asked about a
17 letter in late December and --
18    Q    Okay. I'm going to ask this
19 again. You said in your December 21st fax to
20 the home office that you plan to get a statement
21 from the insured about this. You never did
22 that, did you?
23    A    No, I didn't.
```

Page 266

```
 1    Q    Did you take any steps to attempt
 2 to do that?
 3    A    I had asked him in the December
 4 20th letter to contact me concerning his claim.
 5    Q    Did you take any steps besides the
 6 letter you had written before you wrote this
 7 letter to try to get a statement about this
 8 issue of whether the agent told him to dispose
 9 of the property?
10    A    No.
11    Q    Would you agree that would have
12 been relevant information in considering this
13 claim?
14    A    Not necessarily.
15    Q    Why did you want to know what he
16 said if it wasn't relevant?
17    A    At one point, I thought we may
18 want to ask him about that, but given the fact
19 that he had already destroyed it after being
20 told not to, he had already put this claim in
21 jeopardy.
22    Q    Did you seize on that opportunity
23 to deny the claim?
```

Page 267

```
 1    A    No, I didn't.
 2    Q    Well, if you didn't try to get a
 3 statement about something that was important
 4 enough to write to the home office and you just
 5 told me that he had already put this claim in
 6 jeopardy, don't you agree that all you did from
 7 this point forward was find out to deny the
 8 claim?
 9    A    No.
10    Q    What did you do from December 20th
11 forward to try and find coverage?
12    A    We ran the lightning strike
13 report.
14    Q    Was that trying to find coverage?
15    A    That was trying to verify the
16 lightning claim.
17    Q    Would you agree that was trying to
18 decline coverage?
19        MR. PEARSON: Object to the form.
20    A    No, it was trying to find a way to
21 pay the claim.
22    Q    Well, you had estimates where he
23 complied with Paragraph Five of your December
```

Page 268

