# EXHIBIT "Q"

Deposition of Jimmy Williamson                                                      January 26, 2007

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3             NORTHERN DIVISION
 4
 5   PIONEER SERVICES, INC.,
 6      Plaintiff,
 7   Vs              CIVIL ACTION NO
                     2:06CV377-WKW
 8   AUTO-OWNERS INSURANCE COMPANY,
     INC, et al.,
 9
        Defendant
10
11
12              * * * * * * * * * * * *
13
14      VIDEOTAPED DEPOSITION OF JIMMY WILLIAMSON,
15   taken pursuant to stipulation and agreement before
16   Lisa J Nix, Registered Professional Reporter and
17   Commissioner for the State of Alabama at Large, in
18   the Law Offices of Enzor & Enzor, 208 Dunson
19   Street, Andalusia, Alabama on Friday, January 26,
20   2007, commencing at approximately 10:10 p m.
21
22              * * * * * * * * * * * *
23
```

Page 2

```
 1              APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   Mr. Harry P. Hall II
     FARMER, PRICE, HORNSBY & WEATHERFORD
 5   Attorneys at Law
     100 Adris Place
 6   Post Office Drawer 2228
     Dothan, AL 36302
 7
 8   FOR THE DEFENDANT:
 9   Mr. Joel H. Pearson
     MORROW, ROMINE & PEARSON, P C
10   Attorneys at Law
     122 South Hull Street
11   Montgomery, AL 36104
12
     ALSO PRESENT: Vic Griswold, Videographer
13
14          * * * * * * * * * * * *
15
           EXAMINATION INDEX
16
17   JIMMY WILLIAMSON
       BY MR PEARSON....         5
18           EXHIBIT INDEX
19                      MAR
     DEFENDANT'S EXHIBIT
20   1  Secretary of State corporate detail page  17
21   2  Documents Bates stamped Pioneer 01 - 357  77
22   3  Documents Bates stamped A000001 - 000299  150
23
```

Page 3

```
 1              STIPULATION
 2      It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of JIMMY WILLIAMSON is taken pursuant to
 5   the Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Lisa J Nix,
 7   Registered Professional Reporter and Commissioner
 8   for the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16      It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23      It is further stipulated and agreed by and
```

Page 4

```
 1   between the parties hereto and the witness that the
 2   signature of the witness to this deposition is
 3   hereby waived
 4
 5          * * * * * * * * * * * *
 6
 7      VIDEOGRAPHER: This is the
 8         deposition of Jimmy Williamson
 9         taken in the matter of Pioneer
10         Services, Incorporated,
11         plaintiff, versus Auto-Owners
12         Insurance Company,
13         Incorporated, et al,
14         defendants, Case Number
15         2:06CV377-WKW held in the
16         United States District Court
17         for the Middle District of
18         Alabama, Northern Division
19            Today is January 26,
20         2007. We're at the offices of
21         Enzor and Enzor in Andalusia,
22         Alabama  The local time is
23         10:12 a m  If counsel would
```

Page 253

1   at the Pioneer documents we had
2       181 through 184 is one of them. That's
3   one of the documents I want you to look
4   at. And the other is 274, 275, and the
5   sequential pages following that.
6   A.  There's 274.
7   Q.  Yeah, I'm looking for the rest of it.
8       In any event, the documents that are
9   marked -- the page beginning AO274 and the
10  page beginning AO181, those are documents
11  you took to -- well, that you prepared
12  regarding the damage to the property at
13  Pioneer Telephone Services, aren't they?
14  A.  Yes, sir. This was the contents.
15  Q.  Okay. What I want to ask you about is, on
16  those contents, is that the first documents
17  you gave to anyone from the agency or
18  anyone regarding Auto-Owners Insurance or
19  gave to somebody else regarding your
20  contents claims?
21  A.  The one that -- if this -- if this is it, I
22  mean, I'm sure I gave it to South Central
23  Agency. I walked it over.

Page 254

1   Q.  Okay. When you say it, you mean both the
2   document AO274 and the document that starts
3   AO181, correct?
4   A.  I guess so. I'm not -- I'm not sure if
5   both of them went the same -- I think, if
6   I'm not badly mistaken, I knew the
7   lightning stuff. And I don't think I -- I
8   may not have gone through the water
9   damage -- all of the water damage stuff yet
10  because we were so busy with other
11  customers.
