# EXHIBIT "R"

Page 2

APPEARANCES

FOR THE PLAINTIFF:
   Harry Preston Hall, II
   FARMER, PRICE, HORNSBY & WEATHERFORD
   100 Adris Place
   Dothan, Alabama 36303

FOR THE DEFENDANTS:
   Joel Hartley Pearson
   MORROW, ROMINE & PEARSON, P.C.
   122 South Hull Street
   Montgomery, Alabama 36104

Page 3

INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Hall | 6 |
| Certificate | 146 |

INDEX OF EXHIBITS

| EXHIBITS | PAGE NO. |
|---|---|
| Plaintiff's Exhibit 18 (subpoena) | 7 |
| Plaintiff's Exhibit 19 (report) | 26 |

Page 4

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of RONALD G. DAVENPORT may be taken before Jessica H. Bell, Notary Public, State at Large, at the Law Offices of Rushton, Stakely, Johnston & Garrett, 184 Commerce Street, Montgomery, Alabama, 36104 on April 19, 2007, commencing at approximately 10 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions and that counsel for the parties may make objections and assign grounds at the time

Page 5

of trial or at the time said depositions is offered in evidence, or prior thereto.

   I, Jessica H. Bell, a Court Reporter of Camden, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the Law Offices of Rushton, Stakely, Johnston & Garrett, 184 Commerce Street, Montgomery, Alabama, 36104, commencing at approximately 10 a.m. on April 19, 2007, RONALD G. DAVENPORT in the above cause, for oral examination, whereupon the following proceedings were had:

   COURT REPORTER: Will you raise your right hand?

   RONALD G. DAVENPORT, having first been duly sworn, was examined and testified as follows:

   COURT REPORTER: Usual stipulations?

   MR. PEARSON: Before we go on the

Page 6

1  video -- yeah, usual stipulations. Before we go
2  on the video, I just -- we have the same
3  objections that we've had before on the video.
4        MR. HALL: That's right. That's
5  right.
6        All right. We're going on record
7  with Disk 1 of Ron Davenport's deposition on
8  April 19th, 2007. This is in the case of
9  Pioneer Telephone Services, Inc. versus Auto-
10 Owners Insurance Company.
11       My name is Harry Hall. I
12 represent the plaintiff. I'd ask all persons
13 here to identify themselves.
14       COURT REPORTER: I'm Jessica Bell.
15 I'm the court reporter.
16       THE WITNESS: I'm Ron Davenport.
17       MR. PEARSON: I'm Joel Pearson.
18       MR. HALL: All right. And the
19 witness has already been sworn and we've entered
20 into the usual stipulations and so we'll start
21 from here.
22                EXAMINATION
23 BY MR. HALL:

Page 7

1     Q.   Mr. Davenport, my name's Harry
2  Hall. We've met before. But we're here today
3  for your deposition in this case concerning a
4  claim by Pioneer Telephone Services, Inc.
5  against Auto-Owners Insurance.
6        You have been named as an expert in this
7  case and I have issued a subpoena for you to
8  attend this deposition.
9        I want to mark this as Plaintiff's
10 Exhibit 18. And let me show you that document
11 and see if you received a copy of that document
12 before the deposition today.
13              (Whereupon, Plaintiff's
14 Exhibit No. 18 was marked for identification.)
15    A.   I did.
16 BY MR. HALL:
17    Q.   All right. And I guess let's back
18 up and cover some initial ground. Will you tell
19 us your full name and your professional address?
20    A.   Ronald Greg Davenport. Street
21 address is 184 Commerce Street, Montgomery,
22 Alabama; firm of Rushton, Stakely, Johnston &
23 Garrett, P.A.

Page 8

1     Q.   And Exhibit 18 that I have marked
2  and delivered to you just now, have you reviewed
3  that document prior to this deposition?
4     A.   I have.
5     Q.   And have you brought any documents
6  responsive to the items listed in that subpoena
7  today?
8     A.   I don't have any documents
9  responsive to the items listed. They don't
10 exist.
11    Q.   They don't exist. Is there --
12 well, let's go through them.
13    A.   Okay.
14    Q.   And just cover that --
15    A.   All right.
16    Q.   -- to go ahead and take care of
17 that housekeeping matter.
18       I have Number 1, it says to "produce a
19 list of insurance companies you have represented
20 or been retained by to represent another during
21 the last five years." You have no list within
22 your office of the insurance companies that
23 you've done work for?

