IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| PIONEER SERVICES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:06-cv-377-WKW |
| ) | (WO) |
| AUTO-OWNERS INSURANCE ) | |
| COMPANY, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Pioneer Services, Inc. ("Pioneer") brings this action against Defendant Auto-Owners Insurance Company, Inc. ("Auto-Owners") for Auto-Owners's failure to pay a claim for lightning and water damage to Pioneer's personal property allegedly caused by Hurricane Ivan on the evening of September 16, 2004. South Central Agency, Inc. ("South Central"), formerly a defendant,[1] is an independent insurance agency that markets Auto-Owners and which sold the policy in question to Pioneer. Auto-Owners denies lightning struck in the area during the hurricane, and argues that Pioneer disposed of water-damaged property before Auto-Owners could fully inspect the property, in violation of the terms of the insurance contract. According to Auto-Owners, Pioneer therefore cannot prove a covered loss for water damage. Before the court is Auto-Owners's motion for summary judgment (Doc. # 12).

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Pioneer is a company that installs commercial telephone systems, among other business

---

[1] South Central was dismissed from the action on April 13, 2006, when the Circuit Court for Covington County, Alabama, dismissed Counts Three and Four, the only counts upon which judgment was demanded against South Central. *(See* Doc. # 1.)

activities. It stored electronic inventory in boxes in a back room and had electronic equipment plugged into electrical outlets at its office. (Reaves Letter, AO00109.[2]) It claims the inventory was damaged by water and that its own electronic equipment, in use in its business, was damaged by lightning.[3] (*Id*.) Sometime between 7:30 p.m. on September 16, and 8:00 a.m. on September 17, 2004, Pioneer's office building, including its roof, was damaged as a result of Hurricane Ivan. (Williamson Dep. 158:11, 164:5-9; Reaves Letter, AO00109.) The electronic inventory in question was stored directly under a part of the roof from which water leaked. (Reaves Letter, AO00109.) Jimmy Williamson ("Williamson"), the President of Pioneer, testified that the inventory was soaking wet and that it could not be prevented from corroding. (Williamson Dep. 282.)

---

[2] All Bates Stamped materials referred to in this opinion are appended with the prefix "AO" and are attached to Auto-Owners's Evidentiary Submission in support of its Motion for Summary Judgment as Exhibit G (Doc. # 13).

[3] The part of the parties' agreement which defines "covered property" reads as follows:

    **1.**    **Covered Property**

    Covered Property, as used in this Coverage Part means the following types of property for which a limit of Insurance is shown in the Declarations:

    . . .

    **b.**    **Your Business Personal Property** located in or on the building described in the Declarations or in open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property - Separation of Coverage form:

    . . .

    (2)    Machinery and equipment;

    . . .

    (4)    All other personal property owned by your and used in your business . . . .

On September 17, Pioneer submitted a "catastrophe loss notice" (CAT) form to Auto-Owners by delivering the form to South Central. (AO00113.) The form identified "Roof damage, Water damage to the inside." (*Id.*) It listed "Contents Damage" as "Medium" rather than "Heavy" or "Total Loss." (*Id.*) Also on September 17, John Tomberlin ("Tomberlin"), an insurance agent with South Central, arrived at Pioneer's office to inspect the damage. He saw four to five boxes with evidence of water damage out of thirty to fifty boxes that Pioneer claimed were damaged or destroyed by water. (Tomberlin Dep. 125:3-128:5.) Some of the boxes were open. *(Id.)*

On November 8, Pioneer delivered to Bill Reaves ("Reaves"), a claims representative of the defendant, "Invoices" that listed individual items of property for which the plaintiff was claiming coverage. (Reaves Dep. 165:18-20.) The invoices identified the damaged items by brand name and part number, but they included two lump sum values rather than individual prices. (AO00181-84, 191-92.) The plaintiff also provided lists specifying which items it believed were destroyed by water (AO00185-90) and which it believed were destroyed by lightning (AO00193-94).[4]

---

[4] The parties agreement defines the causes of property damage or loss for which the insured may recover as follows:

**A.   COVERED CAUSES OF LOSS**

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

1. Excluded in Section B. , Exclusions; or

2. Limited in Section C., Limitations;

. . .