```
 1 20th letter from both Pioneer Services as well
 2 as a third party, Telcom Services, didn't you?
 3    A    I did.
 4    Q    You chose to disregard both of
 5 those and put them in the file after looking at
 6 them; right?
 7    A    The one from Pioneer Services was
 8 disregarded because it was a conflict of
 9 interest to write your own lightning affidavit.
10    Q    So when he supplied you with a
11 replacement from a third party, you disregarded
12 that one as well, didn't you?
13    A    Not totally.
14    Q    In what way did you not disregard
15 it?
16    A    It was considered before it was
17 denied.
18    Q    And then put in the file?
19    A    I mean, it was in the file.
20    Q    You looked at it and put it in the
21 file, you told me earlier?
22    A    Right.
23    Q    That's all you did with it; right?
```

**www.AmericanCourtReporting.com**
**January 25, 2007**

## American Court Reporting
### toll-free (877) 320-1050

Page 273

1   suspicions
2       A    I don't have any suspicions
3       Q    I just wanted to be sure there
4   wasn't some other concerns that you had about
5   that
6       A    No.
7       Q    Do you know if Jimmy Williamson
8   had a claim on his personal residence?
9       A    I do not
10      Q    All right  In your letter of
11  December 20th, you set out three subparagraphs
12  of the policy  Were you identifying three
13  subparagraphs that you believe he had not
14  complied with or that Pioneer Services had not
15  complied with?
16      MR PEARSON: Object to the form
17  Asked and answered
18      A    Some of the provisions in there,
19  he had not complied with
20      Q    Okay  And we've been through them
21  in some detail, we talked about that  Are there
22  any other provisions of the policy that would
23  have led to you denying this claim other than

Page 274

1   those three you set out in the December 20, 2004
2   letter?
3       A    I don't believe so
4       Q    And then your February 3rd
5   letter -- which is 244; is that right? AO 244
6   and 245?
7       A    That's correct
8       Q    This is not on letterhead, but it
9   went out on letterhead, didn't it?
10      A    That's just a second copy that
11  went out on the printer
12      Q    It would look the same as this
13  letterhead that the December 20th version is
14  on. And I think we have one, but I'm not going
15  to dig for it right now
16      A    Had I had a copy machine, it would
17  have
18      Q    You just printed it on
19  nonletterhead to save money?
20      A    Yeah
21      Q.    That's a good way to keep
22  records. This is the letter that went out to
23  him on February 3rd?

Page 275

1       A    That's correct
2       Q    This February 3rd letter was a
3   denial of the claim; is that correct?
4       A    Let me look at it
5       Q    Okay.
6       A    That's correct.
7       Q    And you cited two provisions of
8   his policy, Paragraphs Four and Six, in your
9   February 3rd letter; is that right?  Under item
10  three, duties in the event of a loss, and you
11  cited four and six; right?
12      A    Items four and six are --
13      Q    They're cited in your letter?
14      A    That's correct
15      Q    In your December 20th letter, you
16  cited, under part three, duties in the event of
17  a loss, four, five and six  You left five off
18  of this second letter; right?
19      A    It is not on there
20      Q    Is that because they complied with
21  five?
22      A.    I'd have to look at five again to
23  see what it is  At the time the December letter

Page 276

1   went out, we had not received -- I don't believe
2   we had received a complete breakdown of
3   everything he was claiming
4       Q    But after that, you did receive
5   this other stuff we talked about in Exhibits 3
6   through 7 --
7       A    Right
8       Q    -- and the financial records  So
9   that satisfied five; right?
10      A    I believe so
11      Q    So you still had four and six.
12  And we've already agreed that he complied with
13  four as far as protecting the property; right?
14      MR PEARSON: Object to the form
15      A    He protected it for a short period
16  of time
17      Q    Okay  Well, six is really what
18  you're focusing on here:  As often as may be
19  reasonably required, permit us to inspect  Did
20  you believe he violated four or six?
21      A    Yes, I did
22      Q    Both or one or the other?
23      A.    Let me look at four. What was the

69  (Pages 273 to 276)

# American Court Reporting
## toll-free (877) 320-1050

Page 277

1 question again?
2    Q    I believe my question was: Did
3 you believe he had complied with Paragraph Four
4 where he protected the equipment?
5    MR. PEARSON: Object to the form
6 and asked and answered
7    A    He did for a short period of time
8    Q    You said before he had. Now
9 you're going to put on there, for a short period
10 of time?
11    A    Well, he did protect it for -- I
12 don't know when he moved it to the storage shed
13    Q    That's right, you don't know.
14    A    I don't know that  But he
15 protected it for less than a month
16    Q    Six is what you're really
17 concerned about  That you weren't really able
18 to see it again; right?
19    MR. PEARSON: Object to the form
20    A    Number six is where there was a
21 problem with the claim
22    Q    And six says, as often as may be
23 reasonably expected; correct?

Page 278

1    A    Correct
2    Q    And you believe that means more
3 than the inspection that took place on November
4 15th?
5    A    Absolutely.
6    Q    But you never wrote him and told
7 him you wanted another inspection, did you?
8    A    No  I told you I told him while
9 we were in the shed that we were going to send
10 somebody to look at it
11    Q    And you waited how long before you
12 sent somebody?
13    A    It was less than a month
14    MR. PEARSON: Object to the form
15 I'm telling you, Harry, this -- I've been very
16 generous on letting you cover the same ground
17 over and over  Now, get on with it  We've been
18 here -- the time limit is coming in ten
19 minutes  If this deposition isn't over in ten
20 minutes, we're going to call the judge again
21    MR. HALL: Thank you
22    MR. PEARSON: Because I believe
23 that we set a limit on it, but I'll check --

Page 279

1 we'll stop and check the report and see what the
2 time limit is on it  But I'm trying to be -- we
3 are going on six hours.
4    Q    Have you had any other
5 conversations or exchange of information with
6 Pioneer Telephone Services other than the
7 February 3rd letter, December 20th letter and
8 the conversation on November 15th?
9    A    I don't believe so
10    Q    All right. Did you ever tell
11 South Central Agency, either one of the
12 principals there, that if Jimmy Williamson
13 pursued this claim any further that you would
14 subrogate against his personal claim?
15    A    No, I didn't
16    MR. HALL:  That's all I've got
17 Thank you  We'd attach Exhibit 10, which I'll
18 put back together in the right order  Do you
19 have anything?
20    MR. PEARSON: No, I don't have
21 anything
22    ENDED AT 5 p m
23    FURTHER DEPONENT SAITH NOT

Page 280

CERTIFICATE

STATE OF ALABAMA )
MONTGOMERY COUNTY )

I hereby certify that the above
and foregoing deposition was taken down by me in
stenotype, and the questions and answers thereto
were transcribed by means of computer-aided
transcription, and that the foregoing represents
a true and correct transcript of the deposition
give by said witness upon said hearing
I further certify that I am
neither of counsel nor of kin to the parties to
the action, nor am I in any way interested in
the result of said cause

APRIL BENDINGER, CCR
CERTIFICATE NUMBER CCR-384

My Commission Expires
June 8, 2008

70 (Pages 277 to 280)

www.AmericanCourtReporting.com
January 25, 2007