12      Because I had to go through all this
13  because the stuff was in boxes. I did not
14  know exactly what was in it. But I do know
15  the lightning stuff went -- I believe went
16  first.
17      It's like I said, it's all so crazy, we
18  were so busy trying to take care of
19  everybody else.
20  Q.  Well, what I want to know is when you
21  presented those documents there, I want to
22  know first of all, are those -- to your
23  recollection, are those the first documents

Page 255

1   you presented to Auto-Owners or somebody
2   else to get to Auto-Owners regarding
3   contents claims.
4   A.  It looks like them. I would say, yes,
5   sir. I mean, I'm just. I believe it is.
6   Q.  We've talked about earlier some lightning
7   affidavits you did, but did you submit
8   those before or after those invoices?
9   A.  Those were done -- We always try to do them
10  the same time when we do it.
11  Q.  The document marked invoice, AO181, and the
12  document marked quotation, AO274, do you
13  know if you did those before, after, or at
14  the same time as the documents -- the
15  lightning affidavits?
16  A.  I'm not sure. Sheila did it. Usually
17  as -- when we know we have -- or there's
18  going to be a claim involved, the affidavit
19  is actually done -- the item numbers is
20  actually done off of the invoice when -- we
21  try to keep everything the same.
22  Q.  And do you know the date that you took
23  those items or the date you first took any

Page 256

1   item to South Central Agency regarding
2   contents?
3   A.  No, sir, I don't -- I don't remember when I
4   did that.
5   Q.  Was it on -- Was it on September 17th?
6   A.  Oh, Lord, no.
7   Q.  Okay.
8   A.  All they -- All that we knew was we just
9   had a bunch of messed up stuff.
10  Q.  So it was sometime a good while after that?
11  A.  Well, it wasn't a good while. I would say
12  a couple of weeks, maybe a week and a
13  half. Because we -- I mean, like I said,
14  we had -- we had other customers, and we
15  operated the first -- first three or four
16  days, we operated off regular telephones,
17  not even a business system.
18  Q.  Had you done it by the time you met with
19  Mr. Gauthier?
20  A.  Oh, yes, sir.
21  Q.  You had taken the list to Harold -- to
22  South Central Agency prior to that?
23  A.  I believe we had. And if not, it might

Page 257

1  have been right after. I know that I had
2  told them that I was working on it, trying
3  to get it, and they understood. They said
4  they knew how it was.
5  Q   And your best recollection is that it
6  was -- is when in relation to September
7  16th, 2004?
8  A   I'm just not sure. I mean-- I mean, if I
9  was going to guess, what I'd say, three
10 weeks, somewhere in there to be fair.
11     MR. HALL: Don't guess.
12     THE WITNESS: Okay.
13 A   Well, I'm just not sure then.
14 Q   Well, the two documents are dated. What is
15 the date on these two documents marked
16 AO181 and AO274?
17 A   October 29th, 2004.
18 Q   Let me --I'm going to show you the
19 lightning affidavit. You did one, and
20 then -- let me show you what was -- I
21 previously think we've been over it maybe.
22 AO185, does this regard lightning or water
23 here, these items?

Page 258

1  A   Water.
2  Q   Okay. And there, you've listed -- I want
3  to ask you about that. It's got a date
4  on -- that you did something on the 20th of
5  September. You're not maintaining you
6  presented that to anybody on the 20th of
7  September, are you?
8  A   No, this is when I done a list. I hadn't
9  checked anything. Why, I mean --
10 Q   Is that the date you started looking at
11 stuff --
12 A   Yes, sir.
13 Q   -- and compiling it?
14 A   (Nods head up and down.)
15 Q   But it was sometime well after that that
16 you submitted it?
17 A   Right.
18 Q   Okay. And would the -- would the documents
19 that are marked AO181 and AO274 have been
20 presented prior to that -- I mean, yeah,
21 prior to you submitting that?
22 A   What we do, and this is -- I'm doing it
23 like we do everybody else's. We try to

Page 259

1  keep this date -- because we have looked at
2  it, but we haven't fully examined. It's as
3  close as we can to the actual date of the
4  problem.