Page 9

1     A.   I do not of the -- you know,
2  there'd be a list, you know, Martendale-Hubble
3  of some of the clients that the firm represents.
4  But I do not maintain a list of insurance
5  companies I represent.
6     Q.   Do you have in your mind a list of
7  companies that you do work for on a regular
8  basis?
9     A.   Sure. I mean, some come to mind.
10    Q.   Could you tell me the ones that
11 come to mind?
12    A.   Sure. I do a good deal of work
13 for State Farm. I do some work for Amerisure.
14 I do a good deal of work for Safeco. I do work
15 for Aflac. The rest of them are now and then
16 type matters. First Acceptance, American
17 Family, and there are others. But those are the
18 main ones.
19    Q.   Have you ever done any work for
20 Auto-Owners?
21    A.   I have not. I think the firm has
22 done work -- has been retained by Auto-Owners,
23 but no time in recent years. And I'm not -- I'm

Page 38

```
 1  BY MR. HALL:
 2     Q.  Okay.
 3     A.  Because those are put in there and
 4  they change from time to time. I don't know if
 5  we -- if we're good about updating them every
 6  year or not. But it would certainly contain a
 7  sampling.
 8     Q.  All right. Let's go and look at
 9  your list of opinions just so that we can
10  identify what those are. The first sentence
11  under -- on Page 2 under paragraph --
12  parenthesis one, close paren, says, "Auto-Owners
13  paid all amounts to which the insured was
14  entitled under the subject insurance policy." I
15  don't think there's a period, but --
16     A.  There should be a period there.
17     Q.  Should be there.
18  "Auto-Owners properly paid $11,607.92
19  for the structure damage to the property." Is
20  that one of your opinions?
21     A.  Yes.
22     Q.  And what do you base that first
23  opinion on, please?
```

Page 39

```
 1     A.  Well, I reviewed the claim file
 2  and Auto-Owners paid the claim and it appears to
 3  me they paid it appropriately. And, you know,
 4  in reading Mr. Williamson's deposition, he -- as
 5  I recall, he agreed that he had no complaints
 6  about the payment of the structural damage.
 7     Q.  Well, the first sentence says "all
 8  amounts to which the insured was entitled under
 9  the subject insurance policy." The second
10  sentence talked about the structure damage.
11  The first sentence would cover the
12  amounts claimed in this lawsuit I assume. Is
13  that a fair assumption on my part?
14     A.  Yes.
15     Q.  So your first sentence saying that
16  Auto-Owners has paid all amounts to which the
17  insured was entitled would cover all claims in
18  this lawsuit as well?
19     A.  Yes.
20     Q.  All right. And you base that on
21  the claims file and Mr. Williamson's deposition?
22     A.  The first sentence?
23     Q.  Yes, sir.
```

Page 40

```
 1     A.  Well, I base that -- of course, I
 2  didn't -- are you asking at the time this was
 3  generated or now?
 4     Q.  Well,
 5     A.  Because I didn't have -- you know,
 6  there's been a lot of other data of course since
 7  then.
 8     Q.  Sure.
 9  Well, I would say at the time that you
10  issued the opinion, what did you base that on?
11     A.  At the time I issued the opinion
12  it was whatever I had. And I think I listed
13  that in the back which was mainly the claims
14  files as I recall.
15     Q.  Let's see. On Page 7 --
16     A.  Also -- yeah. There was some --
17  the pleadings, the discovery, you know, the
18  interrogatories. They're all listed there.
19     Q.  Can you tell me --
20     A.  But that -- excuse me.
21     Q.  Go ahead.
22     A.  The deposition of John Tomberlin
23  and Harold Young.
```

Page 41

```
 1     Q.  Well, can you tell me what out of
 2  all those items that you reviewed -- can you
 3  tell me what you used to come to the conclusion
 4  that Auto-Owners paid all amounts to which the
 5  insured was entitled?
 6     A.  Yes. Well, of course it's my
 7  opinion that when the insured disposed of the
 8  equipment they were making a claim on that Auto-
 9  Owners appropriately denied that claim because
10  they didn't comply with the condition in the
11  policy to preserve the equipment.
12     Q.  So the disposal of the equipment
13  would have justified a denial of the claim?
14     A.  Yes.
15     Q.  Is there anything that Pioneer --
16  and when we say "Pioneer" today, I think you
17  know that I'm talking about Pioneer Telephone
18  Services, Inc.?
19     A.  Right.
20     Q.  But just to make our conversation
21  a little easier, let's just call them Pioneer.
22  And Auto-Owners we know is the defendant in this
23  case.
```

Page 126

1  mean, it's also I'm referring there to the
2  letter as well. They sent a letter to him that
3  we've discussed.
4  BY MR. HALL:
5      Q.   When you say "attempted to secure
6  the inspection of the property," are you
7  referring to Mr. Reaves going to look at the
8  property?
9      A.   No. I'm referring to Larry
10 Dewberry.
11     Q.   All right. Down in the next
12 paragraph on the third line.
13     A.   Right.
14     Q.   You say, "however -- second line
15 -- "however there was a failure by the insured
16 to maintain or protect the property for a
17 reasonable period of time as required by the
18 loss conditions of the policy." And I want you
19 to tell me what is a reasonable period of time
20 as defined by the loss conditions of the
21 policy.
22          MR. PEARSON: Object to form.
23 Asked and answer.