**B.   Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

3

On November 15, Reaves inspected the plaintiff's damaged property on behalf of Auto-Owners.[5] (Reaves Dep. 185-86.) The inventory had been moved to a storage unit behind Williamson's home. (*Id*. at 202.) Reaves could see no damage in the equipment. (*Id*.) He photographed the property and opened some of the boxes. Reaves told Williamson that he needed a breakdown of prices, and he received it shortly thereafter. (AO00199-204.) Reaves also asked about whether any parts were salvageable, and Williamson responded that they were not. (Williamson Dep. 281-82.) He told Reaves that the parts had been soaking wet and also that it

---

. . .

    **g.**     **water**

        **(1)**     Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

. . .

  **2.**     We will not pay for loss or damage caused by or resulting from any of the following:

    **a.**     Artificially generated electric current, including electric arching, that disturbs electrical devices, appliances or wires.

[5] The duties of the insurer include the following language:

b.     We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

. . .

f.     We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if:

(1) You have complied with all of the terms of this Coverage Part; and

    (2)     (a)     We have reached agreement with you on the amount of the loss; or

        (b)     An appraisal award has been made.

would damage his company's reputation to attempt to sell inventory exposed to water. (*Id*. at 282.) Williamson offered to allow Reaves to take the inventory for further inspection but Reaves refused and stated that he did not need to. (*Id*. at 282-83.) Reaves told the plaintiff that he would be back in touch, though the two never spoke again. On December 9, Reaves contacted an electrical engineer to inspect the property. (*Id*. at 216.) At some point between November 15 and December 16, however, Williamson disposed of the property, and the engineer, calling on December 16, was not able to inspect it.[6] (*Id*. at 301.) Reaves testified that he told Williamson not to dispose of the

---

[6] Auto-Owners claims the following policy provisions are relevant to this act of Pioneer:

**3.     Duties In The Event Of Loss Or Damage**

    **a.**   You must see that the following are done in the event of loss or damage to Covered Property:

        . . .

        **(4)**   Take all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim. This will not increase the Limit of Insurance.

        **(5)**   At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed

        **(6)**   As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records

        Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

        . . .

        **(8)**   Cooperate with us in the investigation or settlement of the claim.

property at the conclusion of their meeting on November 15. (Reaves Dep. 209-10.) Williamson denies that Reaves made such a statement. (Williamson Dep. 301.)

Williamson also states that Tomberlin told him he could dispose of the property:

> I was needing space for Christmas, and John told me that since three adjusters had looked at it, taken pictures of it, and none of them had told . . . me that I had to keep it, that he didn't see a problem with throwing it away because everybody else's claims had been taken care of.

(*Id*.) Williamson had filed four claims with Auto-Owners through Tomberlin and South Central after Hurricane Ivan – contents and structural claims for his home, and contents and structural claims for Pioneer. (AO00113; Def.'s Summ. J. Br., Ex. F 113-14.) He and Tomberlin were in frequent contact, and Tomberlin had checked on the status of his claims. (Williamson Dep. 281-308.)

Williamson claims he had reason to trust Tomberlin when Tomberlin gave his approval to dispose of insured property. When Williamson filed his homeowners claim, Tomberlin told him to dispose of several items damaged by lightning and rain, including a refrigerator, a computer, roofing, and wood from Williamson's deck, and to replace them. Williamson did so and provided lists similar to what he provided for Pioneer's contents claims, that is, lists of all the damaged items specifying which ones were destroyed by lightning and which by rain. (AO00307.) Williamson's

---

(*footnote 6 continued*)

**COMMERCIAL PROPERTY CONDITIONS**

. . .

**D.   LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

1.   There has been full compliance with all of the terms of this Coverage Part.

claim was accepted and paid on December 1, 2004. (Def.'s Summ. J. Br. 10, ¶ 15.)

When Tomberlin notified Williamson that his homeowners claim had been approved, he also stated that Williamson could dispose of the inventory that is the subject of this action. (Williamson Dep. 303-04.) With the exception of one contact with Reaves, Tomberlin and other agents of South Central were the only people with whom Williamson spoke about the contents claim. (*Id*. at 284.) Reaves relayed messages to Williamson through Tomberlin. (*Id*.) Tomberlin, however, denies that he told the plaintiff he could dispose of the property. (Tomberlin Dep. 123-25.)

Two other adjustors viewed Pioneer's inventory prior to Williamson's disposal of it. The first was Kenneth Cleveland who photographed the contents, though he was working on Williamson's homeowners claims at the time. (Williamson Dep. 233, 241.) The second was Phillip Gauthier ("Gauthier"), of GAB Robins, an insurance adjustment company that Auto-Owners assigned to adjust Pioneer's structural claim. Gauthier made it clear, however, that he was not investigating Pioneer's contents claim. (*Id*. at 262.)