5  Q   That you started looking at it?
6  A   Yes, sir.
7  Q   Okay. And I guess what I'm getting at and
8  what I'm asking you is, it was much
9  closer -- it was probably October 29th,
10 2004 when you presented this material to
11 South Central Agency?
12 A   Again, I don't know. I mean, we've done --
13 had to do this again. Got Sheila to -- The
14 date could be wrong. I'm trying to
15 remember.
16 Q   You're welcome to look through any of these
17 documents if you think something will help
18 give you a better -- a better idea on that.
19 A   I'll be glad to. I just don't know if...
20     I'm going to say, I mean, it's close,
21 because I know we were so busy with
22 everything else.
23 Q   And when you say it was close, it's close

Page 260

1  to somewhere around October 29th, 2004 when
2  you presented that to South Central Agency?
3  A   I believe -- what I'm saying is the -- You
4  know, we reported the claim to them. But,
5  now, you know -- I'm not making myself
6  clear still.
7      We reported the claim, of course, that
8  day that it happened. But this may be when
9  we actually got the figures to them, not
10 actually the equipment. But this -- she
11 may have done -- run this that day, typed
12 it out where I had it done.
13 Q   Well, that's what I'm asking you about is
14 the day that you first submitted anything
15 to Auto-Owners or to South Central Agency
16 or Mr. Gauthier or Mr. Cleveland or anyone
17 else that was looking at the claims
18 regarding damaged contents at Pioneer
19 Telephone Services.
20 A   This -- when we done -- where is the
21 Tel-Com? Let's see. Let's see. I think
22 that we did this -- we done another with
23 Pioneer when they -- Bill neglected

Page 273

1  A. Yes, sir, I believe so.
2  Q. Do you know if it was after the second --
3     second week of October?
4  A. No, sir.
5  Q. Do you know whether -- whether your first
6     conversation with Mr. Reaves regarding
7     contents or anyone with Auto-Owners
8     regarding contents was in November?
9  A. It was before then.
10 Q. Do you know how long before then?
11 A. I mean, I believe -- I believe it was
12    around the first week in October, second
13    week in October, I believe.
14 Q. Okay. Do you recall when -- And then what
15    was the next contact you had with anyone
16    from Auto-Owners?
17 A. After I talked with Bill on the phone?
18 Q. Yeah. First of all, before you tell me
19    about the next conversation, tell me what
20    took place in that first conversation
21    between you and Bill Reaves.
22 A. Not a whole lot. I mean, he just didn't
23    talk much. He didn't respond much. You

Page 274

1     know, he -- I hear you've got a claim. I
2     said, yes, sir. When was a good time? I
3     said anytime. And I believe it was on a
4     Tuesday that he came.
5  Q. And you're talking about actually came to
6     meet with you?
7  A. Yes, sir. I think it was the following
8     week after I talked to him.
9  Q. Okay. Your recollection is that you met
10    with him approximately one -- after your
11    first conversation with Mr. Reaves, you met
12    with him approximately one week later?
13 A. Yeah, somewhere in there, a week, two -- I
14    mean, I think it was earlier than a week.
15    I mean, it wasn't long after he called
16    because he was ready to -- I think
17    something -- he come -- he came over to the
18    office every so often or something.
19 Q. And your recollection was that the call
20    that you got from Bill Reaves was not that
21    long after you went over and discussed the
22    contents claim with John and Harold for the
23    first time?

Page 275

1  A. The Pioneer contents claim?
2  Q. Yes, sir.
3  A. Yes, sir.
4  Q. And then you told me not much went on in
5     that first conversation, but y'all --
6     apparently, you set up a time to meet
7     approximately a week later?
8  A. Yes, sir, somewhere -- from what I
9     remember, he said I'm going to be there
10    this Tuesday. I don't remember exactly
11    when the call was, but he was trying to
12    schedule when he was down that way.
13 Q. Okay. And did you, in fact, meet at the
14    time that he said he would be down there
15    next?
16 A. Yes, sir.
17 Q. And did you meet at the premises of Pioneer
18    Telephone Services?
19 A. No, sir. He came to the office, and then
20    we went out to the -- to my shop at the
21    house.
22 Q. To see the items that you had moved to that
23    shop?

Page 276

1  A. Yes, sir. And I had it all, you know, laid
2     out for him.
3  Q. And do you recall whether he took
4     photographs out there at that time?