Page 127

1      A.   Well, it really should be
2  reasonable number of times. I don't know that
3  there's a -- that the language in the policy
4  is --
5  BY MR. HALL:
6      Q.   This really is directed back to
7  what you said earlier about a reasonable number
8  of inspections?
9      A.   That's right.
10     Q.   Not a given period of time?
11     A.   Right.
12     Q.   Okay. And we've discussed that at
13 length. I think that you've expressed all your
14 opinions you have on that point?
15     A.   Yes. Yes.
16     Q.   The last paragraph of -- or the
17 last sentence of Page 6 says, "If called upon, I
18 may also render rebuttal expert testimony with
19 regard to any and all opinions expressed by any
20 expert called by the plaintiff to testify
21 regarding insurance matters, including, but not
22 limited to, Mr. Donald Dinsmore." Do you have
23 any such opinions?

Page 128

1      A.   Do I have any opinions concerning
2  Mr. Dinsmore's opinions?
3      Q.   Yes, sir.
4      A.   Yes.
5      Q.   Have you formulated those in such
6  a way that you're prepared to offer those to
7  supplement this report or are they --
8      A.   I will if he -- I will if Joel
9  requests me to.
10     Q.   Can you tell me what those
11 opinions are?
12     A.   I can tell you some of them. I
13 don't -- you know, his deposition was pretty
14 lengthy. One thing is that he -- I don't think
15 he's qualified to testify as to bad faith
16 because he's not a lawyer. Bad faith is defined
17 in case law in the state of Alabama. Bad
18 faith -- there's not a national standard of care
19 for bad faith. It's peculiar, certainly in
20 Alabama, to what the appellate courts have said
21 in Alabama. They've defined it.
22          I think his use of textbooks is totally
23 inapplicable for the same reason that the courts

Page 129

1  have set out what the requirements are. There's
2  no bad faith case that I'm aware in the state of
3  Alabama that cites textbooks. He's also cited
4  some regulations from the Department of
5  Insurance that are inapplicable. Those
6  regulations state in the regulations themselves
7  that they're for internal use only; that they
8  are -- it specifically says they are not to be
9  used in a court. So I think that was totally
10 inapplicable.
11          I think with all due respect to
12 Mr. Dinsmore, I'm sure he's a fine gentleman,
13 but I don't think he understands what bad faith
14 is as it's been set up by the appellate courts
15 in the state. I saw no indication that he did.
16     Q.   Do you have an understanding of
17 what he did think bad faith was?
18     A.   Well, he had a lot of things -- he
19 thought that this -- that there was a -- that
20 the duty was on the insurer as opposed to the
21 insured to prove the claim as I recall. There
22 were a -- I can't recall them all without going
23 through it, but he had some idea -- a lot of

Page 134

1  we may be close to the end.
2       MR. PEARSON: All right.
3       MR. HALL: We're off.
4           12:46 p.m.
5           (Short recess)
6           12:52 p.m.
7       MR. HALL: We're back on Disk 3 of
8  Ron Davenport's deposition.
9  BY MR. HALL:
10     Q.  Mr. Davenport, it's my
11 understanding from what you've said today so far
12 that you believe the disposal of the property
13 that was the basis for this claim by Pioneer was
14 a violation of the policy that would justify
15 denying any benefits?
16     A.  Violation of the condition -- of
17 the condition of the policy.
18     Q.  I'm sorry. If I say it wrong,
19 please correct me.
20         But a violation of one of the conditions
21 of the policy; is that right?
22     A.  Yes.
23     Q.  And that -- and that's based on