On December 20, Reaves requested by letter that Pioneer provide outside documentation of the damage and salvage value of the destroyed property. (AO00205-06.) Pioneer submitted affidavits and documents virtually identical to the breakdown of prices submitted earlier to Reaves, entitled "Quotation" rather than "Invoice," signed by K. Mac Bracewell ("Bracewell") of Tel-Com Services, Inc., and initialed "SWP." Williamson testified that SWP are the initials of an employee of both Pioneer and Tel-Com Services, Inc., and that she prepared both price breakdowns. (Williamson Dep. at 255.) Reaves testified that he reviewed the document bearing Bracewell's signature and filed it. (Reaves Dep. 223-24.) He also called South Central Agency to inquire as to Bracewell's relationship to Pioneer. He was informed that Bracewell had previously worked for

7

Pioneer and might have been the founder but that he now had no relationship to Pioneer. (*Id.* at 226-27.) Reaves performed no further investigation with respect to the water damage portion of the claim.

On January 27, 2005, Reaves requested a lightning report from Compu-Weather ( AO00111) who provided the defendant with a "Strikenet Report." The report stated that no lightning was detected within a five mile radius of Pioneer's office building from September 15, 2004, at 10:00:00 EDT to September 17, 2004, at 15:59:59 EDT. Williamson testified that he observed lightning "popping all around" from his home, less than two miles from his office. (Williamson Dep. 159.) He also stated that his damaged electrical equipment smelled burnt. (*Id.* at 222.) It is undisputed that Auto-Owners paid a lightning claim on Williamson's homeowners policy.[7] Also, Reaves has accepted lightning affidavits prepared by Pioneer for Pioneer's customers as many as eight times. (Reaves Dep. 137-40.) Those lightning affidavits were based upon the same observations of equipment damage as was testified to by Williamson with respect to Pioneer's equipment.

On February 3, 2005, Auto-Owners rejected Pioneer's claims for lightning damage to equipment and water damage to inventory in writing. (AO00244-5.) It denied the lightning claim based on its Compu-Weather report and denied the water claim because it was "not given the opportunity to have these items inspected by an expert to determine the exact damages." (*Id.*)

Pioneer filed suit against Auto-Owners and South Central in the Circuit Court of Covington County on April 26, 2005. South Central was dismissed from the case on April 13, 2006. (Docs. # 1 & # 2 at 162.) Pioneer removed the action to this court on April 25, 2006, and moved for

---

[7] The court can find no evidence submitted by the parties of this fact. Auto-Owners did not dispute it after Pioneer asserted it in its brief. (Doc. # 27, ¶ 12.)

summary judgment on February 28, 2007. (Docs. # 1 & # 12.) Pioneer responded and Auto-Owners replied. (Docs. # 27& # 31.) This matter is ripe for review.

## II. JURISDICTION AND VENUE

Because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations in support of both.

## III. SUMMARY JUDGMENT STANDARD

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

9

*Id*. at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## IV.  DISCUSSION

### A.  *Breach of Contract*

To survive a motion for summary judgment on a breach-of-contract claim, a plaintiff must offer sufficient evidence for a reasonable jury to find: "(1) the existence of a valid contract binding the parties, (2) [its] own performance under the contract, (3) the defendant's nonperformance under the contract, and (4) resulting damages."  *State Farm Fire & Cas. Co. v. Williams*, 926 So. 2d 1008, 1013 (Ala. 2005).  Auto-Owners contends that Pioneer cannot demonstrate the nonperformance of Auto-Owners because it cannot prove that it suffered a covered loss under its policy.  Proof of a covered loss is a prerequisite to the maturing of Auto-Owners's duty to pay.  Moreover, Auto-Owners argues that Pioneer has not presented sufficient evidence from which a jury could find that Pioneer fulfilled its duties under the contract with respect to the water damage claim.