5  A. Yes, sir.
6  Q. He did?
7  A. Yes, sir.
8  Q. And tell me again looking at these photos
9     which ones are pictures of items in your
10    shop.
11 A. Here.
12 Q. Hold on for me just a minute.
13 A. Oh, I'm sorry.
14 Q. One is at the bottom of AO213.
15 A. All of the pictures on 213. All of the
16    pictures on 273. All of the pictures on
17    272, and the picture -- oh, the two
18    pictures at the bottom of page 271. It's
19    actually two pictures.
20 Q. All right. And all of those pictures that
21    you've pointed out to me now appear to have
22    a date stamp on the bottom of them of
23    11-16-2004, don't they?

Page 277

1  A  Yes, sir, I believe so.
2  Q  Does that help refresh your recollection
3     that perhaps your meeting was with
4     Mr. Reaves on or about that time?
5  A  No, sir. I don't -- I couldn't tell you
6     one way or the other on the date exactly.
7  Q  Okay.
8  A  And that is just a date that appears on a
9     camera. It could have been -- for all I
10    know, it could have been 10-16.
11 Q  I'm not trying to put words in your mouth.
12    I'm just asking you, showing you those
13    pictures and asking you that. You don't
14    have to agree with me. I'm just asking
15    you, does that jog anything in your mind?
16 A  (Shakes head from side to side.)
17 Q  I understand what we're talking about
18    here --
19 A  Uh-huh. (Positive response.)
20 Q  -- and the time frames you've given me, no
21    specific dates, but we've talked about time
22    frames.
23 A  Yes, sir.

Page 278

1  Q  But it's my understanding that you do
2     recall that you met with Mr. Reaves. He
3     took pictures approximately one week after
4     you spoke to him for the first time?
5  A  Sometime in there after we talked. He took
6     pictures whenever we went to the house.
7  Q  Is that the only --
8  A  I'm sorry. The reason that I'm not sure,
9     because I don't remember -- this picture
10    here which is dated the same day, that is
11    my carpet at my office. And I don't
12    remember -- I don't remember -- oh, no,
13    because Bill didn't do anything with my
14    carpet. Mr. Gauthier did with my carpet.
15 Q  Did you have equipment -- did you have
16    contents -- Other than in your shed, did
17    you have contents in the building, in the
18    office at Pioneer that you were making
19    contents claims on?
20 A  No, sir, not -- not to my recollection.
21    Because after we got everything checked and
22    done, I moved it all to the shop because we
23    didn't have room.

Page 279

1     That's a copy of this, I believe.
2  Q  Are all three of those pictures other than
3     the one in the top left-hand corner at your
4     shed?
5  A  I don't know about this one. This one
6     here, I don't know about where that was
7     taken.
8  Q  Okay. The next --
9  A  I don't even recognize that, what that is.
10    I recognize that. That's in my home.
11       MR. HALL: Wait for a question.
12 Q  What about the other items on the left
13    picture of AO214?
14 A  Yes, sir.
15 Q  Do you recognize those?
16 A  Yes, sir.
17 Q  What are those?
18 A  That's Vodavi equipment.
19 Q  And do you recognize any of these?
20 A  I recognize this. I mean, I recognize the
21    equipment, and this is a security system.
22 Q  All right. What discussions did you and
23    Mr. Reaves have on the date he was out

Page 280

1     there, the date you met with him at your
2     shed?
3     What I'm understanding is, y'all -- he
4     met, maybe, you at your office, and y'all
5     then proceeded to your shed?
6  A  Yes, sir, we drove out to the shed, the
7     shop.
8  Q  Did he meet you in your office first?
9  A  I believe he did, yes, sir. I believe he
10    came -- or either John called me and I went
11    over to their office because he didn't know
12    where I lived.
13 Q  Do you know if he looked at anything -- at
14    anything in your office when he met with
15    you the first time?
16 A  I don't remember.
17 Q  All right. Now, then, tell me everything
18    you and he discussed during your meeting.
19 A  We got there, and I showed him where
20    everything was. And we -- I stood around
21    and let him look at stuff. He opened a
22    couple of boxes. He took a few pictures.
23    He actually seemed more interested in what

Page 281

1  I had in the shop -- I'm talking about
2  other -- my other items than the
3  equipment.
4      And in a moment, he asked me was there
5  any salvageable parts. And I thought it
6  was very strange the way things were
7  going. Very few words. And then when he
8  asked me about salvageable parts, I told
9  him no, sir.