Page 135

1  that Paragraph Number 6 under the duties in the
2  event of a loss on Page 3?
3      A.  Yeah. But we've talked about --
4  not to beat a dead horse -- but 4 I think also
5  is encompassed. And, I mean, I know that up
6  until the 15th, you know, I agree that he had
7  persevered it. But I would say 4 and 6 and the
8  paragraph below 6, I guess which is part of 6.
9      Q.  And that the -- would you agree
10 that the length of time that Pioneer was
11 required to protect the property as called for
12 in Number 4 or permit inspection as called in
13 Number 6 is governed by Paragraph 6 where it
14 says, "as often as may be reasonably required
15 permit us to inspect the property?"
16     A.  I'm sorry. Let me just look at
17 the policy here.
18         Okay. All right. I'm sorry.
19     Q.  Let me ask it again.
20     A.  Okay.
21     Q.  Would you agree that the length of
22 time that Pioneer was required to hold on to the
23 damaged property which -- would be governed by

Page 136

1  Paragraph 6?
2       MR. PEARSON: Object to the form.
3      A.  No, I don't -- well, I don't think
4  length of time is the -- I don't know how --
5  they don't talk about length of time. They're
6  talking about allow us as often as may be
7  reasonably required to permit us to inspect the
8  property. I don't think you can quantify length
9  of time. They don't talk about a length of
10 time; they talk about as often as they need to
11 reasonably.
12 BY MR. HALL:
13     Q.  And I think that we asked this
14 earlier -- or I asked earlier and you may have
15 answered it, that opinion about how many
16 inspections are required under Paragraph 6, is
17 that something that the insurance company
18 determines or that the insured determines?
19     A.  Well, I think it's as often as the
20 insurance company reasonably is required to
21 inspect it. You know, looking back and forth --
22 I told you I want to incorporate 4. It says,
23 "set the property aside." I think that that

Page 137

1  suggests you're supposed to keep the property.
2          There's nothing in here that suggests
3  that you can throw the property away. It says
4  that you allow us to inspect it. But at nowhere
5  in here does it say you can throw the property
6  away and still expect Auto-Owners to pay for
7  it.
8      Q.  Does it say that you can't throw
9  the property away after Auto-Owners' adjusters
10 have looked at the property?
11     A.  No. It says that you're to set it
12 aside in the best possible order. But I don't
13 think you can read in there that it's
14 permissible to destroy the property.
15     Q.  Even after it's been inspected by
16 an adjuster?
17     A.  Well, for as many reasonable
18 number of times as may be -- or as often as may
19 be reasonably required. I think Auto-Owners has
20 got -- has got to be the one who decides how
21 often they need to inspect it.
22     Q.  If Bill Reaves had told Jimmy
23 Williamson that he was satisfied with what he

Page 94

1   it and be satisfied looking at it one time?
2       A.   It's possible, but that wasn't the
3   case here.
4       Q.   Well, I'm not asking about here.
5   I'm asking if that could have happened as well.
6       A.   Yeah. If the adjuster says, I've
7   seen all I've seen -- I need to see and you're
8   free to go ahead and dispose of this.
9       Q.   That sentence goes on to say "to
10  inspect the property with regard to losses
11  excluded by the policy." Tell me what you mean
12  by "to inspect the property with regard to
13  losses excluded by the policy."
14      A.   I'm sorry. I'm trying to find --
15  I've lost where you --
16      Q.   Third line from the bottom of Page
17  3.
18      A.   Okay. Well, it just means -- I
19  don't know if there were any exclusions that
20  would have come into play or not but until
21  they've been given a reasonable number of times
22  and an opportunity to inspect the property, they
23  don't have the ability to make that

Page 95

1   determination.
2       Q.   You're saying the inspection is to
3   determine whether or not there are exclusions
4   that might apply?
5       A.   That's one of the -- yeah, that's
6   one of the things for an inspection. It's a lot
7   more than that.
8       Q.   Yeah. But that's what this
9   sentence is talking about?
10      A.   Yes.
11      Q.   All right. On Page 4, second line
12  says that "there was a legitimate basis for
13  denying the claim."
14      A.   Yes.
15      Q.   Is that basis that the property
16  was thrown away?
17      A.   Yes.
18      Q.   Any other basis for denying the
19  claim?
20      A.   Well, they did a lightening report
21  that showed no lighting. So I think that was an
22  additional basis. But I think they -- it could
23  have been denied strictly because they disposed

Page 96

1   of the property, because that was a violation of
2   condition. But they're also -- they also got
3   the lightening report and it showed no
4   lightening.
5       Q.   Your next sentence says, "I will
6   also testify that it appears a proper
7   investigation was performed." Tell me what
8   constitutes a proper investigation of an
9   insurance claim involving property damage.
10      A.   Well, I think here they did --
11  certainly Mr. Reaves went down and looked at the
12  property and --
13      Q.   I'm not asking what happened here.
14      A.   Okay.
15      Q.   I'm asking what constitutes a
16  proper investigation of a first party property
17  damage claim. You said that this was one and
18  we'll talk about the facts in a minute, but what
19  has to happen in order to have a properly
20  investigated property damage --
21      A.   Well, in this -- I say it appears
22  a proper investigation was performed in this
23  case. What happened was he went down --