### 1.  **Proof of Loss**

#### a.  Water

Pioneer claims that some of its inventory was damaged by water.  It is undisputed that water

entered Pioneer's office building through a hole in the roof directly over the inventory in question and that water rolled down the walls. Tomberlin saw water damage on four to five boxes. Pioneer also offers the testimony of its president, Williamson, and its founder, Bracewell, now unaffiliated with the company, who claim the inventory was destroyed by water. Moreover, Pioneer's president explained that because the property in question was inventory, the company would risk its reputation if it attempted to sell it. Auto-Owners attempts to overcome Pioneer's evidence by offering that Reaves could discern no damage to the property he viewed; that its expert, Dewberry (Doc. # 12, Ex. H at 4), stated that inventory of this kind would have been impervious to water because of plastic packaging; and that water does not harm electronic equipment which is not energized.

Pioneer has presented sufficient evidence by which a reasonable jury could find in its favor on the contract claim for water damage. The testimony by the president of Pioneer is itself sufficient to overcome Auto-Owners's motion for summary judgment because his testimony alone raises a genuine issue as to whether the property was damaged. Moreover, the owner of personal property may testify to its value. *Empiregas, Inc. of Huntsville v. Simpson*, 549 So. 2d 27, 29 (Ala. 1989). Auto-Owners has not argued that an expert is necessary to determine that electronic equipment exposed to water is damaged, and the court does not find on the record before it that an expert is required. The contract does not define a loss, and a reasonable jury could find that exposure of electronic equipment to water constitutes a loss for a company that is selling the equipment as inventory. The contract claim as to water-damaged inventory therefore survives summary judgment.

      b.    <u>Lightning</u>

Pioneer contends that electronic equipment that was plugged into electrical outlets in its office was destroyed by lightning. As evidence, it offers that its president viewed lightning from his

home less than two miles away and that the equipment smelled as if it were burnt. As part of its business, Pioneer completes lightning affidavits for its clients and has never had one denied by Auto-Owners.

Auto-Owners claims that there was no lightning in the area and cites a statement by an expert, William Sherman ("Sherman"): "it is my opinion that it can be stated with a reasonable degree of meteorological certainty that for the period commencing September 15, 2004 at 4:00 p.m. EDT until September 17, 2004 at 3:39 p.m., EDT there was no lightning or lightning strikes *detected* withing (sic) a five mile radius of 1833 East Three Notch Street, Andalusia, Alabama 36421." (Sherman Aff. 2.) However Sherman's equivocal statement simply creates a genuine issue of material fact as to the presence of lightning in the area. The court finds that the statement does not prevent a reasonable jury from finding that lightning did strike Pioneer's office building. For the purpose of this opinion under the Rule 56 standard, the court must assume there was lightning in the area.

Auto-Owners argues further that the possibility that some other unidentified power surge destroyed the equipment cannot be excluded. The adoption of such a position to defeat summary judgment would eviscerate coverage for lightning claims as a practical matter. These contentions are rightfully submitted to a jury as a question of fact. Based on the circumstantial evidence that Williamson saw lightning, that there was a hurricane in the area, and that Pioneer's equipment was burnt by electricity, the court finds that a jury could reasonably find for Pioneer on this issue.

    **2.**    **Alleged Non-Performance of Pioneer**

        a.    <u>Failure to Perform</u>

Auto-Owners asks the court to find as a matter of law that Pioneer violated its duties to

cooperate with Auto-Owners in its investigation of the water damage claim and in failing to provide reasonable access to the property. Viewing the evidence in a light favorable to the non-movant, Williamson was never told that he should keep the property or that an expert was needed. Three adjustors viewed the property, and though two of them were adjusting other claims, one photographed the property and the other inspected it. The third, Reaves, viewed the property without restrictions on its access. Pioneer further offered to let Reaves take the property away. There is no evidence that Pioneer refused any request made by Auto-Owners. A jury could find that Pioneer acted reasonably and cooperatively and that Pioneer performed its obligations under the policy. The court cannot say as a matter of law that Pioneer violated its contractual duties when it disposed of the damaged inventory.

b.  Spoliation of Evidence

The disposal of the water-damaged inventory gives rise to an accusation by Auto-Owners that Pioneer is guilty of spoliation of evidence. "[F]ederal law governs the imposition of spoliation sanctions." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). However, "[f]ederal law in this circuit does not set forth specific guidelines, therefore, we will examine [state law factors.]" *Id*. "Spoliation is an attempt by a party to suppress or destroy material evidence favorable to the party's adversary." *Wal-Mart Stores, Inc. v. Goodman*, 789 So. 2d 166, 176 (Ala. 2000) (citation omitted). A court may dismiss a claim because of a party's spoliation of evidence. *Iverson v. Xpert Tune, Inc.*, 553 So. 2d 82 (Ala. 1989). "It is not necessary that the Court find that [the spoliating party] willfully failed to provide discovery, but willfulness is a key consideration, among others. Also, if [the party's] conduct amounts to gross negligence, the Court may consider this a valid reason for dismissal." *Id.* at 86 (internal citations omitted).