10     Do you want me to go on?
11 Q  I want to know every -- every conversation
12    that you and he had.
13 A  Okay.
14 Q  As far as what you noticed or this and that
15    and the other -- what I'm specifically
16    asking you about is the conversations, what
17    you said to him and what he said to you
18    during your meeting.
19 A  Okay.
20 Q  That's all I want to hear from you.
21 A  Okay.
22 Q  If you want to expand on it and say other
23    stuff -- I'm trying to give you leeway to

Page 282

1  do it because I'm not trying to cut you
2  off.
3  A  Okay.
4  Q  But my specific question is what he said to
5     you and what you said to him during your
6     meeting.
7  A  Okay.
8  Q  And that's all I want to know.
9  A  Okay. We -- After I stood there and
10    watched, he asked me was there any
11    salvageable parts. I told him that there
12    was none, that -- that I would not use it
13    for my customers because it had been
14    soaking wet and that it was going to
15    corrode because it was printed circuit
16    boards.
17       And, he said, I couldn't use it
18    anywhere? I said, no, sir. I said, I
19    mean, I can't, I said, because I've worked
20    too hard to build my reputation and the
21    company's reputation and, I said, I can't
22    use it.
23       And I offered to load it up, help him

Page 283

1  take it and load it up, and he said, no --
2  Q  Your entire shed of -- your entire shed of
3     equipment?
4  A  Well, the corner here. It was just this
5     corner.
6       That I'd be glad to do what I needed
7     to, that I needed the space. And he said
8     that, no, he didn't need to take it. And I
9     don't really remember if he -- I think he
10    said he would be back in touch, something
11    to that effect, and I never heard from him
12    again. To the best of my knowledge, it was
13    only through John Tomberlin and Harold
14    Young.
15 Q  Okay. Have you told me everything that
16    took place and was discussed between you
17    and Mr. Reaves in that -- in that
18    conversation that you had at your first
19    meeting?
20 A  Let me think. Let me make sure I didn't
21    miss anything.
22       Yes, sir, I believe so.
23 Q  Okay. Did you meet with Mr. Reaves after

Page 284

1  that day?
2  A  No, sir.
3  Q  Did you talk with him on the phone after
4     that day?
5  A  I believe I talked to -- it was either him
6     or somebody in his office.
7  Q  Okay.
8  A  No. I talked -- I called his office. John
9     had gave me the number, but I dealt mainly
10    through John and him. He relayed messages
11    to John.
12 Q  Okay. Before we get to that, I want to ask
13    you the next contact you had with anyone
14    regarding your contents claim for Pioneer
15    Telephone Services after that meeting with
16    Bill Reaves that we've just discussed.
17 A  I don't remember any.
18 Q  Well, I thought you just said --
19 A  I mean, other than -- not with Bill.
20 Q  No, I'm asking with anybody. Anybody
21    regarding your contents claim after that
22    meeting with Bill Reaves, who was the next
23    discussion with?

Page 285

1   A   John
2   Q   Okay. And tell me what took place in that
3       discussion and what was said.
4   A   I was just wanting to know the status.
5       John told me that Bill -- that's his name,
6       yeah, Bill. That it was in the works and
7       that he didn't see a problem. Said okay.
8           After nothing happened for a little
9       while, I talked --
10  Q   Well, before you -- Okay. I want to just
11      make sure we've covered the conversation.
12      Is that the end of that conversation you
13      had, the next conversation?
14  A   (Witness nods head up and down.) With
15      John. I just called to get an update.
16  Q   Okay. And do you remember when that was?
17  A   No, sir. It was sometime after our
18      meeting.
19  Q   And how long, approximately, after that
20      meeting do you believe that it was?
21  A   I don't remember.
22  Q   You don't know whether it was a week or a
23      month?

Page 286

1   A   No, sir. It was just a few days, I think.
2   Q   Okay. And then you were about to start
3       telling me about another conversation, I
4       believe, that you had, the next
5       conversation you had with anyone.
6   A   Well, the next conversation was with John
7       and Harold.
8   Q   And do you know when that was?
9   A   No, sir. It was sometime very shortly
10      after that.