Page 97

1       Q.   No. No. I'm not asking what
2   happened in this case, I'm asking what has to
3   happen for an insurance company to conduct a
4   proper investigation as you use the term
5   "proper." I want you to define what --
6       A.   I'm making a case specific in my
7   sentence here. But generally I think it depends
8   upon the facts of the case.
9       Q.   All right. So there's no
10  definition of what would constitute a proper
11  investigation, is there?
12      A.   No.
13      Q.   It's --
14      A.   Not a -- just a set definition.
15      Q.   It's case by case basis?
16      A.   Well, yes. For instance, if an
17  insurance company just refused to go down and
18  inspect, that's not -- that would not be -- you
19  could name things that wouldn't be.
20      Q.   Can you give me some more examples
21  of what would not be?
22      A.   No.
23      Q.   All right. Would refusing to look

Page 106

1  care for proper claims handling including the
2  obligation and standard of good faith and fair
3  dealing." Can you explain what the standard of
4  care is that you reference here?
5      A.  Yes. They investigated the
6  claim. Bill Reaves went down and investigated
7  -- looked at the equipment. He then went back
8  and retained an engineer to go back and inspect
9  the equipment. There was certainly a debatable
10 reason for denying the claim. I think there was
11 a good reason, but certainly a debatable reason
12 because the insured had disposed of the
13 property.
14     Q.  All right. The standard of care,
15 is that to do a proper investigation?
16     A.  Well, to investigate.
17     Q.  I'm trying to understand what is
18 the standard of care and your answer talked
19 about this was facts specific to this case. But
20 what is the standard of care?
21     A.  Well, I think the standard case is
22 to investigate a claim. The case law doesn't
23 say exactly what you have to do to investigate a

Page 107

1  claim, but certainly you have to investigate it.
2  You know, it would have been inappropriate for
3  them never to show up and just denied the claim,
4  to never even try to look at it. That clearly
5  would not have been acceptable.
6      Q.  All right.
7      A.  But I think here they certainly
8  investigated it.
9      Q.  Do you have an idea of what the
10 definition for investigation would be concerning
11 the standard of care?
12     A.  No. I think you have to look in
13 the claim. You have to -- that's basically it.
14 To investigate it and see what's going on.
15     Q.  Is an investigation reviewing the
16 documents or information supplied by the insured
17 or is it something more than that?
18     A.  I think it would depend on the
19 type of claim, the circumstances.
20     Q.  Well, here in this claim.
21     A.  Well, I think here looking at the
22 property, if someone's making a claim for
23 property damage -- a sizable claim for property

Page 108

1  damage, that they need to investigate to see
2  whether it's something that is covered and
3  whether or not the property is damaged because
4  there has to be direct physical loss in order
5  for it to be covered. And I think they
6  attempted -- Auto-Owners attempted to do that.
7      Q.  If Auto-Owners was aware of a
8  source of information that would support the
9  claim, would they have any responsibility to
10 gather that information?
11     A.  No. I don't think they have to go
12 out and prove. I think the burden is on the
13 insured to submit information in support of its
14 claim. I don't think it's on Auto-Owners.
15     Q.  And I think you said earlier you
16 don't believe that Auto-Owners has any duty to
17 inform the insured of what information they have
18 to supply, do they or do you?
19     A.  No. No. I don't think they have
20 to go in every time and say here's what you need
21 to do and here's how you need to support your
22 claim. But I think here, as I mentioned before,
23 Auto-Owners was trying to conduct its own

Page 109

1  investigation. It was not relying on what
2  Mr. Williamson said and it wasn't allowed the
3  opportunity to do that.
4      Q.  On Page 5, the first full
5  paragraph, which I think is one sentence, says,
6  "The insured failed to fulfill conditions
7  procedent to payment under the insurance
8  policy." Are those conditions proceeding the
9  ones you've already described?
10     A.  Yes.
11     Q.  Allowing a reasonable number of
12 inspections?
13     A.  Right. And maintaining the
14 equipment, not disposing of the equipment.
15     Q.  All right.
16         MR PEARSON: Object to form.
17 BY MR HALL:
18     Q.  And the violating conditions and
19 duties, those are the ones you've already
20 discussed? I'm in the same sentence.
21     A.  Just a minute. I'm looking.
22         Yeah, I think we've already discussed
23 that. They failed to maintain the equipment and