In the present case, however, Pioneer has presented evidence sufficient to convince a reasonable jury that it acted neither maliciously nor negligently but reasonably. No part of the insurance contract requires the insured to store covered property until the insurer gives permission to dispose of it. Williamson claims Tomberlin authorized him to dispose of the property. Williamson had good reason to trust Tomberlin's advice; after all, Tomberlin had told him to dispose of property related to his homeowners claim and that claim was being paid by Auto-Owners. Auto-Owners had adopted a practice of communicating with Williamson through Tomberlin. A jury could find that Williamson's reliance on Tomberlin's advice was reasonable in view of the course of dealings between the parties. Certainly there is no evidence of willfulness or gross negligence on the part of Pioneer, and thus there are no spoliation grounds to grant summary judgment against Pioneer as a matter of law.

### B.    *Abnormal Bad Faith*

Alabama recognizes two methods of proving claims for bad faith, referred to as "normal" and "abnormal" bad faith. *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 306-307 (Ala. 1999). To prove normal bad faith, one has the burden of establishing (1) a breach of the insurance contract; (2) an intentional refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a "debatable reason"); and (4) the insurer's actual knowledge of the absence of any legitimate or arguable reason. *Employees' Benefit Ass'n v. Grissett*, 732 So. 2d 968, 976 (Ala. 1998). In a normal bad faith case, a plaintiff must show entitlement to a judgment as a matter of law ("JML") on the contract claim in order to have the bad faith claim submitted to the trier of fact. *Id.* "Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the [contract] claim and, thus, the legitimacy of the

denial thereof, the [normal bad faith] claim must fail and should not be submitted to the jury." *Nat'l Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982).

"Abnormal" bad faith arises out of the third element of "normal" bad faith, the absence of any reasonably legitimate or arguable reason for the refusal to pay a claim. It dispenses with "the predicate of a preverdict JML for the plaintiff on the contract claim *if* the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation." *United States Auto. Ass'n v. Hobbs*, 858 So. 2d 966, 974 (Ala. 2003) (citations omitted) (emphasis added). In other words, when a debatable reason is the product of a *reckless or intentional* failure to investigate or subjects the investigation results to cognitive evaluation, the law dispenses with the *qualifier* attached to the first element of normal bad faith: that the plaintiff's breach of contract claim be so strong as to entitle the plaintiff to a preverdict JML.

This case involves an abnormal bad faith claim. Abnormal bad faith cases have been limited to those instances in which the plaintiff produced substantial evidence showing "1) intentional or reckless failure to investigate a claim, 2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, 3) the manufacture of a debatable reason to deny a claim, or 4) reliance on an ambiguous portion of a policy as a lawful basis for denying the claim." *White v. State Farm Fire & Cas. Co.*, 953 So. 2d 340, 349 (Ala. 2006) (citation omitted). Pioneer claims that Auto-Owners failed to marshal all the pertinent facts and failed to subject what facts it had to a cognitive review.

Recent Alabama cases have reemphasized, but not applied, the "dishonest purpose" facet of bad faith. "Bad faith is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of a known duty, i.e., good faith and fair dealing, through some motive of self-

interest or ill will." *Id*. (quoting *Slade*, 747 So. 2d 293*); see also Singleton v. State Farm Fire & Cas. Co.,* 928 So. 2d 280 (Ala. 2005). Squaring this language requiring a dishonest purpose with "recklessly" failing to investigate or evaluate, as held in *Hobbs* and other cases*,* is difficult. "Intentionally" obviously includes intent, whereas "recklessly" implies something less than intentional. The Eleventh Circuit addressed the point, before *White* and *Singleton* were decided, but after *Slade*, in ruling that the district court erred "by requiring proof that [the defendant] *intended* to injure the [plaintiffs] with their investigation in a claim that only requires a 'reckless' failure to investigate." *Mutual Serv. Cas. Ins. Co. v. Henderson*, 368 F.3d 1309, 1316 n.3 (11th Cir. 2004) (emphasis added). The *Henderson* Court took this view:

> The district court stated that . . . "[it] finds no evidence in this case of the intent to injure, dishonest purpose, self interest, or ill will required to sustain even an abnormal bad faith claim." . . .
>
> However, if we rely on the . . . requirement of a "conscious intent to injure" in "abnormal" bad faith claims, we would ignore a slew of precedent . . . holding that an "abnormal" bad faith claim can be submitted to the jury if "the insurer either intentionally or *recklessly* failed to properly investigate the claim." One who acts "recklessly" does not act with a "conscious intent to injure." Rather, one who acts "recklessly" is one who acts in such a way that he may foresee the consequences of his conduct and not desire them to occur, but nonetheless persists with his conduct disregarding the risk of bringing about the unintended consequences of his conduct. Thus, in many of its recent "abnormal" bad faith cases, the Alabama Supreme Court does not impose a separate requirement of evidence of an intent to injure.

*Id.* (internal citations omitted). The *Henderson* Court did not discuss the "dishonest purpose" aspect of abnormal bad faith.[8]

This discussion is particularly relevant in the present case when reviewing Reaves's actions in the investigation of the water damage claim. It is undisputed that Reaves examined the proof of

---

[8] The district court used "intent to injure" in conjunction with "dishonest purpose, self interest, or ill will," but the Eleventh Circuit's discussion centered exclusively on intent to injure.

claim submitted by Pioneer and filed it away without further ado (with the exception of confirming that the Bracewell had a previous relationship with Pioneer); that Reaves failed to take samples of the allegedly damaged inventory with him; that Reaves failed to contact an expert for three weeks after receiving proof of the claim; that Reaves failed to "get back with" Williamson; that Reaves failed to contact and question Bracewell, who supplied the prices for the inventory; and that Reaves failed to do his own investigation of the values of the allegedly damaged inventory. Moreover, there is disputed evidence as to whether Reaves told Williamson that an expert was needed and that he should not dispose of the damaged inventory. Taken together, the court is of the opinion that Pioneer, by this evidence and the circumstances surrounding it, has established proof sufficient for a trier of fact to conclude that Reaves acted recklessly in conducting the investigation. If recklessness alone is the standard, then Pioneer's claim for abnormal bad faith survives summary judgment.

On the other hand, if the standard is a "dishonest purpose," defined as "a breach of a known duty [of] good faith and fair dealing," a breach motivated by "self-interest or ill will," the court finds, on the record before it, no evidence of such purpose or motive on the part of Auto-Owners. Reaves testified he inspected the inventory and saw no damage. The failures of Auto-Owners to diligently pursue investigation, including after the damaged inventory was destroyed by Pioneer, would be attributable at most to recklessness without a dishonest purpose. Thus, Pioneer's abnormal bad faith claim as to failure to investigate or evaluate would not survive summary judgment under the dishonest purpose standard.

After the Eleventh Circuit's pronouncement that recklessness alone would suffice to sustain abnormal bad faith claims in *Henderson*, the Alabama Supreme Court has on two occasions (in

17

*White* and *Singleton*) reiterated the "dishonest purpose motivated by self-interest or ill will" standard. However, the standard was not applied in either case. *White* arose out of a situation similar to the instant case, but summary judgment for the insurer was reversed on grounds unrelated to dishonest purpose analysis. *Singleton* involved a residential roof damage claim in which the adjuster adequately consulted outside sources in denying the claim. There was no evidence referenced in the opinion of a dishonest purpose or of self-interest or ill will on the part of the insurer, and summary judgment for the insurer was affirmed. The court is unaware of any Alabama case applying the dishonest purpose analysis to reckless conduct.

There being no other guidance, the court is compelled to follow the most recent pronouncements of the Alabama Supreme Court that bad faith is more than bad judgment or negligence, and that a dishonest purpose is required. Based on the state of the law, the court finds a dishonest purpose is required even when reckless conduct of the defendant is present. Because there is no evidence of a dishonest purpose on the part of the insurer, Auto-Owners is entitled to summary judgment on Pioneer's bad faith claim.

## V.  CONCLUSION

For the reasons set forth above, it is hereby ORDERED that Auto-Owners's Motion for Summary Judgment (Doc. # 12) is GRANTED in part and DENIED in part. It is GRANTED as to the abnormal bad faith claim and DENIED as to all breach-of-contract claims.

DONE this 12th day of July, 2007.

                                            /s/  W. Keith Watkins
                                    UNITED STATES DISTRICT JUDGE