11  Q   Okay. And what was the substance of that
12      conversation between you and Harold and
13      John?
14  A   John was supposed to be calling me back
15      pretty quick. And he had just heard from
16      Bill, if this is the time -- I think this
17      was the time. He said that there was --
18      that the check was being processed, and
19      I -- we thought everything was okay.
20  Q   And you don't remember the date of that
21      conversation?
22  A   No, sir.
23  Q   And did he tell you -- Did you have any

Page 287

1       other discussion with John or Harold other
2       than a discussion that a check was being
3       processed?
4   A   No, sir, not to my recollection.
5   Q   At that time, had you received a check from
6       Auto-Owners for anything?
7   A   I believe I had received a check for the
8       house.
9   Q   At that time, had you received a check for
10      anything regarding Pioneer Telephone
11      Services?
12  A   I don't believe so.
13  Q   All right. Now, then, the next -- Is that
14      everything that was said in that
15      conversation between you and Harold and
16      John that you've just told me about?
17  A   Yes, sir, basically.
18  Q   When was the next conversation?
19  A   The next day or two when there wasn't a
20      check.
21  Q   Okay. And who was that conversation with?
22  A   John.
23  Q   And did you call him or did he call you?

Page 288

1   A   I called him.
2   Q   In each of these conversations you had with
3       John, were you calling him?
4   A   No, he would call me and let know what was
5       going on.
6           The call, the one about the check John
7       made.
8   Q   Okay. All right. And you've told me
9       everything that occurred in that
10      conversation, correct?
11  A   Yes, sir.
12  Q   All right. And now this one -- this call
13      you initiated, this next call after that
14      conversation --
15  A   Yes, sir.
16  Q   -- you initiated the call to John, and tell
17      me what you discussed then.
18  A   At about that time, it must have been
19      around -- whenever he had gotten there --
20      you know, Bill had come by -- it must have
21      been around Tuesday or Wednesday. Bill had
22      said there was a problem, that it needed to
23      have Tel-Com's name on it -- or I needed to

Page 293

1   A   Yes, sir.
2   Q   Okay. And down there -- And what does it
3       say in the bottom left-hand corner of that
4       draft?
5   A   In payment of building damage.
6   Q   All right. And what is the date of that
7       draft, Mr. Williamson?
8   A   January 18th, 2005.
9   Q   All right. Now, then, you -- we were
10      discussing, one, about the check was
11      being -- going to be -- or being processed
12      and then a conversation you had with John
13      where he said that Bill said there's a
14      problem and somebody else to look at it.
15      And I believe you told me that the
16      conversation where Bill said there's a
17      problem, need somebody else to look at it
18      was before your conversation you said you
19      had with John about there being a check
20      processed.
21  A   The only problem -- The problem I'm talking
22      about is the one where it had Pioneer -- to
23      Pioneer. He just said he wondered if there

Page 294

1       was anybody else I could put there. That
2       was the only problem that he saw. And when
3       I said that we had that, he said, okay, no
4       problem. He said, if you would, get that
5       done and get it sent.
6   Q   Okay. And is that when you did the
7       lightning affidavits?
8   A   Well, the second one. We'd already done
9       the one for Pioneer.
10  Q   The one for Pioneer -- Let me just get that
11      correct.
12  A   Okay.
13  Q   Is that the document that's marked AO185 to
14      190?
15  A   Yes, sir, I believe so.
16  Q   And the second one is. The second one is
17      the one we discussed earlier today --
18  A   Here it is. Tel-Com.
19  Q   That is pages AO132 and 133?
20  A   Yes, sir.
21  Q   And that's what you submitted in response
22      to that conversation?
23  A   Yes, sir. He said all -- we just needed to

Page 295

1       change the name.
2   Q   Well, who said that?
3   A   Bill. Bill told John, and John told me.
4   Q   You didn't specifically have any
5       conversation with Bill about that?
6   A   No, sir.
7   Q   You just heard there was a problem, that
8       Bill told John there was a problem and that
9       could somebody else look at it?
10  A   Uh-huh. (Positive response.)
11  Q   Yes?
12  A   Yes, sir. Yes, sir. I'm sorry.
13  Q   And so then what you submitted in response
14      to that was what's marked AO132 and 133,
15      which is this Tel-Com. States that it's a
16      lightning affidavit, and it's -- it's
17      signed K. Mac Bracewell, and you've already
18      testified earlier it was signed by Sheila.
19  A   Yes, sir.
20  Q   His name was signed by Sheila.
21  A   Yes, sir.
22  Q   All right. And Sheila being the woman that
23      worked for both you -- at that time worked

Page 296

1       for both you and for Tel-Com?
2   A   Yes, sir.
3   Q   All right. Then what was the next
4       conversation you had after that? And I
5       believe you -- because you got them out of
6       order, the next conversation was John and
7       you had a conversation that he said
8       something to the effect that he understood
9       a check was being processed.
10  A   Uh-huh. (Positive response.) The first
11      one would be -- it was 21 -- I think it was
12      21,000 and something, something like that,
13      and that -- that everything was okay.
14      Everything was being processed.
15  Q   At that time, you hadn't received any check
16      from Auto-Owners, had you?
17  A   I'm not -- I may have got -- had one for
18      the home. I don't remember what the date
19      was on the house.
20  Q   Well, what I'm talking about, at that time,
21      you hadn't received a check from
22      Auto-Owners for anything regarding Pioneer
23      Telephone Services' --

Page 301

1  A  Yes, sir, and none after that.
2  Q  Okay.
3  A  I mean, no -- no any other kind of
4     discussion.
5  Q  All right. At this time, did you still
6     have the equipment -- the contents
7     equipment in your shed at your house of
8     Pioneer Telephone Services?
9  A  I'm not sure.
10 Q  Did you --
11 A  I don't believe that I did because John had
12    told me -- because I was needing space for
13    Christmas, and John had told me that since
14    three adjusters had looked at it, taken
15    pictures of it, and none of them had told
16    them, had told me that I had to keep it,
17    that he didn't see a problem with throwing
18    it away because everybody else's claims had
19    been taken care of.
20 Q  And who told you this?
21 A  John Tomberlin.
22 Q  Okay. Well, I've asked you in detail every
23    conversation you had with them, and that's

Page 302

1     the first time I've heard anything about
2     that conversation, right?
3  A  I guess.
4  Q  Isn't that the first time in your
5     deposition I've heard anything about that
6     conversation?
7  A  I'm not sure.
8  Q  Okay. Well, in this list of conversations
9     you've told me, when did that conversation
10    take place?
11 A  I'm not sure. I'm not sure. It was before
12    Christmas. I do know. I do know. I do
13    remember.
14 Q  Okay. When was it?
15 A  It was when the check was being done. That
16    was -- it was right -- it was right during
17    then, because John said it had been cleared
18    or it was being processed, whatever you
19    call it.
20 Q  Okay. And is it your testimony here today
21    that -- Well, and tell me again what that
22    discussion was and who you had it with.
23 A  Which one?

Page 303

1  Q  The one about where you decided -- well,
2     when I asked you about the disposal of the
3     equipment and you told me about the
4     conversation you had.
5  A  With John?
6  Q  Yeah. Is that who it was with, with John?
7  A  Yes, sir.
8  Q  Okay.
9  A  Because I told him I needed the room. And
10    I asked what -- was Bill ever going to come
11    get it or what was they going to do with
12    it, did I need to throw it away, whatever.
13    And John, that's when he said that since
14    the adjusters had come, took pictures of
15    it, I had taken pictures of it and
16    everybody and -- and he said the check was
17    being done -- that's right. The best I
18    remember, that's when it was.
19 Q  And you were present at both John's and
20    Harold's deposition, weren't you?
21 A  Yes, sir.
22 Q  And you heard their testimony in those
23    depositions, didn't you?

Page 304

1  A  Yes, sir.
2  Q  And you understood that both of them
3     said -- it's my recollection is that one or
4     both of them said they didn't have any
5     conversation with you about the disposal of
6     the equipment until after you had already
7     disposed of it. Is that your basic
8     recollection?
9  A  I don't remember what they said, but I -- I
10    know Harold did a complete turnaround,
11    but.
12 Q  Well, is it your --
13 A  I remember John -- I mean, John telling
14    about the $21,000 check that was being
15    processed.
16 Q  And what I'm asking you is, did you discuss
17    the disposal of the equipment -- and when I
18    say equipment, the contents equipment of
19    Pioneer Telephone Services, did you discuss
20    disposing of that equipment prior to your
21    disposing of it?
22 A  Yes, sir.
23 Q  Okay. Tell me what that conversation was.